**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Scotts EZ Seed Litigation | Civil Action No. 12-CV-4727 (VB) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

Dated:  March 31, 2014

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
888 Seventh Ave
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
          jmarchese@bursor.com


**FARUQI & FARUQI LLP**
Antonio Vozzolo
369 Lexington Ave., 10th Floor
New York, NY 10017-6506
Telephone:  (212) 983-9330
Facsimile:  (212) 983-9331
Email:  avozzolo@faruqilaw.com

*Interim Class Counsel*

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ......................................................................................... 1

II.  SUMMARY OF COMMON FACTS ............................................................ 4

III.  THE LEGAL STANDARD FOR CLASS CERTIFICATION ...................... 11

IV.  THE REQUIREMENTS OF RULE 23(a) ARE READILY MET ................. 12

    A.  Numerosity ...................................................................................... 12

    B.  Commonality .................................................................................... 12

    C.  Typicality ......................................................................................... 13

    D.  Plaintiffs Will Adequately Represent The Classes ........................... 14

        1.  Plaintiffs' Interests Do Not Conflict With The Classes............ 15

        2.  Plaintiffs' Counsel Are Qualified .......................................... 16

V.  THE PROPOSED CLASSES SATISFY RULE 23(b)(3) ............................ 17

    A.  Common Questions Of Law Or Fact Predominate ............................ 17

        1.  The Elements Of The California Claims Can Be Established
            Through Common Proofs ........................................................ 17

            a)  California Consumers Legal Remedies Act (CLRA) ........ 17

            b)  California Unfair Competition Law (UCL) And False
                Advertising Law (FAL) ............................................... 19

            c)  California Express Warranty ......................................... 20

            d)  California Unjust Enrichment ....................................... 21

        2.  The Elements Of The New York Claims Can Be Established
            Through Common Proofs ........................................................ 21

            a)  New York GBL §§ 349-350 ......................................... 22

            b)  New York Express Warranty ......................................... 23

        3.  Damages Are Measurable On A Classwide Basis .................... 24

    B.  Class Litigation Is Superior To Other Methods Of Adjudication......... 26

        1.  The No-Quibble Guarantee Does Not Affect The Superiority
            Analysis................................................................................ 26

        2.  The Classes Are Ascertainable ............................................. 30

VI.  THE CLASSES ALSO SHOULD BE CERTIFIED UNDER RULE
    23(b)(2) .................................................................................................... 35

CONCLUSION ..................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ackerman v. Coca-Cola Co.*,
  2013 WL 7044866 (E.D.N.Y. July 17, 2013)................................................. 35, 38

*All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*,
  280 F.R.D. 78 E.D.N.Y. 2012) ............................................................ 35

*AmchemProds., Inc. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................... 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013).................................................................... 17

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ....................................................... 30, 32

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
  222 F.3d 52 (2d Cir. 2000) ............................................................... 15

*Bateman v. Am. Multi-Cinema, Inc.*,
  623 F.3d 708 (9th Cir. 2010) ............................................................. 28

*Beck-Ellman v. Kaz USA, Inc.*,
  283 F.R.D. 558 (S.D. Cal. 2012) ........................................................ 21

*Carnegie v. Household Intern., Inc.*,
  376 F.3d 656 (7th Cir. 2004) ............................................................. 34

Cartwright v. Viking Industries, Inc.,
  2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) .......................................... 21

*Civic Ass'n of the Deaf v. Giuliani*,
  915 F. Supp. 622 (S.D.N.Y. 1996) ...................................................... 12

*Consol. Rail Corp. v. Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) .............................................................. 12

*Cortigiano v. Oceanview Manor Home for Adults*,
  227 F.R.D. 194 (E.D.N.Y. 2005)........................................................ 11

*Ebin v. Kangadis Food, Inc.*,
  2014 WL 737690 (S.D.N.Y. Feb. 25, 2014) ...................................... passim

*Elias v. Ungar's Food Products, Inc.*,
  252 F.R.D. 233 (D.N.J. 2008) ........................................................... 32

ii

*Fogarazzao v. Lehman Bros., Inc.*,
   232 F.R.D. 176( S.D.N.Y. 2005) ........................................................................... 13

*Galvan v. KDI Distribuation Inc.*,
   2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) ..................................................... 21

*Ginett v. Computer Task Group*,
   962 F.2d 1085 (2d Cir. 1992) ............................................................................... 27

*Gorat v. Capala Bros., Inc.*,
   2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) ...................................................... 30

*Gorat v. Capala Bros., Inc.*,
   257 F.R.D. 353 (E.D.N.Y. 2009) ........................................................................ 11

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968) ............................................................................... 14

*Guido v. L'Oreal, USA, Inc.*,
   284 F.R.D. 468 (C.D. Cal. 2012) ............................................................. 19, 23, 25

*In re Aqua Dots Prods. Liab. Litig.*,
   654 F.3d 748 (7th Cir. 2011) .............................................................................. 27

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
   276 F.R.D. 336 (W.D. Mo. 2011) ...................................................................... 29

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
   293 F.R.D. 21 (D. Me. Mar. 20, 2013) ............................................................. 27

*In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) ....................................................................... 30

*In re Oil Spill by Oil Rig Deepwater Horizon*,
   910 F.R.D. 891 (E.D. La. 2012) ........................................................................ 27

*In re Steroid Hormone Prod. Cases*,
   181 Cal.App.4th 145 (2010) ............................................................................... 18

*In re Tobacco II Cases*,
   46 Cal.4th 298 (2009) ........................................................................................ 19

*In Re Visa Check / MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) ......................................................................... 11, 34

*Johns v. Bayer Corp.*,
   280 F.R.D. 551 (S.D. Cal. 2012) ................................................................. 19, 25

*Kasky v. Nike*,
   27 Cal. 4th 939 (2002) ................................................................................ 19

*Keilholtz v. Lennox Hearth Products Inc.*,
   268 F.R.D. 330 (N.D. Cal. 2010) ................................................................. 21

*Leider v. Ralfe*,
   2004 WL 173330 (S.D.N.Y. Jul. 30, 2004) .................................................. 24

*Makaeff v. Trump University, LLC*,
   2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ........................................... 18, 22

*Mariso A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997) .................................................................. 11, 12

*Mass. Mut. Life Ins. Co. v. Sup. Ct.*,
   97 Cal. App. 4th 1282 (2002) ....................................................................... 18

*Maurizio v. Goldsmith*,
   230 F.3d 518 (2d Cir. 2000) ........................................................................ 22

*McCrary v. Elations Co., LLC*,
   2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014) ............................... 31

*McDonald v. North Shore Yacht Sales, Inc.*,
   134 Misc. 2d 910 (N.Y. Sup. Ct. 1987) ........................................................ 28

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ...................................................................... 17

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ................................................................. 30

*Parker v. J.M. Smucker Co.*,
   2013 WL 4516156 (N.D. Cal. Aug. 23, 2013) ............................................. 20

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797, 809 (1985) ............................................................................. 11

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ................................................................. 31

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) ........................................................................ 14

*Rodriguez v. Citimortgage, Inc.*,
   S.D.N.Y. Case No. 11-cv-04718-PGG .......................................................... 16

*Rush v. Nutrex Research, Inc.*,
    2012 WL 2196144 (N.D. Cal. June 13, 2013) ................................................. 20

*Russell v. United States*,
    2012 WL 2343369 (N.D. Cal. June 20, 2012) ................................................. 29

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ................................................. 26

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) ................................................. 18

*Sykes v. Mel Harris & Assocs. LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) ................................................. 35

*Turner v. Murch Oil USA, Inc.*,
    234 F. Supp. 2d 597 (E.D. La. 2006) ................................................. 27

*Valazquez v. GMAC Mortg. Corp.*,
    605 F. Supp. 2d 1049 (C.D. Cal. 2008) ................................................. 20

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ................................................. 11, 33

*Weinstat v. Dentsply Int'l*,
    180 Cal.App.4th 1213 (2010) ................................................. 20

*Wiener v. Dannon Co.*,
    255 F.R.D. 658 (C.D. Cal. 2009) ................................................. 19, 25

*Yamada v. Nobel Biocare Holding AG*,
    275 F.R.D. 573 (C.D. Cal. 2011) ................................................. 20

## STATUTES

Bus. & Prof. Code § 17200 ................................................. 13

Cal. Bus. & Prof. Code § 17203 ................................................. 28, 35

Cal. Bus. & Prof. Code §§ 17200 ................................................. 19

Cal. Bus. & Prof. Code §§ 17500 ................................................. 19

Cal. Civ. Code § 1780 ................................................. 28, 35

Cal. Civ. Code §§ 1750 ................................................. 17

Calif. Civ. Code §§ 1750 ................................................. 13

California's Commercial Code § 2313 ................................................. 13

Fed. R. Civ. P. 23 ........................................................................................................ passim

Fed. R. Civ. P. 23(a) ................................................................................................ 12, 13, 14

Fed. R. Civ. P. 23(b)(2)-(3) .................................................................................................. 3

Fed. Rule Civ. Proc. 23 ..................................................................................................... 24, 27

New York GBL §§ 349 ...................................................................................... 13, 14, 22

New York GBL §§ 350 ..................................................................................................... passim

UCC § 2-313 ......................................................................................................................... 13

## OTHER AUTHORITIES

*Manual For Complex Litigation, Fourth* § 21.311 292 (Federal Judicial Center 2004) .............. 34

## I.     INTRODUCTION

In January 2009, Defendants The Scotts Miracle-Gro Company, Inc. and The Scotts Company LLC (collectively, "Scotts") began selling EZ Seed, a combination product containing approximately 8% grass seed, 4% fertilizer, and 88% mulch.  The mulch material, called "coir," is made from ground and compressed coconut shell fibers.  This coir mulch can absorb up to 8 times its weight in water.  Scotts represented that EZ Seed's coir mulch ██████████████████ ████████████████████████████████████████ Marchese Decl. Ex. A, at SMG-EZ020815.  But the opposite is true.  Because the super-absorbent mulch competes with the seed for available water, EZ seed requires <u>more water</u> than ordinary seed, <u>not less</u>.

