UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

In re Scotts EZ Seed Litigation : 12-CV-4727 (VB)

-------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

HUNTON & WILLIAMS LLP
Shawn Patrick Regan
Joshua S. Paster
200 Park Avenue
New York, NY 10166

- and -

Samuel Danon (*pro hac vice*)
Jason B. Sherry
1111 Brickell Avenue, Suite 2500
Miami, FL 33131

*Counsel for Defendants The Scotts Miracle-Gro Company, The Scotts Company LLC, and Lowe's Home Centers, LLC*

# TABLE OF CONTENTS

Page

A. FACTUAL BACKGROUND ..... 2

I. EZ Seed Was Developed in Multiple Varieties to Serve a Specific Purpose. ..... 2

A. EZ Seed's 2009 Launch; Scotts' Responsiveness to Consumers. ..... 3

B. Scotts Offers Full Reimbursement Under Its No Quibble Guarantee Refund Program, and [redacted]. ..... 5

II. Plaintiffs' Experiences with EZ Seed were Individualized and Varied. ..... 5

III. The Alleged "Defects" At Issue In This Case. ..... 7

A. Scotts' "50% Thicker Claim." ..... 8

1. Kenneth Hignight's Testing. ..... 9

2. Jason Kruse's Testing. ..... 10

3. Scotts' Additional Testing. ..... 10

B. EZ Seed's Directions For Use. ..... 11

B. ARGUMENT ..... 12

I. Standard for Class Certification. ..... 12

II. Plaintiffs Fail to Meet the Commonality and Predominance Requirements Because Their Claims Turn on Highly Individualized Proof. ..... 13

A. Plaintiffs' Assertion that the Coir Mulch Prevents EZ Seed from Growing "At All" Is Belied by Plaintiffs' Own Evidence. ..... 14

B. Plaintiffs' Claim that EZ Seed Does Not Grow 50% Thicker than Ordinary Seed When Both Are Watered at Half-Water Rates Cannot Be Proven by Classwide Evidence. ..... 15

C. Plaintiffs Have No Evidence EZ Seed's Directions For Use Cause Any Failure to Germinate. ..... 16

D. Individual Issues Predominate On the Question Why Any Individual Failed to Grow Grass. ..... 18

E. Plaintiffs Cannot Demonstrate The 50% Thicker Claim Caused An Injury to All EZ Seed Purchasers. ..... 19

F. Damages Are Not Measureable on a Classwide Basis. ..... 21

1. The "Full Compensatory Damages" and "Disgorgement of Money Damages" Models Require Individual Inquiries into the Value Received by Absent Class Members. ..... 22

2. Plaintiffs' Price Premium Model is Unrelated to Their Liability Theory. ..... 23

III. A Class Action Is Not Manageable. ..... 24

IV. A Class Action is Not Superior. ..... 25

V. Plaintiffs Have Not Shown By a Preponderance of the Evidence That The Court Can Identify Absent Class Members. ....29
VI. Certification Is Improper Because the Named Plaintiffs' Claims Are Not Typical of Those of the Putative Class Members. ....32
VII. An Injunctive-Relief Class Under Rule 23(b)(2) is Improper Under Supreme Court Precedent. ....34
C. CONCLUSION ....35

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ackerman v. Coca-Cola Co.*,
2013 WL 7044866 (E.D.N.Y. July 18, 2013)......19 n.31, 20, 22, 22 n.35

*Aguilar v. Immigr. & Customs Enforcement Div.*,
2012 U.S. Dist. LEXIS 53367 (S.D.N.Y. Apr. 16, 2012)......15

*Akkerman v. Mecta Corp.*,
62 Cal. Rptr. 3d 39 (Cal. Ct. App. 2007)......22

*Algarin v. Maybelline, LLC*,
2014 WL 1883772 (S.D. Cal. May 12, 2014)......20, 24, 24 n.37, 30

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......32 n.45

*Berley v. Dreyfus & Co.*,
43 F.R.D. 397 (S.D.N.Y. 1967)......26

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)......20

*Bruce v. Teleflora, LLC*,
2013 WL 6709939 (C.D. Cal. Dec. 18, 2013)......19

*Caro v. Procter & Gamble Co.*,
18 Cal. App. 4th 644 (Cal. Ct. App. 1993)......23

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013)......30

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012)......35

*City of L.A. v. Lyons*,
461 U.S. 95 (1983)......35

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013)......passim

*Drimmer v. WD-40 Co.*,
2007 WL 2456003 (S.D. Cal. Aug. 24, 2007)......35

*Ebin v. Kangadis Food, Inc.*,
2014 WL 737960 (S.D.N.Y. Feb. 25, 2014) ........ 32

*Fogarazzo v. Lehman Bros., Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ........ 29

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ........ 33

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........ 32

*Great Am. Ins. Co. v. Summit Exterior Works, LLC*,
2012 U.S. Dist. LEXIS 24780 (D. Conn. Feb. 27, 2012) ........ 5 n.8

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012) ........ 35

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ........ 12, 19

*In re Aqua Dots Prods. Liab. Litig.*,
654 F.3d 748 (7th Cir. 2011) ........ 26 n.39, 29, 30

*In re Canon Cameras Litig.*,
237 F.R.D. 357 (S.D.N.Y. 2006) ........ 21

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
251 F.R.D. 689 (N.D. Ga. 2008) ........ 26 n.38, 28

*In re Currency Conversion Fee Antitrust Litig.*,
230 F.R.D. 303 (S.D.N.Y. 2004) ........ 13

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ........ 33

*In re Google AdWords Litig.*,
2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ........ 23

*In re Initial Public Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ........ 12, 13

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
214 F.R.D. 614 (W.D. Wash. 2003) ........ 26 n.38

*In re POM Wonderful LLC*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........ 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .....21

*Karhu v. Vital Pharm., Inc.*,
2014 WL 815253 (S.D. Fla. Mar. 3, 2014) .....30

*Leonard v. Abbott Lab., Inc.*,
2012 WL 764199 (E.D.N.Y. March 5, 2012) .....29

*McLaughlin v. American Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) .....20

*McNair v. Synapse Grp. Inc.*,
672 F.3d 213 (3d Cir. 2012) .....35

*Melnick v. Press*,
809 F. Supp. 2d 43 (E.D.N.Y. 2011) .....5 n.8

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .....13, 34 n.48

*Nationwide Life Ins. Co. v. Haddock*,
460 F. App'x 26 (2d Cir. 2012) .....34, 34 n.49

*New Dance Grp. Studio v. St. Paul Fire & Marine Ins. Co.*,
1995 U.S. Dist. LEXIS 10205 (S.D.N.Y. July 21, 1995) .....34

*Pagan v. Abbott Lab., Inc.*,
287 F.R.D. 139 (E.D.N.Y. 2012) .....15, 26, 29 n.43

*Patton v. Topps Meat Co.*,
2010 WL 9432381 (W.D.N.Y. May 27, 2010) .....26

*Philadelphia v. Am. Oil Co.*,
53 F.R.D. 45 (D.N.J. 1971) .....30

*Ries v. Ariz. Beverages USA LLC*,
2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) .....23

*Small v. Lorillard Tobacco Co.*,
720 N.E.2d 892 (N.Y. 1999) .....21 n.33

*Solomon v. Bell Atlantic Corp.*,
777 N.Y.S. 2d 50 (1st Dept. 2004) .....33

*Spread Enter., Inc. v. First Data Merchant Servs. Corp.*,
2014 WL 724803 (E.D.N.Y. Feb. 22, 2014) .....13 n.19

*Stutman v. Chem. Bank*,
95 N.Y.2d 24 (2000) ........ 19 n.31

*The Scotts Co. LLC v. Pennington Seed, Inc.*,
Civ. Action No. 3:12-cv-0168 (Feb. 26, 2014 E.D. Va.) ........ passim

*United Egg Producers v. Bauer Int'l Corp.*,
312 F. Supp. 319 (S.D.N.Y. 1970) ........ 30

*Vaccariello v. XM Satellite Radio, Inc.*,
295 F.R.D. 62 (S.D.N.Y. 2013) ........ 19

*Wal-Mart Stores, Inc., v. Dukes*,
131 S. Ct. 2541 (2011) ........ passim

*Webb v. Carter's Inc.*,
272 F.R.D. 489 (C.D. Cal. 2011) ........ 26 n.38

*Weiner v. Snapple Beverage Corp.*,
2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ........ 19, 20, 30

**OTHER AUTHORITIES**

7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC.§ 1779 (3d ed. 2013) ........ 25, 29 n.43

Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can Be a Fair and Efficient Alternative to a Class Action*, 31 REV. LITIG. 617 (2012) ........ 26

Fed. R. Civ. P. 23 ........ passim

Fed. R. Civ. P. 23(a) ........ 12

Fed. R. Civ. P. 23(b) ........ 12

Fed. R. Civ. P. 23(b)(2) ........ 34

Fed. R. Civ. P. 23(b)(3) ........ passim

JAMES B. BEARD, TURFGRASS: SCIENCE AND CULTURE 520-21 (Prentice-Hall, Inc. 1973) .. passim

New York General Business Law §§ 349, 350 ........ 19 n.31, 21

Plaintiffs are a handful of individuals alleging that they failed to grow grass using Scotts EZ Seed – a product combining grass seed, fertilizer, and an innovative mulch that is one of Scotts' most successful products ever. One Plaintiff planted EZ Seed in Rockland County shortly before Hurricane Irene, one of the most devastating and destructive wind and water storms to hit the Northeastern United States in 75 years. Another planted in San Francisco in January 2012, a month in which National Weather Service records show the daily average temperature ranged from 34°F to 65°F. Two others planted near Rochester and Syracuse in early April and May, respectively, when temperatures dipped into the 20s and 30s. Plaintiffs now complain that Scotts EZ Seed is defective for the millions of other people who used the product, including, incredibly, those who successfully grew grass and were fully satisfied.

It is beyond question that the process of seeding and growing grass is subject to endless human and natural variables. As a result, it is neither remarkable nor surprising that EZ Seed does not result in grass growth every single time – Scotts does not promise that EZ Seed is foolproof or that it can defy the laws of nature. Indeed, Scotts' own canisters say that results may vary, and Scotts provides a money-back No Quibble Guarantee to dissatisfied consumers.