EZ Seed's packaging states in bold capital letters that it will grow "50% THICKER WITH HALF THE WATER."




That statement is false.  Scientific tests done by NexGen Turf Research LLC ("NexGen"), and also by Scotts itself, both show that when used precisely according to the instructions on the packaging, EZ Seed will not grow a blade of grass when watered at half the recommended rate.

EZ Seed's directions for use, which appear on the packaging, specify an application rate that results in too much super-absorbent coir mulch sucking moisture away from the soil, preventing germination of the grass seed.  The directions for use instruct purchasers to "apply a 1/8-inch layer" of EZ Seed.



**2. APPLY** • APLIQUE

Apply a 1/8" layer to bare spots
(1/16" to thin areas)
Aplique una capa de 3A.2 mm

As Scotts' lawyer, Samuel A. Danon, argued in another lawsuit, the 1/8-inch application of EZ

Seed is grossly excessive and will cause the product to perform poorly:

> "That is not the rate that EZ Seed was created or developed to be
> applied at.  It is not the rate that Scotts intends or intended that
> product to be applied. … And you will hear testimony from both
> Scotts' R&D and from some independent experts showing how
> that is just, the application of eight-of-an-inch of product, is a huge
> application or over application of the product."

Marchese Decl. Ex. B, at 23:16-24:1; *see also id.* at 25:12-14 (Mr. Danon describing the 1/8-inch

application of EZ Seed as "the misapplication of EZ Seed, which grossly over applied our

product, four times as much regarding the proper application rate").  So according to Scotts' own

lawyer, EZ Seed's directions for use were wrong because they instructed consumers to

over-apply the product, which would hinder the growth of grass.

Each of the seven plaintiffs in this action purchased Scotts EZ Seed with packaging

stating it would grow "50% THICKER WITH HALF THE WATER," and with directions for use

stating it should be applied at 1/8-inch thickness.  Each testified they used EZ Seed as directed.

None grew grass.[1]

---

[1] *See* Arcuri Dep. at 76:21-77:2, Marchese Decl. Ex. C ("Q:  So tell me what happened as time
went on.  What did you see happen with EZ Seed?  A:  Nothing happened.  Q:  What do you
mean by nothing?  A:  Nothing.  It looked like the day I put it down."); Browne Dep. at 103:17-
19, Marchese Decl. Ex. D ("Q:  Did you see any germination of grass in the EZ Seed that you
planted on your shady area?  A:  No."); Eskinazi Dep. at 90:5, Marchese Decl. Ex. E ("Did not
grow a blade of grass."); Lonardo Dep. at 149:12-13, Marchese Decl. Ex. F ("Q:  You didn't see
any blades [of grass grow]?  A:  I did not."); Moore Dep. at 182:4-7, Marchese Decl. Ex. G ("Q:
In any of your plantings of EZ Seed, did you ever see any sign of any form of germination or
growth of – from a grass seed?  A:  No."); Smith Dep. at 120:13-15, Marchese Decl. Ex. H ("Q:

This case is ideally suited for class treatment.  Every package of EZ Seed included the statement "50% THICKER WITH HALF THE WATER," and every package in fact contained a product that has been scientifically shown to not grow any grass at half-water rates.  The Scotts company has admitted the directions for use are misleading and wrong.  Scotts has admitted EZ Seed requires more water to germinate than ordinary seed.  And Scotts' own testing confirms the product does not grow "50% THICKER WITH HALF THE WATER."  Plaintiffs therefore assert claims for breach of warranty and for violation of the consumer protection statutes of California and New York, and move pursuant to Fed. R. Civ. P. 23(b)(3) and (b)(2) for certification of two classes:

> (1)     All persons who purchased EZ Seed in the state of California, excluding persons who purchased for purpose of resale (the "California Class").
>
> (2)     All persons who purchased EZ Seed in the state of New York, excluding persons who purchased for purpose of resale (the "New York Class").

Plaintiffs Browne and Smith purchased EZ Seed in California and seek to represent the California Class.  Plaintiffs Arcuri, Eskinazi, Lonardo, Moore and Thomas purchased EZ Seed in New York and seek to represent the New York Class.[2]

---

And you saw no sign of germination across any of the bare patches that you planted?  A:  Not one blade."); Thomas Dep. at 65:18-23, Marchese Decl. Ex. I ("Q:  Were you successful growing grass in the spring of 2011?  A:  No.  Q:  Were you successful growing grass in August 2011?  A:  No.").

[2] In light of the limitations imposed by the Court's May 22, 2013 Order (Dkt. No. 46), Plaintiffs do not move for certification of a nationwide class, or certification of a class on Count I of the complaint, under the Magnuson-Moss Warranty Act.  Plaintiffs also do not move for certification of any of the remaining claims against the True Value, Home Depot or Lowe's.  Plaintiffs have dismissed their claims against True Value and Home Depot (Dkt. Nos. 19, 69), and also proposed to dismiss their claims against Lowe's on the same terms as Home Depot.  Remarkably, Lowe's, refused to be dismissed from the case.  Marchese Decl. ¶ 58.  Though Lowe's remains a party, this motion seeks no relief against Lowe's.

## II.    SUMMARY OF COMMON FACTS

In April 2008, Scotts' market research confirmed that ███████████████

███████████████████  Marchese Decl. Ex. A, at SMG-EZ020811.  As Scotts Vice President

of Marketing, John Sass, explained, "When you look at grass seed, the number one issue that you

need or the number one concern that consumers have is all around watering."  Marchese Decl.

Ex. B, at 67:10-12.  So Scotts developed EZ Seed, a new product that ████████████████

███████████████████████████  Marchese Decl. Ex. A,

at SMG-EZ020815.  EZ Seed's label has always said "50% THICKER WITH HALF THE

WATER" in both English and Spanish, "50% MAS DENSO CON LA MITAD DE AGUA."

*See* Marchese Decl. Ex. J (photographs of label).  Scotts explained:



Marchese Decl. Ex. K, at SMG-EZ004614.

Scotts knew those statements were false.  Because of its super-absorbent mulch, EZ Seed

requires <u>more water</u> than ordinary seed, <u>not less</u>.  Scotts Director of Turfgrass Research, Dr. Eric

Nelson, admitted at his deposition that, with EZ Seed, ██████████████████████

███████████████████████  Nelson Dep. at 101:1-10, Marchese Decl. Ex. L;

Scotts Vice President of Marketing, John Sass, also admitted that █████████████████

███████████████████████  Sass Dep. at 210:10-12, Marchese Decl.

Ex. M.

Internally, Dr. Nelson warned that the company did not have data supporting the claim

that EZ Seed grows 50% thicker with half the water.  On July 11, 2008, Dr. Nelson sent an email

to several members of Scotts marketing department, stating:



Marchese Decl. Ex. N, at SMG-EZ014834.

When the marketing department failed to heed Dr. Nelson's initial warnings, he warned them again.  On November 25, 2008, Dr. Nelson sent another email to Mr. Sass and others, stating: ███████████████████████████████████████████ ████████████████████████ Marchese Decl. Ex. O, at SMG-EZ000382.  And again, Dr. Nelson's warnings were ignored.

Scotts launched the EZ Seed product with retail sales beginning in January 2009.  Sass Dep. at 179:1-4, Marchese Decl. Ex. M.  The product is sold in a variety of package sizes, and with varying seed mixtures, or "flavors."  But every flavor of every package of EZ Seed, regardless of size, states in bold capital letters: "50% THICKER WITH HALF THE WATER." Sass Dep. at 274:10-13, Marchese Decl. Ex. M.  And the material contained in every package of EZ Seed, regardless of size or flavor, is approximately 88% super-absorbent coir mulch.  *Id.* at 274:19-275:6.  Thus every package of EZ Seed includes a product that suffers from the exact same design defect.  It is comprised primarily of a super-absorbent coir mulch that sucks water away from the seed and soil and prevents germination at half water levels.  When used as directed EZ Seed will not grow grass at half water levels.  It requires <u>more water</u> than ordinary seed, <u>not less</u>.

EZ Seed sold well, but as soon as Scotts got its first bit of customer feedback it was clear there was a problem.  Within 5 months, by May of 2009, there was a █████████████ to the Scotts call center.  Sass Dep. at 179:11-14, Marchese Decl. Ex. M.  And 91% of the complaints were for ████████████████ *Id.* at 183:15-17.

███  ████████████████████████████████ ███████████████████

█████   █████████████████████████████

*Id.* 183:24-184:2, Marchese Decl. Ex. M.  The customer complaints about EZ Seed were so

significant that Scotts Sr. Vice President for marketing, Dan Paradiso wrote an email to the Sr.

Brand Manager for EZ Seed, Tiffany Peoples, and Mr. Sass, stating: █████████████████

████████████████████████   Marchese Decl. Ex. P.