The evidence shows that EZ Seed grows grass and that [redacted]. The evidence also undercuts Plaintiffs' theories of liability – that EZ Seed does not work as advertised due to (i) legally actionable flaws in its original directions or (ii) a product defect. Plaintiffs misrepresent the studies they cite in support, studies that actually demonstrate that EZ Seed works as advertised. For instance, the author of one study Plaintiffs cite concluded [redacted].

From the beginning of this case, the Court intuitively (and properly) recognized that

adjudicating the claims here would require highly individualized inquiries arising from the countless array of human and natural variables that may affect whether grass grows. The predominant inquiry for each absent class member is: *under what conditions did he or she plant EZ Seed, and did it grow?* Common issues do not predominate and a class action is not manageable because these issues must be addressed individually for each putative class member. Plaintiffs' motion should be denied.

## A. FACTUAL BACKGROUND

### I. EZ Seed Was Developed in Multiple Varieties to Serve a Specific Purpose.

Scotts EZ Seed is an all-in-one seeding product that combines premium grass seed and fertilizer with a mulch composed of coconut pith fiber, known as coir. (Faust Decl. ¶ 6.) Each distinct EZ Seed variety – or "flavor" – utilizes a particular type or types of seed. (Sass Decl. ¶ 5.) EZ Seed Sun & Shade grows in a wide variety of climates and is sold in New York and California among other places. (*Id.* ¶ 6.) EZ Seed Tall Fescue is a cool-climate seed that grows well in mid-latitudes. (*Id.* ¶ 7.) EZ Seed Dog Spot Repair includes an additional neutralizing ingredient to minimize the effects of salts from dog urine on the seed. (*Id.* ¶ 2.) All six EZ Seed varieties are available for purchase in California. (*Id.* ¶ 10.) EZ Seed Sun & Shade, Tall Fescue, Dog Spot Repair for Sun & Shade, and Dog Spot Repair for Tall Fescue Lawns are available for purchase in New York. (*Id.* ¶ 11.) EZ Seed Bermudagrass is not sold in New York. (*Id.* ¶ 8.)

Combination-product mulches, like EZ Seed's coir mulch, serve different purposes than traditional turfgrass mulches used with ordinary seed. (Faust Decl. ¶¶ 7-10.) When ordinary seed, fertilizer, and mulch are purchased separately, the seed is raked into the soil. It is then watered and covered with a traditional mulch to reduce evaporation and protect the seed from wind, runoff, animals and other hazards. (*Id.* ¶ 9.) The seeds are under the mulch and in direct contact with the soil. (*Id.*) With EZ Seed, the mixture of fertilizer, mulch, and seed is sprinkled

directly on top of the soil, not raked in. (*Id.* ¶ 10.) EZ Seed's coir mulch is designed to serve as a seedling nursery, caring for seeds until they root properly into the soil. (*Id.* ¶ 11.) Because the seed may not touch the soil (and therefore cannot draw water from it), a combination product's mulch must do more than a traditional turfgrass mulch: it must absorb water and allow the seeds to draw that water. (*Id.* ¶ 10.) EZ Seed's coir mulch does this by being highly absorbent, while also allowing seeds to draw the absorbed water from the coir. (*Id.* ¶¶ 10-11.) Still, any number of variables can impair germination and grass growth, including hurricanes, tornadoes, extreme temperatures, erosion, airflow, animals, toxins, compacted soil, extreme pH levels, soil salinity, water quality, foot traffic, malfunctioning irrigation systems, lawn mowers, inadequate site preparation, and dog or other animal waste. (*Id.* ¶ 12; JAMES B. BEARD, TURFGRASS: SCIENCE AND CULTURE 520-21 (Prentice-Hall, Inc. 1973) (identifying four environmental and eight other factors that influence germination) (attached as Ex. 1)[1].)

### A. EZ Seed's 2009 Launch; Scotts' Responsiveness to Consumers.

When Scotts launched EZ Seed in 2009, its directions for use suggested as a guide that consumers apply a "thin (⅛") layer" of product to the area to be treated. (Ex. 3, Scotts' Resp. to Interrog. 5; Sass Decl. ¶ 12; Faust Decl. ¶ 13.) Scotts anticipated this would result in consumers applying EZ Seed at a thinness approximating the rate at which the product had been tested and shown to grow effectively – 1.875 pounds of product per 20 sq. ft. – while being more easily understandable than explicit pounds-per-square-feet language. (Faust Decl. ¶¶ 13-14.[2])

[1] Exhibits are attached to the Declaration of Shawn Patrick Regan, filed with this memorandum.

[2] Plaintiffs noticed Michael Faust for deposition, and Scotts identified Mr. Faust as a 30(b)(6) designee, but Plaintiffs decided not to take his deposition. (Faust Decl. ¶ 4.)

[redacted].[3] (Sass Decl. ¶ 13; *see also, e.g.*, Exs. 5-6.) [redacted] (Ex. 7 at 1.)

To address this finding, Scotts introduced different directions in 2011.[4] In addition to a revised written description, Scotts provided a more detailed picture of how EZ Seed should appear when applied at the recommended planting rate. (Sass Decl. ¶ 14.) The new picture shows an application rate that equals the same 1.875 pounds of EZ Seed per 20 sq. ft. (Faust Decl. ¶ 16.) [redacted]. (Ex. 3, Scotts Resp. to Interrog. 6.)[5]

---

[3] Plaintiffs improperly cite this good business practice as evidence that the product and/or its instructions were legally actionable. [redacted]

[4] The change did not affect product already purchased or not yet sold-through, meaning that for much of 2011, 2012, and possibly 2013, both sets of instructions remained available to consumers.

[5] Even if overapplied, EZ Seed grows with proper care. (*See* Faust Decl. ¶ 14; Ex. 37 at App'xs 2, 4, 6, 8, 10, 12, 14, 16 [redacted]

### B. Scotts Offers Full Reimbursement Under Its No Quibble Guarantee Refund Program, and Goodwill Refunds [redacted].

Every jug or bag of EZ Seed includes the terms of its No Quibble Guarantee[6]:

*If for any reason you, the consumer, are not satisfied after using this product, you are entitled to get your money back. Simply send us original evidence of purchase and we will mail you a refund check promptly.*

(Ex. 12; Taubler Decl. ¶¶ 5-7.)

Although the No Quibble Guarantee requires that a consumer provide original evidence of purchase (Taubler Decl. ¶¶ 9-10), [redacted] (*Id.* ¶ 12;[7] Ex. 8 at 1.) Because Scotts does not place a time limit on refunds, consumers who purchased EZ Seed in 2009 may still seek a refund under the No Quibble Guarantee. (Taubler Decl. ¶ 11.)

## II. Plaintiffs' Experiences with EZ Seed were Individualized and Varied.

The seven Named Plaintiffs each allege that they purchased and attempted to use EZ Seed. Only two, Plaintiffs Thomas and Arcuri, preserved the container or other evidence of purchase. (Thomas Tr., Ex. 21, at 131:2-6; Ex. 9.) Several used EZ Seed in extreme weather conditions. For example, Thomas seeded her lawn shortly before Hurricane Irene struck Rockland County, where she resides. (Thomas Tr., Ex. 21, at 111:2-4, 23:4-20; Ex. 24.[8])

---

[6] The No Quibble Guarantee's terms appear on the outside of every 10-pound and 20-pound bag and, due to size constraints, on the inside of an adhesive flap on the 3.75-pound jug. Scotts requires original evidence of purchase to ensure that the same receipt or barcoding cannot be used to obtain multiple refunds. (Taubler Decl. ¶¶ 5, 9.)

[7] [redacted]

[8] The Court may judicially notice weather conditions, including the date Hurricane Irene made landfall in Rockland County and weather conditions at the time. *See Melnick v. Press*, 809 F. Supp. 2d 43, 49 n.4 (E.D.N.Y. 2011); *see also Great Am. Ins. Co. v. Summit Exterior Works, LLC*, 2012 U.S. Dist. LEXIS 24780, at *1-4, 10 (D. Conn. Feb. 27, 2012) (court may judicially notice "'specific facts' found in governmental weather reports").

NOAA records indicate that during the hurricane wind speeds reached 56 mph and 8 inches of rain fell across Rockland County. (Ex. 24 at 4-5.) Plaintiff Arcuri planted EZ Seed on April 1, 2012 in Clay, New York (near Syracuse), a day when the average temperature was 40°F.[9] (Arcuri Tr., Ex. 15, at 73:3-14; Ex. 25 at 7.) The next seven days had low temperatures in the 20s and 30s. (Ex. 25 at 7.) Plaintiff Lonardo planted in May 2011 in Rochester, New York, where the temperature dipped into the 30s and 40s. (Lonardo Tr., Ex. 18, at 74:22-24, 103:10-12; Ex. 26.) Plaintiff Browne planted his EZ Seed in January 2012 in San Francisco, where the temperature fell below 50°F every day of the month except one. (Browne Tr., Ex. 16, at 81:2-11, 97:2-100:6; Ex. 27.)