But Scotts already knew the answer to Mr. Paradiso's question.  When applied as directed

on the packaging, at either the 1/8-inch or 3/8-inch application rates, the super-absorbent mulch

sucks water away from the soil and no grass grows.  *See* Marchese Decl. Ex. J; *id.*, Ex. Q at

SMG-EZ0016978.  As Scotts research scientist, Mike Faust, explained:

████████████████████████████████

████████████████████████████

█████████████████████████████████

████████████████████████████

██████████████████████████████████

███████████████████████

Marchese Decl. Ex. R.  This was essentially the same problem Dr. Nelson described in his June

11, 2008 email:

███████████████████████████████████

██████████████████████████████████████

████████████████████████████

Marchese Decl. Ex. N.  According to Mr. Faust, EZ Seed's ██████████████████████████

████████████████████████████   Marchese Decl. Ex. S (ellipsis in original).

Internal documents show that Scotts Sr. Vice President, Dave Swihart, concluded: ████████

████████████████████   Marchese Decl. Ex. T.

Scotts marketing team concluded that the problem of over-application occurred █████████

█████████:

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████

Marchese Decl. Ex. U, at SMG-EZ097284-85 (emphasis added).

Scotts' research showed that it was not only consumers who over-applied EZ Seed in nearly every case, but that Scotts' own employees did as well.  Scotts ran a test to see if employees at the Scotts facility in Gervais, Oregon ████████████████████████████ ████████████████████████ Marchese Decl. Ex. V.  Four Scotts employees were instructed to apply 1/8-inch of product into a test area.  One employee applied 3.2 times that amount.  A second Scotts employee applied 4.1 times the recommended amount.  A third applied 4.9 times the recommended amount.  And a fourth applied 13.4 times the recommended amount. *Id.* at SMG-EZ034182.  The conclusion:

*Id.* at SMG-EZ034180-81.

But the problems with EZ Seed could not be blamed on over-application alone.  Even in laboratory settings where the directions for use were followed precisely by research scientists, Scotts own testing showed that EZ Seed would not grow a blade of grass when watered at half the recommended rate.  In September 2009, Dr. Nelson commissioned a study by Dr. Jason K. Kruse of the University of Florida to compare EZ Seed and regular seed when watered with four irrigation regimes:

1. 2x daily
2. 1x daily
3. 1x every-other-day
4. 1x every third day

Marchese Decl. Ex. W, at SMG-EZ000920.  Dr. Nelson explained: ████████████████ ████████████████████████████████

*Id.* at SMG-EZ000921.  Here, that would be watering regime #3, 1x every-other-day, which is 50% less frequent than EZ Seed's recommended once-per-day watering.  *See* Nelson Dep.

7

at 63:19-20, Marchese Decl. Ex. L.  On October 7, 2009, Dr. Kruse reported the results: ███
████████████████████████████████████████████████████ Marchese Decl. Ex. W,
at SMG-EZ000920.  Thus, under laboratory testing commissioned by the Scotts company, EZ
Seed did not grow 50% thicker with half the water.  It failed to grow a single blade of grass.

The results of Dr. Kruse's tests were, in this respect, similar to the results of NexGen's
half water study, which is referenced in the Consolidated Class Action Complaint ¶¶ 30-39 (Dkt.
No. 14).  The NexGen half water study conducted by Kenneth W. Hignight showed that EZ Seed
failed to grow a single blade of grass in 32 days when watered at half the recommended rate in
16 simultaneous trials utilizing 4 plots in 4 different soil conditions.  *See* Marchese Decl. Ex. X,
at Tables 7A and 7B.  Mr. Hignight's half water rate used half the *amount* of water, 0.80 inches
per week as compared to 1.60 inches per week.  *See* Marchese Decl. Ex. X, at Table 6.  Dr.
Kruse's half water rate used half the *frequency* of watering, once every other day.  Either way,
EZ Seed failed to grow a single blade of grass.

Scotts has criticized Mr. Hignight's study for over-applying EZ Seed at the 1/8-inch rate,
as illustrated by the statements of Scotts' lawyer, Mr. Danon, quoted above.  But the 1/8-inch
application precisely followed the directions for use printed on EZ Seed's packaging.  And
Scotts' research scientist, Michael Faust, admitted that ordinary consumers following the
directions on the package would get the same results Mr. Hignight did:

> Q:     Okay.  So the consumers who were trying to follow the
>        instructions often came up with the same results that Mr.
>        Hignight did?
>
> A:     I would say that is probably correct, yes.

Marchese Decl. Ex. B, at 204:14-205:7.

Scotts' description of the problem with EZ Seed as "over-application" is misleading.  The
real reason that EZ Seed requires more water than ordinary seed, and will not grow at half water
levels, is because the super-absorbent coir material that comprises roughly 88% of the product is
fundamentally unsuitable for use as a mulch.  As Professor Douglas E. Karcher explained:

"The primary function of a mulch is to improve moisture retention
in the underlying soil [by covering the soil to prevent evaporation].
And if you have a high absorbent mulch and you get a little bit of
rainfall or light irrigation, the mulch is less likely to allow water to
infiltrate into the soil.  And then once the soil has been wetted, it is
more likely that … a high absorbent material will actually increase
the rate at which water is pulled from the soil back up into the
mulch and evaporated into the atmosphere.  This has been shown
in classic peer-reviewed literature studying mulches."

Marchese Decl. Ex. Y, at 606:18-607:2.  Scotts tried to solve this problem by changing the

directions for use on EZ Seed's packaging to no longer specify application of a 1/8-inch layer,

and to state, instead, that users should "apply EZ Seed® so the area is mostly covered but bare

ground is still visible … so that seedlings have enough space to access water and nutrients."[3]



But that quick-fix cannot cure EZ Seed's design defect.  The direction to leave bare

ground defeats the fundamental purpose of using mulch in the first place.  Mulch is supposed to

cover the area to prevent evaporation – not leave bare ground.  This revised packaging confirms

the coir material's fundamental lack of utility as a mulch.  The coir mulch is worse than useless.

It actually hinders germination.  It must be applied so sparsely that it cannot cover the area and

cannot function as a mulch.

---

[3] Scotts changed EZ Seed's directions for use on a rolling basis from December 2011 through
April 2013.  *See* Scotts' Response to Interrogatory No. 6, Marchese Decl. Ex. Z (listing first ship
date with new directions for use for each SKU).

The folly of this change to EZ Seed's directions for use is highlighted by the fact that Scotts did nothing to change the formulation of the product.  88% of the product is comprised of material that is known to choke off what little grass seed is contained in the remainder.  And by applying it so sparsely that "bare ground is still visible," there is no way that the tiny amount of grass seed could grow "50% thicker with half the water."  Furthermore, Dr. Nelson's testimony confirms that even with such a sparse application, EZ Seed still requires ███████████████ ████████████████████  Nelson Dep. at 101:1-10, Marchese Decl. Ex. L.  This admission is reinforced by the newly revised directions for use, which state "A deep and thorough watering" is necessary, and instructs users to "water the area until EZ Seed® is completely saturated and no more water is being absorbed (this may take several minutes)."  Marchese Decl.  Ex. BBB.  So both before and after the label change, the product contained the same materials, and suffered from the same defect.  Before and after the label change, EZ Seed required <u>more water</u>, not less, and was never capable of growing grass "50% thicker with half the water."

Scotts' internal documents confirm that EZ Seed is priced at a substantial premium to ordinary seed, fertilizer and mulch purchased separately.  *See, e.g.*, Marchese Decl. Ex. AA ██████████████████████████████████████████████);  *see also* Complaint ¶ 6 (Dkt. No. 14) ("EZ Seed commands an 81% price premium over Pennington Annual Ryegrass at both Home Depot and Lowe's").  The inclusion of the super-absorbent coir mulch is the reason for the premium.  And ironically, that defective mulch, which comprises 88% of the EZ Seed, is actually detrimental to the product's performance.

Scotts received ███████ complaints in 2009 during the initial ███████ in complaints when EZ Seed first hit the market.  Marchese Decl. Ex. BB.  ████████████████████████ ████████████████  Marchese Decl. Ex. CC.  And complaints continued to increase in 2011, ████████████████████████  Marchese Decl. Ex. DD.  Scotts internal reports show that EZ Seed receives more than triple the rate of complaints per POS units, and more than double the refund rate per POS units as the next highest Scotts product.  *See* Marchese Decl. Ex. EE, at SMG-EZ014469 ████████████████████████████████████  *id.*

10

████████████████████████████████ *id.* at SMG-EZ014468 ██████████████

████████████████████████████████████████████.   According to Scotts' internal

reports, the top complaint reason was ████████████████   Marchese Decl. Ex. CC.

██████████████████████████████ Sass Dep. at 247:5-7, Marchese Decl.

Ex. M; *see also* Marchese Decl. Ex. CC.  EZ Seed has the highest complaint rate for a seed

product in the 150-year history of the Scotts company.  *See* Nelson Dep. at 104:13-16, Marchese

Decl. Ex. L.

## III.   THE LEGAL STANDARD FOR CLASS CERTIFICATION

Class actions are an essential tool for adjudicating cases involving many small claims that

are not economically feasible to prosecute individually.  In crafting Rule 23, "the Advisory

Committee had dominantly in mind vindication of the rights of groups of people who

individually would be without effective strength to bring their opponents into court at all."