Each Plaintiff testified to following strictly the direction to apply a ⅛" layer. (Arcuri Tr., Ex. 15, at 61:22-62:20; Browne Tr., Ex. 16, at 82:23-83:8; Eskinazi Tr., Ex. 17, at 138:5-139:19; Lonardo Tr., Ex. 18, at 118:7-119:19; Moore Tr., Ex. 19, at 135:22-136:3; Smith Tr., Ex. 20, at 110:6-7; Thomas Tr., Ex. 21, at 117:4-6.) Some Plaintiffs used irrigation systems to water the seed along with the rest of their lawn; some did not. (Browne Tr., Ex. 16, at 42:11-43:4; Eskinazi Tr., Ex. 17, at 63:3-16; Moore Tr., Ex. 19, at 39:2-41:8, 51:9-13.) Some attempted to grow grass in places where they had *never* been able to grow grass. (*E.g.*, Browne Tr., Ex. 16, at 59:4-22; Lonardo Tr., Ex. 18, at 187:3-189:5, 191:8-16.) Some subsequently grew grass in those areas (Arcuri Tr., Ex. 15, at 31:7-14, Eskinazi Tr., Ex. 17, at 52:25-58:10, 65:22-66:5); others never did. (Moore Tr., Ex. 19, at 44:11-22, 51:14-22, 60:13-61:8; Lonardo Tr., Ex. 18, at 55:22-56:7, 187:3-23; Smith Tr., Ex. 20, at 57:13-60:6, 105:22-106:8; 144:7-145:11 (tore up lawn and installed sod); Browne Tr., Ex. 16, at 62:11-64:8, 66:23-68:1, 171:8-172:6). Some Plaintiffs had lawn services apply insecticide, herbicide, and/or crabgrass preventer throughout the yard where

[9] (Ex. 1, BEARD, TURFGRASS: SCIENCE AND CULTURE 520 (cool-season grasses germinate in 60°F to 85°F range).)

they planted EZ Seed. (*E.g.*, Arcuri Tr., Ex. 15, at 18:25-19:22, 20:24-21:2; Eskinazi Tr., Ex. 17, at 41:22-43:9, 48:25-49:20.) Some protected their planting area from animals and foot traffic; others did not. (Arcuri Tr., Ex. 15, at 38:3-7, Moore Tr., Ex. 19, at 168:20-23, Smith Tr., Ex. 20, at 50:16-18.) One Plaintiff saved his receipt; none of the others did. (*Compare* Arcuri Tr., Ex. 15, at 121:9-22; Ex. 9; *with* Browne Tr., Ex. 16, at 71:11-16; Eskinazi Tr., Ex. 17, at 180:5-18; Lonardo Tr., Ex. 18, at 64:21-24; Moore Tr., Ex. 19, at 123:16-20; Smith Tr., Ex. 20, at 121:4-5; Thomas Tr., Ex. 21, at 101:14-22.) At least one Plaintiff purchased EZ Seed twice. (Thomas Tr., Ex. 21, at 71:19-73:5.)

Only one Plaintiff, Eskinazi, contacted Scotts.[10] She testified that she was not aware Scotts offered a refund when she called. (Eskinazi Tr., Ex. 17, at 140:12-17.) Scotts issued Ms. Eskinazi a [redacted] refund, equal to the purchase price of three jugs of EZ Seed, [redacted] (*Id.* at 140:18-141:4, 164:2-9.) Eskinazi accepted and deposited the refund into her checking account. (*Id.* at 95:7-25; Ex. 10; Ex. 28, Eskinazi Resp. to Request for Admis. 1.)

## III. The Alleged "Defects" At Issue In This Case.

Plaintiffs' motion seems to posit two theories of defect: (i) EZ Seed does not grow grass that is "50% thicker with half the water" and (ii) Scotts' directions for use are actionable.[11] Plaintiffs' Complaint sought a nationwide class of EZ Seed consumers (Compl. ¶ 102, ECF No. 14), but Plaintiffs now move for certification of a class of all persons who purchased EZ Seed in

---

[10] (Eskinazi Tr., Ex. 17, at 140:12-141:4.) Indeed, Plaintiff Browne testified that as "a consumer, I know most companies will stand behind their product," but "*I have other things to do in life*." (Browne Tr., Ex. 16, at 108:14-109:5, 113:3-114:25 (emphasis added).) Plaintiff Browne explained that he "wasn't going to spend [his] time to take [EZ Seed] back to Lowe's or get ahold of Scotts on whatever website Scotts has and fill out a receipt and put it in an envelope and mail it off for a $15 product." (*Id.*)

[11] Specifically, Plaintiffs assert that Scotts' "50% Thicker …" statement "is false" because "when used precisely according to the instructions on the packaging, EZ Seed will not grow a blade of grass when watered at half the recommended rate." (Br. at 1.)

New York and California. (Br. at 3.) Plaintiffs have abandoned claims under the Magnuson-Moss Warranty Act and no longer challenge the No Quibble Guarantee.

### A. Scotts' "50% Thicker Claim."

As to the first theory, it is crucial to begin with the actual language of the claim. Scotts states that EZ Seed grows "50% Thicker with Half the Water* … *[v]ersus ordinary seed when each was watered at half the recommended rate. Results may vary."[12] [hereinafter, the "50% Thicker claim"]. Thus, Scotts represents that when *both* EZ Seed and ordinary seed are watered sub-optimally (*i.e.*, at half the recommended rate for ordinary seed), EZ Seed will grow grass that is 50% thicker than the grass grown by the ordinary seed.[13] Nothing on the EZ Seed package instructs consumers to water EZ Seed less often than ordinary seed.[14]

Prior to introducing EZ Seed, Scotts performed no fewer than 10 trials, comprising dozens of replications, both in the field and in greenhouses, designed to test the 50% Thicker claim under a frequency-based definition of full and half watering rates. (*See* Exs. 44-53 [redacted] In each of these trials, at half-water rates, EZ Seed grew 50% Thicker than ordinary seed. (Ex. 44 at 1; Ex. 45 at 1; Ex. 46 at 1; Ex. 47 at 1; Ex. 48 at 1; Ex. 49 at 1; Ex. 50 at 1; Ex. 51 at 1; Ex. 52 at 1; Ex. 53 at 1.)

---

[12] A similar statement appears on the inside flap of the 3.75-pound jug and on the outside of the 10-pound and 20-pound bags of EZ Seed. Both versions contain the qualifying language that the claim is in comparison to ordinary seed also watered at half-water rates, and "results may vary."

[13] Plaintiffs offer two interpretations of this claim that deviate from its language. First, they assert that EZ Seed will grow 50% Thicker when watered at half the rate at which ordinary seed is watered. (*See* Br. at 3-5.) Second, Plaintiffs contend that the 50% Thicker claim suggests that EZ Seed needs less water to grow. (*See id.*) Plaintiffs have not provided a survey or other evidence that consumers interpret the 50% Thicker claim in either manner, both of which are inconsistent with the actual wording.

[14] Plaintiffs cite a single document, clearly labeled "draft," that references EZ Seed needing less water. (*See* Br. at 4 (discussing Pl. Ex. K).) [redacted]

### 1. Kenneth Hignight's Testing.

Plaintiffs primarily rely on a "Half Water Study" conducted by Mr. Kenneth Hignight of "NexGen," which is a wholly owned subsidiary of Scotts' largest competitor, Pennington Seed, and is Pennington's R&D department. (Pl. Ex. X.) Pennington claims that its combination mulch product grows grass "**80%** thicker with half the water than ordinary seed." (Ex. 30.) Hignight's studies were used by Pennington to assert counterclaims in *The Scotts Co. v. Pennington Seed, Inc.*, Civ. Action No. 3:12-cv-0168 (E.D. Va.) [hereinafter *Scotts*], and those counterclaims largely serve as the model for this case. Although the particular study at issue in this litigation was not addressed in *Scotts*, the court there found that many of Hignight's studies had "fundamental flaws," and Hignight "did not use published, scientifically accepted methodologies." (Ex. 29, *The Scotts Co. v. Pennington Seed, Inc.*, Civ. Action No. 3:12-cv-0168, at 15 (E.D. Va. Feb. 26, 2014).)

Hignight's Half-Water Study vastly over-applied EZ Seed, at rates 3.7 to 6.25 times above the weight-per-area of 1.875 pounds per 20 sq. ft.,[15] and did not water any ordinary seed at the half-water rate; thus, he did not test the actual claim made by Scotts. (Pl. Ex. X, at Tables 3, 6; Ex. 54, *Scotts* Trial Ex. 275 at 2; Ex. 55, *Scotts* Trial Ex. 327 (detailing application rate Hignight used to represent ⅛" in each competitive trial of EZ Seed and Pennington's 1 Step Complete, and showing "sowing rates" many times the 1.875 pounds per 20 sq. ft. rate intended for EZ Seed).) Despite over application, EZ Seed grew grass in the vast majority of plots in Hignight's studies.[16] (Ex. 38, at App'xs 1- 4; Ex. 37 at App'xs 2, 4, 6, 8, 10, 12, 14, 16.) In fact,

---

[15] Plaintiffs take Mr. Danon's comments on ⅛" of EZ Seed out of context. (Br. at 2.) One of the issues in the *Scotts v. Pennington* litigation was what constitutes ⅛" of EZ Seed. Mr. Danon was discussing a massive overapplication by Pennington's scientist, Mr. Hignight, that was purported to be ⅛" of EZ Seed. (*See id.*; Pl. Ex. B.)

[16] Plaintiffs' Complaint contended EZ Seed "does not grow grass at all." (Compl. ¶ 1.) It appears from their motion for class certification that they have wisely abandoned this theory but, to the extent that is

in one of Mr. Hignight's tests EZ Seed grew grass in all of 125 replications despite being applied at 3.7 times (or more) the intended rate. (Exs. 37, 55.)

**2. Jason Kruse's Testing.**

The only other testing Plaintiffs cite is a study commissioned by Scotts and conducted at the University of Florida on EZ Seed Bermudagrass. (Br. at 7-8.) Dr. Kruse watered outdoor plots twice a day, once a day, every other day, and every third day. (Pl. Ex. W.) In Dr. Kruse's testing, twice-daily watering represented the recommended rate (in Florida for Bermudagrass) and once-daily was the half rate. (*See* Faust Decl. ¶ 21; Ex. 1, BEARD, TURFGRASS: SCIENCE AND CULTURE 523.) The EZ Seed that was watered once a day – half the recommended rate – supported the 50% Thicker claim. (Pl. Ex. W. at 1-2.) Only the less-frequently watered plots (once every other day and once every third day) failed to germinate, as did the ordinary seed when watered at the same rates. (*Id.*) Dr. Kruse therefore told Scotts, "[y]ou should have no problem supporting the [50% Thicker] claim …." (*Id.*)

**3. Scotts' Additional Testing.**

Following the claims made by Pennington and in this suit with respect to the 50% Thicker claim, Scotts initiated new research with respect to that claim.[17] (Exs. 31-33.) [redacted] (*See* Exs. 44-53.) Consistent with the approach taken by Hignight for Pennington, upon which Plaintiffs attempt to piggyback here, in this latest research Scotts used [redacted] (*See* Exs. 31-33.) In those trials, control plots of ordinary seed were watered to keep the

---

not so, it is important to note that numerous studies by Mr. Hignight, including one relied upon by Plaintiffs, as well as the Dr. Kruse study relied upon by Plaintiffs, show that EZ Seed grew grass in nearly every case. (*E.g.*, Ex. 38, at App'xs 1- 4; Ex. 37 at App'xs 2, 4, 6, 8, 10, 12, 14, 16.)