*AmchemProds., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  Class actions give voice to plaintiffs

who "would have no realistic day in court if a class action were not available."  *Phillips*

*Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

To qualify for certification, plaintiffs must demonstrate by a preponderance of the

evidence that the putative class action meets each of the four requirements of Rule 23(a), and

also satisfies at least one of the categories provided in Rule 23(b).  *See In Re Visa Check /*

*MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001).  The Court must conduct a

"rigorous analysis," which may require it to "probe behind the pleadings before coming to rest

on the certification question."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

However, "[t]he Second Circuit has emphasized that Rule 23 should be 'given liberal rather than

restrictive construction."  *Gorat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009)

(quoting *Mariso A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).  Indeed, "it seems beyond

peradventure that the Second Circuit's general preference is for granting rather than denying

class certification."  *Id.* at 316-62 (quoting *Cortigiano v. Oceanview Manor Home for Adults*,

227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

## IV.   THE REQUIREMENTS OF RULE 23(a) ARE READILY MET

Rule 23(a) sets forth four prerequisites for certification:  numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).

### A.   Numerosity

A presumption of numerosity attaches to classes of more than 40 in the Second Circuit. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Both the California Class and the New York Class easily satisfy this requirement.  From January 2009 through year-end 2013, approximately 1,524,812 packages of EZ Seed were sold in the state of California, and 992,338 packages were sold in the state of New York.  Weir Decl. ¶ 10; *see also* Marchese Decl. Ex. FF (SMG-EZ131678, showing the unit sales in both states); Marchese Decl. Ex. GG (Scotts' supplemental response to Interrogatory No. 1).

### B.   Commonality

Commonality is met "if there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In other words, Plaintiffs' and Class members' claims "depend on a common contention," "capable of class-wide resolution ... meaning that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  "Commonality does not mandate that all class members make identical claims and arguments." *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996).  The commonality requirement may be met where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997).  In fact, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Dukes*, 131 S. Ct. at 2562.

One common question that cuts across every claim of every class member is whether statements that appear on every label of every package, that EZ Seed grows grass "50% thicker with half the water" compared to "ordinary seed" are express warranties.  Another common

question is whether that statement is false or misleading.  As this Court recognized, "[t]hese statements promise that EZ Seed will perform in specific, measurable ways; namely, that it grows thicker grass with less water than normal grass seed."  5/22/13 Memorandum Decision at 12 (Dkt. No. 46).  Plaintiffs contend these statements are false, as demonstrated by the scientific testing done by Dr. Kruse and Mr. Hignight showing no growth whatsoever at half water rates, as well as the testimony of Dr. Nelson and Mr. Sass, both of whom admitted at their depositions that EZ Seed in fact requires <u>more water</u> than ordinary seed, <u>not less</u>.  *See, e.g.*, Nelson Dep. at 101:1-10, Marchese Decl. Ex. L ██████████████████████████ ████████████████████████; Sass Dep. at 210:10-12, Marchese Decl. Ex. M ████████ ██████████████████████████████████.

Other common questions for the California Class include, for example, whether Scotts' representations that EZ Seed grows thicker grass with less water than normal grass seed violated the California's Consumers Legal Remedies Act (CLRA), Calif. Civ. Code §§ 1750, *et seq.*, Unfair Competition Law (UCL), Bus. & Prof. Code § 17200, *et seq.*, False Advertising Law (FAL), Bus. & Prof. Code § 17200, *et seq.*, breached an express warranty under California's Commercial Code § 2313, and whether Scotts was unjustly enriched from the sale of EZ Seed under California law.  *See* Consolidated Complaint Counts II-V and VII (Dkt. No. 14).

Other common questions for the New York Class include whether Scotts' conduct violated GBL §§ 349 and 350, whether Scotts breached an express warranty under New York's UCC § 2-313, and whether Scotts can be held liable for breach of contract / common law warranty under New York law.  *See* Consolidated Complaint Counts VIII-X and XII (Dkt. No. 14).

### C.    Typicality

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class.  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is not demanding."  *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (internal quotations omitted).  Typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes

similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936-37. *See also Green v. Wolf Corp.*, 406 F.2d 291, 300 (2d Cir. 1968) ("[to deny class certification] because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle … would destroy much of the utility of Rule 23").

Here, Plaintiffs' and other class members' claims arise out of the same course of conduct by Scotts and are based on the same legal theories. Every package of EZ Seed was labeled "50% THICKER WITH HALF THE WATER," when in fact every package contained a product that required <u>more water</u> than ordinary seed, and which had been shown in scientific testing conducted by Dr. Kruse and Mr. Hignight, to not grow at all at half water rates. Each of the named plaintiffs has therefore been injured in the same manner as other class members – through payment of the purchase price for a product that did not conform to the representations on its packaging. Each seeks redress through common legal claims. Each seeks a remedy based on statutorily mandated minimum damage awards, *see* New York GBL §§ 349(h), 350-e(3), or alternatively actual damages based on the purchase price paid. These circumstances are essentially identical to *Ebin v. Kangadis Food, Inc.*, 2014 WL 737690 (S.D.N.Y. Feb. 25, 2014), where Judge Rakoff found that plaintiffs who had purchased mislabeled olive oil products were typical of a nationwide class of purchasers, despite alleged differences with respect to their individual purchasing decisions and use of the product. *See id.* at *3-4.

### D.    Plaintiffs Will Adequately Represent The Classes

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced, and able to conduct the

litigation." *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both of these factors are met here.

### 1.   Plaintiffs' Interests Do Not Conflict With The Classes

Neither Plaintiffs nor their counsel has any interest antagonistic to absent class members. Plaintiffs, like each absent Class member, have a strong interest in proving Scotts' common course of conduct, establishing its unlawfulness, demonstrating the impact of the unlawful conduct, and obtaining redress. As Plaintiffs prove their own claims, they will also prove the claims of absent class members.

The proposed representatives of the California Class, Mr. Browne and Mr. Smith, have demonstrated their commitment to pursue these claims on behalf of absent class members. Each has responded to extensive written discovery requests and each has sat for a lengthy deposition.[4] So too have the proposed representatives of the New York Class, Mr. Arcuri, Ms. Eskinazi, Ms. Lonardo, Mr. Moore and Ms. Thomas.[5]

---

[4] *See, e.g.*, Browne Dep. at 162:12-17, Marchese Decl. Ex. D ("Q: Do you understand that moving forward in the case, there may be significant additional demands on your time? A: Whenever, wherever the courts request me to handle the suits as the lead in the class-action suit, I'll be there."); Smith Dep. at 159:6-12, Marchese Decl. Ex. H ("Q: Do you understand that if this case progresses, you may be called away to testify at trial or perform other functions as the plaintiff in this case? A: I do. Q: Do you understand that may take a significant amount of time? A: I understand that."); *id.* at 180:14-16 ("Q: Do you want to be a class representative? A: I believe in this – I believe in this case, yes.").

[5] *See, e.g.*, Arcuri Dep. at 195:18-196:19, Marchese Decl. Ex. C ("Q: In your position as a named plaintiff, are you prepared to see this case through to its conclusion, even if that means if the case goes to trial? A: Yes, I am."); Eskinazi Dep. at 181:12-18, Marchese Decl. Ex. E ("Q: Do you understand that this case could go to trial? A: Yes. Q: Are you prepared to continue participating in this case to see this matter through trial if it comes to that? A: Yes."); Lonardo Dep. at 204:22-205:8, Marchese Decl. Ex. F ("Q: Will you be available to testify at trial? A: Yes. Q: Do you understand you may be required to spend several days on this case? A: I do; I am willing to do what it takes to make sure that a product says what it is going to do and does what it says and keeps other people from purchasing something that does not work."); Moore Dep. at 228:2-8, Marchese Decl. Ex. G ("Q: Would you personally be willing to sacrifice [your] vacation time in order to participate in this lawsuit? A: Yes. Q: Even at the expense of vacation time that you could spend with your family? A: Yes."); Thomas Dep. at 147:5-11, Marchese Decl. Ex. I ("Q: Should this case go to trial, would you be able to testify at trial? A:

### 2.      Plaintiffs' Counsel Are Qualified

Plaintiffs' counsel, Bursor & Fisher, P.A., are experienced and qualified class action lawyers who have experience litigating consumer claims.  *See* Bursor & Fisher, P.A. Firm Resume, Marchese Decl. Ex. HH.  The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million verdicts or recoveries in 5 of 5 class action jury trials since 2008.  *Id.*  Faruqi & Faruqi is likewise qualified to serve as class counsel. Faruqi & Faruqi is a national law firm with more than 29 attorneys in offices in New York, California, Delaware, and Pennsylvania.  Marchese Decl. ¶ 56.  The firm focuses on complex and class action litigation involving antitrust, consumer, financial, corporate governance, and securities matters.  *Id.*

This Court has already recognized the qualifications of plaintiffs' counsel in appointing them co-lead interim class counsel in this case.  *See* Order Granting Plaintiffs' Motion For Appointment Of Co-Lead Interim Class Counsel.  These same firms were appointed co-lead counsel in *Rodriguez v. Citimortgage, Inc.*, S.D.N.Y. Case No. 11-cv-04718-PGG, to represent a certified nationwide class of active-duty military personnel whose homes were foreclosed in violation of the for Servicemembers Civil Relief Act ("SCRA").  Marchese Decl. ¶ 57.  Working together, these firms achieved a nationwide class settlement which has been preliminarily approved by Judge Gardephe, providing each class member with a monetary recovery of at least $116,785.00.  *Id.*  In a prior order appointing interim class counsel, Judge Gardephe commented that these are "well-established law firms that have the resources and personnel necessary to carry out large-scale class action litigation."  Marchese Decl. Ex. II, at 3.  Judge Rakoff also commented favorably on the qualifications of Bursor & Fisher, P.A. in appointing the firm to represent a certified nationwide class of purchasers of Capatriti olive oil.  *See Ebin v. Kangadis Food, Inc.*, 2014 WL 737690, at *4 (S.D.N.Y. Feb. 25, 2014) ("As for plaintiffs' counsel, Bursor

---

Yes.  Q:  Do you understand that you might be required to spend several days testifying at trial? A:  Yes.").