[17] Scotts also voluntarily discontinued using the 50% Thicker claim in revised packaging and advertisements at that time. (Sass Decl. ¶ 18.)

soil moist. The volume of water used to keep the soil moist was recorded, and then half that volume of water was applied to test plots for EZ Seed and ordinary seed. In every trial, EZ Seed grew *more than* 50% Thicker than ordinary seed watered at the same reduced rate. (Ex. 31 at 2, 8; Ex. 32 at 2, 7; Ex. 33 at 2, 7.) Below are two representative photographs of the comparison testing after 32 days:

EZ Seed Ordinary seed



Plaintiffs have not presented to the Court any study they commissioned.

**B. EZ Seed's Directions For Use.**

Plaintiffs also contend Scotts' original Directions for Use – suggesting consumers apply a "thin (⅛") layer" of product to the area to be treated – were defective. (Br. at 6-7.) Relying solely on Pennington's materials, Plaintiffs allege that when EZ Seed is applied as directed, the coir robs the seed of water and grass will not grow. (*Id.* at 6.) The court in *Scotts v. Pennington*, however, rejected this exact contention, finding that EZ Seed's mulch freely provides water to the seed. (Ex. 29, *Scotts*, No. 3:12-cv-00168, at 12-13.) Also, relying on a four-person test, Plaintiffs contend that the original Directions for Use led to over application.[18] (*Id.* at 6-7.)

---

[18] Plaintiffs, without any citation, claim EZ Seed's updated directions for use, with an image of EZ Seed scattered on soil, prove EZ Seed is incapable of acting as mulch because "leav[ing] bare ground defeats the fundamental purpose of using mulch in the first place." (Br. at 9.) Plaintiffs are wrong. First, the photo shows how the product is to be applied and appear *before it is watered.* EZ Seed granules expand when watered, closing gaps as the product swells. (Faust Decl. ¶ 11; Ex. 57.) Second, traditional

## B. ARGUMENT

### I. Standard for Class Certification.

A class action is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). Plaintiffs bear the burden of proving by a preponderance of the evidence that each requirement of Rule 23(a) and one of the subdivisions of Rule 23(b) has been satisfied. *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 40-42 (2d Cir. 2006) ["*In re IPO*"]; *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Given the exceptional nature of the class mechanism, a court must conduct a "rigorous analysis" and may not certify a class "without making a ruling that each Rule 23 requirement is met ... resolv[ing] factual disputes relevant to each Rule 23 requirement ...." *In re IPO*, 471 F.3d at 27, 41. The court must receive enough evidence "by affidavits, documents, or testimony[] to be satisfied that each Rule 23 requirement has been met." *Id.* at 41.

Contrary to Plaintiffs' suggestion, which is based on outdated case law, this is a difficult standard to meet. Plaintiffs must produce evidence demonstrating that "a classwide proceeding [can] generate common answers *apt to drive the resolution of the litigation*." *Dukes*, 131 S. Ct. at 2551 (emphasis altered). Because "any competently crafted class complaint literally raises common 'questions,'" a classwide proceeding must be able to adjudicate "the truth or falsity" of an issue "*central to the validity of each one of the claims in one stroke*." *Id.* (emphasis added).

---

turfgrass mulches are generally not expected or intended to cover completely the soil surface, which would impede the seedlings' ability to grow and gather sunlight. (Faust Decl. ¶¶ 8-9.) Plaintiffs also claim that "by applying [EZ Seed] so sparsely that 'bare ground is still visible,' there is no way that the tiny amount of grass seed could grow '50% Thicker with half the water.'" (Br. at 10.) Plaintiffs' assertion demonstrates a fundamental misunderstanding of grass-seed products. The "tiny amount of grass seed" applied at the depicted rate is more than sufficient to seed a new lawn. (Faust Decl. ¶ 16.) [redacted]

To certify a legal-damages class, a district court must consider "*all* factual or legal issues" to determine whether those that are "subject to generalized proof are more 'substantial' than those subject to individual inquiry[.]" *Myers v. Hertz Corp.*, 624 F.3d 537, 550 (2d Cir. 2010) (emphasis in original); *see also In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309-10 (S.D.N.Y. 2004). These standards apply regardless of whether they overlap with merits issues. *Dukes*, 131 S. Ct. at 2552 n.6; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("[O]ur cases requir[e] a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim.").

## II. Plaintiffs Fail to Meet the Commonality and Predominance Requirements Because Their Claims Turn on Highly Individualized Proof.

Plaintiffs' liability theory appears to have three elements: (1) EZ Seed does not grow (2) when the original directions for use are followed and (3) EZ Seed is watered at half-water rates. (*E.g.*, Br. at 3.) Each element is replete with highly individualized questions – did the consumer follow EZ Seed's directions for use, did the consumer water at half-water rates, and did the consumer grow grass.[19] Even after those initial questions are addressed, further individualized questions remain as to why a particular consumer failed to grow grass in light of the innumerable human, weather, or other natural impediments to germination.

As demonstrated below, Plaintiffs cannot meet the Rule 23 predominance or commonality tests for numerous reasons. First, there is no common evidence to support any of Plaintiffs' defect theories. Second, the question why anyone failed to grow grass is highly

[19] Plaintiffs cannot cure this problem by limiting their proposed classes to consumers who followed EZ Seed's instructions, those who watered at half-water rates, or those who grew no grass (or some combination thereof). Class definitions must be based on objective criteria and cannot require individualized evidentiary inquiries to determine membership. *See In re IPO*, 471 F.3d at 44-45 (denying certification where class definition required individualized determinations of whether investors paid "any undisclosed compensation to the allocating underwriters"); *Spread Enter., Inc. v. First Data Merchant Servs. Corp.*, 2014 WL 724803, at *14-15 (E.D.N.Y. Feb. 22, 2014) (holding class defined as those who were "charged excessive fees" was impermissible fail-safe class).

individualized. Third, Plaintiffs cannot prove a common injury that can be proven by classwide evidence. Fourth, damages are not measureable on a classwide basis.

### A. Plaintiffs' Assertion that the Coir Mulch Prevents EZ Seed from Growing "At All" Is Belied by Plaintiffs' Own Evidence.

Insofar as Plaintiffs' theory is that EZ Seed's coir mulch competes with the grass seed for water, wicking it away from the seed and soil and preventing grass from growing (Br. at 1), their claims are not viable as a class action.

As an initial matter, this theory is not supported by science. Numerous studies demonstrate that coir holds water loosely so that the water is easily imbibed by grass seed. (Ex. 29, *Scotts*, No. 3:12-cv-00168, at 12-13 (relying on, *inter alia*, Dr. Hummel's testing and finding coir freely gives water to seed); Ex. 56, *Scotts* Trial Ex. 333 (Dr. Hummel's data showing water in coir is available for use by plants).) It is presumably for this reason that Plaintiffs have apparently abandoned one of their original theories: that EZ Seed "does not work at all" under any circumstance.

Indeed, another federal judge, after a full trial, expressly rejected the ***same argument*** that EZ Seed wicks water away from the seed. (Ex. 29, *Scotts*, No. 3:12-cv-00168, at 12.) Instead, he found that EZ Seed's coir makes an excellent mulch, providing grass seed with available water for a long period of time. (*Id.*) The court there made findings of fact, that as water comes into contact with the individual coconut pith fibers, capillary action pulls the water into the small gaps between the compressed fibers, which flexibly expand under the growing pressure and water volume. (*Id.* at 12-14.) The expanded fibers – with larger gaps – hold water loosely, making it "plant available." (*Id.*) "Plant available" water is the amount of water that can be used by the seed or plant, which can be estimated by measuring the energy required to pull the water from saturated pores. (*Id.*) Mulches "that freely give moisture back to the soil and seed are

beneficial." (*Id.* at 13.) In sum, the court in *Scotts* rejected the identical allegation that Plaintiffs make here, finding "[t]he mulch in EZ Seed is a rare combination of a material that can hold a large amount of water ***and also holds that water loosely so that it can be easily used by seeds***." (*Id.* (emphasis added).)

Without viable common classwide proof that EZ Seed does not grow grass at all – something Plaintiffs pled in their complaint, but seem to have abandoned in the face of the overwhelming contrary evidence – class certification on this theory is not appropriate. *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 148-49 (E.D.N.Y. 2012) (denying class certification where court's "rigorous analysis" of evidence showed plaintiffs "presented no evidence that would counter [testing that indicated almost all products worked] and have only provided the Court with unsupported and misleading statements"); *Aguilar v. Immigr. & Customs Enforcement Div.*, 2012 U.S. Dist. LEXIS 53367, at *28-29 (S.D.N.Y. Apr. 16, 2012) (no commonality or certification where plaintiffs relied on speculation to support claim and not evidence).[20]

### B. Plaintiffs' Claim that EZ Seed Does Not Grow 50% Thicker than Ordinary Seed When Both Are Watered at Half-Water Rates Cannot Be Proven by Classwide Evidence.