& Fisher, P.A. are class action lawyers who have experience litigating consumer claims ….  The firm has been appointed class counsel in dozens of cases in both federal and state courts ….").

## V.      THE PROPOSED CLASSES SATISFY RULE 23(b)(3)

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both are met here.

### A.      Common Questions Of Law Or Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  Notably, Rule 23(b)(3) calls only for "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

In this action, the legal and factual issues do not require individualized determinations, but can be resolved through generalized proof applicable to each of the Plaintiffs' claims.

#### 1.      The Elements Of The California Claims Can Be Established Through Common Proofs

Mr. Browne and Mr. Smith purchased EZ Seed in California and assert Counts II-V and VII on behalf of the California Class.  Each element of these claims can be established with common classwide proof.

##### a)      California Consumers Legal Remedies Act (CLRA)

Count II asserts that Scotts violated the California Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA") by "representing that goods [EZ Seed] have … characteristics, ingredients, uses, benefits … which they do not have."  Complaint ¶ 121 (Dkt. No. 14).  To establish a CLRA claim, Plaintiffs need only "show that members of the public are likely to be

17

deceived" by Scotts' misrepresentations.  *See Williams*, 552 F.3d at 938.  This is an objective test that is subject to common proof.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (citing *Tobacco II*, 46 Cal. 4th at 320); *Makaeff v. Trump University, LLC*, 2014 WL 688164, at *11 (S.D. Cal. Feb. 21, 2014).  Plaintiffs will be able to make this showing through evidence that the phrase "50% THICKER WITH HALF THE WATER" appeared on every package of EZ Seed, that this statement promised that "EZ Seed will perform in specific, measurable ways; namely, that it grows thicker grass with less water than normal grass seed," 5/22/13 Memorandum Decision at 12 (Dkt. No. 46).  Plaintiffs will prove that promise was false by presenting common evidence that EZ Seed in fact requires <u>more water</u> than ordinary seed and will not grow at all when watered at half water rates.  This common evidence will include, among other things, the admissions of Dr. Nelson and Mr. Sass, as well as the scientific testing by Dr. Kruse and Mr. Hignight.  *See supra* Parts I & II.

While reliance is an element of a CLRA claim, it may be inferred as to the entire class if the representations were objectively material.  *In re Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 157 (2010); *Mass. Mut. Life Ins. Co. v. Sup. Ct.*, 97 Cal. App. 4th 1282, 1293 (2002).  Stated differently, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members."  *Makaeff*, 2014 WL 688164, at *13 (internal quotations and citations omitted).  Under California law, a misrepresentation is material:

> "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable mind would have been influenced by it."

*Id.* (quoting *Stearns*, 655 F.3d at 1022).  Evidence of the materiality of Scotts' misrepresentations – which appeared in bold all-caps type in both English and Spanish on the front of every package of EZ Seed – is abundant.  First, Scotts' internal documents confirm that purchasers relied on EZ Seed's packaging in making the decision to purchase the product.  *See,*

18

*e.g.*, Marchese Decl., Ex. JJ, at SMG-EZ101248 █████████████████████████████

██████████████████.  Second, Defendants' documents and employees provide common

evidence that will establish the materiality of the "50% THICKER WITH HALF THE WATER"

misrepresentation.  *See, e.g.*, Marchese Decl. Ex. A, at SMG-EZ020811 ████████████████

████████████████████████████  Marchese Decl. Ex. KK, at SMG-EZ017458 ███████████

███████████████████████████████████████████████████████████████

████████████.  The same is true for the "grows anywhere" misrepresentation.  *See, e.g.*, LL, at

SMG-EZ101781 ████████████████████████████████████████████████████████████

████████████████████████████  Indeed, the fact that these statements appeared on the

labels is evidence of their materiality.  *See, e,g, Johns v. Bayer Corp.*, 280 F.R.D. 551, 558-59

(S.D. Cal. 2012); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 669-70 (C.D. Cal. 2009).

### b)  California Unfair Competition Law (UCL) And False Advertising Law (FAL)

Counts III and IV assert claims against Scotts for violation of the "fraud" prong of

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL"), and

for violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

(the "FAL").  Both of these claims require proof that (i) the class representatives' reliance on the

labeling claims resulted in injury in fact, *In re Tobacco II Cases*, 46 Cal.4th 298, 327-28 (2009),

and (ii) "members of the public are likely to be deceived."  *See Williams*, 552 F.3d at 938.[6]

Proof of reliance by absent class members is <u>not</u> required.  *See, e.g., Guido v. L'Oreal, USA, Inc.*,

2013 WL 3353857, at *28-29 (C.D. Cal. July 1, 2013) ("under the UCL and FAL, only

the named plaintiffs are required to establish reliance and causation, not each class member.").

The California Plaintiffs can prove individual injury and reliance through their own

testimony.  *See* Browne Dep. 72:14-20; 120:2-14, Marchese Decl. Ex. D; Smith Dep. 82:16-83:5,

Marchese Decl. Ex. H.  Whether "members of the public are likely to be deceived" is an

---

[6] The same elements of proof apply to both a UCL "fraud" claim and an FAL claim.  *See Williams*, 552 F.3d at 938; *Kasky v. Nike*, 27 Cal. 4th 939, 950-51 (2002).

objective test that is subject to common proof, and can be established with the evidence described in Parts I and II, above.

Count III also asserts claims under the "unlawful" prong of the UCL.  *See* Compl. ¶ 132. Unlawful business acts include "any practices forbidden by law."  *Rush v. Nutrex Research, Inc.*, 2012 WL 2196144, at *8 (N.D. Cal. June 13, 2013).  As discussed above, Plaintiffs will be able to establish through common evidence that Defendants' misrepresentations violate both the FAL and the CLRA, *see supra* Section IV.A.1.a.  Each of these violations gives rise to claims under the "unlawful" prong of the UCL.  *See Valazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008) ("[S]ection 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq.").  Notably, the proof needed to establish these violations is not based on any individualized factor and is common to the California Class.

### c)      California Express Warranty

Count V asserts claims against Scotts for breach of express warranty under California law.  *See* Compl. ¶ 143.  This claim requires proof of an "affirmation of fact or promise" or "description of goods," which was "part of the basis of the bargain," and breach.  *See Weinstat v. Dentsply Int'l*, 180 Cal.App.4th 1213, 1227 (2010) (reversing order decertifying breach of express warranty class and noting that the UCC does not require proof of reliance on specific promises made by the seller).  Express warranties can be created by representations on a product's label.  *See Parker v. J.M. Smucker Co.*, 2013 WL 4516156, at *6 (N.D. Cal. Aug. 23, 2013) (finding express warranty claim can be based on product's "All Natural" label).  Here, EZ Seed's packaging created the express warranty that EZ Seed will grow thicker grass with less water than normal grass seed and is versatile enough to grow in "Dry, sunny areas!"  Plaintiffs will be able to prove this claim with common evidence described in Parts I and II, above.  *See Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 576, 581 (C.D. Cal. 2011) (certifying

breach of express warranty claim); *Galvan v. KDI Distribuation Inc.*, 2011 WL 5116585, at *11 (C.D. Cal. Oct. 25, 2011) (finding common issues predominate on express warranty claim).

### d) California Unjust Enrichment

Count VII asserts claims against Scotts for unjust enrichment under California law. *See* Compl. ¶ 158. A claim for unjust enrichment requires Plaintiffs to establish (i) the receipt of a benefit, and (ii) the unjust retention of the benefit at the expense of another. Both of these elements can be proven with common classwide evidence. Scotts' business records show that it received revenue from every sale of EZ Seed, which is a benefit received. *See* Weir Decl. ¶ 14; *see also* Marchese Decl. Ex. GG (Scotts' supplemental response to Interrogatory No. 1, showing ▉▉▉▉▉▉ in total revenue from sales of EZ Seed in California from January 1, 2009 through December 31, 2013); Marchese Decl. Ex. FF (SMG-EZ131678, showing ▉▉▉▉▉▉ in invoiced sales in California from January 1, 2009 through December 31, 2013, and ▉▉▉▉▉▉ in net sales in California from January 1, 2009 through December 31, 2013); Marchese Decl. Ex. MM (SMG-EZ131681, showing ▉▉▉▉▉▉ in total net sales in California). And the evidence described in Parts I and II, above, concerning the falsity of the representations on the EZ Seed label and the defects in the EZ Seed products, will provide common classwide proof that Scotts' retention of those benefits at the expense of California Class members would be unjust. *See, e.g.*, *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568-69 (S.D. Cal. 2012) (finding common issues predominate and certifying class for unjust enrichment claim); *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 343 (N.D. Cal. 2010) (same); *Cartwright v. Viking Industries, Inc.*, 2009 WL 2982887, at *12-13 (E.D. Cal. Sept. 14, 2009) (same).