Nor is class certification proper on a theory that EZ Seed "does not grow '50% thicker with half the water.'" (Br. at 3.) This theory is fatally defective because it relies on a misconstruction of the 50% Thicker claim. The 50% Thicker claim does not say EZ Seed needs less water to grow. Rather, it says that EZ Seed grows grass "50% thicker with half the water* … *[v]ersus ordinary seed when each were watered at half the recommended rate. Results may vary," and "50% thicker with half the water* …*Results 32 days after planting; each watered at

[20] The very evidence Plaintiffs cite supports the conclusion that EZ Seed grows grass. Mr. Hignight consistently grew EZ Seed, even at application rates more than six times that instructed on the package. (Ex. 38, at App'xs 1- 4; Ex. 37 at App'xs 2, 4, 6, 8, 10, 12, 14, 16; Ex. 55, *Scotts* Trial Ex. 327 (showing Hignight using "sowing rates" more than six times instructed rate in some trials).)

half the recommended rate for ordinary seed. Results may vary."[21] (Exs. 11-12.) The claim is that EZ Seed grows thicker than ordinary seed when each is watered at half the rate recommended for ordinary seed.[22] In sum, words matter and Plaintiffs' theory for class certification hinges on ignoring them.

Turning this into a case in which Plaintiffs allege that consumers miscomprehend the claim to mean EZ Seed "needs less water to grow" would extend the claim's terms unrecognizably beyond their plain language. (Br. at 13.) That is not what Plaintiffs plead, and is not supported by any evidence, and, even if pleaded, is not viable absent consumer survey evidence supporting such a theory, which Plaintiffs do not have. (Ex. 29, *Scotts*, No. 3:12-cv-00168, at 15 (rejecting interpretation of claim beyond literal language because defendant provided no supporting consumer survey evidence).)

### C. Plaintiffs Have No Evidence EZ Seed's Directions For Use Cause Any Failure to Germinate.

The last part of Plaintiffs' theory seems to be that EZ Seed's former Directions for Use (the ⅛" direction), in conjunction with the coir mulch, cause EZ Seed not to germinate. (Br. at

[21] Plaintiffs claim that Dr. Nelson felt the 50% Thicker claim on the packaging was misleading. (Br. at 4-5.) This is incorrect. [redacted] The language used on the packaging contains the qualifying language that the thickness is in comparison to ordinary seed also watered at half-water rates, and that "results may vary."

[22] The so-called admissions Plaintiffs rely on to support their claim that EZ Seed needs more water to grow, (Br. at 4), do not support their position, and thus cannot constitute generalized proof. [redacted] EZ Seed advises users to provide a "thorough" initial watering. (Ex. 12.) This is not surprising, given an absorbent material is being added to the soil, but after the initial watering, the mulch effect will reduce the need for further waterings as compared to the non-mulched ordinary seed.

6-7.) But Plaintiffs provide no evidentiary link to support this assertion.[23] They submit no science demonstrating that over application alone will prevent germination; nor do they have an expert who draws this correlation. Indeed, even with an over application, EZ Seed germinates with proper care.[24] (Faust Decl. ¶ 14; Pl. Ex. X; *see also* § A.III.A.1., *supra*.)

Furthermore, assuming *arguendo* that EZ Seed's former Directions for Use were flawed, individual issues as to which Directions for Use were on a particular consumer's packaging would predominate. Scotts changed EZ Seed's Directions for Use beginning in 2011.[25] (Ex. 3, Scotts' Resp. to Interrog. 6.) There is no way to identify a purchase date after which only the original EZ Seed's Directions for Use were available for purchase; [redacted] (*Id.*) Indeed, due to the sell-through period of the old Directions for Use, absent individuals providing a bar code or an actual container, it is impossible to determine which directions were on any plaintiff's/claimant's package. Each consumer would need to be questioned about the directions he or she saw.[26] And even if Plaintiffs could

[23] Michael Faust, one of the scientists who developed EZ Seed, described the application rate as "intentionally vague." (Faust Decl. ¶ 14.) This reflected Scotts' desire not to overwhelm the consumer with information, such as instructing an application rate of 1.875 lbs per 20 feet squared. (*Id.*)

[24] Plaintiffs quote an email from [redacted]. (Br. at 5-6 (quoting Pl. Ex. P).) But this email illustrates the evidentiary gap. [redacted] (Pl. Ex. P.) This demonstrates a good-faith directive to address a potential problem; it is not evidence of a problem.

[25] Plaintiffs do not challenge EZ Seed's new Directions for Use other than alleging that they do not cure the alleged design defect. (Br. at 9.)

[26] To the extent Plaintiffs' claims rest on any allegations of flawed Directions for Use, this raises ascertainability and typicality issues as well. Even assuming the universe of EZ Seed purchasers could be ascertained (it cannot, *see* Part B.V *infra*), then ascertaining which consumers purchased the original versus the new Directions for Use would be impossible. Like Named Plaintiffs, many people discard their EZ Seed container after use. (*See, e.g.* Moore Tr., Ex. 19, at 106:16-107:3.) Because all Named Plaintiffs testified that they followed the old Directions for Use (*see supra* at 6), to the extent absent class members relied on the new Directions for Use and Plaintiffs claim the new Directions for Use are flawed as well (Br. at 9-10), no Named Plaintiff is typical of that class.

somehow overcome this problem, each individual would still need to prove that the product did not actually work since EZ Seed will grow even when over-applied. (Faust Decl. ¶ 14.)

### D. Individual Issues Predominate On the Question Why Any Individual Failed to Grow Grass.

Although Scotts endeavors to deliver to every consumer a satisfying experience with its products, with the varied nature of growing grass, not every consumer will be satisfied and some small percentage may have no success whatsoever. The fact that EZ Seed failed to work for some small percentage of individuals is therefore neither remarkable nor surprising.[27] Rather, this reflects the essence of grass seed and the growth of a living organism. It also reflects the innumerable variables that affect grass growth. (*See, e.g.*, Ex. 1, BEARD, TURFGRASS: SCIENCE AND CULTURE 520-21 (identifying environmental and other factors influencing germination).)

Recognizing the inherent variables affecting grass growth, Scotts offers all consumers a money-back guarantee, regardless of why their grass failed to germinate. (*See* Part B.IV *infra*.) Although EZ Seed can grow anywhere, Scotts cannot dictate that the product will "always" work "every time" no matter the conditions or care. Scotts has no control over individuals planting EZ Seed before a hurricane like Ms. Thomas,[28] in freezing or sub-optimal weather like Plaintiffs Arcuri, Lonardo, and Browne,[29] or after applying insecticides, pesticides, herbicides, or crabgrass preventer to their lawns like Plaintiffs Arcuri, Moore, Eskinazi, and Smith.[30]

---

[27] The Faust emails cited by Plaintiffs (Br. at 6 (quoting Pl. Exs. R, Q)) confirm the need for individual inquiries because they further demonstrate that how an individual applies and waters EZ Seed, including initial watering, is necessary to understand why the seed did not germinate in those relatively rare instances where it did not.

[28] (Thomas Tr., Ex. 21, at 23:4-20, 111:2-4; Ex. 24.)

[29] (Arcuri Tr., Ex. 15, at 73:6-74:18; Lonardo Tr., Ex. 18, at 74:22-24, 103:10-12; Browne Tr., Ex. 16, at 81:2-11, 97:2-100:6; Exs. 25-27.)

[30] (Arcuri Tr., Ex. 15, at 18:22-19:22, 20:24-21:2, 54:16-55:23; Moore Tr., Ex. 19, at 33:17-34:15; 37:14-20; Eskinazi Tr., Ex. 17, at 41:22-45:4, 48:25-49:20; Smith Tr., Ex. 20, at 60:20-61:4.)

In light of the evidence that EZ Seed grows grass, Plaintiffs cannot demonstrate there is any common answer as to why anyone's grass did not germinate, or that common questions predominate over the individual issues of why grass failed to grow in any particular instance. *Dukes*, 131 S. Ct. at 2551; *Am. Med. Sys.*, 75 F.3d at 1084-86. Whether or why any consumers' grass failed to germinate or grow to their satisfaction is a highly individualized issue that will require individualized testimony about the specific circumstances of that class member, including how they applied EZ Seed, where they applied EZ Seed, when they applied EZ Seed, and how they cared for their EZ Seed after application. (*See, e.g.*, Ex. 1, BEARD, TURFGRASS: SCIENCE AND CULTURE 520-21.) Thus, this case would inevitably devolve into individual trials of the innumerable issues relevant to putative members' individual application and growth area. *See, e.g.*, *Bruce v. Teleflora, LLC*, 2013 WL 6709939, at *6-7 (C.D. Cal. Dec. 18, 2013); *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 73 (S.D.N.Y. 2013); *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *4 (S.D.N.Y. Aug. 5, 2010). Accordingly, common issues do not predominate.

### E. Plaintiffs Cannot Demonstrate The 50% Thicker Claim Caused An Injury to All EZ Seed Purchasers.

Plaintiffs claim that they have been injured by a "substantial price premium" from the advertising claims that they allege are false or misleading. (Compl. ¶ 3.) Although Plaintiffs correctly note that some of the 12 causes of action brought in this case lack a reliance element or, alternatively, may allow for a reliance presumption when the advertisement is material (Br. at 18, 19), each cause of action does require a showing of causation and injury,[31] both of which Plaintiffs must demonstrate can be adjudicated on a classwide basis. Plaintiffs' "Price Premium"

---

[31] *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (GBL §§ 349, 350); *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *4, *20 n.32 (E.D.N.Y. July 18, 2013) (UCL, FAL, CLRA).

model, however, lacks any economic analysis that would demonstrate the 50% Thicker claim caused a price premium for EZ Seed purchasers. (Weir Decl. ¶¶ 16-20, ECF No. 80.) Plaintiffs simply assume, without evidentiary support, that the difference in EZ Seed's average price per unit of and some unidentified "alternate product" result from the 50% Thicker claim.[32]

The Second Circuit has rejected Plaintiffs' approach. In *McLaughlin v. American Tobacco Co.*, the court affirmed denial of class certification of claims alleging misrepresentation of health benefits associated with light cigarettes, which were alleged to have caused consumers to purchase the product at artificially high prices. 522 F.3d 215, 220 (2d Cir. 2008), *abrogated in part on other grounds*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The court held that the price premium could not be established on a classwide basis because factors other than the claims at issue "may have intervened and affected the demand and price of lights ... and ... determining the portion of plaintiffs' injury attributable to defendants' misrepresentation" would require individualized inquiry. *Id.* at 227. District courts regularly deny class certification for this reason. *See, e.g.*, *Weiner*, 2010 WL 3119452, at *6 (denying class where plaintiffs failed to show that Snapple purchasers "in fact paid more for Snapple beverages *as a result* of Snapple's 'All Natural' labeling") (emphasis in original); *Ackerman*, 2013 WL 7044866, at *20 (same, where plaintiff did not provide "suitable methodology" to demonstrate that "each class member paid a premium for vitaminwater"); *Algarin v. Maybelline, LLC*, 2014

[32] Plaintiffs' proposed damages expert, Colin B. Weir, testified that [redacted] (Weir Tr., Ex. 22, at 76:14-19.) Weir then acknowledged that those premiums [redacted]. (*Id.* at 76:20-77:2.); *see also* Defs. Mot. to Exclude Plaintiffs' Proffered Damages Expert Colin B. Weir at 13-15 (noting that "Weir performed no testing or consumer surveys to demonstrate any premium exists for the 50% Thicker claim").) Scotts has moved to exclude Weir because his model does not calculate any premium that resulted from the 50% Thicker claims, his model lacks sound methodology and it does not fit Plaintiffs' theory of liability, and because Plaintiffs have proposed no alternative models.