### 2.   The Elements Of The New York Claims Can Be Established Through Common Proofs

Mr. Arcuri, Ms. Eskinazi, Ms. Lonardo, Mr. Moore and Ms. Thomas purchased EZ Seed in New York and assert Counts VII-X and XII on behalf of the New York Class. Each element of these claims can be established with common classwide proof.

a)      **New York GBL §§ 349-350**

Counts VIII and IX assert claims against Scotts for violation of New York GBL §§ 349 and 350.  To establish a prima facie case under § 349, plaintiffs must demonstrate that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."  *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  "Deceptive acts" are defined objectively as those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Id.* at 522; *see also Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005).  As this Court recognized, "[t]he same analysis applies to claims brought under Section 350 claim."  5/22/13 Memorandum Decision at 18 (Dkt. No. 46); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir. 1994) ("In order to establish a claim under either section, a plaintiff must show (i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured.") (internal quotations omitted).  Sections 349 and 350 do not require proof of reliance, or proof that defendants knew or should have known the alleged statements were false or misleading.  *See* 5/22/13 Memorandum Decision at 18-19 (Dkt. No. 46), citing *Koch v. Ackert, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) and *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995).

As already noted by the Court, Plaintiffs assert Scotts' misrepresentations (i) were directed at consumers, (ii) were false or misleading in a material way, and (iii) caused injury to Plaintiffs.  *See* 5/22/13 Memorandum Decision at 19 (Dkt. No. 46).  Plaintiffs will prove these claims with the same common evidence described in Parts I and II, above.  *See Makaeff*, 2014 WL 688164, at *14 ("Based on the same showing of the UCL claims, the Court concludes common issues predominate for alleged violations of New York General Business law."); *Jermyn v. Best Buy Stores, L.P.*, 356 F.R.D. 418, 435-36 (S.D.N.Y. 2009) (certifying GBL §§ 349 and 350 claims where "[t]he predominant issue before the Court is whether Best Buy's advertisements about its price match guarantee were false and misleading because the company had a secret Anti-Price Matching Policy."); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D.

22

468, 480-83 (C.D. Cal. 2012) (certifying class under GBL §§ 349 and 350 where all purchasers of hair product were subject "to the same deceptive marketing and advertising").

**b)    New York Express Warranty**

Counts X and XII assert claims against Scotts for breach of express warranty, and for breach of contract and warranty under New York common law.  An express warranty is "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  N.Y.U.C.C. § 2–313(1)(a).  "In order to demonstrate that an express warranty was created under New York law, a plaintiff must prove that the statement falls within the definition of warranty, that she relied on it, and that it became part of the basis for the bargain."  *Kraft v. Staten Island Boat Sales, Inc.*, 715 F. Supp. 2d 464, 473 (S.D.N.Y. 2010) (internal quotations omitted).  The elements for the common law claims are similar.  *See Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725 (N.Y. App. Div. 2009) (common law breach of contract); *Promuto v. Waste Management, Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (common law breach of warranty).

Here, EZ Seed's label warranted that EZ Seed would grow thicker grass with less water than normal grass seed and is versatile enough to grow in "Dry, sunny areas!"  Marchese Decl. Ex. J.  Reliance will be demonstrated through class wide evidence because "as practical matter, proof of reliance [under New York law] amounts to proof of the existence of an express warranty."  *See NSA Invs. II L.L.C. v. SeraNova, Inc.*, 227 F. Supp. 2d 200, 203-04 (D. Mass. 2002) (applying New York law), citing *Ainger v. Michigan Gen. Corp.*, 476 F. Supp. 1209, 1225 (S.D.N.Y. 1979); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2d Cir. 1992).  The remaining elements also can be established through common evidence that: (i) the express warranties were on every package of EZ Seed; (ii) each misrepresentation was material; (iii) the misrepresentations are literally false, and (iv) the EZ Seed did not perform as warranted thereby injuring class members.  *See, e.g.*, *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *11

23

(N.D.N.Y. Mar. 13, 2012) (finding common issues predominated plaintiffs' common law breach of contract claim under New York law).

### 3.     Damages Are Measurable On A Classwide Basis

When issues of liability can be determined with classwide evidence, the predominance standard is generally satisfied even if damages are not provable in the aggregate. *See* Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App. at 141 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by the individuals within the class."); Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1781, at 235-37; W. Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012) ( "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").  In any event, at the class certification stage, "Plaintiffs are not required to set forth their final suggested protocol for how damages should be calculated. Instead, they need only show that the methodologies that they propose are not so insubstantial as to amount to no method at all."  *Leider v. Ralfe*, 2004 WL 173330, at *13 (S.D.N.Y. Jul. 30, 2004) (internal quotations and citations omitted).

Proof of damages for the New York claims will be very simple.  For Count VIII, New York's GBL § 349(h) provides for the recovery of "actual damages or fifty dollars, whichever is greater."  Plaintiffs acknowledge that, under New York's CPLR § 901(b), a class action to recover statutory damages under § 349(h) cannot be maintained.  But New York's procedural rules do not apply to a class action in federal court.  *See Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1448 (2010) (holding that CPLR § 901(b) does not apply to class actions in federal court); *Bristol Village, Inc. V. Louisiana–Pacific Corp.,* 2013 WL 55698, at *11 n.5 (W.D.N.Y. 2013) ("Although N.Y. C.P.L.R. 901(b) prohibits class action relief for a statutorily-imposed penalties or minimum damages, the Supreme Court held in [*Shady Grove*] that the certification requirements of Rule 23 preempted this state law

'procedural' limitation in federal actions."); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *17 (C.D. Cal. July 2, 2013) (granting class certification on a claim under GBL § 349(h) "to pursue these statutory damages on behalf of the New York class").  So for Count VIII, the classwide damage calculation is simply the number of units sold in New York, ████████, multiplied by the $50 statutory minimum, which equals ████████████.

For Count IX, New York's GBL § 350-E(3) provides for the recovery of "actual damages or $500, whichever is greater."  For this claim, the statutory damage calculation is the number of units sold in New York, ████████, multiplied by the $500 statutory minimum, which equals ████████████.  Alternatively, actual damages for these claims, as well as for counts X and XII, can be calculated using a full refund approach, *see* Weir Decl. ¶ 11, a price premium calculation, *see id.* ¶ 16, or a disgorgement theory, *see id.* ¶ 14.  Each of these methodologies for calculating actual damages is recognized under New York law.  *See, e.g., Ebin*, 2014 WL 737878, at *1, n.1; N.Y. U.C.C. § 2-714(2); *Shuldman v. DaimlerChrysler Corp.*, 1 A.D.3d 343, 345 (2d Dept. Nov. 3, 2003); *Smith v. Nikolayevskiy*, 23 Misc.3d 1133(A), at *3 (N.Y. Civ. Ct. May 12, 2009).

Damages for the California claims also are amenable to classwide proof.  Each of the California consumer protection statutes provides for class restitution as a form of relief.  *See, e.g., Colgan v. Leatherman Tool Group, Inc.,* 135 Cal.App.4th 663, 694 (2006).  Damages for each of the California claims also can be calculated using a full refund approach, *see* Weir Decl. ¶ 11, a price premium calculation, *see id.* ¶ 16, or a disgorgement theory, *see id.* ¶ 14.  *See also Guido*, 2013 WL 3353857, at *14; *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003); *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 670-71 (C.D. Cal. 2009); *Johns v. Bayer Corp.*, 380 F.R.D. 551, 559 (S.D. Cal. 2012); *Kirkton v. Daimlerchrysler Corp.*, 2008 WL 1947916, at *4 (Cal. Ct. App. 2008); *Colgan*, 38 Cal.Rptr.3d at 42-43; *Allen v. Similasan Corp.*, 2013 WL 2120825, at *6 (S.D. Cal. May 14, 2013).[7]

---

[7] These calculations will be facilitated by Home Depot's agreement to provide information concerning sales of EZ Seed and ordinary grass seed products in the United States "within 60 days after entry of an order granting, or granting in part, class certification in this action, to

**B.      Class Litigation Is Superior To Other Methods Of Adjudication**

Finally, a class action is the superior method of adjudication.  Rule 23(b)(3) provides four factors for the Court's consideration:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).  All four of these factors favor class treatment here.

First, Rule 23(b)(3)(A) weighs in favor of certifying a class because it would cost class members much more to litigate an individual case than they could recover in damages.  Where proceeding individually would be prohibitive due to the minimal recovery, "the class action device is frequently superior to individual actions."  *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  The average price for a package of EZ Seed was ▇▇▇▇ in California and ▇▇▇▇ in New York.  Weir Decl. ¶ 9.[8]  The small amount at issue for each class member renders individual litigation infeasible, but a class action offers the potential for meaningful redress.

**1.      The No-Quibble Guarantee Does Not Affect The Superiority Analysis**

Scotts may argue that a class action not superior to the so-called "No Quibble Guarantee" refund program.  But that would be wrong for at least five reasons.  First, a private refund program is irrelevant to Rule 23's superiority analysis and therefore cannot even properly be considered pursuant to the text of the Rule.  Rule 23(b)(3) looks to whether "a class action is

---

ensure that the most up-to-date sales figures are provided for the full class period." *See* Stipulation No. 1, ¶ 4 (Dkt. No. 69).