WL 1883772, at *13 (S.D. Cal. May 12, 2014) (court rejected as "pure speculation on the part of Plaintiffs" that "24 hour/no transfer" claim resulted in price premium that, under California law, injured all purchasers).

Members of the putative class may have purchased EZ Seed, and paid more for it than they would have for other seed, for various reasons.[33] Purchasers may value the Scotts brand name (*see, e.g.*, Plaintiff Thomas[34]). Purchasers might buy EZ Seed because a variety is suited for a region or use. Some purchasers previously may have used the product and liked it. Some purchasers may have bought EZ Seed because its packaging states in bold that it is a "Combination Mulch, Seed & Fertilizer." To certify a class of millions of people with unique stories, and then determine which few, if any, were actually injured by Scotts' packaging "would render the class action device nothing more than a façade for conducting a small number of highly individualized cases." *In re Canon Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) (denying class certification of claims for unjust enrichment, breach of implied warranty, and GBL § 349 arising from allegedly defective cameras).

### F. Damages Are Not Measureable on a Classwide Basis.

It is the court's "duty to take a 'close look' at" Plaintiffs' model for classwide injury and damages. *Comcast*, 133 S. Ct. 1432-33. Before *Comcast*, "the case law was far more accommodating to class certification" with respect to classwide proof of damages and injury. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253, 255 (D.C. Cir. 2013). It is now clear that Plaintiffs' damages model must comport with substantive law and the theory of

[33] The New York Court of Appeals has rejected as "legally flawed" the argument that consumers would not have purchased a product at all but for the defendant's alleged misrepresentation, on the ground that such a theory failed to show how the cost of a product "was affected by the alleged misrepresentation[.]" *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999).

[34] (Thomas Tr., Ex. 21, at 75:7-15.)

liability that is certified by the district court. *Comcast*, 133 S. Ct. 1432-33. "If the measure of out-of-pocket damages requires individualized proof, then classwide issues cannot be said to predominate." *Ackerman*, 2013 WL 7044866, at *20 n.32 (internal marks omitted).[35]

### 1. The "Full Compensatory Damages" and "Disgorgement of Money Damages" Models Require Individual Inquiries into the Value Received by Absent Class Members.

Plaintiffs' first and second damages theories seek a full refund or full "disgorgement." (Weir Decl. ¶¶ 8, 13.) Both models assume there is no need for an offset under California or New York law; Mr. Weir presumes liability to all purchasers.[36] (Weir Dep. Tr., Ex. 22, at 61:23-63:4, 104:18-105:5, 149:21-150:9.) That, however, is not the law. Restitution in New York and California is measured by the difference "between what the plaintiff paid and the value of what the plaintiff received." *In re POM Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014); *see also Akkerman v. Mecta Corp.*, 62 Cal. Rptr. 3d 39, 45 (Cal. Ct. App. 2007); *Ackerman*, 2013 WL 7044866, at *17 n.28. Where plaintiffs cannot reliably prove, on a class-wide basis, the amount of restitution or damages net of any applicable offset, courts routinely deny class certification. *See Akkerman*, 62 Cal. Rptr. 3d at 45 (rejecting UCL/FAL class that

---

[35] The requirement for individual proof is not obviated under any of Plaintiffs' three damages theories just because Plaintiffs seek statutory damages as part of their GBL claims. A GBL claim allows for a minimum statutory award if Plaintiffs' "damages are less than the statutory minimum." *Ackerman*, 2013 WL 7044866, at *20 n.32. "This would require a showing of how much each class member paid and the price of a comparable [product] that the class member would have purchased absent the alleged misrepresentation." *Id.*

[36] When asked how his models account for persons who received full refunds, Mr. Weir testified that they might be carved out of the class. (Weir Dep. Tr., Ex. 22, at 106:15-108:11.) But his actual models fail to account for fully (or partially) refunded consumers; the models assign full damages for *every* unit of EZ Seed sold in both New York and California. (Weir Decl. ¶¶ 8, 13, 16.) To avoid the individual inquiries necessary in carving out these and other putative members, Weir just ignores them. (*Id.* (assigning damages for *all* EZ Seed units).) Further, Mr. Weir states that his models do not account for how individual damages would be calculated. (Weir Dep. Tr., Ex. 22, at 117:24-118:15, 124:25-125:5.) This is improper, and is one of the reasons Scotts has sought to exclude Weir's testimony. But even assuming his models are valid, they fail to explain how actual damages incurred by the putative class could be calculated classwide.

would result in "windfall" to members who received benefits); *In re Google AdWords Litig.*, 2012 WL 28068, at *15 (N.D. Cal. Jan. 5, 2012) (rejecting UCL/FAL class because "restitution due must account for the benefits received"); *Ries v. Ariz. Beverages USA LLC*, 2013 WL 1287416, at *7 (N.D. Cal. Mar. 28, 2013) (decertifying class after plaintiffs failed to establish restitution accounting for value received); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668-69 (Cal. Ct. App. 1993) (rejecting CLRA class of purchasers because class members "would be required individually to prove liability and damages").

Plaintiffs' theory might be plausible if the evidence showed that EZ Seed did not work at all for anyone. But that would be a very different case. Here, more than 99% of units sold did not result in a complaint to Scotts, and testing by the very scientist whose work Plaintiffs rely upon shows hundreds of applications in which EZ Seed successfully grew grass. (Ex. 38, at App'xs 1-4; Ex. 37 at App'xs 2, 4, 6, 8, 10, 12, 14, 16.) And Scotts is certainly entitled to prove through individualized evidence that EZ Seed works for specific individuals. Plaintiffs' expert admitted that neither the Full Compensatory Damages nor the Disgorgement of Money Damages model accounted for the value that individual class members received. (Weir Dep. Tr., Ex. 22, at 110:6-13, 117:24-118:23, 125:6-12.) Determining the value of what benefit each consumer received – for instance if it grew as expected, only grew partially or did not grow at all – would require individual inquiry of each consumer. Consequently, neither model can "possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 133 S. Ct. at 1433.

### 2. Plaintiffs' Price Premium Model is Unrelated to Their Liability Theory.

"[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the theory of liability that is certified by the district court.

*Comcast*, 133 S. Ct. at 1433. Plaintiffs cannot rely on a price premium model because they set forth no evidence of what the retail price would have been "but for" the challenged advertising, and therefore Plaintiffs cannot identify what premium absent class members paid "*as a result*" of the 50% Thicker claim. *See, e.g.*, *Algarin*, 2014 WL 1883772, at *13 (rejecting price premium model where plaintiff speculated that allegedly misleading claim caused the alleged price premium). Plaintiffs offer a price premium model that purports to compare EZ Seed with a comparable product (Weir Decl. ¶ 16.) This approach is improper. Whatever difference in price exists between EZ Seed and an "alternate product" could be attributable to numerous factors, such as the Scotts brand name, lack of mulch/coir, or species of seed (as opposed to the 50% Thicker claim). Such a model therefore fails to "measure only those damages attributable to" the theory for liability at issue in the case, that is, the 50% Thicker claim. *Comcast*, 133 S. Ct. at 1434-5 (rejecting certification of antitrust class because members may have suffered damages based on different liability theories, not all of which were subject to classwide adjudication).

Mr. Weir contends he *could* perform a consumer survey that *may* disclose the amount of any price premium from the 50% Thicker claim.[37] (Weir Tr., Ex. 22, at 71:16-73:2, 86:2-89:17.) But he has not done so. (*Id.* at 82:6-19, 85:16-20, 99:2-14.) Thus, "Plaintiffs have still failed to propose a viable method **supported by evidentiary proof** of awarding relief that is consistent with Plaintiffs' theory of liability." *Algarin*, 2014 WL 1883772, at *14 (emphasis added).

## III. A Class Action Is Not Manageable.

Plaintiffs must propose a viable trial plan that would not result in the sort of "Trial by Formula" that the Supreme Court rejected in *Dukes*. *Dukes*, 131 S. Ct. at 2561. Plaintiffs must

[37] As discussed in Part B.II.E, *supra*, Plaintiffs have not demonstrated that any "premium" injured Plaintiffs. Mr. Weir's speculation, lacking evidentiary support, fails to meet Plaintiffs' burden. *Algarin*, 2014 WL 1883772, at *13-14.

explain in detail how they and the defendant will introduce evidence to prove or defend the claims of all absent class members in a way that will not overwhelm the Court and jury, and will not devolve into thousands or millions of "mini-trials." The primary study Plaintiffs rely on, Mr. Hignight's Half-Water Study, shows, at best for Plaintiffs, that EZ Seed does not grow when overapplied and watered at half the recommended rate or, at worst, that EZ Seed grows under some conditions and not others. Whether believed or not, Mr. Hignight's study necessarily demonstrates the predominant question that arises for each absent class member: *under what conditions was EZ Seed planted, and did it grow?* To answer that question, mini-trials will be necessary on the following issues, among others: weather (storms, flooding, freezing temperatures), pets (urine, traffic, digging), kids playing in EZ Seed, foot traffic, pests (grubs, birds, livestock, gophers, rabbits, deer), herbicides, insecticides, crabgrass preventer, fertilizer, lawn disease, soil salinity, proper application of the seed, proper watering of the seed, septic systems, sun, and shade. Only by hearing the testimony of each individual could the Court and a jury could determine whether that individual has a claim based on the failure to grow grass, whether that failure is attributable to Scotts, whether that individual suffered damages and, if so, the amount of those damages. A class action is not manageable where these issues must be addressed individually among millions of class members. *See Dukes*, 131 S. Ct. at 2561.