[8] *See also* Marchese Decl. Ex. UU (Home Depot retail sales data); Marchese Decl. Ex. VV (same); Marchese Decl. Ex. WW (same); Marchese Decl. Ex. XX (Lowe's retail sales data); Marchese Decl. Ex. YY (same); Marchese Decl. Ex. ZZ (Sam's Club retail sales data); Marchese Decl Ex. FF (Scotts' sales data).

superior to other available methods for fairly and efficiently <u>adjudicating</u> the controversy."
(underlining added).  This provision, like all Federal Rules of Civil Procedure, must be given its
plain meaning.  *See, e.g.*, *Ginett v. Computer Task Group*, 962 F.2d 1085, 1091 (2d Cir. 1992)
("We give the Federal Rules of Civil Procedure their plain meaning, and generally with them as
with a statute, when we find the terms unambiguous, judicial inquiry is complete.") (internal
quotation marks omitted).  Rule 23(b)(3) poses the specific question whether a single suit would
handle the dispute better than multiple suits, not a general question about whether there might be
other ways to redress an injury.  *See, e.g.*, *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752
(7th Cir. 2011) ("[T]he advisory committee's notes demonstrate that Rule 23(b)(3) was drafted
with the legal understanding of 'adjudication' in mind: the subsection poses the question whether
a single suit would handle the dispute better than multiple suits.  A recall campaign is not a form
of 'adjudication' under the committee note.") (internal citation omitted); *In re Oil Spill by Oil
Rig Deepwater Horizon*, 910 F.R.D. 891, 920 (E.D. La. 2012) ("The analysis is whether the class
action format is superior to other methods of *adjudication,* not whether a class action is superior
to an out-of-court, private settlement program.") (italics in original), quoting *Turner v. Murch
Oil USA, Inc.*, 234 F. Supp. 2d 597, 610 (E.D. La. 2006); *see also In re Hannaford Bros. Co.
Customer Data Sec. Breach Litig,* 293 F.R.D. 21, 27 (D. Me. 2013) ("Rule 23(b)(3) does not
address superiority as a matter of abstract economic choice analysis, but asks if a class action is
'superior … for *adjudicating* the controversy' ….  Indeed, all four enumerated factors in this
portion of the Rule deal with adjudication.") (emphasis in original).  The only alternatives to a
class action contemplated by the rule are other in-court procedures for adjudication.  *See* Fed. R.
Civ. P. 23(b)(3)(A)-(D) (identifying four factors, all of which reference "litigation" or a court
"action"); *see also* Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23(b)(3)
(referencing "test or model actions," "consolidat[ion]," and other "litigation actually pending").
Neither the text of the Rule, nor the Advisory Committee's explanatory notes, make any
reference to private refund programs, which cannot be considered in connection with the
superiority analysis.

<u>Second</u>, "[t]he factors that a court considers when assessing the superiority of a class action under Rule 23(b)(3) must be consistent with the[] dual purposes of [the] statutory damages remedy." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010). Thus, even if the Court finds that it can consider the No Quibble Guarantee as part of the superiority analysis, a class action is still superior to a private remedy because it is the only procedure that can effectuate the purposes and complete remedial schemes of California's and New York's consumer protection statutes, both of which provide for remedies above and beyond a refund. For example, the California and New York statutes both expressly provide for injunctive relief, which is unavailable under the No Quibble Guarantee. *See* NY GBL §§ 349(b), 350-e; Cal. Bus. & Prof. Code § 17203; Cal. Civ. Code § 1780. Also, New York's GBL §§ 349 & 350 provide for statutory damages as well as treble damages. And California's CLRA provides for punitive damages. Civ. Code §1780(a)(4). Furthermore, because Scotts imposes a secret 1-year limitation on the No Quibble Guarantee, *see* Marchese Decl. Ex. OO, Taubler Dep. at 204:24-205:13, Marchese Decl. Ex. NN, that guarantee is no longer available to any of the named plaintiffs, and is likewise unavailable to the vast majority of class members. Scotts' secret 1-year limitation is much shorter and more restrictive than the applicable limitations periods under California and New York law. Of course, the No Quibble Guarantee does nothing to further these states' purposes of deterring the use of false and deceptive advertising. *See, e.g.,* *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, 914-15 (N.Y. Sup. Ct. 1987) (noting that GBL §§ 349-350 were designed to "add a strong deterrent against deceptive business practices and supplement the activities of the Attorney General in the prosecution of consumer fraud complaints").

<u>Third</u>, Scotts fails to honor its No Quibble Guarantee. Scotts' records indicate that the company received thousands of complaints from dissatisfied customers who requested but never actually got a refund. *See* Marchese Decl. Ex. AC (listing ███████████████████████ as the second most frequent complaint from EZ Seed purchasers, ███████████████); *Id.* Ex. TT ████████████████████████████████ Eskinazi Dep. at 140:18-141:4,

163:19-23, Marchese Decl. Ex. E (discussing Scotts failure to provide a full refund to Ms.

Eskinazi); *see also* Marchese Decl. Ex. OO, at SMG-EZ106718 (letter from an EZ Seed

purchaser stating: ███████████████████████████████████████

███████████████████████████████████████ Many more complained to Scotts about

receiving coupons instead of the cash refund they requested.  *See* Marchese Decl. Ex. TT

███████████████████████████████████████ Where, as here, a defendant's

reimbursement policy has failed thousands of class members who have been unable to obtain

their refund payment, the class action mechanism is not only superior, but also "necessary to

ensure adequate relief for the class."  *Russell v. United States*, 2012 WL 2343369, at *9 (N.D.

Cal. June 20, 2012); *see also Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 702 (S.D. Fla.

2010).

 <u>Fourth</u>, the refund policy is inferior to a class action because the No Quibble Guarantee is

not adequately publicized.  *See In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab.

Litig.*, 276 F.R.D. 336, 347 n.12 (W.D. Mo. 2011) (finding that defendants "satisfaction

guaranteed policy" was not a superior alternative to a class action because defendants had not

publicized their refund policy nearly as vigorously as they had promoted the false product claims

at issue).  Nor is it publicized "in a manner similar to that which would be used to notify

consumers that a class has been certified."  *Id.*  The No Quibble Guarantee is concealed behind a

sealed flap on the inside back panel of the 3.75 lb. jug of EZ Seed.  In order to reveal the No

Quibble Guarantee language, a consumer must peel back a flap that is sealed with adhesive on

the backside of the jug.  *See* Taubler Dep. at 156:23-157:10, Marchese Decl. Ex. NN.  There is

no indication that the label beneath the flap contains any guarantee or refund information.  Thus

several plaintiffs testified they never saw it and were not aware of it.[9]

---

[9] *See*, *e.g.*, Lonardo Dep. at 222:14-18, Marchese Decl. Ex. F ("Q: At any time prior to filing this
lawsuit, were you aware of the Scotts no quibble guarantee concerning the EZ Seed that you
purchased? A: I was not."); Browne Dep. at 111:25-112-4, Marchese Decl. Ex. D ("I do not
recall reading that guarantee."); Smith Dep at 105:5-7, Marchese Decl. Ex. H ("Q: At that time,
did you notice something on the package called the 'Scotts No Quibble Guarantee?'  A: No.");

Fifth, the conditions for receiving a refund under the No Quibble Guarantee are too onerous to be considered a superior alternative to class action treatment.  Purchasers must present to Scotts either the bar code from the package or an **original** itemized receipt.  *See* Taubler Dep. at 160:2-5, Marchese Decl. NN.  But most people do not save original receipts or packaging after use, thus satisfying the requirement for the refund becomes an impossibility. *See, e.g.*, *Ebin v. Kangadis Food, Inc.*, 2014 WL 737960, at *5 (S.D.N.Y. Feb. 24, 2014) ("Nor is it likely that consumers consistently maintain receipts of their purchase or the actual tins or bottles [of olive oil].").  It can take several weeks before the purchaser realizes that EZ Seed is defective.  By then, the original proof of purchase likely will have been discarded.

### 2.    The Classes Are Ascertainable

Though it does not appear in the text of Rule 23, courts in this circuit have recognized an "implied requirement of ascertainability."  *Ebin v. Kangadis Food, Inc.*, 2014 WL 737960, at *4 (S.D.N.Y. Feb. 25, 2014) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)).  The implied requirement of ascertainability turns on the definition of the proposed class.  *Initial Pub. Offering*, 471 F.3d at 30.  The class must be "identifiable" such that "its members can be ascertained by reference to objective criteria."  *In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).  "The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'"  *Ebin*, 2014 WL 737960, at *5 (quoting *Gorat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010)).

Although an effort to identify class members must be made "at some point in the case," there is no requirement that any class members, other than the named class representatives, be identified prior to class certification.  *See, e.g.*, *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 341-42 (S.D.N.Y. 2004) (internal quotations and citations omitted).  As Judge Marilyn Huff explained in *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013):

---

Thomas Dep. at 136:24-137:5, Marchese Decl. Ex. I ("Q: Are you aware that Scotts has what's called a 'no quibble' guarantee? A: No.").

> Defendant's concern that the Court will have difficulty identifying
> members of the class is unavailing.  Because Defendant does not
> have records of consumer purchases, and potential class members
> will likely lack proof of their purchases, Defendant argues that the
> Court will have no feasible mechanism for identifying class
> members and will have to pursue proof individual to each class
> member.  However, "[t]here is no requirement that 'the identity of
> the class members ... be known at the time of certification.'"  *Ries
> v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 536 (N.D. Cal.
> 2012); *Wolph,* 272 F.R.D. at 482.  If class actions could be
> defeated because membership was difficult to ascertain at the class
> certification stage, "there would be no such thing as a consumer
> class action."  *Ries,* 287 F.R.D. at 536.  As long as the class
> definition is sufficiently definite to identify putative class
> members, "[t]he challenges entailed in the administration of this
> class are not so burdensome as to defeat certification."