## IV. A Class Action is Not Superior.

Because Scotts' No Quibble Guarantee refunds the purchase price to any dissatisfied consumer, a class action is not "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The No Quibble Guarantee may not be "judicial" or "adjudicative" – however those words are defined – but as part of the superiority analysis, a court need not "confine[] itself to only 'judicial' methods of handling the controversy." 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC.§ 1779

(3d ed. 2013); Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can Be a Fair and Efficient Alternative to a Class Action*, 31 REV. LITIG. 617, 635-36 (2012) ("Rule 23(b)(3) does not limit courts to consider only judicial alternatives to a class action."). Indeed, "where available refunds afford class members a comparable or even better remedy than they could hope to achieve in court, a class action would merely divert a substantial percentage of the refunds' aggregate value to the class lawyers," *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 151 (E.D.N.Y. 2012), thereby serving to "creat[e] [a] lawsuit[] where none previously existed," *Berley v. Dreyfus & Co.*, 43 F.R.D. 397, 398-99 (S.D.N.Y. 1967). *See also Patton v. Topps Meat Co.,* 2010 WL 9432381, at *10 (W.D.N.Y. May 27, 2010) ("[F]ollowing the authority from this Circuit, I conclude that defendants' refund program constitutes a superior form of adjudication to plaintiffs' proposed consumer class.").[38]

Scotts' "No Quibble Guarantee" is prominently identified on every EZ Seed container and permits any consumer complying with its minimal terms to obtain a full refund. (Ex. 12.) [redacted] (Taubler Decl. ¶¶ 7, 12.) All of the putative class members can obtain such refunds without needing to prove EZ Seed did not grow, and, if it did not grow, why. The No Quibble Guarantee is surely superior to a lengthy and difficult litigation and trial at which class members have a significant burden of proof.[39]

---

[38] Courts outside this Circuit have reached the same conclusion. *See Webb v. Carter's Inc.*, 272 F.R.D. 489, 504-05 (C.D. Cal. 2011) ("Because Carter's already offers the very remedy sought in this suit, the Court concludes that a class action is not 'superior'" under Rule 23); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) ("It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress."); *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 700 (N.D. Ga. 2008) (same).

[39] At least one court felt so strongly about the issue that it disqualified a plaintiff on the basis that suggesting a class action when a refund was already available showed that the plaintiff could not actually be suitably representing the class. *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (a "representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the

Plaintiffs offer several reasons why they claim a multi-year class action is superior.[40] The Court should reject Plaintiffs' arguments.

First, Plaintiffs argue that absent class members cannot learn of Scotts' refund program because Scotts' No Quibble Guarantee is "concealed." (Br. at 29.) That argument falls flat in light of Plaintiffs' own Complaint, which describes the No Quibble Guarantee: "*On [Scotts'] website and on every package* of EZ Seed, *Scotts highlights* what it refers to as [its] 'No Quibble Guarantee®.' The terms of the guarantee are *unequivocally stated on the product packaging*…." (Compl. ¶ 66 (emphasis added).) Plaintiffs' argument also completely ignores that the No Quibble Guarantee is on the *outside* of the 20-pound and 10-pound bags of EZ Seed.[41] Several of the Named Plaintiffs testified that they recalled seeing the No Quibble Guarantee or Scotts' toll-free helpline, and one named Plaintiff even called in and received a refund. (*E.g.*, Moore Tr., Ex. 19, 245:11-23, Thomas Tr., Ex. 21, 80:7-25; Eskinazi Tr., Ex. 17, at 95:7-25.) Other consumers have availed themselves of the program as well. (Taubler Decl. ¶ 13; Ex. 8 at 1.)

class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests."). This seems to be the case with Plaintiffs in this action as well. Mr. Browne thought it was too much effort to contact Scotts to seek a $15 refund. (Browne Tr., Ex. 16, at 108:14-110:5, 113:3-114:25.) But he is willing to prosecute a federal lawsuit seeking that same refund.

[40] While the Complaint asserted a claim challenging the No Quibble Guarantee on Eskinazi's behalf (Compl. ¶¶ 88, 144, 181), it is now clear, and Eskinazi has admitted, that she did not comply with the No Quibble Guarantee's terms (Eskinazi Tr., Ex. 17, at 164:2-9). Indeed, following discovery, Plaintiffs have dropped their claim that Scotts does not honor its No Quibble Guarantee. (*See* Br. (providing no argument for certification of No-Quibble class).)

[41] The No Quibble Guarantee or a warranty with substantially similar terms appears on nearly all Scotts products, (Taubler Decl. ¶ 5.), and at least one Named Plaintiff, and presumably many putative class members, purchased other Scotts products. (Smith Tr., Ex. 20, 62:3-8.)

Second, Plaintiffs argue that Scotts has a "secret" one-year limit on its refund policy.[42] This is false. (*See* Part A.I.B *supra*; Taubler Decl. ¶ 11.) Any person who purchased EZ Seed since it was released in 2009 is eligible for a refund. (Taubler Decl. ¶ 11.)

Third, Plaintiffs misconstrue a line in Scotts' summary of consumer contacts, which uses a code named [redacted] (Br. at 28.) [redacted]. (Taubler Decl. ¶ 16.) [redacted] (*Id.*) [redacted] (*Id.*) [redacted]. (*Id.*) [redacted] (*Id.*)

Fourth, Plaintiffs argue that Scotts' proof-of-purchase requirement is too "onerous." (Br. at 30.) This is ridiculous. [redacted]. (Taubler Decl. ¶ 12.) To prevail in litigation, Plaintiffs would need to prove much more than just a purchase; they would be required to prove among other things that the product failed to work for them and the failure was due to a defect in the product, not some idiosyncratic, personal reason. *ConAgra Peanut Butter*, 251 F.R.D. at 700 ("Defendant's voluntary [refund] program would

42 [redacted].

likely require no more (and probably less) proof that a claimant actually purchased the [product] than would be required in litigation.")[43]

In sum, as one court in this Circuit explained, "[s]ince the defendants will provide a refund – without needless judicial intervention, lawyer's fees, or delay – to any purchaser who asks for one, there is no realistic sense in which putative class members would be better off coming to court." *Leonard v. Abbott Labs., Inc.*, 2012 WL 764199, at *27 (E.D.N.Y. March 5, 2012) (quoting *Aqua Dots*, 270 F.R.D. at 383-85).

## V. Plaintiffs Have Not Shown By a Preponderance of the Evidence That The Court Can Identify Absent Class Members.

Plaintiffs must show that the class they purport to represent is ascertainable. *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005). "Class members need not be ascertained prior to certification, but the *exact* membership of the class must be ascertainable at some point in the case." *Id.* (emphasis added). Ascertainability is of increased importance when Plaintiffs move for certification of a legal-damages class under Rule 23(b)(3). *Id.* at 181 n.42.

Certification of consumer cases is anything but "routine[]" as Plaintiffs claim. (Br. at 32.) In the years after Rule 23 was adopted in 1966, courts often denied certification in consumer cases specifically *because* the consumer class could not be ascertained. A court from this district reasoned in 1970 that it was "obvious" that a class comprised of all egg consumers was "unmistakably beyond the limit of a permissible class action" since "[i]t would be next to

---

[43] The superiority prong of Rule 23(b)(3) allows courts to weigh pragmatic considerations of "judicial time and energy" along with the risk of prejudicing rights of absent class members. 7AA FED. PRAC. & PROC. § 1779. As for statutory damages, Plaintiffs focus on awards they *may* receive from a favorable judgment while ignoring entirely the chance they lose at trial or, even if they prevail, the chance they are not entitled to statutory damages. Plaintiffs also ignore completely the costs that *will* be deducted from a judgment after classwide notice and years of federal court litigation. In *Pagan*, for instance, the court held proposed classes of New York and New Hampshire consumers were not superior to a voluntary recall program even though plaintiffs were seeking "declaratory, injunctive, and monetary relief." *Pagan*, 287 F.R.D. at 142.

impossible to identify members of the class and to give them appropriate notice." *See United Egg Producers v. Bauer Int'l Corp.*, 312 F. Supp. 319, 321 (S.D.N.Y. 1970). And a District of New Jersey court declined to certify a class of gasoline consumers for the reason that "it would be impossible or at the very minimum prohibitively expensive to compile a list of the members of this class." *Philadelphia v. Am. Oil Co.*, 53 F.R.D. 45, 74 (D.N.J. 1971).

This principle remains applicable today. The Third Circuit recently vacated certification of a class where plaintiffs wanted to ascertain the class with loyalty cards and individual affidavits. *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). A class that is ascertainable with objective evidence "provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Id.*; *see also Aqua Dots*, 654 F.3d at 752-53 ("No one knows who bought the kits. No one knows who used them without problems; this would make it difficult if not impossible to determine who would be entitled to a remedy."); *Algarin*, 2014 WL 1883772, at *7-8 (class not ascertainable where no list of purchasers existed and parties would rely on self-identification). This was the same conclusion reached by Judge Cote in a case in which the plaintiff had moved for certification of a class of Snapple consumers. *Weiner*, 2010 WL 3119452, at *12-13. A proposal to use receipts, product labels, and declarations to confirm class membership was "unrealistic" and was an invitation for putative class members "to speculate, or worse." *Id.* at *13. Indeed, another judge recently denied certification on similar ascertainability grounds brought by Named Plaintiffs' counsel. *Karhu v. Vital Pharm., Inc.*, 2014 WL 815253, at *3 (S.D. Fla. Mar. 3, 2014) (denying certification where consumers were unlikely to retain receipts or records of purchase, and finding self-identification raised due-process concerns).