*Id.* at 500.

Here, both the California Class and New York Class are defined objectively such that

class members can be identified by reference to "objective criteria."  They consist of individuals

who purchased EZ Seed in New York or California.  There is nothing subjective about the class

definitions.  An individual either purchased the product, or not.  The location of the purchase,

whether in New York, California, or elsewhere, is an objective fact.  It is administratively

feasible to identify class members by reference to these criteria.  Accordingly, the

ascertainability requirement is met even though class members may not possess receipts or other

documentation evidencing their EZ Seed purchases.  *See Ebin*, 2014 WL 737960, at *5 (finding

nationwide class of olive oil purchasers ascertainable even though they were unlikely to have

proof of purchase); *see also McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443, at

*22-29 (C.D. Cal. Jan. 13, 2014) (rejecting argument that putative class members must be likely

to have proof of purchase in order to satisfy ascertainably requirement).

Indeed, requiring consumers to have a proof of purchase as a prerequisite to class

certification "would render class actions against producers almost impossible to bring."  *Ebin*,

2014 WL 737960, at *5; *see also Ries v. Ariz. Bevs. United States LLC, Hornell Brewing Co.*,

287 F.R.D. 523, 535 (noting that if proof of class membership was required for certification,

"there would be no such thing as a consumer class action.").  Such an outcome would be inconsistent with the very purpose of the class action device, which "is designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual suit."  *Ebin*, 2014 WL 737960, at *5.  For this reason, class certification is routinely granted in consumer cases even where class members are unlikely to have proof of purchase.  *See, e.g., id.* at *5 (certifying nationwide class of purchasers of mislabeled olive oil); *Astiana*, 291 F.R.D. at 510 (S.D. Cal. 2013) (certifying a California class of purchasers of Kashi food products that were mislabeled with the representation "Nothing Artificial"); *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 240 (D.N.J. 2008) (certifying nationwide class of purchasers of frozen food products that misrepresented the amount of calories and fat per serving); *see also* Marchese Decl. Ex. PP (listing 35 cases in which classes were certified on claims where purchasers were unlikely to have retained receipts).

Interim Class Counsel have already obtained names, addresses, phone numbers, and/or email addresses for 55,531 purchasers of EZ Seed,[10] and have secured an agreement with Home Depot, one of the largest retail distributors of EZ Seed, to produce class member identifying information within 30 days after a class is certified.  *See* Stipulation No. 1, at ¶ 3 (Dkt. No. 69) ("Home Depot will preserve and will not destroy the class member identifying information within its possession, and will produce such information to Class Counsel within 30 days after entry of an order granting, or granting in part, class certification in this action.").  Defendant Lowe's refused a similar stipulation, *see supra* footnote 2, but has admitted that it too possesses class member identifying information.  *See* 3/3/14 Lowe's First Amended Objections And Responses To Plaintiffs' First Set of Requests For Admission (No. 1), Marchese Decl. Ex. QQ at 4-5.  Scotts also has admitted that it possesses class member identifying information.  *See, e.g.*, Taubler Dep. at 45:25-46:4, 47:8-50:7; 50:24-51:17, 64:20-65:14, Marchese Decl. Ex. NN.

---

[10] In response to a third-party subpoena Wal-Mart Stores, Inc. produced contact information for ▮ individuals who purchased Scotts EZ Seed.  Marchese Decl. ¶ 59.

Thus, identifying class members from Scotts' records, and the records of other retailers, has already been shown to be administratively feasible.

This mechanism for identifying class members was recently utilized by Judge Rakoff in the *Ebin* case to provide individual notice to nearly 200,000 olive oil purchasers identified from records subpoenaed from retailers' loyalty card programs. *See* Marchese Decl. ¶ 45 & Ex. RR. Interim Class Counsel expect to propose a similar procedure for identifying class members here, though it would be more streamlined than in *Ebin*. Here, roughly ██ of EZ Seed sales were made through only 4 retailers (Home Depot, Lowe's, Wal-Mart and Sam's Club), *see* Sass Dep. at 124:1-125:7, Marchese Decl. Ex. M, while the olive oil sales in *Ebin* were made through 41 retailers and distributors. *See Ebin* Class Notice Order ¶ 2, Marchese Decl. Ex. RR (directing the issuance of subpoenas to "41 retailers and distributors" seeking the production of class member identifying information). Here there are only 4. Two, Wal-Mart and Sam's Club, have already produced the information for ██ purchasers. Home Depot, which accounts for ██ of the total sales of EZ Seed, has agreed to produce class member identifying information within 30 days. *See* Stipulation No. 1 (Dkt. No. 69); Marchese Decl. Ex. SS, SMG-EZ005275-77 (showing Home Depot ████████████ of total EZ Seed sales). Lowe's has confirmed it possesses the information, and since Lowe's is a party to this action it can be compelled to produce the information without issuance of a subpoena. So while 41 subpoenas were required in *Ebin*, the same task here probably can be completed without even issuing a subpoena.

This process will not produce a complete class list. But it will identify a substantial number of class members "who can be identified with reasonable effort" and provided individual notice. Fed. R. Civ. P. 23(c)(2)(B). This is more than enough. Rule 23 does not require a roll call. The text of the rule contemplates that certified classes will contain members who are not easily identifiable: it requires that absent class members must be given "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," and published notice to those who cannot be. Fed. R. Civ. P. 23(c)(2)(B); *see also Manual For Complex Litigation, Fourth* § 21.311, at 292 (Federal

Judicial Center 2004) ("[I]f no records were kept of sales of an allegedly defective product from retailers to consumers, publication notice may be necessary.").  The text of Rule 23(c)(2)(B) would make no sense if a class could consist only of members who are identifiable.

Admittedly, some amount of effort will be required to appropriately manage this case as a class action.  But the difficulties in doing so are not insurmountable, and can readily be addressed by techniques that have been shown to work in similar cases.  In any event, with respect to the manageability prong of Rule 23(b)(3), the Second Circuit has noted that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."  *In re Visa Check/Mastermoney Antitrust Litig.*, 208 F.3d 124, 140 (2d Cir. 2001) (citations and internal quotations omitted). Instead, the Second Circuit recommends that district courts make use of a variety of management tools to temper potential manageability problems.  *See id.* at 141.

It would be particularly unjust for theoretical manageability concerns to pose an obstacle to class certification here.  The evidence in this case leaves little doubt that Scotts committed a massive fraud on millions of purchasers of EZ Seed.  Without class certification, Scotts will retain the profits of that fraud and be incentivized to repeat its illegal conduct.  This is precisely the type of case that requires class treatment if there is to be any possibility of redress.  As Judge Posner put it:

> The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.  But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative – no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied – to no litigation at all.

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Hypothetical concerns about the manageability of this action pale by comparison to concerns about the actual fraud that Scotts has already committed, on a massive scale.

34

## VI.      THE CLASSES ALSO SHOULD BE CERTIFIED UNDER RULE 23(b)(2)

Injunctive relief is expressly authorized for plaintiffs' statutory claims under New York's GBL §§ 349-350, and California's UCL and CLRA.  *See* NY GBL §§ 349(h), 350-e; Cal. Bus. & Prof. Code § 17203; Cal. Civ. Code § 1780.  Thus, Plaintiffs also seek certification of the New York and California Classes pursuant to Fed. R. Civ. P. 23(b)(2), which is appropriate where the defendant "acted ... on grounds generally applicable to the class, and injunctive relief constitutes a significant aspect of the relief sought."  *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *17 (E.D.N.Y. July 17, 2013) (internal quotation marks and punctuation omitted).  "That plaintiffs are seeking substantial monetary damages is of no concern given [that Plaintiffs seek] certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively."  *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 293 (S.D.N.Y. 2012); *All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*, 280 F.R.D. 78, 86 (E.D.N.Y. 2012) (same).  Here, both the New York and California plaintiffs adamantly testified that one of their primary goals is to prevent Defendant from continuing to make the false and misleading claims at issue.  Browne Dep. at 155:8-9, Marchese Decl. Ex. D ("I want the advertising corrected, them stop making false representation of a guaranteed product."); Eskinazi Dep. at 167:12-16, Marchese Decl. Ex. E ("I really believe that the product is misleading and I seriously believe that the product should be taken off the market or they should change their claim[s] ....").  Accordingly, the court should also certify an injunctive relief class pursuant to Fed. R. Civ. P. 23(b)(2).  *See Ackerman*, 2013 WL 7044866, at *71 (certifying Rule 23(b)(2) injunctive relief class in case involving false claims found on Vitamin Water labels).

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for class certification.

Dated:  March 31, 2014

Respectfully submitted,


By:     */s/ Scott A. Bursor*
        Scott A. Bursor

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
888 Seventh Ave
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com

**FARUQI & FARUQI LLP**
Antonio Vozzolo
369 Lexington Ave., 10th Floor
New York, NY 10017-6506
Telephone:  (212) 983-9330
Facsimile:  (212) 983-9331
Email:  avozzolo@faruqilaw.com

*Interim Class Counsel*