The proposed classes in this case suffer from the same defects. Plaintiffs improperly propose using records of purchases made with loyalty cards and affidavits (Br. at 32-34) and overstate their ability to ascertain class members. For example, they claim Home Depot [redacted] (Br. at 32.) But Home Depot [redacted] (Ex. 41, Home Depot Suppl. Resp. to Request for Admis. 1.) Similarly, Lowe's [redacted]. (Ex. 42, Lowe's Am. Resp. to Request for Admis. 1.) And, while Plaintiffs claim to have identified [redacted] (Br. at 32; Ex. 43), [redacted] The reality is retailers cannot identify the vast majority of EZ Seed purchasers, as illustrated by the fact that no Named Plaintiff provided contact information to the retailer at purchase, and only one provided her information to Scotts (to receive a refund). (Eskinazi Tr., Ex. 17, at 140:18-141:4, Browne Tr., Ex. 16, at 72:4-13, 108:23-24; Moore Tr., Ex. 19, at 124:16-125:19, 192:10-193:7; Arcuri Tr., Ex. 15, at 170:20-172:2; Thomas Tr., Ex. 21, at 103:16-104:17; Smith Tr., Ex. 20, at 81:25-82:8; Lonardo Tr., Ex. 18, at 64:3-20.) Finally, Plaintiffs vastly overstate the degree to which Scotts has information from which one can reasonably identify or ascertain EZ Seed purchasers.[44]

---

[44] Plaintiffs claim that Scotts has [redacted]. (Br. at 32.) [redacted] (Ex. 3, Scotts' Resp. to Interrog. 7 [redacted] Ex. 40, Scotts Resp. to Request for Admis. 1; Taubler Tr., Ex. 36, at 45:25-46:4; Sass Tr., Ex. 34, at 292:18-297:15). [redacted]

Plaintiffs also argue that Rule 23 does not require a "roll call" and published notice suffices. (Br. at 33.) Plaintiffs miss the issue completely. The cases cited above address the very real concern that a class that cannot be identified denies Scotts the opportunity to defend against individuals who may come forward to claim money based only on their unchallengeable assertion that they are "class members." The cases recognize Scotts' fundamental right to challenge the claims of these people.

Plaintiffs cite a single recent opinion, *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), to support their ascertainability argument. In that case, the court held that the lack of classwide identifying information "raise[d] concerns" but did not as the "sole ground" defeat certification because "the class action device, at its core, is designed for cases like this." *Id.* at 567. Rule 23 cannot be molded to fit the facts of any one case.[45] Because Plaintiffs have not proven that the class is ascertainable, certification should be denied here.

## VI. Certification Is Improper Because the Named Plaintiffs' Claims Are Not Typical of Those of the Putative Class Members.

To satisfy typicality, Plaintiffs must show that they are (1) part of the proposed class, (2) possesses the same interest as the class, and (3) suffered the same injury as the class. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). To the extent they seek to represent a class based on persons who could not follow EZ Seed's original Directions for Use and apply ⅛" of EZ Seed (*e.g.*, Br. at 6-7), no Named Plaintiff is typical of this class, since all purportedly were

---

[redacted]

[45] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure 'shall not abridge … any substantive right.") (alteration in original).

able to apply accurately that amount.[46] Further, no Named Plaintiff can show he or she actually relied on the 50% thicker claim because each testified he or she followed EZ Seed's Directions for Use exactly.[47] To the extent they followed EZ Seed's directions none would have watered any less than EZ Seed's directions for use recommended. This would separate them from a class that corresponds with their liability theory – those unidentified individuals who watered at half the recommended rate and grew no grass. Further, because Plaintiffs have no evidence to support a theory that EZ Seed never germinates, they cannot demonstrate that some common course of conduct caused the same injury to all putative members. *E.g.*, *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 398-401 (S.D.N.Y. 2008). As discussed in Part B.II, there are innumerable reasons any person's grass might not germinate unrelated to Scotts or EZ Seed. Plaintiffs simply are not typical of, and cannot represent, any absent members whose EZ Seed did not germinate for a wide variety of reasons (*e.g.*, extreme weather, herbicides, animals or pests), the proof of which will be unique to each putative class member, as it is for Named Plaintiffs. *E.g.*, *Fosamax*, 248 F.R.D. at 398-401 (no typicality where claims require individualized proof).

Named Plaintiffs also are are subject to unique defenses. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). Ms. Thomas, for example, purchased EZ Seed twice, months apart (Thomas Tr., Ex. 21, at 110:25-111:9), and was unable to recall if she grew grass the first time (*id.* at 111:13-15, 128:2-12.) She is subject to a voluntary payment doctrine defense. *E.g.*, *Solomon v. Bell Atlantic Corp.*, 777 N.Y.S. 2d 50,

---

[46] (Arcuri Tr., Ex. 15, at 117:11-118:22; Moore Tr., Ex. 19, at 136:25-137:25; Lonardo Tr., Ex. 18, at 118:7-119:19; Thomas Tr., Ex. 21, at 119:15-121:7; Smith Tr., Ex. 20, at 109:19-111:9; Browne Tr., Ex. 16, at 82:23-83:8; Eskinazi Tr., Ex. 17, at 137:23-138:15.)

[47] (Arcuri Tr., Ex. 15, at 55:24-56:5; Moore Tr., Ex. 19, at 146:19-148:5; Lonardo Tr., Ex. 18, at 49:24-50:2, 72:3-8, 80:19-81:3; Thomas Tr., Ex. 21, at 115:11-22, 117:4-6; Smith Tr., Ex. 20, at 103:13-20; Browne Tr., Ex. 16, at 81:19-84:25, 93:21-94:3; Eskinazi Tr., Ex. 17, at 135:7-17.)

54-56 (1st Dept. 2004). Ms. Eskinazi, accepted a refund from Scotts (Eskinazi Tr., Ex. 17, at 95:7-25), and is subject to an accord and satisfaction defense. *E.g.*, *New Dance Grp. Studio v. St. Paul Fire & Marine Ins. Co.*, 1995 U.S. Dist. LEXIS 10205, at *7-8 (S.D.N.Y. July 21, 1995). Putative class members will face these and other individual defenses.[48]

## VII. An Injunctive-Relief Class Under Rule 23(b)(2) is Improper Under Supreme Court Precedent.

Rule 23(b)(2) is limited to claims for injunctive relief. Fed. R. Civ. P. 23(b)(2). Plaintiffs argue Rule 23(b)(2) applies because an injunction is supposedly one of their "primary goals." (Br. at 35.) But Rule 23(b)(2) does not apply where "a plaintiff class, at its option, combines its monetary claims with a request – even a 'predominating request' – for an injunction." *Dukes*, 131 S. Ct. at 2559. Instead, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.... [I]t does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.* at 2557; *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012). "[U]nless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2)." *Haddock*, 460 F. App'x at 29 (citing *Dukes*, 131 S. Ct. at 2557-60).[49]

To certify a (b)(2) class a District Court must find that:

---

[48] Potential defenses also must be considered as part of the predominance analysis. *See Myers*, 624 F.3d at 551 ("[C]ourts must consider potential defenses in assessing the predominance requirement.").

[49] The Second Circuit recently rejected a 23(b)(2) class where, even if liability were found, "the district court would then need to determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged," finding this "would require the type of non-incidental, individualized proceedings for monetary awards that *Wal–Mart* rejected under Rule 23(b)(2)." *Haddock*, 460 F. App'x at 29; *see also Dukes*, 131 S. Ct. at 2560. As discussed in Part B.II.F *supra*, complex individual determinations would be required to determine an individual's damage recovery, if any. *See Dukes*, 131 S. Ct. at 2560.

> (1) even in the *absence of a possible monetary recovery*, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits.

*Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 (2d Cir. 2012) (emphasis added). In this case, Plaintiffs seek to certify a two-state class that "by definition[] already purchased the product[.]" *Drimmer v. WD-40 Co.*, 2007 WL 2456003, at *5 (S.D. Cal. Aug. 24, 2007); *see also Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 558-62 (C.D. Cal. 2012). As the *Drimmer* court noted, where a putative class is comprised of persons who already purchased a product the case is primarily for damages, and plaintiffs may not "make an end-run around Rule 23(b)(3) by tacking on a request for an injunction." *Drimmer*, 2007 WL 2456003, at *5. Finally, without a likelihood of any future injury, Plaintiffs lack standing to seek an injunction. *City of L.A. v. Lyons*, 461 U.S. 95, 105-110 (1983); *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223-27 (3d Cir. 2012).

## C. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Dated: May 30, 2014
New York, New York

By: /s/ Shawn Patrick Regan
Shawn Patrick Regan
Joshua S. Paster
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 309-1000
Facsimile: (212) 309-1100
Email: sregan@hunton.com
Email: jpaster@hunton.com

- and -

Samuel A. Danon *(pro hac vice)*
Jason B. Sherry
HUNTON & WILLIAMS LLP

1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
Email: sdanon@hunton.com
Email: jsherry@hunton.com

*Counsel for Defendants The Scotts Miracle-Gro Company, The Scotts Company LLC, and Lowe's Home Centers, LLC.*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2014, I served a copy of the foregoing, on all counsel of record at the addresses listed below, by filing same with the Court's CM/ECF system.

/s/Shawn Patrick Regan
Shawn Patrick Regan

TO:

Scott A. Bursor, Esq.
Joseph I. Marchese, Esq.
Neal Deckant
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Telephone: (212) 989-9113
Email: scott@bursor.com
jmarchese@bursor.com
ndeckant@bursor.com

-and –

Antonio Vozzolo, Esq.
Christopher Marlborough, Esq.
Courtney E. MacCarone, Esq.
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Email: avozzolo@faruqilaw.com
cmarlborough@faruqilaw.com
maccarone@faruqilaw.com

*Attorneys for Plaintiffs*