**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Scotts EZ Seed Litigation | Civil Action No. 12-CV-4727 (VB) |

## SUPPLEMENTAL DECLARATION OF JOSEPH I. MARCHESE

I, Joseph I. Marchese, declare as follows:

1.      I am an attorney at law licensed to practice in the State of New York.  I am a member of the bar of this Court, and I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs Michael Arcuri, David A. Browne, Gwen Eskinazi, Stacy D. Lonardo, Lance Moore, Vance Smith, and Nancy Thomas (collectively, "Plaintiffs").  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

2.      Attached hereto as Exhibit LLLL is a true and correct copy of the document bearing Bates numbers SMG-EZ0151196-200.

3.      Attached hereto as Exhibit MMMM is a true and correct copy of the opt-out notice of Connie Weinman.

4.      Attached hereto as Exhibit NNNN are true and correct copies of excerpts of Allen, *et al.*, 1999 FAO Irrigation and Drainage Paper, No. 56.

5.      Attached hereto as Exhibit OOOO is a true and correct copy of the July 29, 2013 trial transcript in *Scotts Company, LLC v. Pennington Seed, Inc.*, Civil Action Nos. 12-cv-00168 and 12-cv-00254 (E.D. Va.).

6.      Attached hereto as Exhibit PPPP is a true and correct copy of the January 12, 2007 order in *In re: Cellphone Termination Fee Cases*, Civil Action No. JCCP004332 (Cal. Super. Ct., Alameda Cnty.).

7.      I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.  Executed on September 1, 2016 at New York, New York.

  */s/ Joseph I. Marchese*  
Joseph I. Marchese

**EXHIBIT LLLL**

[SEALED PURSUANT TO THE COURT'S PROTECTIVE ORDER DATED MARCH 7, 2014]

**EXHIBIT MMMM**

[SEALED PURSUANT TO THE COURT'S PROTECTIVE ORDER DATED MARCH 7, 2014]

**EXHIBIT NNNN**

# FAO Irrigation and Drainage Paper

# No. 56

# Crop
# Evapotranspiration

## (guidelines for computing crop water requirements)

This pdf version of FAO-56 has a February 2006 errata sheet at the end of the document followed by the corrected Examples 35 and 38

by
Richard G. ALLEN
Utah State University
Logan, Utah, U.S.A.

Luis S. PEREIRA
Instituto Superior de Agronomia
Lisbon, Portugal

Dirk RAES
Katholieke Universiteit Leuven
Leuven, Belgium

Martin SMITH
FAO, Water Resources, Development and Management Service
Rome, Italy

**Table 12 continued**

| Crop | $K_{c\,ini}$[1] | $K_{c\,mid}$ | $K_{c\,end}$ | Maximum Crop Height (h) (m) |
|---|---|---|---|---|
| **j.  Forages** | | | | |
| Alfalfa Hay          – averaged cutting effects | 0.40 | 0.95[13] | 0.90 | 0.7 |
|                          – individual cutting periods | 0.40[14] | 1.20[14] | 1.15[14] | 0.7 |
|                          – for seed | 0.40 | 0.50 | 0.50 | 0.7 |
| Bermuda hay          – averaged cutting effects | 0.55 | 1.00[13] | 0.85 | 0.35 |
|                          – Spring crop for seed | 0.35 | 0.90 | 0.65 | 0.4 |
| Clover hay, Berseem – averaged cutting effects | 0.40 | 0.90[13] | 0.85 | 0.6 |
|                          – individual cutting periods | 0.40[14] | 1.15[14] | 1.10[14] | 0.6 |
| Rye Grass hay  – averaged cutting effects | 0.95 | 1.05 | 1.00 | 0.3 |
| Sudan Grass hay (annual) – averaged cutting effects | 0.50 | 0.90[14] | 0.85 | 1.2 |
|                          – individual cutting periods | 0.50[14] | 1.15[14] | 1.10[14] | 1.2 |
| Grazing Pasture - Rotated Grazing | 0.40 | 0.85-1.05 | 0.85 | 0.15-0.30 |
|                        - Extensive Grazing | 0.30 | 0.75 | 0.75 | 0.10 |
| Turf grass - cool season[15] | 0.90 | 0.95 | 0.95 | 0.10 |
|                 - warm season[15] | 0.80 | 0.85 | 0.85 | 0.10 |
| **k.  Sugar Cane** | 0.40 | 1.25 | 0.75 | 3 |
| **l.  Tropical Fruits and Trees** | | | | |
| Banana  – 1st year | 0.50 | 1.10 | 1.00 | 3 |
|               – 2nd year | 1.00 | 1.20 | 1.10 | 4 |
| Cacao | 1.00 | 1.05 | 1.05 | 3 |
| Coffee          – bare ground cover | 0.90 | 0.95 | 0.95 | 2-3 |
|                    – with weeds | 1.05 | 1.10 | 1.10 | 2-3 |
| Date Palms | 0.90 | 0.95 | 0.95 | 8 |
| Palm Trees | 0.95 | 1.00 | 1.00 | 8 |
| Pineapple[16]  – bare soil | 0.50 | 0.30 | 0.30 | 0.6-1.2 |
|                    – with grass cover | 0.50 | 0.50 | 0.50 | 0.6-1.2 |
| Rubber Trees | 0.95 | 1.00 | 1.00 | 10 |
| Tea    – non-shaded | 0.95 | 1.00 | 1.00 | 1.5 |
|          – shaded[17] | 1.10 | 1.15 | 1.15 | 2 |
| **m.  Grapes and Berries** | | | | |
| Berries (bushes) | 0.30 | 1.05 | 0.50 | 1.5 |
| Grapes  – Table or Raisin | 0.30 | 0.85 | 0.45 | 2 |
|              – Wine | 0.30 | 0.70 | 0.45 | 1.5-2 |
| Hops | 0.3 | 1.05 | 0.85 | 5 |

**continued...**

[13] This $K_{c\,mid}$ coefficient for hay crops is an overall average $K_{c\,mid}$ coefficient that averages $K_c$ for both before and following cuttings.  It is applied to the period following the first development period until the beginning of the last late season period of the growing season.

[14] These $K_c$ coefficients for hay crops represent immediately following cutting; at full cover; and immediately before cutting, respectively. The growing season is described as a series of individual cutting periods (Figure 35).

[15] Cool season grass varieties include dense stands of bluegrass, ryegrass, and fescue.  Warm season varieties include bermuda grass and St. Augustine grass.  The 0.95 values for cool season grass represent a 0.06 to 0.08 m mowing height under general turf conditions.  Where careful water management is practiced and rapid growth is not required, $K_c$'s for turf can be reduced by 0.10.

[16] The pineapple plant has very low transpiration because it closes its stomates during the day and opens them during the night.  Therefore, the majority of $ET_c$ from pineapple is evaporation from the soil.  The $K_{c\,mid} < K_{c\,ini}$ since $K_{c\,mid}$ occurs during full ground cover so that soil evaporation is less.  Values given assume that 50% of the ground surface is covered by black plastic mulch and that irrigation is by sprinkler.  For drip irrigation beneath the plastic mulch, $K_c$'s given can be reduced by 0.10.

[17] Includes the water requirements of the shade trees.

**Table 12 continued**

| Crop | $K_{c\ ini}$[1] | $K_{c\ mid}$ | $K_{c\ end}$ | Maximum Crop Height (h) (m) |
|------|------|------|------|------|
| **o. Wetlands – temperate climate** | | | | |
| Cattails, Bulrushes, killing frost | 0.30 | 1.20 | 0.30 | 2 |
| Cattails, Bulrushes, no frost | 0.60 | 1.20 | 0.60 | 2 |
| Short Veg., no frost | 1.05 | 1.10 | 1.10 | 0.3 |
| Reed Swamp, standing water | 1.00 | 1.20 | 1.00 | 1-3 |
| Reed Swamp, moist soil | 0.90 | 1.20 | 0.70 | 1-3 |
| **p. Special** | | | | |
| Open Water, < 2 m depth or in subhumid climates or tropics | | 1.05 | 1.05 | |
| Open Water, > 5 m depth, clear of turbidity, temperate climate | | 0.65[25] | 1.25[25] | |

[24] These coefficients represent about 40 to 60% ground cover. Refer to Eq. 98 and footnotes 21 and 22 for estimating $K_c$ for immature stands. In Spain, Pastor and Orgaz (1994) have found the following monthly $K_c$'s for olive orchards having 60% ground cover: 0.50, 0.50, 0.65, 0.60, 0.55, 0.50, 0.45, 0.45, 0.55, 0.60, 0.65, 0.50 for months January through December. These coefficients can be invoked by using $K_{c\ ini}$ = 0.65, $K_{c\ mid}$ = 0.45, and $K_{c\ end}$ = 0.65, with stage lengths = 30, 90, 60 and 90 days, respectively for initial, development, midseason and late season periods, and using $K_c$ during the winter ("off season") in December to February = 0.50.

[25] These $K_c$'s are for deep water in temperate latitudes where large temperature changes in the water body occur during the year, and initial and peak period evaporation is low as radiation energy is absorbed into the deep water body. During fall and winter periods ($K_{c\ end}$), heat is released from the water body that increases the evaporation above that for grass. Therefore, $K_{c\ mid}$ corresponds to the period when the water body is gaining thermal energy and $K_{c\ end}$ when releasing thermal energy. These $K_c$'s should be used with caution.

**Primary sources:**   $K_{c\ ini}$: Doorenbos and Kassam (1979)
              $K_{c\ mid}$ and $K_{c\ end}$: Doorenbos and Pruitt (1977); Pruitt (1986); Wright (1981, 1982), Snyder et al., (1989)

The values for $K_{c\ mid}$ and $K_{c\ end}$ in Table 12 represent those for a sub-humid climate with an average daytime minimum relative humidity ($RH_{min}$) of about 45% and with calm to moderate wind speeds averaging 2 m/s. For more humid or arid conditions, or for more or less windy conditions, the $K_c$ coefficients for the mid-season and end of late season stage should be modified as described in this chapter.

The values for $K_c$ in Table 12 are values for non-stressed crops cultivated under excellent agronomic and water management conditions and achieving maximum crop yield (standard conditions). Where stand density, height or leaf area are less than that attained under such conditions, the value for $K_{c\ mid}$ and, for most crops, for $K_{c\ end}$ will need to be modified (Part C, Chapters 8, 9 and 10).

## Crop coefficient for the initial stage ($K_{c\ ini}$)

### Calculation procedure

The values for $K_{c\ ini}$ in Table 12 are only approximations and should only be used for estimating $ET_c$ during preliminary or planning studies. For several group types only one value

estimated to obtain the required frequency of wetting necessary to keep the crop stress free. The interval might be as small as a few days for small vegetables, but up to a week or longer for cereals depending on the climatic conditions. Where no estimate of the interval can be made, the user may refer to the values for $K_{c\ ini}$ of Table 12.

---

**EXAMPLE 23**
**Estimation of interval between wetting events**

Estimate, from mean monthly rainfall data, the interval between rains during the rainy season for a station in a temperate climate (Paris, France: 50 mm/month), dry climate (Gafsa, Tunisia: 20 mm/month) and tropical climate (Calcutta, India: 300 mm/month).

| Station | monthly rain (mm/month) | typical rainfall (mm) | number of rainy days | interval between rains |
|---------|-------------------------|-----------------------|----------------------|------------------------|
| Paris | 50 | 3 | 17 | ~ 2 days |
| Gafsa | 20 | 5 | 4 | weekly |
| Calcutta | 300 | 20 | 15 | ~ 2 days |

---

## Determination of $K_{c\ ini}$

The crop coefficient for the initial growth stage can be derived from Figures 29 and 30 which provide estimates for $K_{c\ ini}$ as a function of the average interval between wetting events, the evaporation power $ET_o$, and the importance of the wetting event.

### Light wetting events (infiltration depths of 10 mm or less): rainfall and high frequency irrigation systems

Figure 29 is used for all soil types when wetting events are light. When wetting during the initial period is only by precipitation, one will usually use Figure 29 to determine $K_{c\ ini}$. The graph can also be used when irrigation is by high frequency systems such as microirrigation and centre pivot and light applications of about 10 mm or less per wetting event are applied.

---

**EXAMPLE 24**
**Graphical determination of $K_{c\ ini}$**

A silt loam soil receives irrigation every two days during the initial growth stage via a centre pivot irrigation system. The average depth applied by the centre pivot system is about 12 mm per event and the average $ET_o$ during the initial stage is 4 mm/day. Estimate the crop evapotranspiration during that stage.

| From Fig. 29 using the 2-day interval curve: | $K_{c\ ini} =$ | 0.85 | - |
|---|---|---|---|
| - | $ET_c = K_c\ ET_o = 0.85\ (4.0) =$ | 3.4 | mm/day |
| The average crop evapotranspiration during the initial growth stage is 3.4 mm/day | | | |

---

### Heavy wetting events (infiltration depths of 40 mm or more): surface and sprinkler irrigation

Figure 30 is used for heavy wetting events when infiltration depths are greater than 40 mm, such as for when wetting is primarily by periodic irrigation such as by sprinkler or surface irrigation. Following a wetting event, the amount of water available in the topsoil for evaporation is considerable, and the time for the soil surface to dry might be significantly increased. Consequently, the average $K_c$ factor is larger than for light wetting events. As the time for the soil surface to dry is, apart from the evaporation power and the frequency of wetting, also determined by the water storage capacity of the topsoil, a distinction is made between soil types.



**FIGURE 29**
**Average $K_{c\ ini}$ as related to the level of $ET_O$ and the interval between irrigations and/or significant rain during the initial growth stage for all soil types when wetting events are light to medium (3-10 mm per event)**

Figure 30a is used for coarse textured soils and Figure 30b is used for fine and medium textured soils. Coarse textured soils include sands and loamy sand textured soils. Medium textured soils include sandy loam, loam, silt loam and silt textured soils. Fine textured soils include silty clay loam, silty clay and clay textured soils.

*Average wetting events (infiltration depths between 10 and 40 mm):*

Where average infiltration depths are between 10 and 40 mm, the value for $K_{c\ ini}$ can be estimated from Figures 29 and 30:

$$K_{c\ ini} = K_{c\ ini\ (Fig.\ 29)} + \frac{(I-10)}{(40-10)} \left[ K_{c\ ini\ (Fig.\ 30)} - K_{c\ ini\ (Fig.\ 29)} \right] \qquad (59)$$

where
$K_{c\ ini\ (Fig.29)}$   value for $K_{c\ ini}$ from Figure 29,
$K_{c\ ini\ (Fig.30)}$   value for $K_{c\ ini}$ from Figure 30,
$I$   average infiltration depth [mm].

The values 10 and 40 in Equation 59 are the average depths of infiltration (millimetres) upon which Figures 29 and 30 are based.

---

**EXAMPLE 45**
**Effects of surface mulch**

A plastic mulch is placed over cucumbers under drip irrigation. The mulch is clear plastic covering the entire field surface, with small openings at each plant. Adjust both the mean and basal $K_c$ values for this crop to reflect the presence of the mulch.

From Table 12, $K_{c\ ini}$, $K_{c\ mid}$ and $K_{c\ end}$ for fresh market cucumbers have values equal to 0.4, 1.0 and 0.75.

As the plastic mulch is continuous with only small vents at each plant, the $K_{c\ ini}$ is assumed to be only 0.10 (this value should be adjusted upward if precipitation occurs).

The $K_{c\ mid}$ and $K_{c\ end}$ values are estimated as:

$$K_{c\ mid} = 0.85\ (1.0) = 0.85$$
$$K_{c\ end} = 0.85\ (0.75) = 0.64$$

where the 0.85 multipliers are derived from Table 25 and reflect an assumed 15% reduction in $ET_c$ due to the mulch, assuming an approximately weekly irrigation frequency.

From Table 17, the values for $K_{cb\ ini}$, $K_{cb\ mid}$ and $K_{cb\ end}$ are 0.15, 0.95 and 0.7 for this same cucumber crop. The $K_{cb\ ini}$ is assumed to be similar to the $K_{c\ ini}$ for mulched cover and is therefore set equal to 0.10. The $K_{cb\ mid}$ and $K_{cb\ end}$ values are estimated to be reduced by 10% so that:

$$K_{cb\ mid} = 0.9\ (0.95) = 0.86$$
$$K_{cb\ end} = 0.9\ (0.7) = 0.63$$

These basal values are similar to the adjusted values for $K_c$. This is expected as evaporation from the mulch covered surface can be ignored. Additional adjustment to these $K_c$ values to account for climate is necessary using Eq. 62 and 70.

---

The values for mean $K_c$ and $K_{cb}$ are similar with values of 0.10 for the initial stage, 0.85 for the mid-season stage and 0.64 at the end of the late season stage.

---

### Single crop coefficient, $K_c$

A general rule when applying $K_c$ from Table 12 is to reduce the amount of soil water evaporation by about 5% for each 10% of soil surface that is effectively covered by an organic mulch.

For example, if 50% of the soil surface were covered by an organic crop residue mulch, then the soil evaporation would be reduced by about 25%.

- In the case of $K_{c\ ini}$, which represents mostly evaporation from soil, one would reduce $K_{c\ ini}$ by about 25% in this situation.

- In the cases of $K_{c\ mid}$ and $K_{c\ end}$, one would reduce these values by 25% of the difference between ($K_{c\ mid}$ - $K_{cb\ mid}$) and ($K_{c\ end}$ - $K_{cb\ end}$) from Tables 12 and 17. Generally, the differences between values in Tables 12 and 17 are only 5-10% so that the adjustment to $K_{c\ mid}$ and $K_{c\ end}$ to account for an organic mulch may not be very large.

EXHIBIT OOOO

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      RICHMOND DIVISION

 3   -------------------------------------------

 4   SCOTTS COMPANY, LLC,

 5                            Plaintiff;
 6   v.                                  Civil Action

 7                            3:12CV168 and 3:12CV254

 8   PENNINGTON SEED, INC.,

 9                            Defendant.
10   -------------------------------------------

11                 July 29, 2013
                   Richmond, Virginia
12                 11:00 a.m.

13              BENCH TRIAL -VOLUME I

14   BEFORE:     HONORABLE JAMES R. SPENCER
                 United States District Judge
15

16   APPEARANCES:  SAMUEL A. DANON, ESQ.
                   STEPHEN P. DEMM, ESQ.
17                 SHELLEY L. SPALDING, ESQ.
                   JOSHUA M. KALB, ESQ.
18
19                       Counsel for Plaintiff;

20
                   RONALD Y. ROTHSTEIN, ESQ.
21                 CHARLES M. SIMS, ESQ.
                   THOMAS M. WOLF, ESQ.
22
                         Counsel for Defendant.
23

24

25                 JEFFREY B. KULL
                   OFFICIAL COURT REPORTER
```

P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Case Number 3:12CV168:  Scotts Company LLC versus Pennington Seed, Inc.  The plaintiff is represented by Samuel Danon, Stephen Demm, Shelley Spalding, and Josh Kalb.  The defendant is represented by Ron Rothstein, Thomas Wolf, and Charles Sims.  Are counsel ready to proceed?

MR. DANON:  On behalf of Scotts, we are ready to proceed.

MR. ROTHSTEIN:  On behalf of Pennington, we are ready to proceed.

THE COURT:  All right.  We had a last-minute filing regarding Dr. Jacoby's testimony.  Does anybody want to be heard on that briefly?

MR. DEMM:  Yes, Your Honor.

THE COURT:  Well, I guess we can go on.  If anybody has any opening statements, we will do it that way and then resolve the other issue.

MR. DEMM:  Your Honor, we have not filed a motion.  We have corresponded with opposing counsel about Thomas Maronick and our belief that he should be excluded from testifying based on the courts's summary judgment ruling about the "bunch of ground-up paper" claim.  Pennington is not really committed as to whether or not, as far as I can tell, whether or not they are going to try

to put on Maronick.  We believe if they do, he should be excluded.

MR. ROTHSTEIN:  Your Honor, I explained to Mr. Demm in correspondence that it is our position that Mr. Maronick's survey had more to do with just the composition claims about the paper composition.  They were stating the commercial.  They also conveyed messages of superiority.  They are laid out in his report.  We have a whole section on the concept of superiority message that is being conveyed about superior performance and it is backed up by a lot of advertising claims that they had in the marketplace claiming superiority for that product.  On that basis, we think he should be allowed to testify as to the superiority message being conveyed by the commercial.

THE COURT:  All right.  I will resolve both of those.  I wanted to hear this Jacoby thing.  Like I said, if it is not teed up, we can go ahead and get started.

MR. ROTHSTEIN:  We are teed up.  He is here.

MR. SIMS:  Good morning, Your Honor.  Charles Sims here on behalf of Pennington.  As the Court is aware, this morning we filed a motion to exclude the testimony of Dr. Jacoby which we had provided to the Scotts attorneys yesterday.

As the Court is aware from the various preliminary injunction hearings as well as the summary

judgment motion, Scotts hired Dr. Jacoby to conduct a survey of consumer understanding of a Pennington TV commercial.  The Court has seen that commercial.  I'm not going to replay it.  It was played at summary judgment as well as the preliminary injunction.  If the Court will recall, the gist of that commercial is a farmer, and he separates some seed from a stalk and then there is a barrel of seed that he runs his hands through.  Then there is a voiceover that says, "We put in twice as much seed as they put in Scotts EZ SEED."

Then there is also, along with that commercial, what we have referred to as the lift test at the end of the commercial.  Hands grab grass from two trays and lifts them.  And the complaint by Scotts is that that shows a depiction of the root systems being inadequate or not strong.

Now, pursuant to Paragraph 7 of the Revised Corrected Stipulation, Pennington has withdrawn that commercial.  It has also withdrawn the claim we put in twice as much seed as they put in Scotts EZ SEED.  It was made in that 2012 commercial and then in a 2013 commercial, both that dealt with 1 STEP COMPLETE.  Again, if the Court recalls, the commercial at issue dealt with a product called 1 STEP COMPLETE, which is a combination product.  We have also withdrawn that claim in respect to

any radio or television advertisements.

Now, Scotts continues to pursue its Lanham Act claim, and it does so under what it groups colloquially into the "Twice The Seed" claim. But Your Honor, those claims are distinct and different from the claim that we have withdrawn; that was part of the commercial that formed the basis of Dr. Jacoby's testimony. The "Twice The Seed" claim that is now -- has now been aired both in a commercial, a 2013 commercial, is a claim that says, "No Filler Twice The Seed vs. Coated Product." There is also a claim of "No Filler, Twice The Seed vs. Other Combination Products" in various other advertisements which form the basis of their exhibits.

Your Honor, Dr. Jacoby did not test or conduct a survey on any of those claims. He has no empirical evidence upon which to base an opinion that the consumer survey that he did do on that 2012 commercial has any relation to these other ads, Your Honor. For that reason, we believe that Dr. Jacoby's testimony should be excluded.

The law is well established that in order for testimony, including an expert, to be admissible, it has to be relevant. And that really is an issue in this case of whether or not the testimony fits the claims that are at issue. And it doesn't, Your Honor. The claims that are at issue now are very distinct, it is the "No Filler,

Twice The Seed vs. Coated Product" and of similar ilk. And Dr. Jacoby did not test that.

Your Honor, we don't really, we don't have to do anything more than rely on Dr. Jacoby's own testimony. We submitted this as part of our motion. But at his deposition, he admitted that he merely has a hypothesis as to whether or not his survey would relate to these advertisements, point of purchase, display ads, other TV ads, or even the packaging itself. And he has no empirical evidence to support that hypothesis. And as we included with our motion, Your Honor, and prior testimony in other cases, Dr. Jacoby, in a moment of candor, admitted that for science, you have to test. Absent testing, your hypothesis is just that. It is a guess. We quoted to the Court out of the SMITH case, in the law we have the ipse dixit philosophy: I say it it is because it is. But in science that isn't the way it works.

The SMITH case is right on point, Your Honor. In that case, which dealt with a trademark claim, Your Honor, and the issue he was testifying on behalf of Wal-Mart, and Wal-Mart was complaining about Mr. Smith, who had, it produced shirts that said "WAL" and then "ocaust," and then WAL with a store, Qaeda, Wal-Qaeda. So Dr. Jacoby had tested consumer response to various shirts and then was extrapolating from that response to other

shirts that had the same WAL-hyphen WAL store but different language.

And in the context of that case, there was two websites. And one was a website called Cafe Presse that had these shirts up for sale and then there was another website. Dr. Jacoby testified in the deposition in connection with that case that he couldn't draw opinion on the one website that Smith had put these shirts up because he hadn't tested it. And the Court quoted Dr. Jacoby's testimony, or not quoted, summarized his testimony and stated, "Jacoby's own deposition testimony supplies a fitting framework for analyzing this issue. When declining to offer an opinion whether consumers would also be confused over the sponsorship of Smith's Walocaust website, Jacoby stated that consumers respond actively to given stimulus depending on the context in which it is presented. And because his survey tested only Smith's Cafe Presse website, his survey provided him with no data upon which to answer the question about consumer confusion about the Smith website."

So then the Court said, "Your survey on these certain shirts, I can't draw a correlation to the other shirts because you didn't test that and it is a different context."

Well, that is very much true in this case, Your

Honor. These advertisements are clearly in a different context. It is plain on its face that when you say, "No Filler, Twice The Seed," you are referencing the fact that the product has no filler and the filler adds half the weight. It is clearly an indication that there is a weight component in the claim.

At least, even if it is ambiguous about that, that has to be tested. And Dr. Jacoby didn't test that. He made no test of the "No Filler, Twice The Seed vs. Coated Product" or vs. the other products. He didn't test these claims. He also didn't test it in the context in which the consumer would see it. The Court will see today bags, the packaging themselves, that has "No Filler, Twice The Seed." In the context of packaging, as the Court is aware, the consumer gets the opportunity to handle the package. The consumer has the opportunity to turn it around. In fact, that's what our purpose of that ad is, to invite the consumer to turn that package around, look at the labeling, and compare our product to Scotts. When you make that comparison, you see that our bag, three-pound bag, is three pounds of seed versus theirs of a pound-and-a-half.

So, Your Honor, he hasn't made that test. He didn't test the advertisement in the context that it would be viewed or seen by the consumer. And therefore, his

testimony is completely irrelevant, Your Honor.

Now, we heard at summary judgment in response to our points, Your Honor, which weren't as fully developed as we have in this motion, that Scotts relies on this Court's decision in the PBM case. And with all due respect, I know the Court knows that case better than I do, but I think the difference between -- in fact, I know the difference between that case and this case was that the Court first found -- and that dealt with a "Compare to Enfamil" claim. So it was the same. The Court found that the claim was the same. Our case, the claim is not the same. It is different. We put in twice as much seed. It is very different from "No Filler, Twice The Seed" versus coated. And we don't know how the consumer reacts to that and we don't know in the context that it reviews. Also, in the Enfamil case, the PBM case, it was packaging for the most part. That's where that claim was, "Compare to Enfamil." It was on the packaging. So we knew the context in which the consumer was seeing it. For that reason, we believe that the PBM case is very distinguishable from the facts of this case and we would move to exclude Dr. Jacoby's testimony.

THE COURT: All right.

MR. DEMM: Good morning, Your Honor. Stephen Demm on behalf of the Scotts Company. We believe that the

motion to exclude Dr. Jacoby from testifying at trial should be denied. In the summary judgment order that this Court issued on Thursday, it noted that several material facts remain in genuine dispute on Scotts' claim in this case that Pennington's "Twice The Seed" advertising is false and misleading. In their motion to exclude, Pennington admits that the standard here for inclusion is relevance. And they even admit in their brief, Dr. Jacoby's testimony is relevant as long as it will assist the trier of fact to understand the evidence or to determine a fact in issue.

Now, Dr. Jacoby's survey, his report, and his testimony is clearly relevant to the issue of whether Pennington's "Twice The Seed" advertising is misleading and deceptive. Pennington tries to argue that Dr. Jacoby's survey now does not meet this broad relevancy standard because at the last minute they decided to pull one of the ads that Dr. Jacoby focused on.

But in trying to make this relevancy argument, they ignore the breadth of Dr. Jacoby's report and his findings. This Court already has it, but if the Court would like, I can hand up a copy of Dr. Jacoby's report, which I have tabbed at a few areas.

So on Page 3 of his report, Dr. Jacoby notes the objective of his survey, and the objective is to determine

to what extent if any is Pennington's comparative advertising for grass seed likely to mislead consumers. So that's the objective. Then he specifically notes at Page 12 and 13 of his report why the section called selection of test and control stimuli, and he notes specifically why he chose the ad that he chose. He notes specifically that his study relates to "Twice The Seed" and "Twice As Much Seed" advertising claims that Pennington makes about 1 STEP and about its SMART SEED products. And he says, this is a direct quote at Page 12, "The current Pennington advertising campaign consists of several radio and television advertisements as well as point of purchase and label advertising for its 1 STEP products, its SMART 1 FEED products and its SMART SEED products. He notes he selected the particular commercial that he selected to focus on, just because that commercial has the same characteristics as the other "Twice The Seed" claims that Pennington is making in other contexts.

Again, he says at 12 and 13: "A copy of the storyboard for the TV commercial selected to be tested in the present investigation is provided in Appendix D. This commercial possesses characteristics that appear in other contested Pennington advertisements. Specifically, numerous other advertisements for Pennington grass seed products make the claim that the advertised product has

"Twice The Seed" or "Twice As Much Seed" versus Scotts' products." And again, so he is testing that particularly because it includes the same type of claim that Pennington is making in these other contexts. And then likewise in his conclusions, in his summary of opinions which is back on Page 8, he notes that his opinions and his reporting beyond just that particular ad. He says: "Based upon the obtained findings it is my opinion that the tested Pennington commercial is likely to deceive substantial numbers of grass seed consumers into believing that Scotts EZ SEED product -- and it goes beyond just 'Twice The Seed' -- grows grass with inadequate roots, Scotts EZ SEED products did not grow healthy grass, and Pennington's EZ SEED product." At the end of that in the next sentence he says, "It is also my opinion that to the extent that other Pennington advertising contains the same elements, one could expect roughly the same findings would apply."

So his report does apply beyond this and his opinions and what he will testify on does apply beyond this.

It is hardly surprising that Dr. Jacoby, based on his survey he did here and experience in the field, would conclude it is likely to be equally deceptive whether Pennington says "Twice The Seed" or "We put in twice as much seed" or "2x the seed."

1  Both parties have treated this way the entire
2  case.  It is the same advertising claim.  It uses very
3  similar wording.  And it covers the same type of grass
4  seed products.
5  In fact, Pennington itself has recognized, and I
6  believe we will hear from Mr. Crow if he testifies today,
7  which I expect he will, that this is an integrated
8  advertising campaign for Pennington.  The theme being
9  "Twice The Seed" or "We put in twice as much seed or two
10  times the seed."
11  In fact, Mr. Crow has even said there is a halo
12  effect that they get from advertising "Twice The Seed"
13  across these different products.
14  So what Pennington has done here, they are
15  basically, we believe, trying to play games with the
16  stipulation proceeding that the parties have set up and
17  filed here.  At the last minute, they pulled the specific
18  TV advertisement, but they are now trying to get room to
19  make the exact same claim or the very similar claim by
20  just changing a few words or changing the context
21  slightly.
22  We believe that the PBM PRODUCTS case and what
23  this Court did there controls that.  In that case, this
24  Court rejected a motion to exclude a survey and an expert
25  report on false advertising because the proposed survey

1  fits Mead Johnson's claim and moreover may be used to
2  prove their claim on other Mead Johnson formulas.
3  So again, Jacoby's survey and report here
4  clearly fits the claims in this case.  The claims in this
5  case, which are still alive and at issue, are the "Twice
6  The Seed" claims that Pennington makes.  That is exactly
7  what Jacoby tested and what he opines on and what his
8  report is about.  And it can apply to other Pennington
9  products just like the surveys in PBM applied to other
10  Mead Johnson formulas.
11  Otherwise, if Pennington is allowed to get away
12  with this maneuver, then obviously it could continue to
13  make its false advertising claims just by slightly
14  changing a word or changing background text or changing
15  something in an ad and then saying, "There is no test,
16  there is no evidence."  That's clearly not the law.  If
17  that were, there would have to be ten different surveys
18  for every different permutation of the same "Twice The
19  Seed" claim that Pennington is making.
20  This Court and other courts have recognized that
21  that's not the law and that that's unworkable.  And that's
22  why in cases like this, whether it be trademark
23  infringement or false advertising, if the advertising
24  claim is found to be false and deceptive, which we believe
25  it is here, it gets enjoined.  It doesn't enjoin just a

1  specific ad or a specific commercial.
2  I have nothing further on that at this moment.
3  Did you want me to address Maronick?
4  THE COURT:  I don't think it would be very
5  helpful.
6  MR. DEMM:  Thank you.
7  THE COURT:  I'll let you have the last word on
8  Jacoby.
9  MR. SIMS:  Your Honor, I think counsel did
10  concede that there's changes in words, there's changes in
11  context in these ads.  And Your Honor, there was only one
12  of the 2012 television commercial that Dr. Jacoby examined
13  and did a survey on.  The "Twice The Seed," the "No
14  Filler, Twice The Seed" claims, the "No Filler, Twice The
15  Seed vs. Coated," they knew of that when they filed their
16  complaint.  They've got pictures of that at Paragraph 74
17  of their complaint, Your Honor.  They've got pictures both
18  of the bag and the point of purchase display trays.  So
19  this isn't something that's new out there.  They tested
20  only one claim, "We put in twice as much seed," in
21  connection with a commercial.  Then they want to
22  extrapolate that over to different words, different
23  context, in print advertising and packaging, Your Honor.
24  And Dr. Jacoby's own words explain what he is
25  doing.  He may have reached an opinion, Your Honor, he may

1  say that there is some connection.  But he has admitted
2  that it is a hypothesis.  He was asked, "As you sit here
3  today, whether or not your survey would apply to the
4  package or to the Internet or print ad.  That's just
5  speculation, right?  Answer:  It is a hypothesis that
6  would be in need of a test.  But it is an informed
7  hypothesis based on more than 45 years of consumer
8  research.  Question:  But it is speculation, right?
9  Answer:  All hypotheses are in a sense speculation.  They
10  have to be tested out."
11  In this case, they didn't test the claims that
12  we are now in Court on, Your Honor.  And there is no
13  empirical evidence to support a conclusion, and Dr. Jacoby
14  has admitted that he can only hypothesize.  So that's not
15  relevant.  That's of no assistance to the trier of fact.
16  Thank you, Your Honor.
17  THE COURT:  All right.  I'm going to deny both
18  of these motions.  As it relates to Dr. Jacoby, I can see
19  some potential relevance.  The fact that he hasn't tested
20  particular wording or particular context will certainly go
21  to the weight, and that weight may ultimately be zero.  I
22  have no idea.  But he will be heard.
23  This thing with Maronick, the motion is denied.
24  Are we ready to proceed?
25  MR. DANON:  Yes, we are, Your Honor.

```
 1              THE COURT:  All right.
 2              MR. DANON:  Good morning, Your Honor.  May it
 3    please the Court, Sam Danon on behalf of Scotts.  Your
 4    Honor, I know we have been before you a number of times, a
 5    full day preliminary injunction hearing and then we had an
 6    extensive argument last week.  But I'll try to keep the
 7    opening as brief as possible here and get to the point as
 8    far as what's at stake and what we are trying this case
 9    about.
10              Your Honor, I know we have been before you here,
11    but just a little background on who Scotts is.  Scotts is
12    a company that's based in Marysville, Ohio.  It was
13    founded in 1868.  And it has grown to become the world's
14    leading consumer lawn and garden industry leader, and as
15    you see as we popped up on the slides, it markets some of
16    the most well-known and strongest brands in that space.
17    Scotts, Ortho, Miracle-Gro, Roundup, Osmocote.
18              What this case is about is grass seed, and
19    Scotts' grass seed products are also the market leader in
20    that space.  It sells numerous what we call flavors, Your
21    Honor.  I think you heard that from prior testimony.
22    Flavors are the blends that the grass seed comes under,
23    depending on the region and the combination of seed
24    species.
25              It also includes, the grass seed also includes a
```

```
 1    TURF BUILDER line, which is coated.  And that technology
 2    is known as WATER SMART.
 3              Also in the grass seed business is the EZ SEED.
 4    EZ SEED is a product that Scotts developed.  It first
 5    launched in 2009 in a test area, and then it released it
 6    nationwide in 2010.  The product is often referred to by
 7    our associates as revolutionary or revolutionized the
 8    consumer grass seed space.  It offered a combination, and
 9    what we call now a combination product.  It offered a
10    combination of premium seeds, fertilizer, and mulch, all
11    in one application, and it introduced a new natural mulch
12    made from coconut which is super absorbent.  And that
13    product was revolutionary because it created a whole new
14    product line, a whole new category at these retail stores,
15    which was the combination product.
16              Scotts as a company has been an industry leader
17    in innovation and consumer experience.  That's what drives
18    its associates, that's what it is driven to do in its
19    business.  And these recent innovations, like the coated
20    seed with WATER SMART and EZ SEED, as I just described,
21    are just two examples of how Scotts stays as the market
22    leader that it has been for almost 100 years.
23              Now, what's this?  This is an example, Your
24    Honor, of what that super absorbent mulch can do.  It can
25    grow four times its size when water is applied.  And this
```

```
 1    is a demonstration, a marketing demonstration that was put
 2    together and you can see on the left side is the product
 3    out of the bag and on the right side of that picture is
 4    what happens when you water that product.  It grows to
 5    four times its size.
 6              So why are we here and what's left in this case?
 7    Well, Scotts is certainly not afraid of competition.  It
 8    has been around a long time and it has faced a lot of
 9    competitors.  But there comes a time when competitors go
10    too far in how they talk about Scotts' products and what
11    they try to do in order to try to get some market share
12    from Scotts.  In this case, the first claim that we just
13    heard some argument on, "Twice The Seed."  They are
14    pursuing a "Twice The Seed" claim on their bags.  They
15    have advertising, the most recent advertisement that you
16    will see is one from this year where they end saying,
17    "Pennington has twice the seed.  Scotts can't say that."
18    with a picture of a Scotts bag right behind it.  So that
19    is a marketing campaign that they pursue.  They pursue it
20    with the grass seed product.
21              And you will hear testimony and you have heard
22    testimony before in the preliminary injunction hearing how
23    "Twice The Seed" from our perspective, from our consumer
24    survey evidence, means twice the number of seeds.  There
25    is an actionable percentage of consumers that interpret
```

```
 1    "Twice The Seed" as having twice the number of seeds in
 2    there.  And you have heard testimony before regarding the
 3    counts that were conducted and the estimates that were
 4    conducted to show that there aren't twice the number of
 5    seeds.
 6              We don't dispute that bags of seed are sold by
 7    weight.  We also don't dispute that in certain
 8    circumstances, some of our coated product is going to be
 9    50 percent coating and compared to other products of
10    Pennington, maybe 50 percent by weight.  But what we are
11    focused on here is the consumer message and the message
12    that "Twice The Seed" means or is interpreted as twice the
13    number of seeds, which they cannot establish across their
14    product line or even on a number of specific bags.
15              The ad on the right is the clip of the end of a
16    TV ad, and that is what you will hear throughout this case
17    as the lift test, lift tray test, however we are going to
18    talk about it.  But as you can see, Pennington ran some
19    tests, and they end the ad by showing two hands grabbing a
20    fistful of the grass and lifting the tray and showing EZ
21    SEED and 1 STEP COMPLETE right behind there, and showing
22    EZ SEED or trying to demonstrate that the EZ SEED came
23    apart, and from there, making claims that the EZ SEED does
24    not have the ability to establish roots in a sufficient
25    way.
```

1    So the four issues as I go through here, "Twice
2 The Seed" claims, the lift test, which is the one I just
3 reviewed, a part of that lift test results. Pennington is
4 also making a claim that 1 STEP COMPLETE's better mulch is
5 responsible for the results of that lift test. And then
6 Pennington is moving or what's left in Pennington's claim
7 as we understand it is Scotts' claim that EZ SEED's mulch,
8 what I talked about earlier, the mulch with the coconut
9 fiber, our claims that EZ SEED's mulch absorbs and holds
10 water better than 1 STEP COMPLETE's mulch.
11    I went through the "Twice The Seed" claim, Your
12 Honor. This is another slide with that. I think that we
13 are about to resolve an issue regarding the EZ SEED, or
14 "Twice The Seed" as EZ SEED, which is a follow-up from the
15 withdrawal that was taken before the summary judgment
16 hearing, and there is still, because there's still some
17 ads out there that are "Twice The Seed" versus other
18 competition or other combination products, obviously,
19 Scotts and other -- Scotts is another combination product
20 and obviously that's directed at Scotts, I think we are
21 going to have some conversations during the break to deal
22 with that.
23    What the evidence will show and what we are
24 presenting before you, Your Honor, besides twice the seed
25 count, we have had physical counts, you have heard that

1 testimony, you have seen the exhibits introduced during
2 the preliminary injunction hearing that consisted of
3 physical counts Scotts did, mathematical estimation based
4 on the generally-known estimates of seeds per pound by
5 species. There were physical counts, confirmatory
6 physical counts by a seed technologist. And as this Court
7 already found in the PI order, that there aren't twice the
8 number of seeds in the Pennington SMART SEED products.
9    There will be the testimony of Dr. Jacoby. Dr.
10 Jacoby's study found that 40 percent of consumers, which
11 is, I think we all agree, is an actionable percentage of
12 consumers, were misled or confused to believe that "Twice
13 The Seed" is by number and means the number of seeds. As
14 well, another exhibit that you had heard about in the
15 preliminary injunction hearing and you will hear about is
16 Dr. Beard's treatise, which is he is an authority on the
17 turfgrass industry and he has his own comment regarding
18 the confusion that can occur, that the layman can see,
19 particularly when they are selling blends.
20    We believe as a result of discovery, too, that
21 Mr. Hignight, who is Pennington's R&D person and scientist
22 and employee, that he, through discovery we have seen some
23 documents where Mr. Hignight has confirmed that seed size
24 and blends can mislead consumers into understanding
25 what -- or the counts that go into the bags.

1    Finally, through discovery, we also found
2 Pennington documents where they themselves described these
3 claims as seed counts and confirm what the interpretation
4 or the message of those seed counts are.
5    Application rate: Your Honor, you heard some of
6 that during the PI hearing and application rate is going
7 to be something that we are going to talk about a lot
8 during this trial because it is our position and what we
9 will establish is that in that lift test that Pennington
10 has submitted, they have submitted a number of studies of
11 their own where they have compared Pennington's 1 STEP to
12 EZ SEED and made certain claims regarding that, including
13 the lift test and then some other claims regarding
14 rooting.
15    The biggest difference and the issue here is
16 that all of Pennington's tests apply the EZ SEED product
17 and the 1 STEP COMPLETE product at eighth-of-an-inch,
18 eighth-of-an-inch thickness. That is not the rate that EZ
19 SEED was created or developed to be applied at. It is not
20 the rate that Scotts intends or intended that product to
21 be applied. And in fact, that rate is inconsistent with
22 the current packaging that EZ SEED has on its containers.
23 And you will hear testimony both from Scotts' R&D and from
24 some independent experts showing how that is just, the
25 application of eighth-of-an-inch of product, is a huge

1 application or over application of the product, yields to
2 seeding rates, which really means the actual pound of seed
3 per square foot, into seeding rates that are not
4 agronomically sound and excessive. It also becomes
5 scientifically unreliable because it is just variable.
6 You can't replicate it from test to test. That is why in
7 studies that you will see from Scotts and from some of the
8 independent scientists that are testifying on behalf of
9 Scotts, you will see that they apply product always on a
10 weight per square foot basis.
11    This is explaining the Scotts application rate,
12 Your Honor. Again, this product when was developed was
13 developed to be applied at 1.875 pounds per 20 square
14 feet. The bag of 1 STEP COMPLETE says a planting rate of
15 one pound per 20 square feet, and those are the rates that
16 the Scotts R&D Department used. Regardless of what, you
17 know, Pennington is going to say about eighth-of-an-inch
18 because the EZ SEED container when we were here before you
19 in the preliminary injunction hearing, that prior
20 container of EZ SEED did include an instruction about
21 applying a thin layer of eighth-of-an-inch. There was
22 testimony about that. You will hear about that during
23 this trial. But regardless of what used to be on that
24 container, the new container does not have that. EZ SEED
25 very clearly indicates now what the consumer should do,

and what the directions for use are on the back of the
container show how products should be applied, and all the
testing that Pennington has done has applied product
inconsistent with the directions for use for EZ SEED that
are on the back of the panel.

The lift test I already talked about. I think
I'll pass through that. Basically, with the lift test,
what you are going to hear from our testimony, from our
experts that are testifying, methodology was not going to
be scientifically reliable in the context of how the test
was created or applied. But the biggest issue you are
going to find from there is the misapplication of EZ SEED,
which grossly over applied our product, four times as much
regarding the proper application rate. We did last night
get information finally as to -- that would allow us to
calculate what this application rate is on a weight per
area basis. And that confirms what our experts were
prepared to testify that they had seen by visual
observation and also what they have been able to calculate
in some of the reports. But at the end of the day, now
that we have this confirmed through last night, some
information we got last night from Pennington, it confirms
there was just a gross over application of the product.

You will hear some other issues that we take
with the testing, but really, at the end of the day and

the bottom line is, that the testing that was done to try
to support this is just inconsistent with any rate that
Scotts intended this product to be used and any rate that
is now on the back of the panel as far as instructions.

Then what's left as far as what Pennington is
claiming against Scotts is the claim, quote, "Absorbs And
Holds Water Better Than Paper Can." Your Honor, you will
hear testimony about the absorptive quality or qualities
of EZ SEED. I think you will hear throughout this
testimony, there is no issue that EZ SEED and the mulch in
EZ SEED absorbs a lot of water. And I don't think it is
going to be disputed that EZ SEED and the mulch in EZ SEED
absorbs more water than the mulch in 1 STEP COMPLETE.
This is just an example of, again, how the product can
grow. You can see on the top there's two containers, one
with 1 STEP COMPLETE on the left, the container on the
right has EZ SEED, and then after they are watered, you
can see how each one grows but you can see how the EZ SEED
expands to cover that entire tray.

And so you will see in the testimony how EZ SEED
absorbs more. All our tests and the testing that's been
provided both at the hearing and what we will talk about,
the preliminary injunction hearing and what we will talk
about with our witnesses, will confirm that. Pennington's
expert confirms it. And you will also see data confirming

a claim that Pennington, I think, is challenging, which is
the claim by Scotts that the product actually absorbs
eight times its weight in water. You will see the data
that supports that.

From Scotts you are going to hear from
Mr. Faust, who was here during the preliminary injunction
hearing. You will also hear from an independent
scientist, Dr. Hummel, who has ran his own test and
confirmed both the claims that are being made regarding
the absorption claims of the mulch.

Another point, testing reliability. We just
want to emphasize in this case when you see a lot of these
studies and a lot of these testings, keep in mind that
Pennington's testing is all by an employee. It is all by
an internal R&D Department. And even to the extent they
have a professor, that professor is on retainer for
Pennington. So everyone that you are going to hear on the
science end from Pennington is going to be someone who is
either an employee or on a retainer.

From Scotts, you are going to hear from
Mr. Faust, from the R&D Department, and you will hear from
two independent experts outside of Scotts. One, Dr.
Rogers from Michigan State University, and then Dr. Hummel
who did the absorption testing, an ex-Cornell University
professor and owns an independent lab.

So Your Honor, in sum here, the Court has
already found Pennington's products do not contain twice
the number of seeds than Scotts grass seed. That's in the
PI order at Page 8. The application rate that Pennington
has used is unreasonable. It is unreliable. You will see
the variability. And it contradicts the current EZ SEED
directions for use. It is unquestionable at this point, I
think, that EZ SEED's mulch absorbs and holds water better
than 1 STEP. You will see those studies and see the
support. And in fact, as it has already been found by
this Court in the preliminary injunction, after the
preliminary injunction hearing, it found that Scotts'
testing, the testing that we had introduced during that,
supported our establishment claims and that Pennington had
failed to demonstrate that our testing was not
sufficiently reliable.

Finally, Your Honor, there is one claim left
regarding a claim that Pennington makes at the end of its
ad, and you will hear this in one of the television
commercials that's playing this year, calls itself Honest
Green. We have taken issue with that. And basically, it
is a very simple argument, Your Honor. If they are making
false claims about "Twice The Seed," they can't claim to
be honest in that ad.

With that, Your Honor, we look forward to

presenting our testimony and conducting this trial. Thank
you, Your Honor.

THE COURT: All right. Pennington?

MR. ROTHSTEIN: Good morning, Your Honor. Thank
you for hearing us here in this trial. We look forward to
spending a few days with you. And I'll try to keep this
brief. We will try to stay to the point. We will try not
to repeat too much that Your Honor has heard before.
Obviously we are going to try to create a record, but we
will try not to belabor points that I think Your Honor has
heard perhaps four times now.

The first thing I'd like to do is just play the
Scotts commercial that remains at issue in this case.

(Video played.)

All right, Your Honor, now I'm going to play the
radio ad that remains at issue in this case.

(Audio played.)

Your Honor, I played those commercials at the
beginning. I hope I never have to play them again, and I
hope Your Honor rules that they never have to be played to
consumers again. But with that said, I think that the
tenor of our argument here today and this week is going to
be that Scotts is making unbridled claims of superior
performance with its EZ SEED product; that it outperforms
the Pennington product. And as you can see on this bin

display that they are showing at the point of purchase,
they claim to have withdrawn it, but it conveys the
message that has been conveyed throughout their
advertising for this product: That this revolutionary
growing material, this super absorbent mulch, outperforms
Pennington 1 STEP COMPLETE.

Now, on the flipside of that, the advertising
issues that remain in controversy on the Pennington side
have to do with SMART SEED. I just want to clear up for
Your Honor, because I think this is a point worth
repeating and you are going to hear it perhaps over and
over again in this trial, is that there are two products
or two types of products at issue. One is a straight
grass seed product. And on the Pennington side, we've got
a product called SMART SEED. That's just a straight seed.
It has nothing on it, doesn't have filler or any other
coatings. And on the Scotts side, they've got this TURF
BUILDER WITH WATER SMART. And that's a coated seed
product. So if you buy the bag of seed and you pour it
out, you will just see coated seeds. You will see -- you
won't actually see the seeds, you will see a coating over
the seeds.

On the other hand, there is the EZ SEED and 1
STEP COMPLETE products, and those are the combination
products. And they are quite different. Do they have

similar applications? They do. They both have seed in
them. But one telling difference is that while Scotts
does manufacture a coated seed product it calls TURF
BUILDER WITH WATER SMART, the EZ SEED product, that's
their combination product, the seed inside the product is
not coated. I think that's a very important distinction
that we should all keep in mind as we proceed through this
trial.

And this is just another slide, Your Honor, that
I want to just point out for you, because it shows all the
contexts in which Pennington makes its "Twice The Seed"
claim as to its SMART SEED product. On the ones that you
are seeing on the screen, Your Honor, it says: "No
Filler, Twice The Seed" compared to coated seed products.
So I think that really calls out a distinction that Scotts
captain run from, and that is that this comparison is not
being made to uncoated seeds, and the only seed at issue
in the case then is coated seed, which is their TURF
BUILDER WITH WATER SMART, and it is not the uncoated seed
inside of EZ SEED, as I'll get to just a little bit
later, I'm not going to repeat any of these arguments,
that's why we think the Jacoby survey is irrelevant.

Your Honor, you are going to hear from a number
of witnesses on this case on behalf of Pennington. One is
Mr. Kenneth Highight. He is an expert who has 23 years of

experience testing grass seed products. He worked with
NexGen Turf Research. He has released over 100 cultivars
and has done extensive testing over the years, 38 tests
involving 1 STEP COMPLETE and/or EZ SEED, and he has done
extensive testing on the straight grass seed products,
those being SMART SEED and TURF BUILDER WITH WATER SMART.

You will also hear from a professor, his name is
Dr. Douglas Karcher. He has a Bachelor of Science in
agronomy and Master's of Science and a Ph.D. in crop and
soil sciences. He is well published. This is what he
does. He tests grass seed products. And he has been peer
reviewed with a number of articles over the years. And
most importantly, he conducts statistics. And you are
going to hear a lot about statistics in this case. And
the importance of statistics is if you test one bag of
seed or test one product, and you have no ability to
project whether or not the behavior of that product in
that one test that you conducted is going to translate to
the rest of the products in the marketplace, then it is
useless. And that's why Dr. Karcher conducts this
statistical analysis, so that the results can be projected
over a population. Scotts doesn't bother to do that so
you can't rely on their science.

You are going to hear, Your Honor, from Dr.
Thomas Maronick. Dr. Maronick performed a survey in this

case. The survey dealt with the television commercial that I just played to you. But the conclusions in the survey, in his survey, were that Scotts is making superiority claims. They are claiming that based on these superior characteristics that they parade through the advertisements and the disparagement of our product in those ads, that their product performs superior to 1 STEP COMPLETE. And we have extensive testing, extensive testing that that's false. Not only that, Scotts' experts are all going to admit, at least in their own testing, that the product performed the same. So they have no basis to claim superiority of their EZ SEED product over 1 STEP COMPLETE.

You are also going to hear from Dr. Gary Ford. He is a very well-credentialed Ph.D. marketing expert. And he will provide criticisms to Dr. Jacoby and Dr. Jacoby's survey, which we believe is just a gerrymandered survey. It fed responses to the respondents in the survey. It begged for them to provide certain types of responses to the questions so he could get the result that he was looking for. Because one thing we do know about Dr. Jacoby is, that he is experienced enough that when he designs a survey, he can design it to get the result that he wants.

Now, Scotts' claims are false and misleading.

First, they are claiming that their product, their EZ SEED product, outperforms or is superior to 1 STEP COMPLETE in that it holds and retains water better than 1 STEP COMPLETE, that it absorbs and holds eight times its weight in water and that's something that ground-up paper in Pennington 1 STEP COMPLETE just can't match; that it outperforms paper mulch. The falsity of these ads is demonstrable, Your Honor, because the EZ SEED product does not outperform 1 STEP COMPLETE.

You are going to see extensive science from Mr. Hignight and backed up by Dr. Karcher that when you look at the characteristics of water retention, which is a claim that resonates throughout Scotts' advertising, that in fact 1 STEP COMPLETE has superior water retention characteristics versus EZ SEED. But not only that. You are going to hear from Scotts' own experts that they don't believe that the water retention characteristics as between EZ SEED and 1 STEP COMPLETE are any different. And that's going to back up the very point that we are trying to argue here, that the EZ SEED product is not superior to 1 STEP COMPLETE.

You heard in Mr. Danon's opening statement argument about the extreme and severe over application of the Scotts product; that when Mr. Hignight performed his tests, he applied it at this eighth-of-an-inch rate. And

he also alluded to a new package that involves the removal of the one-eighth rate.

Your Honor, I mean, they introduced that new package this year. And we can talk about that new package because there's some interesting facts that we are going to inform Your Honor of. But if the consumer is being told, and you can see here on the right-hand side of the page that they should apply an eighth of an inch to bare spots, and sixteenth of an inch to thin areas, that those are the two rates that the consumer is going to apply those products at. There is no other indication on the bag that they should apply it at a different rate. And you are going to hear from one of the experts, I'll get to this later, that maybe if they have extremely superior math skills they could figure it out, but that's what the consumer is being told. So if the consumer is being told to apply it at that rate, then apparently Scotts is telling them to severely over apply the product.

Well, all I can say is that, Your Honor, on the Pennington bag it says an eighth of an inch. On the Scotts bag it says an eighth of an inch. And the tests that were conducted by Pennington by Mr. Hignight were done at an eighth of an inch, just like consumers are told to do.

Now, there is an issue in this case about

consumer experience and what's relevant to consumers. And Mr. Hignight is going to explain that when he applied water to the products, and he applied it from above as opposed to soaking them in a water bath, and I don't know if Your Honor recalls from last year when we argued these points, but it became apparent that what Scotts did is that they soaked the products in a bath of water to come up with the various calculations that they did. But what you are going to hear from all of the experts in this case is that consumers don't apply this flood or subsurface irrigation type of watering to grass. Scotts' own expert, Dr. Hummel, somebody you are going to hear from, he acknowledged this. I asked him, "Are you aware of any situation where a consumer would be able to flood or apply subsurface irrigation to the product?" He said, "No." I said, "That's not the intended application of the product, correct?" He said, "That's correct."

Now, another critical point that you are going to hear about in this case is that Mr. Hignight tested the products on top of soil, which is how consumers use them. And Dr. Hummel, that's Scotts' expert, acknowledged -- I said, "And consumer experience would involve utilizing these products on top of soil, right?" He said, "Yes." Why is that important? Because all of his tests were done in a beaker outside the presence of soil.

You are going to hear from a number of experts from Scotts who all did experiments. And none of them, none of them, did testing of the EZ SEED product or the 1 STEP COMPLETE product to come up with their absorption and retention and superiority claims on soil. So when I asked Dr. Hummel at his deposition, I said: "So let me just ask you this. When you conducted your absorption and retention studies, you did not introduce soil as a confounding factor, right?" He said, "Correct." I said, "Okay, you didn't use the soil at all, right?" He said, "Correct." "Okay, so your studies were incapable of measuring the interaction that will occur when the mulches and the seed interact with the soil in the real world, correct?" He said, "That's true."

We are here to talk about the real world. We are not here to talk about abstract concepts in a laboratory. Because this is an advertising case. And advertising goes to consumers in the real world who use the products as they are intended to be used. And in this case, on soil.

Now, you are also going to hear from an expert, this guy, his name is Dr. Rogers, Dr. Trey Rogers. And you are going to hear straight from his mouth that the mulch in EZ SEED is actually inferior, that it is not providing a benefit to consumers. I'd just like to play

you a short clip from his deposition.

(Video played.)

That's Scotts' own witness. Their own expert witness who just testified to that.

Now, let's turn to the lift test. You have heard and seen some pictures about the lift test. And Mr. Hignight conducted and designed some very, very strong tests that were scientifically valid and they were methods for comparing the rooting capabilities of EZ SEED and 1 STEP COMPLETE. And the reason this is important, Your Honor, is that it is all about the differences in the mulch. It is whose mulch is providing an environment for the roots of these grass seeds to effectively reach the soil where they belong. And when I talked to Dr. Rogers at his deposition about this point, I said, "And so if the grass seed, once germinated, has trouble rooting into the soil because of the composition of the mulch product, it might result in poor and not deeply rooted roots in the soil; is that right?" He said, "That's right."

"So," I said, "at least theoretically, this lift test conducted Mr. Hignight could help to determine whether the roots of the blades of grass rooted deeply into the soil or not, correct?" He said, "Depends on how deep the soil is, I guess." So I said, "But the experiment could be used for that purpose, right?" He

says, "It could. I guess it could."

He just validated, Your Honor, the fact that the testing conducted by Mr. Hignight, this lift test featured in the commercials, is a valid scientific method for testing the rooting capabilities of these products.

And what you are going to see from Mr. Hignight is that he conducted statistics and that, as you can see from this slide, Your Honor, that the statistics bore out that the successful lift probability for 1 STEP COMPLETE was far superior to that of EZ SEED, as it appears in the commercial.

Now, we have talked a little bit about rates of planting, Your Honor. And what you can see here is the different rates that we are talking about in this case. On the right-hand side of this slide you are going to see that an eighth of an inch, as stated on the bag for both EZ SEED and 1 STEP COMPLETE, looks like that. It is a complete cover. And you are going to see and hear testimony, Your Honor, that that's the way these mulch products are intended to be applied. But when you hear from Scotts and the testing that they conducted, they, in our view, severely under applied the 1 STEP COMPLETE product, and we think intentionally so, to plant it at the rate that you can see on the left-hand side of this page, where on the top you can see the green product is the

sparse EZ SEED product. And it is not intended to be planted that way, because when it is, it doesn't create that complete covering that you are going to hear in testimony is important. And then at the bottom is the rate that they used for the EZ SEED product, which is not an eighth of an inch thickness like you see on the right-hand side of the page, which is what they are telling consumers to apply it at.

Now, in talking about this application rate, Scotts' own expert can barely explain his application rate, and he admits that consumers aren't going to be able to replicate it. When I asked him about this, I said, "How would the consumer arrive at the application rate he arrived at, the 1.875 pounds per 20 square feet?" He answered: "It would be challenging for them to do that." I said, "Right, they really couldn't with the information provided, could they?" He said, "I did." I said, "But tell me how an individual consumer would replicate what you did." He said, "I don't know how. I mean, if they would, if they had a strong math skill, they probably could do that."

We are not talking about testing the consumer with strong math skills to pick up a bag and test the calculations on weights on the bag and maximum coverage rates that appear on the back of the bag. That's really

not what Scotts is telling the consumer to do.  They are
just telling the consumer to apply it at a rate that they
indicate on the back of the bag and that at the time was
an eighth of an inch.

Dr. Hummel is going to admit that his
application rate was based on what the attorneys told him
to do.  Watch.

(Video played.)

So in other words, Dr. Hummel, in conducting his
tests, didn't even bother to do an independent analysis as
to whether that rate was correct.  He just did what the
attorneys told him to do.  That's not proper science, Your
Honor.  And that's the quality of expert that you are
going to hear from on the Scotts side.

Dr. Hummel admits that his application in fact
was not correct.  He said at his deposition:  "If I were
setting this up, this experiment up, I would have done
them both at the eighth of an inch thickness."  That's
what he admitted.  He admitted that he would have done it
at the rate that Mr. Hignight did it in his test.

He admits that his application rate was not
correct in saying:  "Right."  "And in your view, the
correct way to have conducted this test would have been to
apply both products at an eighth of an inch, which would
have been identical, correct?"  He says:  "If I had to do

it again, that's how I would do it, yes."

He completely retrenched and retracted his
opinion at his deposition because he realized you've got
to treat the products fairly, and you've got to apply the
directions on the package.  He didn't do that.  And he
said in hindsight he wishes that he did.

You are also going to hear testimony, Your
Honor, Mr. Danon alluded to this when he was talking in
his opening statement, that Scotts changed its label
instructions this year.  But what's ironic about that is
you are not going to see a single test from Scotts
applying that new application rate.  Not a single test
that they did in this case applies that application rate.
They actually just, they rely on the old bag.  And the
instructions that they claim, if you have strong math
skills you could figure out from the old bag.  But you're
not going to hear about any of the application rates that
they might allege exist on the new bag.  Which, to me,
says what we are talking about in their testing is
absolutely and completely irrelevant to what they have got
in the marketplace today.

Your Honor, I want to talk for a minute about
the "No Filler, Twice The Seed" claim that I alluded to
before.  I showed you a bunch of pictures of it.  You have
heard this all before.  I don't want to belabor the point.

But I think that it is worth repeating very quickly, that
the Federal Seed Act, the Georgia Seed Act, and the
Association of Official Seed Analysts, that's AOSA, all
call for seed to be measured and sold by weight, not by
counting the individual number of seeds.

Mr. Faust, that's Scotts' in-house witness, said
that's how seed is sold, by weight.  Scotts admits that
SMART SEED contains twice the seed as its TURF BUILDER
products on a weight basis.  And again, that's admitted by
Mr. Faust, their own witness.  And it is worth pointing
out, Your Honor, that there is no dispute.  There is no
dispute in this case that across the board, the "Twice The
Seed" claim as justified by weight is absolutely and 100
percent true.

And without Mr. Jacoby or Dr. Jacoby's survey,
which we think Your Honor should apply absolutely no
weight to, they've got no evidence of falsity at that
point.  The law is very clear that if a claim is literally
true, they've got to have survey evidence to demonstrate
that it is misleading.  But if they didn't do a survey on
the product, that being SMART SEED, and the actual claim,
that being "No Filler Twice The Seed" or
"vs. TURF BUILDER," that they've got no evidence of
falsity in this case, and Your Honor should rule as a
matter of law that they can't meet their burden.

And the final point I want to make on that, and
you heard this earlier this week, or about a week ago when
we were before Your Honor on the summary judgment motion,
that Scotts doesn't make an uncoated TURF BUILDER product
anymore.  And as a result, the argument that they made
that if consumers believed that the comparison is to the
commodity grade TURF BUILDER product, that argument is out
the window because that product is not being made and sold
by Scotts anymore.

You heard a little bit about seed counts, Your
Honor.  The only thing I can say about this right now, and
you will hear a lot of testimony about it, is that there's
no statistics.  So beyond what Mr. Caldwell did or perhaps
what Mr. Levy did, and you might hear a little bit of
testimony about those two individuals, what they can
testify about might only apply to those particular bags of
seed, but not anything beyond that, because they applied
absolutely no statistics to demonstrate that the results
are applicable beyond the very experiment that they did.

You are going to hear a lot of criticism of
those tests on behalf of Mr. Hignight and Dr. Karcher.
And it is, I think, going to bring out the point, Your
Honor, that this whole point of seed counting is
completely purposeless and irrelevant to the sale and
manufacture of seed, at least as it is demonstrated and

represented to consumers, because the laws and the
industry regulations and the industry bodies have all
universally adopted this concept that seed is to be
represented by weight and nothing else.

Again, Your Honor, I'm not going to belabor this
point, but I think that Scotts' real argument in this case
is that consumers might misunderstand that the content of
the seed as represented based on the advertising claims is
misunderstood, not that it is misleading. But
misunderstood claims are not actionable under the Lanham
Act.

Your Honor, we have argued, and I'm not going to
belabor this point, either, but the Jacoby survey, we
think, is irrelevant to the current case, irrelevant to
the claims at issue that remain at issue, and as a result,
should be completely discounted. And as a result, the
Court should find that there is no evidence to back up the
claim that the "Twice The Seed" claim, that it currently
exists in the marketplace, is misleading.

So with that, Your Honor, I just want to say
that it is Pennington's view, and we are going to argue
through witnesses in this case, that Scotts' claims that
they hold and retain water better than paper can, that
they retain water in a way that Pennington COMPLETE just
can't match, that they outperform 1 STEP COMPLETE, and

other such superiority claims, are false and misleading.

We are also going to prove that the evidence
will further demonstrate that Pennington's SMART SEED,
Pennington's SMART SEED's "No Filler, Twice The Seed"
claim in all its forms is completely truthful and not
misleading. Thank you.

All right.

MR. DANON: I would just like to move to strike
those portions that consisted of deposition testimony of
available witnesses, witnesses that are going to testify
here, that would otherwise be inadmissible during the
proceeding. I would just like to move to strike those
from the record.

MR. ROTHSTEIN: It is just part of an opening
statement, and I think deposition excerpts are used all
the time in opening statements to get the point across.
Of course you are going to hear from those witnesses, as I
explained while I was providing my opening statement.

THE COURT: All right. Your motion will be
denied.

Let's take about ten minutes before we have the
first witness.

(Recess taken from 10:50 a.m. to 11:10 a.m.)

THE COURT: All right. Scotts?

MR. DANON: Your Honor, we would like to call

John Sass.

JOHN SASS,
called as a witness by and on behalf of the plaintiff,
having been first duly sworn by the Clerk, was examined
and testified as follows:

MR. DANON: One preliminary matter before we
start. I would like to advise the Court, the two sides
have agreed on at least a tentative order of witnesses.
We will be alternating witnesses or we will be taking them
out of order by really just theme and also by
availability. I just wanted to raise that so you know for
purposes of cross or redirect there may be some, you know,
on cross they will elicit what they would have done in
their case.

THE COURT: All right. Sure.

MR. ROTHSTEIN: That's correct, Your Honor. I
think it is a function of the fact that we have competing
cases going on and we thought that was the fairest way to
do it.

THE COURT: That's fine.

DIRECT EXAMINATION
BY MR. DANON:
Q    State your name for the record.
A    My name is John Sass.
Q    Mr. Sass, could you tell us about your educational

background?
A    I have three degrees, all from The Ohio State
University. In 2000 I graduated with a Bachelor of
Science in business administration. In 2001 I received a
Masters of Arts in sports management. In 2005, a Masters
of Business Administration, again all from Ohio State.
Q    What do you do now?
A    Currently I'm the Vice-President of Marketing for the
Gardens Division at Scotts Miracle-Gro.
Q    And how long have you worked for Scotts?
A    Since January of 2005.
Q    Can you tell us about the positions you have held at
Scotts?
A    Since my starting at Scotts in January of '05, I have
had all marketing-related responsibilities and roles. I
started as an Assistant Brand Manager on the Brand Team,
then was promoted to Brand Manager, Senior Brand Manager,
and then ultimately Director of Marketing on the Grass
Seed Division and then now as of May of this year,
Vice-President of Marketing.
Q    Can you tell us about what your current duties and
responsibilities are as Vice-president of Marketing for
the lawn and garden business?
A    So current responsibilities are within the gardens
business, as I mentioned, which is essentially all of the

1  Miracle-Gro-branded products, having from soils to plant
2  foods to live goods.
3  Q   And could you describe for us your responsibilities
4  when you were Director of Marketing for the grass seed
5  business?
6  A   As the Director of Marketing for grass seed, my
7  responsibilities were more tied to the day-to-day
8  management of the grass seed business.  So everything from
9  the product and product development, the advertising, the
10 selling materials, et cetera, working with the cross
11 functional team.
12 Q   How many members of the team did you have when you
13 were Director of Marketing?
14 A   There was three direct reports and myself that worked
15 on grass seed, and then I had one additional person on our
16 lawns controls.
17 Q   Tell us a little bit about Scotts and where it is
18 based and a little history.
19 A   Scotts today is the global leader in lawn and garden.
20 It started in 1868 in Marysville, Ohio, which is today
21 where our headquarters still are.  We have roughly 8,000
22 associates worldwide, and the products we market under at
23 least in the U.S. are some of the biggest in Scotts:
24 Miracle-Gro, Roundup, Osmocote and Ortho being the
25 biggest.

1  Q   Focusing on when you were Director of Marketing for
2  grass seed, what were the product lines that were the
3  focus of your job?
4  A   Within grass seed we had two products lines we sold,
5  straight grass seed product line, which is essentially
6  grass seed in the bag, so no other mixed-in components for
7  the most part, then we had a series of combination
8  products, which are products that include both grass seed,
9  but then also fertilizer and a mulch material as well.
10 Q   And going back to your role in marketing, do you have
11 any interaction or coordination with the R&D Department?
12 A   Absolutely.  So part of the, you know, the day-to-day
13 operation would be involving R&D on a regular basis.  We
14 would have a standing weekly meeting where we would do
15 product development types of meetings and conversations,
16 but we worked very closely with the R&D group.
17 Q   And going back to the product line that you
18 identified, could you identify the straight seed product
19 line?
20 A   So within the straight seed line we have a couple
21 different sub brands, the biggest being Scotts TURF
22 BUILDER product line.  And within our straight seed line
23 we have products that are uncoated grass seed, but then we
24 also have products that are coated, which we talk to and
25 refer to as the WATER SMART coating.  All fall under TURF

1  BUILDER.
2  Q   Just very briefly, what is the coating, coated seed,
3  what coating goes on the seed?
4  A   Essentially what we did was we took the grass seed
5  that we sold in the past and added what we refer to as a
6  WATER SMART coating.  And really, it is a wrap component
7  that wraps each individual seed with added value and added
8  benefits to a consumer.  So, you know, in this instance
9  the biggest one being water retention and absorption,
10 which we refer to as WATER SMART.
11 Q   You have referred to different flavors of products.
12 What does that mean?
13 A   So within the grass seed line, whether it is the
14 combination or straight seed products, we have a variety
15 of formulas that are agronomically correct depending on
16 parts of the country or consumer home lawn conditions.  So
17 whether it is a Dense Shade Mix or a High Traffic Area or
18 it is a straight Tall Fescue Blend, we refer to all those
19 different types of products just as flavors, just for ease
20 of reference.
21 Q   And do those blends or mixes have different kind of
22 seeds, species in them?
23 A   Absolutely.  They all have a variety of different
24 species and varieties.
25 Q   Now, what combination products, what is the line

1  under the combination products?
2  A   So the biggest being Scotts EZ SEED.  We have Scotts
3  PATCHMASTER.  The biggest one was Scotts EZ SEED.
4  Q   What is EZ SEED?
5  A   EZ SEED is a combination product that as mentioned
6  earlier would have premium grass seed.  It includes a
7  fertilizer and a mulch which is a super absorbent material
8  we refer to as coir.
9  Q   Are there also different flavors of EZ SEED?
10 A   There are.  So we have different mixes for different
11 types of lawns like a Sun & Shade or a Tall Fescue Lawn.
12 Then we also have kind of more specialized products in the
13 portfolio with a Dog Spot Repair product and a Winter Lawn
14 Mix product as well.
15 Q   Where was EZ SEED developed?
16 A   Where?
17 Q   Yes.
18 A   So primarily within our R&D facility in Marysville,
19 Ohio.
20 Q   When was it developed?
21 A   I believe the development started in, you know,
22 probably in the 2005, 2006 time frame.
23 Q   When was it launched from a marketing perspective?
24 A   It launched regionally in the Midwest and Northeast
25 U.S. in 2009 and rolled out nationally in 2010.

```
 1   Q    And in your role, are you familiar with the products
 2   of Pennington?
 3   A    I am.
 4   Q    Okay.  And do they also have grass seed products that
 5   compete with Scotts' products?
 6   A    They do.
 7   Q    Do they have similar or comparable blends and mixes?
 8   A    Yes, they do.
 9   Q    And are they marketed under similar names for the
10   mixes?
11   A    Very similar, yes.
12   Q    What are some examples of that?
13   A    So within -- Pennington offers a SMART SEED line,
14   which would be a straight grass seed product line that
15   would compete directly with our Scotts TURF BUILDER line,
16   and you would have on a store shelf a very similar Scotts
17   TURF BUILDER Sun & Shade mix next to a Pennington SMART
18   SEED Sun & Shade mix.  And then likewise on the
19   combination side, they offer a product line called
20   Pennington 1 STEP COMPLETE, which would compete directly
21   with Scotts' EZ SEED, and likewise they would have for Sun
22   & Shade lines that would compete directly against the EZ
23   SEED version.
24   Q    And as part of your role in marketing, were you
25   familiar with Pennington's advertising of its products?
```

```
 1   A    Yes, I am.
 2   Q    And what about Pennington's advertising where they
 3   would compare to the Scotts products?
 4   A    Yes, I am.
 5   Q    Are the ads that Pennington would put on, how would
 6   they come to your attention?
 7   A    They would, so as the Director of Marketing, they
 8   would come from a variety of places, so whether it is our
 9   sales force out in the marketplace or our advertising
10   agency, if we would hear about an ad, we would have them,
11   you know, track it for us and find the right ad.
12   Q    Are you aware of Pennington's "Twice The Seed"
13   claims, comparing SMART SEED to Scotts TURF BUILDER?
14   A    I am.
15   Q    Let me play for you a television ad, Number 231.
16        (Video played.)
17        Did you know when this ad played or is playing?
18   A    This ad aired this spring, in 2013.
19   Q    And is there a use there of Pennington's "Twice The
20   Seed" claim against Scotts?
21   A    Yes, there is.
22   Q    Can you please describe it?
23   A    So at the end of the commercial, it shows a bag being
24   poured into a spreader of the Pennington product and it
25   says "Twice The Seed, No Filler.  Scotts can't say that."
```

```
 1   Q    Let me show you what is Scotts Exhibit 18.  There we
 2   go.  Do you recognize that picture?
 3   A    I do.
 4   Q    What is that?
 5   A    This is a picture of Pennington's SMART SEED Dense
 6   Shade Mix on a store shelf at a Lowe's store sitting in
 7   the case tray.
 8   Q    Okay.  And the reference under "Twice The Seed,"
 9   Scotts TURF BUILDER.  As you identified before, does
10   Scotts TURF BUILDER also include uncoated seed?
11   A    It does.
12   Q    Okay.  And what product or what uncoated seed
13   products does Scotts sell under the TURF BUILDER brand?
14   A    At the time of this case, we had multiple offerings,
15   including our Contractor's Mix and Landscaper's Mix.
16   Today we still sell a Quick Fix mix which is branded
17   Scotts TURF BUILDER.
18        (Exhibit proffered to defense counsel.)
19        (Counsel conferring.)
20        MR. ROTHSTEIN:  Your Honor, I object to this
21   exhibit only to the extent that it is not actually present
22   on their exhibit list.  They said it is part of a
23   catch-all.
24        MR. DANON:  We have numbers of pictures that we
25   have used throughout the case here, but on 310 we said
```

```
 1   "Representative product samples of packages for 1 STEP
 2   COMPLETE, EZ SEED, TURF BUILDER WITH WATER SMART and SMART
 3   SEED."
 4        THE COURT:  If that's an objection, it is
 5   overruled.  Let's move on.
 6        (Exhibit proffered to witness.)
 7   BY MR. DANON:
 8   Q    I placed in front of you what has been marked as
 9   Exhibit 328.  What is that?
10   A    This is a product of a Scotts TURF BUILDER grass seed
11   mix, Quick Fix mix.
12   Q    Is this the uncoated TURF BUILDER grass seed that you
13   were referring to?
14   A    This is.
15   Q    Let me show you or put up on the screen exhibit --
16        THE COURT:  This is, you are currently
17   manufacturing this, it is part of your current product
18   line?
19        THE WITNESS:  It is.
20   BY MR. DANON:
21   Q    If we can put up Number 20.  If you look at Trial
22   Exhibit 20, do you recognize that picture?
23   A    I do.
24   Q    What is that?
25   A    This is a point of purchase advertisement or display
```

1  for Pennington products that has the, both the SMART SEED
2  and 1 STEP COMPLETE products together here.
3  Q    Okay.  And can you just tell us, what is an
4  integrated marketing campaign?
5  A    Well, from an integrated -- from a marketing
6  perspective, an integrated campaign would be when you put
7  together a marketing campaign, you want to have all the
8  consumer touch points all tied back together so you can
9  leverage the synergy of the advertising campaign, all the
10  touch points.  So starting with one theme, typically, and
11  using that through all your mediums to talk to consumers.
12  Q    In Exhibit 20, you see the reference to the number 2
13  with an X and then the seed.  Is that integrated, do you
14  believe that's integrated with the "Twice The Seed" claim?
15        MR. WOLF:  Objection, leading.
16        THE COURT:  Overruled.
17        THE WITNESS:  I'm sorry?
18  BY MR. DANON:
19  Q    Do you believe that that is integrated with the
20  "Twice The Seed" spelled out campaign that Pennington is
21  using?
22  A    I do.
23  Q    And on the bottom there where there is a reference to
24  coated seed, do you consider Scotts TURF BUILDER to be
25  implied by the term coated seed?

1  A    I do.
2        MR. WOLF:  Objection, asking for his opinion,
3  Your Honor.
4        THE COURT:  Overruled.
5  BY MR. DANON:
6  Q    In fact, how many different brands or I would say
7  companies sell coated seed?
8  A    Very few.  The biggest would be a product called
9  Sta-Green with a Nitro-Fuze coating.  It is the private
10  label offering at Lowe's.  Then there's a couple smaller
11  product lines that you could find on the Internet.  But
12  nothing on a national level.
13  Q    And going back to the Quick Fix product, Exhibit 328
14  that's currently being sold, is that sold in the same
15  stores that TURF BUILDER coated seed products are sold?
16  A    Yes.  Many of the same.  It may vary by store to
17  store, but primarily it is all the same.
18  Q    We showed you two exhibits, the television ad and the
19  display tray and now this third one, Number 20, referring
20  to the "Twice The Seed" claim from Pennington.  Based on
21  your familiarity with the product, do you believe that
22  that claim is accurate?
23  A    No, I do not.
24  Q    Why not?
25  A    I know that we have conducted seed count studies to

1  show in fact Pennington does not have "Twice The Seed" in
2  the bag of their product versus ours.
3        MR. WOLF:  Your Honor, I object.  What he is
4  talking about was not as to that product that he is
5  referring to, and he is not an expert to testify about
6  that.
7        THE COURT:  The objection is overruled.
8  BY MR. DANON:
9  Q    I'm just showing the next exhibit.
10        (Exhibit proffered to counsel.)
11        (Exhibit proffered to witness.)
12  BY MR. DANON:
13  Q    Mr. Sass, before you is Exhibit 328 -- 329, sorry,
14  Exhibit 329.  Do you recognize that?
15  A    I do.
16  Q    What is that?
17  A    This is a bag of Pennington SMART SEED Sun & Shade
18  mix.
19  Q    Okay.  And does the bag contain a seed analysis
20  panel?
21  A    It does.
22  Q    Where is that located?
23  A    The seed analysis panel would be on the back label
24  down here in this white block section.
25  Q    What does the seed analysis panel include?

1  A    It specifically will designate and specify what
2  exactly is in the product, inside the bag, the type of
3  varieties and species and the percents that make up the
4  bag that's being sold.
5  Q    Is that analysis panel on the bag pursuant to any
6  regulations?
7  A    It is.  So part of the federal seed laws require you
8  to have this type of material on every product of grass
9  seed sold.
10  Q    If you look at the front of the bag, and there is a
11  claim there regarding "Twice The Seed."  Is that claim
12  part of the seed analysis panel that would be regulated by
13  any seed law?
14  A    No.  This would be a marketing-related claim, not
15  seed analysis panel.
16  Q    Now, have any of the retailers, Home Depot or Lowe's,
17  to your knowledge, reacted to the "Twice the Seed vs.
18  Scotts Turf Builder" advertising campaign that we saw in
19  Exhibit 20?
20        MR. WOLF:  It is calling for hearsay, Your
21  Honor.
22        THE COURT:  Overruled.
23        THE WITNESS:  When these products in bags
24  started to show up into the retail stores, once brought to
25  the attention of the buyers, shortly thereafter we started

1  seeing the products being over stickered in the stores.
2  So yes.
3  BY MR. DANON:
4  Q   And are you aware of any claims by Pennington in
5  which they used the word "seeds" to describe their "Twice
6  The Seed" campaign?
7  A   I am.
8  Q   Let me show you what is Exhibit 218.  And can you
9  tell us what that is?
10  A   Yes.  So this is a screen capture of the
11  dictionary.com website with a banner ad at the top here of
12  the screen, the upper third, for Pennington SMART SEED --
13      MR. WOLF:  I object because this has been
14  withdrawn for a stipulation.
15      MR. DANON:  Your Honor, the ad itself has been
16  withdrawn but we have agreed that we can use it for
17  evidentiary purposes.  We are not seeking an injunction on
18  that claim because it has been withdrawn, but we are using
19  it for the evidentiary value of the use of the word
20  "seeds."
21      THE COURT:  Your objection will be overruled.
22      THE WITNESS:  So this is the banner ad for
23  Pennington's SMART SEED that says, "2x more seeds" with an
24  "S."
25  BY MR. DANON:

1  Q   Do you recall how you got a copy of this screenshot?
2  A   I believe somebody on our team screen captured this
3  and we saved it onto our hard drive.
4  Q   Let me show you what has been marked as Scotts
5  Exhibit 13.  And can you tell us what that exhibit is?
6  A   This is a screen capture of the Pennington SMART SEED
7  website.
8  Q   And --
9      MR. WOLF:  Same objection, Your Honor.  This has
10  been withdrawn for a stipulation.
11      THE COURT:  Overruled.
12  BY MR. DANON:
13  Q   Is there any reference in this screenshot regarding
14  twice the number of seeds?
15  A   There is.  So in the bottom third of the page there
16  where it says "More Seed Per Bag," this section, and the
17  information below it, if you go two paragraphs down, there
18  is a paragraph here and I would read, it starts with, "Be
19  informed.  These two 3 lbs. Tall Fescue products may weigh
20  the same and claim to cover about the same area, but the
21  actual number of seed in each bag is dramatically
22  different.  It takes over two bags of the Scotts product
23  to equal the amount of seed found in just one bag of the
24  Pennington SMART SEED product."
25  Q   Now, Mr. Sass, I think you recently or you previously

1  said -- are you aware of Scotts conducting any seed counts
2  or studies?
3  A   I am.
4  Q   And are you aware of any studies that were conducted
5  at Scotts that compared the number of seeds in
6  Pennington's SMART SEED products to Scotts' products?
7  A   I am.
8  Q   And do you know who conducted those tests?
9  A   Yes.  The Scotts R&D group led by Mike Faust and his
10  team.
11  Q   Do you have any knowledge as to the results of those
12  tests?
13  A   I know the results showed that Pennington --
14      MR. WOLF:  I object to his testifying about what
15  somebody else did, that person who is also going to be a
16  witness in the case.
17      THE COURT:  This objection is sustained.
18  BY MR. DANON:
19  Q   Now, at the end of the television ad that was shown,
20  was there any reference to Pennington's Honest Green?
21  A   They did.  They had a reference.
22  Q   What is your understanding of that claim in that ad?
23      MR. WOLF:  I object to asking for the witness to
24  give an opinion about his understanding of something.
25      THE COURT:  He can answer the question.  Go

1  ahead.
2      THE WITNESS:  Pennington has been using that as
3  kind of a slogan or tag line on a lot of their advertising
4  campaign in the last couple of years here referencing
5  their ability and their honesty.
6  BY MR. DANON:
7  Q   And does Scotts have an issue with that?
8  A   We do.
9  Q   What is that?
10  A   Well, within that very claim, as I just mentioned,
11  from the seed count tests that we have done, in fact, that
12  Pennington does not have "Twice The Seed" versus Scotts,
13  that spot closes with the headline of "Scotts can't say
14  that," so by default, if they are making false claims, I
15  don't think they could be honest from the slogan.
16  Q   Let me play for you another television ad, Pennington
17  Number 88.  I'm sorry, Scotts Trial Exhibit 88.
18      (Video played.)
19      Mr. Sass, were you involved in the development of
20  that TV ad?
21  A   I was.
22  Q   What was your role?
23  A   As the Director of Marketing I worked closely with
24  our advertising agency to both create the film or film the
25  commercial and put it on there.

```
1    Q    Is there a claim in that ad regarding absorption and
2    holding water?
3    A    There is.
4    Q    And what is that claim?
5    A    It says it absorbs the natural -- "The natural mulch
6    absorbs and holds water better than paper can."
7    Q    What was the ad conveying from the purposes of
8    Scotts' marketing?
9    A    In that ad we were trying to illustrate the
10   difference between the two products in that our mulch that
11   we used, the coir in EZ SEED and the water absorption, the
12   retention capabilities, compared to the mulch in the
13   Pennington product, which is paper-based.
14   Q    Now, what's the basis for the statement that EZ SEED
15   absorbs more water than Pennington's 1 STEP, the mulch in
16   EZ SEED?
17   A    That's been validated through Scotts' R&D.
18   Q    Do you know who has conducted some of those studies?
19   A    Mike Faust has.
20   Q    And do the studies support the statement that EZ
21   SEED's mulch absorbs and holds more water?
22              MR. WOLF:  Your Honor, again, I object to
23   his --
24              THE COURT:  Sustained.
25              MR. DANON:  Your Honor, if I can follow up on
```

```
1    that.
2    BY MR. DANON:
3    Q    Have you read the reports that R&D has provided?
4    A    Some of them.
5    Q    Were some of those reports provided to you in your
6    capacity as Director of Marketing?
7    A    They were.
8    Q    And based on the reports that you have seen, did
9    those reports support the statement that EZ SEED
10   absorbs --
11              MR. WOLF:  Same objection.
12              THE COURT:  The objection is sustained.  He has
13   already said in his estimation it was validated.  That's
14   all we can get from him.
15   BY MR. DANON:
16   Q    Have you personally seen the absorption capabilities
17   of the mulch in EZ SEED?
18   A    I have.
19   Q    Let me put up Exhibit 280.  I'm sorry, 281.  Okay.
20   Can you tell us what Exhibit 281 is?
21   A    So this was something that we created for internal
22   purposes to show really the absorption power of EZ SEED in
23   the mulch.  So this is an example of something we would do
24   in the office or for customers or retailers showing EZ
25   SEED dry on the left here and then after adding water, you
```

```
1    would see it expand up four times its size, what it would
2    look like on the right.  This is something we would do
3    quite often.
4    Q    Where was this demonstration or these photos used?
5    A    Well, these photos would be used to just help
6    communicate to our internal team as well as any customers
7    or retailers how to use the product and how it performs.
8    Q    From a marketing perspective, why was Scotts
9    concerned with water absorbency?
10   A    When you look at grass seed, the number one issue
11   that you need or the number one concern that consumers
12   have is all around watering.  It is critical to the
13   success for growing grass.  You have to have water.  And
14   so what you will see on both of our product lines is that
15   we try to do as much as we can to help consumers be
16   successful by bringing water or trying to eliminate the
17   water variable as much as we can.
18   Q    As part of your role as Director of Marketing with
19   the grass seed business, are you familiar with the
20   instructions on the back of an EZ SEED container?
21   A    I am.
22   Q    Those are commonly referred to as directions for use;
23   is that correct?
24   A    Yes.
25              THE COURT:  I have a question before you move to
```

```
1    the next topic here.  You may not be able to answer this,
2    but I'll ask you anyway.  In terms of water absorption by
3    the mulch, how is that valuable to the grass seed and the
4    growing of the grass seed?
5              THE WITNESS:  How is it valuable?
6              THE COURT:  Right.
7              THE WITNESS:  So for seed to germinate it has to
8    be moist.  And so when seed is just laying on the ground
9    by itself, it has very little opportunity to have water.
10   The benefit with EZ SEED, the way it expands up, it
11   actually surrounds the seed, so that's one of the real
12   advantages to the absorbency.  It will expand four times
13   its size.  So the seed has more contact with water and
14   then can get access to it.
15              THE COURT:  Thank you.
16   BY MR. DANON:
17   Q    Mr. Sass, in front of you is Exhibit 330.  Can you
18   tell us what that is?
19   A    This is a Scotts EZ SEED Tall Fescue Mix.
20   Q    If you look at the back or the Directions For Use
21   panel on that container, is this what the current label
22   for EZ SEED looks like?
23   A    No, this does not.
24   Q    You mentioned that Scotts' R&D Department developed
25   EZ SEED.  Was an application rate for EZ SEED also
```

1 developed at that time?

2 A    It was.

3 Q    Okay.  And what's your understanding of what that

4 rate is?

5 A    That's the 1.75 pounds per 20 square feet rate.

6 Q    Is that rate reflected on that container, Exhibit

7 330?

8 A    Not directly, but there are two locations on the

9 label where the rate comes to life, and that is on the

10 square foot coverage on the front and then on the back

11 within the directions for use.

12 Q    Okay.  And where on the front, and what specifically

13 are you referring to?

14 A    Right here in the bottom third of the bottle, it

15 says, "See how easy it is, covers up to 80 square feet."

16 So the consumer would, this 3.75-pound jug would cover up

17 to 80 square feet if applied.  Or when applied.

18 Q    And what about on the back of the container?

19 A    Within the back under the Directions For Use, it

20 says, "Simply prepare the area where you want to grow

21 grass, apply a thin, one-eighth of an inch layer of EZ

22 SEED."

23 Q    Do you understand why Number 2 in that instruction

24 panel says, "Apply a thin, one-eighth inch layer,

25 one-sixteenth inch for thin areas"?

---

1 A    So these directions were intended to try to

2 communicate to the consumer the importance of applying

3 just a thin amount of the product.  And so at the time it

4 was determined to use a one-eighth of an inch layer, a

5 thin layer, to communicate that to consumers.

6 Q    Why was not the 1.875 per 20 square feet rate

7 indicated in that Instruction Number 2?

8 A    Well, the entire EZ SEED package, even with its name,

9 was always intended to be easy.  We never really wanted to

10 communicate that this product was hard to use, and that it

11 actually provided a lot of consumer benefit by just being

12 able to simply put it down and add water, and EZ SEED,

13 with the magic of the coir, actually helped consumers be

14 more successful.  We tried not to be overly wordy in the

15 directions.

16 Q    Did Scotts intend for customers to apply an eighth of

17 an inch uniform thick layer?

18 A    Never at a uniform thick layer.  It was always

19 intended to be a thin rate that would be applied over an

20 area.

21 Q    And did Scotts intend for that rate to be the 1.875

22 per 20 square feet?

23 A    Yes.

24       MR. DANON:  I'm going to show opposing counsel

25 what we have marked as Exhibit 331.

---

1       (Exhibit proffered to counsel.)

2       (Exhibit proffered to witness.)

3 BY MR. DANON:

4 Q    Mr. Sass, in front of you now is Exhibit 331.  Can

5 you tell us what that is?

6 A    This is a Scotts TURF BUILDER EZ SEED product that

7 is -- the product that is being currently sold on the

8 market.

9 Q    Okay.  Does that package also contain a Directions

10 For Use label?

11 A    It does.

12 Q    Is that label any different than what we see in

13 Exhibit 330?

14 A    Yes.  The major difference is with the Directions For

15 Use section.

16 Q    Were you involved with the creation of the new label

17 that is contained on the EZ SEED container?

18 A    I was.

19 Q    Can you describe what your involvement was?

20 A    So as the Director of Marketing, I oversaw the

21 research that went into this, and then was directly

22 involved with the R&D team in our Consumer Call Center to

23 craft the actual language and visuals used on the product,

24 directions.

25 Q    When did the process for changing the label begin?

---

1 A    In the 2010 year or 2010 season.

2 Q    And when was it approved or approved to be put on the

3 containers?

4 A    We submitted to the regulatory to states in July of

5 2011.

6 Q    And when was product first shipped from Scotts with

7 the new label?

8 A    The very first product shipped out in December of

9 2011 on some mixes or flavors, and then it has been a

10 rolling change throughout the 2012 and 2013 years.

11 Q    So if consumers go today to Home Depot or Lowe's or

12 Wal-Mart and see EZ SEED, are they going to see this

13 label?

14 A    Think primarily should see this label.  There may be

15 some turnover at retail with the inventory, but primarily

16 this would be the label I would expect to see.

17 Q    Now, why did Scotts change the EZ SEED label?

18 A    Well, when we launched EZ SEED, we started to

19 recognize that we were getting a lot of calls to our call

20 center with consumers having challenges with EZ SEED.  And

21 so that led us to do some follow-up research with

22 consumers where we identified that they were over applying

23 it and possibly not watering enough.  So that led to, that

24 research led us to clarifying the directions and making

25 the changes we did.

| | |
|---|---|
| 1 | Q    And when was that research conducted? |
| 2 | A    The research was conducted in August of 2009 after |
| 3 | that launch year, test year, and then validated through |
| 4 | research in 2010 as well. |
| 5 | Q    Again, as Director of Marketing for grass seed, were |
| 6 | you involved in this research? |
| 7 | A    Yes, I was. |
| 8 | Q    Let me show you what's marked as Scotts Exhibit 325, |
| 9 | which is a PowerPoint titled "EZ SEED Consumer Complaints, |
| 10 | October 22nd, 2010." Can you tell us what that document |
| 11 | is? |
| 12 | A    So this document is a summary presentation that was |
| 13 | pulled together for internal purposes at Scotts to be |
| 14 | shared with senior management to just update them on the |
| 15 | situation regarding the consumer complaints and the |
| 16 | research that was involved and then the actions we were |
| 17 | going to take as a result. |
| 18 | Q    How was this research conducted, what was done? |
| 19 | A    So we had, there's a couple bits of research that |
| 20 | this includes, the biggest part being the consumers who |
| 21 | called our call center.  We had their contact information. |
| 22 | We sent them out an online survey that then they responded |
| 23 | to and that's where we were able to show them some visuals |
| 24 | as well.  That was also then combined with some in-home |
| 25 | research that we saw people actually apply EZ SEED.  So |

| | |
|---|---|
| 1 | that was the two research methods we used. |
| 2 | Q    If we turn to Page 8 of this PowerPoint, what does |
| 3 | that page show and what was that used for? |
| 4 | A    So this picture or this slide was a visual |
| 5 | representing what was e-mailed out to consumers, who |
| 6 | again, the consumers who called in a complaint to the call |
| 7 | center that received this survey, we asked and the |
| 8 | question there is at the bottom of the screen, we asked |
| 9 | them to help identify for us what visual looks like the |
| 10 | amount of product that they applied when they applied EZ |
| 11 | SEED.  And then we had them select which choice closely |
| 12 | represented their application rate. |
| 13 | Q    If we turn to Page 10.  What does Page 10 show? |
| 14 | A    So Page 10 is an update for senior management saying |
| 15 | that we were, based on the research that was on the |
| 16 | previous slides, we were taking actions with our updated |
| 17 | directions for use, and here we call out some of the |
| 18 | changes we were going to make.  The two here that are |
| 19 | called out show the second step here with a close, tight |
| 20 | shot of the product being applied.  And the copy |
| 21 | underneath changed as well with the language of "Evenly |
| 22 | apply EZ SEED so the area is mostly covered, but bare |
| 23 | ground is still visible."  That was one of the biggest |
| 24 | changes.  Then the other change would be within Step 3, |
| 25 | really calling out with more clarity around the importance |

| | |
|---|---|
| 1 | of watering.  So the language changed to "A deep and |
| 2 | thorough initial watering is the key to success."  We say, |
| 3 | "Gently water the area until EZ SEED is completely |
| 4 | saturated and no more water is being absorbed." |
| 5 | Q    Why did you use pictures to convey the application |
| 6 | rate? |
| 7 | A    Well, consumers are very visual.  We know that.  And |
| 8 | so again, within the whole premise of EZ SEED and the |
| 9 | whole product line being easy, we wanted to clarify with |
| 10 | visuals to consumers just how easy and how they should be |
| 11 | applying the product. |
| 12 | Q    Did Scotts intend to convey to consumers a different |
| 13 | application rate than what it intended to convey in the |
| 14 | prior containers? |
| 15 | A    No.  The application rate is essentially the same. |
| 16 | Q    Now, let me play for you another TV ad, Number 228. |
| 17 |      (Video played.) |
| 18 |      MR. WOLF:  Again, Your Honor, I would point out |
| 19 | that this was withdrawn for stipulation. |
| 20 |      MR. DANON:  Your Honor, I think the claim is |
| 21 | still on the lift -- just one second.  The lift test at |
| 22 | the end is very much part of this case, Your Honor.  The |
| 23 | very end of that television ad is the two hands we talked |
| 24 | about grabbing up the grass.  It is very much part of this |
| 25 | case.  I wanted to make sure it was the right one before I |

| | |
|---|---|
| 1 | argued it. |
| 2 |      THE COURT:  Go ahead. |
| 3 | BY MR. DANON: |
| 4 | Q    Do you believe this TV ad accurately depicts EZ |
| 5 | SEED's ability to establish roots? |
| 6 | A    No, I don't. |
| 7 | Q    Why not? |
| 8 | A    Based on the testing that I have seen from Scotts R&D |
| 9 | would indicate that that is not an accurate depiction. |
| 10 | Q    And again, is this an ad that as Director of |
| 11 | Marketing was brought to your attention? |
| 12 | A    Yes, it was. |
| 13 | Q    And what did you do once it was brought to your |
| 14 | attention? |
| 15 | A    Well, once I saw this ad, I immediately connected |
| 16 | with our R&D team and asked them to try to validate that |
| 17 | research and see if that was actually how EZ SEED would |
| 18 | perform. |
| 19 | Q    And do you know what R&D at Scotts did? |
| 20 | A    They replicated the study -- |
| 21 |      MR. WOLF:  I object to his testifying to what |
| 22 | other witnesses are going to testify to who actually did |
| 23 | the test.  It is just hearsay. |
| 24 |      MR. DANON:  Again, he is the Director of |
| 25 | Marketing.  He conveyed it to R&D and he collaborates with |

R&D.

THE COURT: I don't need to hear it multiple times. The objection is sustained.

BY MR. DANON:

Q    Mr. Faust will testify about that test?

A    He will.

Q    Is that your understanding?

A    Yes.

MR. DANON: Thank you, Your Honor. I tender the witness.

THE COURT: All right. Cross?

CROSS-EXAMINATION

BY MR. WOLF:

Q    Good morning, Mr. Sass.

A    Good morning.

Q    You are here as a representative for both defendants, Scotts Miracle Grow Company and the Scotts Company LLC?

A    Yes.

Q    And the Scotts Miracle Grow Company is the parent company for the Scotts Company LLC?

A    That's correct.

Q    And the companies have the same address in Marysville, Ohio?

A    Yes.

Q    And just last year, Scotts was found guilty in

federal court of knowingly selling the TURF BUILDER product with false and misleading claims on the label; isn't that correct?

MR. DANON: Objection, Your Honor. Relevance.

THE COURT: What does that have to do with anything?

MR. WOLF: It is relevant under Rule 609, Your Honor, to impeach the credibility of the corporation on whose behalf he is testifying. I have two cases right on point.

THE COURT: I don't need to see your cases. The objection is sustained. Let's try this case.

MR. WOLF: Their claim is that we are not being honest.

THE COURT: I don't need any more argument. I have ruled.

MR. WOLF: Very well, Your Honor.

BY MR. WOLF:

Q    The TV ad that Mr. Danon played, the Scotts TV ad, the Scotts message there to consumers is that the TV commercial, in that TV commercial, is that Scotts EZ SEED is superior to Pennington's 1 STEP COMPLETE, correct?

A    With reference to the mulches that coir does perform better than Pennington's mulch.

Q    Could we play Pennington Exhibit 90, please, the

radio ad? This is Scotts' radio ad.

(Audio played.)

MR. WOLF: Play it from the beginning.

(Audio played.)

BY MR. WOLF:

Q    And here again, Scotts' message to consumers is that EZ SEED is superior to Pennington's 1 STEP COMPLETE?

A    The ad shows or tells that the mulch absorbs eight times its weight and that mulch is better than Pennington's mulch.

Q    So the product is better.

A    On that attribute, the mulches are better in EZ SEED.

Q    Play Scotts Exhibit 227, please.

(Video played.)

BY MR. WOLF:

Q    You are aware that this commercial was in the media for two years before the present 2013 commercial that Pennington is running?

A    Yes.

Q    And you would agree that the message of this commercial is that Pennington's product is all seed while Scotts' product is half seed and half filler.

A    That's what it says. That's what it claims.

Q    It specifically references the weight of each product's seeds, not the number of seeds, right?

A    It does.

Q    It specifically references the filler that's in Scotts' product, right?

A    It makes mention to filler.

Q    And there is no coating or filler in Scotts' EZ SEED, right?

A    There is no coating, that's correct.

Q    So comparing a Pennington product to Scotts' products that are coated would not be a comparison to EZ SEED, right?

A    That would be correct.

Q    Now, it has been agreed by everybody that the amount of seed in Scotts' bags of grass seed is stated in pounds.

A    On the back panel, yes.

Q    And it is not stated anywhere in terms of number of seeds in the bag.

A    That's correct.

Q    But you could, if you chose, state the number of seeds in a bag.

A    I think it would be highly impossible to do that and replicate it on every bag that was sold in the market.

Q    Well, if you wanted to count the seeds using your seed counters and state even the range of number of seeds that would be in the bag, you could do that, right?

A    I'm sure it is possible.

```
1   Q    But the number of seeds would depend on the mix of
2   the cultivars and varieties in the bag, right?
3   A    It would.
4   Q    And if you wanted to have more seeds per pound, you
5   could do that by mixing in more of the varieties that have
6   the smaller seeds like Kentucky bluegrass, right?
7   A    Yes, but at the end of the day, the products are
8   developed based on how the consumer would use them.  We
9   wouldn't arbitrarily put different seeds in just for
10  purposes of a count.
11  Q    You wouldn't try to get more seeds per pound because
12  that's not necessarily what's best for the consumer,
13  right?
14  A    Consumers are looking to buy coverage when they buy a
15  bag of grass seed.
16  Q    It is true that more seed means more plants, right?
17  A    Yes.
18  Q    And nobody in the industry lists the number of seeds
19  contained in a bag on their packaging, do they?
20  A    That's correct.
21  Q    If you thought that it would add value to the
22  consumer or give them some important information, then you
23  would put it on the bag, wouldn't you?
24  A    You know, and we do put the most important, which is
25  the coverage, on the top of the bag.
```

```
1   Q    If you thought the number of seeds would give
2   important information to the consumer, you would put that
3   on the bag.
4   A    I suppose so.
5        THE COURT:  Mr. Wolf, let's pause for just a
6   second.  We need to change out reporters.  Let's do that
7   now.
8   Q    So what you place on the bag in terms of quantity of
9   seed is the weight and that's in compliance with the
10  various laws and the industry regulations?
11  A    Yes, we do.
12  Q    And Scott's does not advertise that its products
13  contain any more seeds per pound than Pennington's?
14  A    No, we do not.
15  Q    Now, consumers may compare pounds of seed because
16  that's how they are actually shown on the retail shelves,
17  right, side by side?
18  A    There is, yeah, uniform sizes, yes.
19  Q    But, you believe they don't care about the number of
20  seeds, they care about the coverage?
21  A    That's accurate.
22  Q    You know that Pennington means its two times the seed
23  based on the weight of the bag, right.
24  A    Yes.
25  Q    The seed component of 1 STEP COMPLETE is twice that
```

```
1   of EZ SEED by weight, right?
2   A    The weight of the EZ SEED 1 STEP COMPLETE compares to
3   EZ SEED, is that the question?
4   Q    Right.  The question is the EZ SEED components, that
5   is, 1 STEP COMPLETE like EZ SEED is a combination product,
6   part of its seed, the part that is seed is twice that of
7   the seed by weight?
8   A    I believe that the 2013 package does not have two
9   times by weight.
10  Q    When this case started it was two times?
11  A    Correct.
12  Q    It is pretty standard in the grass seed industry that
13  the coverage claim on the front of the bag is an up-to
14  number, up to in quotes, that coincides with half the rate
15  that is used for bare spots.  Right?
16  A    That's correct.
17  Q    In other words, it is typical in the industry that
18  the up-to coverage number on the front of the bag is the
19  thin spot allocation rate, not the bare spot rate.
20  Correct?
21  A    That's correct.
22  Q    And that's standard across most of the packaging in
23  the market, right?
24  A    Yes.
25  Q    Its seed is intended for patching, not for reseeding
```

```
1   an entire lawn, right?
2   A    It varies.  It is not our position that it is just
3   bare spot repair.
4   Q    The thrust of your ads for seed is it is a patch and
5   repair product.  Right?
6   A    We illustrate in the ad that the consumer patch a
7   bare spot in the lawn.  But, there is no limitation that
8   seed cannot only be used for patching.
9   Q    Do you advertise it to consumers to seed an entire
10  bare soil new home, for example?
11  A    We don't advertise that.  And I don't believe any
12  product grass seed advertising shows that.
13  Q    The intended uses for EZ SEED and 1 STEP COMPLETE are
14  similar, correct?
15  A    I would believe so, yes.
16  Q    A bag of TURF BUILDER WITH WATER SMART is half seed
17  and half coating or filler?
18  A    The ones that have the coating, yes.
19  Q    And the coating is about 95 percent limestone?
20  A    Give or take.
21  Q    And limestone is a type of rock?
22  A    Yes.
23  Q    So, according to Scott's logic, TURF BUILDER WITH
24  WATER SMART is a bunch of rock?
25  A    The valuable component is the water absorbent
```

```
1   component.  And so while small in percentage it is by far
2   the reason we have the coating on the product.
3   Q    But, the bag is approximately half rock?
4   A    By weight.
5   Q    And the mix called EZ SEED is made up of mulch,
6   fertilizer and seed?
7   A    Yes.
8   Q    And the mulch is made from something called coir?
9   A    Yes it, is.
10  Q    And by weight seed it is 88 percent mulch?
11  A    Yes.
12  Q    And the coir is discarded coconut fills?
13  A    Coconut coir is the husk, the pit of the coconut.
14  Q    Coir is a waste material?
15  A    It is.
16  Q    So EZ SEED is a bunch of waste then because it is 88
17  percent?
18           MR. DANON:  Objection.
19           THE COURT:  Sustained.
20  BY MR. WOLF:
21  Q    You would agree that the deeper and denser the root
22  system, the less water that is required, right?
23  A    Yes.
24  Q    And that's because the grass that has the deep run
25  denser roots is more efficient at absorbing whatever water
```

```
1   happens to be in the ground.  Right?
2   A    I believe that's the case, yes.
3   Q    You would agree that claims that are made in
4   advertising should be based on real world application of
5   the product?
6   A    Yes.
7   Q    For example, if you put your product in a medium that
8   the consumer would never be using, and make claims based
9   on that, it is really not appropriate because it could be
10  misleading to the consumer.  Right?
11  A    I would have to see the entire ad to know that for
12  sure.
13  Q    Now, seed is used by consumers only in soil?
14  A    It is intended for home lawn use.
15  Q    So the answer is yes, it is intended for use in soil?
16  A    Yes.
17  Q    Going back to the previous question, you said you
18  couldn't tell without seeing the actual ad, but do you
19  recall that in your deposition I asked you, for example,
20  this is on page 29, line 24, I asked you:  For example, if
21  you put your product in a medium that the consumer would
22  never be using, and make claims based on that, it is
23  really not appropriate because it could be misleading to
24  the consumer, right.  You recall that you answered, that
25  is correct?
```

```
1   A    Now that you repeat it, I do remember that.
2   Q    So you have never seen a study by Scott's using soil
3   that supports the claim that EZ SEED absorbs 8 times its
4   weight in water?
5   A    No.
6   Q    You have never seen a study by Scott's using soil
7   that supports its claim that the EZ SEED retains water
8   better than 1 STEP COMPLETE, have you?
9   A    No.
10  Q    Those claims by Scott's are supported by trials using
11  just seed put into a water bath without soil, right?
12  A    That's what I've seen.
13  Q    And you're not aware of any validation studies using
14  soil that supports Scott's claims of absorption and
15  retention as to any of the Scott's seed.  Correct?
16  A    Correct.
17  Q    And Scott's claim of superior water absorption and
18  retention for its coated seed, the claim absorbs twice the
19  water and holds it twice as long is not base on studies
20  with soil?
21           MR. WOLF:  Objection, Your Honor.  Relevance.  That
22  has nothing to do with this case as far as the absorbency
23  of the grass seed.
24           THE COURT:  Sustained.
25  Q    Well, as far as the absorption and retention of the
```

```
1   products that are at issue in this case, you haven't seen
2   validation studies using soil for those products.
3   Correct?
4   A    That's correct.
5   Q    Mr. Sass, I will tell you, if we have been looking
6   long and hard for some TURF BUILDER uncoated seed product
7   and we couldn't find any, do you know why it would be so
8   difficult to find that TURF BUILDER uncoated seed product?
9   A    I don't know.
10  Q    There is no SUN AND SHADE variety of EZ SEED, is
11  there?
12  A    There is the northern version that we have which does
13  not have a designation of SUN AND SHADE is intended for
14  distribution only, percentage only.
15  Q    There is nothing called EZ SEED SUN AND SHADE?
16  A    Today, no.  That's correct.
17  Q    The seed count of a TURF BUILDER product that you're
18  talking about, it wasn't on that product, that sold
19  uncoated TURF BUILDER product, was it?
20  A    It was not.
21  Q    The statement advertise the seed and no filler,
22  Scott's can't say that, it is true that Scott's can't say
23  that, correct, because they can't say that they have twice
24  the seed of anybody else, two times the seed, were that
25  they have or that they have no filler?
```

```
 1        MR. WOLF:  Objection, Your Honor.
 2        THE COURT:  He can answer the question.
 3   A    That statement says that, twice the seed and no
 4   filler, Scott's can say that.  They are saying that, I
 5   interpret that to be all Scott's products which would open
 6   up the research that we have done.  And so by a weight
 7   basis we have a Scott's product that would not hold true.
 8   And then also from the coated perspective, the seed count
 9   would show that is not true either.
10   Q    From the one count that is used by anybody on the
11   bags of weight, it is true, correct, as to the coated
12   product?
13   A    If it said Scott's TURF BUILDER SEED WITH WATER SMART
14   COATING, then it would be correct.
15        MR. WOLF:  May I have a moment, Your Honor?
16        THE COURT:  Sure.
17   BY MR. WOLF:
18   Q    Can you explain why the QUICK FIX is not on the
19   Wal-Mart or Lowe's website where other TURF BUILDERS are?
20   A    I would say that in the past, historically, I've
21   personally seen issues with some of the retailer's sites
22   on accurately picking what's on the stores.  I am not sure
23   why it would not on the retail website.
24   Q    This undercoated grass seed is a commodity rate or
25   price point product?
```

```
 1   A    It does have a lower price point.
 2        MR. WOLF:  No further questions, Your Honor.
 3        THE COURT:  All right.  Redirect.
 4                 REDIRECT EXAMINATION
 5   BY MR. DANON:
 6   Q    Mr. Sass, as far as distribution of grass seed at
 7   Scott's by volume, where does the QUICK FIX product end up
 8   or how does that compare?
 9   A    It is one of the, at least through the last year, it
10   was one of the largest selling by actual units.  But, I'm
11   not sure what range and dollar wise.
12   Q    It is one of the most widely something?
13   A    Yes.  I think it is because it's not regionally
14   relegated, it can be applied across the U.S.  It does have
15   a pretty large footprint.
16   Q    In response to some of the questions by Mr. Wolf, you
17   identified that consumers are looking for coverage.  Is
18   that accurate?
19   A    Yes.
20   Q    What did you mean by that?
21   A    I meant that when a consumer goes to the store with
22   their mind set that they are going to purchase a grass
23   seed product, they are going based on what their problem
24   is at home.  So they are going to the store and looking to
25   buy a bag that's relevant, gives them the size and
```

```
 1   coverage that they are trying to actually fill in at home
 2   or to patch at home.
 3        So, when they go to the store shelf, yes, the
 4   seed bags have a uniform weight of three pounds, seven
 5   pounds or 20 pound bag.  But, at the end of day, the
 6   coverage on each one of those bags are dramatically
 7   different because of all the different species that go
 8   into the bag.  That's why coverage is really, at the end
 9   of the day, what the consumer is buying to take home.
10   Q    And how does the coverage or the coverage rate
11   interplay with the number of seeds?
12   A    Well, essentially, the mix you have and the seed
13   count that goes into that will essentially establish your
14   coverage rate for the product.
15   Q    And do consumers understand the number?
16        MR. WOLF:  Objection.
17   Q    Of seeds in the bag?
18        MR. WOLF:  Testifying what consumers understand.
19   MR. DANON:  Based on his experience.
20        MR. WOLF:  He is not a consumer expert.
21        THE COURT:  That objection will be sustained.
22   Q    Mr. Wolf asked you questions about testing that's
23   done on soil or whether testing was conducted on soil.  Do
24   you believe that Scott's ads that you were a part of
25   needed any testing on soil in order to be made?
```

```
 1   A    Not for the point in which we are making claims.
 2   Q    Why not?
 3   A    Well, within the TV ad and the radio ad we are
 4   specifically calling out a point of difference compared
 5   between the two products which is the mulch.  And we're
 6   explicitly saying the power of the mulch in EZ SEED
 7   compared to the power of mulch in 1 STEP COMPLETE, you
 8   know, I think we generate the data.  I know we generate
 9   the data based on showing that clear difference is
10   between the two mulches.
11        MR. DANON:  Thank you, Mr. Sass.  Give me one second.
12        MR. WOLF:  May I ask one or two questions?
13        THE COURT:  No, sir.
14        MR. DANON:  I am done, Your Honor.
15        THE COURT:  Thank you.  You may stand down.
16   Call your next witness.
17        MR. DANON:  At this point, Your Honor, we will
18   turn it over to Pennington.
19        MR. SIMS:  Jeff Crow, Your Honor.
20        MR. WOLF:  For planning purposes, when does the
21   court plan a break.
22        THE COURT:  1:00 or thereabouts.  Depending on
23   what happens.
24
25                 JEFFREY CROW,
```

1  called as a witness by and on behalf of the Defendant,

2  having been first duly sworn by the Clerk, was examined

3  and testified as follows:

4

5  DIRECT EXAMINATION BY MR. SIMS:

6  Q    Good morning, Mr. Crow.  Will you state your name?

7  A    Jeffrey Crow.

8  Q    And what company do you work for?

9  A    Central Garden and Pet.

10  Q    What is the relationship between Central Garden and

11  Pet and Pennington Seed?

12  A    Pennington Seed is owned by Central Garden and Pet.

13  Q    How long have you been working for Central Garden and

14  Pet?

15  A    About two-and-a-half years.

16  Q    What would be your approximate start date?

17  A    February 2011.

18  Q    And what is your current position with Central Garden

19  and Pet?

20  A    Vice-president of marketing for the grass seed

21  division.

22  Q    How long have you held that position?

23  A    As long as I have been with the company.

24  Q    Now, how long has been your experience in the

25  marketing field?

1  A    I have been in consumer package goods for about 20

2  years.

3  Q    Did you obtain a bachelor of science degree from the

4  University of Pennsylvania?

5  A    I did.

6  Q    What was that area focus?

7  A    Marketing concentration from the Horton School.

8  Q    Did you also obtain an MBA?

9  A    I have an MBA from the Fuqua School of Business, Duke

10  University.

11  Q    Did that have an area of concentration as well?

12  A    Also in marketing.

13  Q    Talk a little bit about the Pennington products.

14  What are the primary grass seed products that Pennington

15  sells?

16  A    We have straight seed products and combination

17  products.  Straight seed products, as mentioned earlier,

18  would include our Pennington SMART SEED line and/or

19  combination with Pennington 1 STEP COMPLETE.

20  Q    What is the 1 STEP COMPLETE?

21  A    Combination of seed, mulch and fertilizer.

22  Q    All right.  And is the SMART SEED product, which is

23  the straight grass seed, is that considered a premium

24  product?

25  A    It is.

1  Q    And what does it -- what do you mean by premium?

2  A    Well, a combination of things.  It is the highest

3  grade of grass seed.  It is the best varieties that

4  provide the most benefits for consumers and then the

5  highest price products.

6  Q    What was the purpose for the SMART SEED product?

7  A    Not sure I understand your question.

8  Q    What do you anticipate or what solution are you

9  selling to the consumer?

10  A    It would be there to over-seed an existing lawn and

11  plant a new lawn.

12  Q    So in that context who do you view to be your

13  competitors?

14  A    All other grass seeds in the industry.  But,

15  primarily Scott's TURF BUILDER.

16  Q    And what about the TURF BUILDER makes it a competitor

17  of the SMART SEED?

18  A    It is also a premium product and premium price.

19  Q    Do you view your product as competing against Scott's

20  non-premium products?

21  A    No.

22  Q    Now, with respect to Pennington's combination

23  product, the 1 STEP COMPLETE, do you also consider that to

24  be a premium product?

25  A    We do.

1  Q    For the same reasons the SMART SEED is a premium

2  product?

3  A    Yes.

4  Q    And, in that context with respect to Scott's, what

5  are you competing against?

6  A    EZ SEED.

7  Q    For the period when you came to the company in 2011,

8  has Pennington advertised its SMART SEED and 1 STEP

9  COMPLETE using different types of media?

10  A    Yes.

11  Q    All right.  And what media did it use?

12  A    TV, radio, digital media, point of purchase

13  packaging.

14  Q    Now, generally, is each type of media tailored for a

15  specific purpose?

16  A    Absolutely.  Each part of those campaigns would be

17  designed to engender a different response or get to a

18  different end.

19  Q    Okay.  So, with respect to the digital, what

20  primarily were you tailoring that type of advertisement

21  for?

22  A    Digital is an interactive media which would mean you

23  would be able to educate consumers a little bit more, be

24  able to provide a lot more details, consumers spend as

25  much or as little time as they want with digital media.

```
 1   Q   How about with respect to radio?
 2   A   Radio is a medium that would really encourage a
 3   consumer to go purchase.
 4   Q   How about with respect to T.V. as a medium?
 5   A   TV would be to drive awareness and to build the
 6   overall understanding of the brand.
 7   Q   And once you are in the store for the packaging and
 8   the point of purchase, the display advertising, what's the
 9   purpose of that advertising?
10   A   Once a consumer is in the store, looking to make a
11   purchase, the point of purchase in packaging would be
12   designed to actually get the consumer to recognize, in
13   many case it is the same messages they have seen in
14   various other mediums as well as to actually make a
15   purchase.
16   Q   In your experience, have you found that the consumer
17   response is different based on the type of media that you
18   are using?
19   A   Yes.
20   Q   Now, in 2011 did Pennington begin advertising a
21   comparison between its SMART SEED product and the Scott's
22   TURF BUILDER product?
23   A   We did.
24   Q   All right.  And what was the primary focus or purpose
25   of that advertising?
```

```
 1   A   So the advertising in 2011 was a way to establish
 2   Pennington as a premium player in the marketplace with our
 3   SMART SEED brand and to educate consumers that indeed one
 4   of the key differences between SMART SEED and SCOTT'S TURF
 5   BUILDER was that there is no filler or is that there is no
 6   filler in the SMART SEED package whereas there is
 7   ingredients other than seed in the Scott's TURF BUILDER
 8   package.
 9   Q   In terms of making those comparisons, at that time
10   period, you were in here when we had Scott's Exhibit
11   227 -- let me put that up real quick.
12        (Video played.)
13   Q   Sir, do you recognize that commercial?
14   A   I do.
15   Q   Is that consistent with the advertising that was
16   being done back in that time period comparing the
17   different weights of the bags?
18   A   Yes, it is.
19   Q   Now, let me show you also Plaintiff's Exhibit 228
20   which is the 2012 video.  Now, sir, when did this
21   advertisement last run?
22   A   Last ran in 2012.
23   Q   And what products were being compared in that
24   advertisement?
25   A   Pennington 1 STEP COMPLETE and Scott's EZ SEED.
```

```
 1   Q   Any other products?
 2   A   No.
 3   Q   Now, the voice in the commercial, do you recall it
 4   saying that 1 STEP COMPLETE has twice as much seed as
 5   Scott's EZ SEED?
 6   A   Correct.
 7   Q   Did you believe that to be the case at the time?
 8   A   I did.  It was verified by the seed labels on our
 9   products and theirs.
10   Q   Now, how is grass sold in the United States?
11   A   By weight.
12   Q   All right.  We've heard some discussion from the
13   earlier witness about coverage.  How's coverage displayed
14   on all the grass seed packaging that you are familiar
15   with?
16   A   There is a square foot average on, I would assume
17   every, if not every, virtually every package of grass seed
18   that's sold.
19   Q   Is it pounds per square feet or number of seeds per
20   square foot?
21   A   It is pounds.
22   Q   Do you know of anything in terms of the packaging of
23   these products that ever references in terms of the amount
24   or the coverage in the number of seeds?
25   A   I have never seen a package reflect the number of
```

```
 1   seeds in the bag.  In all the experience I have had with
 2   consumers in this industry I have never heard a consumer
 3   say they were going to purchase a number of seeds.
 4   Q   Let's show you Plaintiff's Exhibit 231 which is a
 5   2013 commercial.  We don't need the visual.  It is the
 6   words I'm more interested in.  In terms of that
 7   commercial, what products are being advertised?
 8   A   SMART SEED.
 9   Q   And what are you advertising comparing yourself to?
10   A   Well, the point of the advertising is water
11   efficiency and the point of comparison is where SMART SEED
12   is compared to Scott's TURF BUILDER.
13   Q   Is that their premium brand?
14   A   It is.
15   Q   And, with respect to that, what is the purpose or
16   intent of the commercial which references no filler?
17   A   Just to communicate to consumers that indeed SMART
18   SEED is a pure seed product, that 20 pounds of seed is 20
19   pounds of seed.  Whereas, in Scott's TURF BUILDER it is a
20   coated seed product and indeed half the bag is filler, it
21   is limestone.
22   Q   In today's advertising, the company is using, when it
23   states twice the seed, does it ever do that by itself?
24   A   No.
25   Q   And in what context is twice the seed used in
```

Pennington's advertising?

A    It is compared to coated seed products.

Q    Okay.  Now, going back to the 2012 commercial which was the 1 STEP COMPLETE combination, there was a statement in there, it says twice as much seed as SCOTT'S EZ SEED. Does Pennington use that language by itself in any advertisement currently?

A    Not to my knowledge.

Q    Let me show you, there was a Power Point, show you, it was the summary judgment PowerPoint.

        MR. DEMM:  Objection.  I am not sure what this --

        MR. SIMS:  This is a demonstrative.  It was used during Scott's summary judgment.  I am not offering it as an exhibit.

        THE COURT:  All right.

        MR. SIMS:  Trying to shorten the discussion.

BY MR. SIMS:

Q    Sir, I am having you take a look at the demonstrative point of purchase in the package.  You see here where there is advertisement with respect to twice the seed?  Is that consistent with your understanding that these claims are made in the context no filler?

A    Yes.

Q    Or versus a coated product?

A    Or versus other combination products as the context may be.

Q    All right.  Now, when Pennington is making the claim no filler, twice the seed versus a coated seed product, what is that claim based on?

A    The fact that SMART SEED is a pure seed product and SCOTT'S TURF BUILDER or frankly any coated seed product is about half the seed in the bag.

Q    In context of the point of purchase or the packaging, what is it that Pennington is desiring the consumer to do in reference to the no filler twice the seed claim?

A    Grass seed is a relatively low involvement category. Education is of significant importance for every player in the category.  So what you have here is packaging and point of purchase materials that are reinforcing claims that are made in other media.  And the ideal situation for us would be for our consumer to actually do the comparison themselves.  To literally take a three pound bag of SCOTT'S TURF BUILDER TALL FESCUE and a three pound bag of Pennington SMART SEED TALL FACE and turn it over and look at the seed analysis which isn't marketing, it is actually the ingredients as well.  Any consumer that does that will see that SMART SEED is three pounds of seed and SCOTT'S TURF BUILDER by the acknowledgement on the seed analysis is about a pound and-a-half of seed and about a pound

and-a-half of limestone.

Q    All right.  Let me show you Scott's Exhibit 18.  Now, you see here where it says no filler, twice the seed, versus SCOTT'S TURF BUILDER?

A    I do.

Q    Okay.  Does Pennington run that display or that ad now?

A    They do not.  We do not.  Indeed, obviously it looks like it is a Lowe's shelf.  Those were on the shelf for a short period.  And it is consistent with the advertising that we have gone over with our retailer partners because they sell both Pennington SMART SEED and SCOTT'S TURF BUILDER and requested that we adjust the comparison or the basis of comparison there to combination products as opposed to particular brands at least within the real estate of their stores.

Q    When did that occur?  When did you all change that display?

A    So this packaging and POP that you are showing is for the spring of 2012.  I don't know for certain when it got out.  It was out for a very short period of time.  Again, our retail partners made a request, we honored that request in very short order.  As Mr. Sass said, before they were stickered over and the claim changed to reference coated seed products as opposed to SCOTT'S TURF

BUILDER specifically.

Q    Show you now Plaintiff's Exhibit 20.  Or Scott's I should say.  All right.  Do you recognize this display?

A    That's point of purchase materials from the 2012 spring season.

Q    Okay.  And how does a point of purchase display or a packaging advertisement differ from a TV or radio ad?

A    So, again, in order for a consumer to see this particular, or any point of purchase material, by definition they have to be at the point of purchase so they are in a store presumably interested in the category grass seed that we are talking about.

        And, again, our point for developing materials like these that are in stores are to actually incite consumers to make a purchase decision obviously pointing them to our products because they are branded with our messages.  And a point of purchase item like this would be designed to educate, to reinforce what we had already been saying in other mediums and to get consumers to make the comparison themselves with our product and the competitive products that are out there.

Q    I now will have you pull up Scott's Exhibit 322. Okay.  There is a picture, if you scroll through, there is a picture.  All right.  There was some discussion by Mr. Sass during his testimony, in the retail area how is it

that the SCOTT'S TURF BUILDER product and its EZ SEED, how
are they displayed in comparison or connection with the
Pennington products?

A    It would depend on the retailer because each retail
environment is a little bit different.  But, in most cases
they are in the same aisle, an area for, quote, unquote,
straight seed products and then combination products
because the two categories, regardless of the competitors
in those particular segments, are essentially used by
consumers and meant for use by consumers in different
ways.

Q    So is it your experience -- first of all, have you
been to the retail stores and seen the displays of Scott's
products and Pennington products?

A    More times than I care to admit.

Q    And, in your experience, do the consumers have an
opportunity to compare the packaging?

A    Yes.

Q    Do they have the opportunity to turn the package over
and look at the labels on the back?

A    They do.

Q    Have you at times talked to consumers and asked them
whether they have looked at the packaging and the
labeling?

A    So we -- during the spring season we work stores

pretty much every weekend.  And, indeed, some consumers
are aware of what a seed analysis tag is and some are not.
Again, it is on every package of our product and every
competitive entry in the industry.  So when consumers
become aware of it, it is information that's very
important to them.

Q    What has been your experience when the consumer
compares the labels?

A    The decision is pretty clear.  It is in the store,
they are looking at ingredient statements, and the
declarations and the seed package are consistent with the
messages they have heard in the marketplace.

    MR. SIMS:  No further questions.

        THE COURT:  Cross.

        MR. DANON:  Your Honor, we have got a notebook
of exhibits that I was going to focus on Mr. Crow.  If I
might hand one up?

        THE COURT:  Certainly.

        CROSS-EXAMINATION

BY MR. DEMM:

Q    Good afternoon, Mr. Crow.  You testified that you
have worked at Central Garden and Pet since February of
2011; is that correct?

A    That's correct.

Q    And Central Garden and Pet owns Pennington, one of

the parties in this lawsuit?

A    Yes, sir.

Q    Central Garden and Pet also owns the company NexGen;
is that correct?

A    That's correct.

Q    You testified in your deposition that Kenneth
Highight runs, I'm sorry, that Kenneth Highight runs
NexGen?

A    It is not his company.  But, he is the de facto
leader of NexGen.

Q    And you describe NexGen as functioning like the R & D
or research and development division of Pennington; is
that correct?

A    Yes.

Q    Now, you don't yourself have scientific training in
horticulture or seed or soil science, those types of
things?

A    I do not.

Q    Your expertise is in marketing?

A    Yes.

Q    And before you came to Pennington or Central Garden
and Pet you had not worked in the lawn and garden
industry; is that correct?

A    That's correct.

Q    You worked for Coca-Cola?

A    Yes.

Q    And then for a start-up company that sold laundry
detergents?

A    Correct.

Q    Your current position is vice-president of marketing
for grass seed for Pennington; is that correct?

A    Correct.

Q    So you head up the marketing function for
Pennington's grass seed products?

A    Correct.

Q    And this includes both the SMART SEED product and the
1 STEP COMPLETE product that we have been talking about
today?

A    Yes.

Q    I believe you testified those are Pennington's
premium products?

A    Yes.

Q    And Pennington tends to get higher margins on these
grass seed products, SMART SEED and 1 STEP COMPLETE, than
on other non-premium products that it sells?

A    That's fair.

Q    And Pennington's primary competitor in the grass seed
marketplace is Scott's; is that correct?

A    Yes.

Q    And Scott's also sells straight grass seed and

```
1   combination grass seed products in competition with
2   Pennington?
3   A    They do.
4   Q    And I believe you said one of your goals as the
5   vice-president for marketing for Pennington is to take or
6   steal market share from Scott's; is that correct?
7   A    That's the goal of any marketer.
8   Q    And one way that the Pennington SMART SEED and 1 STEP
9   COMPLETE products compete is that they are cheaper in
10  price than the corresponding Scott's product; is that
11  correct?
12  A    In some cases.  Not in all.
13  Q    Okay.  Do you recall testifying that there was
14  basically a 25 percent discount and a 10 percent discount
15  roughly from the Pennington products to the Scott's
16  products?
17  A    I don't recall that.
18  Q    Okay.  But, over the past few years the price gap, I
19  believe you've testified, tell me if you agree with this,
20  that over the past few years the price gap between the
21  Pennington products and the Scott's products is narrowed;
22  is that correct?
23  A    That's correct.
24  Q    And because this price gap has been shrinking, or one
25  reason is the price gap has been shrinking, you have had
```

```
1   to give other messages to consumers to justify having them
2   spend the money to buy Pennington's products; is that
3   correct?
4   A    I am not sure what you mean by other messages.
5   Q    You have to present to consumers that they get a
6   volume with the Pennington products to justify the higher
7   prices.  Is that fair?
8   A    I think that's fair.
9   Q    And one of your goals, I assume, is also to convince
10  consumers that when they are buying Pennington's products
11  they are getting a better value overall than the Scott's
12  products?
13  A    I think that's fair.
14  Q    And in 2011 SMART SEED and 1 STEP COMPLETE did take
15  market share from Scott's; is that correct?
16  A    There was no syndicated market share to reliably say
17  yes or no.  But, based on my analysis of the market, that
18  would be correct.
19  Q    Okay.  And the reason for your belief is that the
20  reason for it is this is the first time that, at least the
21  first time in your experience, that Pennington made a
22  concerted marketing effort for its 1 STEP and SMART SEED
23  products; is that correct?
24  A    That's correct.
25  Q    And part of this marketing effort was to compare the
```

```
1   1 STEP and the SMART SEED to the corresponding Scott's
2   products, right?
3   A    When you talk about ONE STEP, I assume you're talking
4   about 1 STEP COMPLETE.  Is that fair?
5   Q    We can say 1 STEP COMPLETE.
6   A    Then yes.
7   Q    Okay.  And one of the themes of this advertising has
8   been that Pennington's products have twice the seed versus
9   Scott's product.  Correct?
10  A    Correct.
11  Q    And that having twice the seed makes the Pennington's
12  products a better value than the Scott's products?
13  A    Certainly connotes a feeling that they are more
14  premium.
15  Q    Okay.  But, having more grass seed in the Pennington
16  products would make them the better value only if that
17  translates to having more grass plants; is that correct?
18  A    Well, the purpose of having grass seed is to develop
19  grass plants.  So more would be better, yes.
20  Q    So there is no value to a consumer in just having a
21  grass seed that weighs more per seed than another grass
22  seed.  Is that fair?
23  A    I think that's fair.
24  Q    For example, just to use an example, if I had 100
25  grass seeds, the most grass plants I could get from that
```

```
1   is 100; is that correct?
2   A    Correct.
3   Q    And it doesn't matter whether those 100 grass seeds
4   weigh one pound or two pounds or five pounds, the most I
5   can get is 100 grass plants out of that?
6   A    Out of 100 seeds, correct.
7   Q    Now, Pennington SMART SEED products do not have twice
8   the number of seeds of SCOTT'S TURF BUILDER products; is
9   that correct?
10  A    I couldn't say.  I've never counted them.
11  Q    You don't know?
12  A    I don't know.
13  Q    Have you ever looked at any data that counted the
14  seeds?
15  A    I have seen some data that counts seeds.  But, it's
16  been here and there.
17  Q    So if a consumer sees a twice the seed claim on
18  Pennington's products, and that's what the customer
19  believes that that translated to twice the number of seeds
20  and twice the plants, they would be getting a deceptive
21  message, wouldn't they?
22  A    I couldn't say what a consumer believes and how they
23  interpret it.
24  Q    Okay.  But, if they did, I am just asking you to
25  suppose if a consumer sees Pennington saying twice the
```

seed in our product versus the Scott's product, and they
believe that refers to the number of seeds or the amount
of grass plants they would get, they would be deceived,
right?

A    In your hypothetical, I agree with your conclusion.
But, I couldn't state that that's what a consumer would
believe.

Q    Okay.  Now, you contend -- well, let me -- is it your
contention that when a consumer sees Pennington's twice
the seed advertising, they will believe that that refers
only to the weight of the seeds?

A    Yes.

Q    Okay.

A    So I am clear, it is the weight of the seed, not of
the seeds.

Q    All right.  That's fine.  Now, even if a consumer
thinks that twice the seed means by weight only, if there
are TURF BUILDER products or if there are instances where
the Pennington product does not have twice the seed either
by weight versus the corresponding Scott's product, then
that consumer would be deceived.  Correct?

A    I am not following you.

Q    Okay.  If a consumer believes, as you contend, that
twice the seed, when Pennington suggests twice the seed,
it means twice the seed only by weight and the Pennington

product does not, in fact, have twice the seed by weight
versus the Scott product, that consumer would be deceived?

A    Yes.

Q    Now, I believe, so you have seen -- is it your
contention that when a consumer sees Pennington
advertising saying twice the seed, you know that that
consumer is going to interpret that as meaning by weight
only?

A    Yes.

Q    And what is your basis for saying that?

A    That seed, like many other categories, is based on
weight.  Like I said, I have never spoken to a consumer
that is going to buy 100 grass seeds.  But, I have spoken
to hundreds that are going to buy five pounds of grass
seed.

Q    And I believe it is your testimony that no one in the
industry counts grass seeds?

A    That's what I believe.

Q    And that you think that the right way or the only way
to talk about grass seed products is by weight, not by
number?

A    Yes.

Q    Okay.  So, is it your testimony or your belief that
Pennington has never done its own counting of grass seeds?

A    Not in the time I've been there.

Q    Okay.  And is it your belief or your testimony that
Pennington has never advertised grass seed by seed count
or by numbers of seeds?

A    Not in the time I have been there.

Q    Okay.  Could you turn to -- or let me ask you first.
Are you familiar with the author James Beard?

A    James Beard?

Q    Yes.

A    I'm not.

Q    Are you familiar with his book that's entitled Turf
Grass Science and Culture?

A    I'm not.

Q    Could you turn to in the folder to what's marked
Scott's Trial Exhibit 12.  If you could turn, there is a
page 170 in that.

        MR. SIMS:  I am going to object.  The witness
said he is not familiar with this and he is not being
offered as an expert.  Lack of relevance, lack of
foundation.

        THE COURT:  I understand.  Let me see what the
question is.

Q    Yes.  Are you familiar with James Beard's contention
that the competitive ability of a specific species and a
mixture is best evaluated on a seed number basis rather
than on a weight basis.  Seed mixtures are usually

prepared and sold on a weight basis, this can be
misleading to the layman due to the large variation in
seed size and weight among the turf grass?

A    I am not familiar with that.

Q    Does that change your opinion at all whether it is
appropriate to talk about seed in terms of weight versus
number?

A    I would need to spend some time talking with
Mr. Beard.  I have no idea.

Q    Now, are you also aware we have talked about
Mr. Hignight and his position?

A    Yes.

Q    Now, are you also aware that Mr. Hignight prepared a
document noting that consumers can be misled when
information on grass seed varieties is given in terms of
weight rather than number again because of the variation
in sizes among difference species of seeds?

A    I am not familiar with the document.

Q    Could you turn to what's marked as STX 25 or Scott's
Trial Exhibit 25.  I believe you will see this is a
product comparison report that Mr. Hignight prepared
discussing the establishment of grass seedlings from 1
STEP COMPLETE compared to another product called QUICK AND
THICK.  Have you seen this document?

A    I have not.

```
1    Q    All right.  Do you know what QUICK AND THICK is?
2    A    I believe it is a product that used to be private
3    label, it is a combination product that was used to be
4    private label.
5    Q    Now, if you look in the first paragraph there about
6    halfway down it is written percentage of species which
7    appears on a bag label can be misunderstood.  Program for
8    any annual rye grass combines 16.23 percent of the QUICK
9    AND THICK SPEED mix.  The consumer would surmise this
10   would be better than 3.21 quicker on Kentucky Bluegrass.
11   He says towards the end of that paragraph when seed size
12   is taken into account, Kentucky Bluegrass comprises over
13   50 percent of the seed components in QUICK AND THICK?
14   A    I do.
15   Q    Isn't Mr. Highight here also expressing that the
16   amount of seed in terms of weight can be misleading
17   because of variations in the size of seeds?
18        MR. SIMS:  I am going to object, Your Honor.
19   That question is more properly --
20        THE COURT:  The objection is sustained.
21   Q    Now, are you aware that Mr. Highight, that Pennington
22   and Mr. Highight himself, have counted the seeds in
23   Pennington's own products and competitors' products
24   including the Scott's products?
25   A    I am not aware.
```

```
1    Q    Okay.  Could you turn to what's been marked as
2    Scott's Trial Exhibit 100?  Which is an internal
3    Pennington document, I believe.  Now, are you familiar
4    with this document?
5    A    This document was sent almost a year before I joined
6    the company.
7    Q    So this preceded your time with Pennington?
8    A    It did.
9    Q    Isn't this document showing a chart, Pennington could
10   up the number of seeds in their products and Scott's?
11        MR. SIMS:  I am going to object.
12        THE COURT:  Sustained.
13   Q    I would like to show you what's been marked as
14   Exhibit 11, please.  Now, this is, do you recognize the
15   that this is a Pennington Seed website from what's in the
16   upper right corner?
17   A    It is actually a Love Seed (phonetic).  Love was
18   purchased by Pennington Seed.  It was purchased in 2007
19   which again precedes my time at the company.
20   Q    Do you see where it does say towards the bottom of
21   all content, copyright 2007 Pennington Seed, Incorporated?
22   A    I do.
23   Q    If you flip over to the next page of that, do you see
24   where it has a seed count guide?
25   A    I do.
```

```
1    Q    Does any of this change your opinion as to no one in
2    the industry has ever counted seeds or whether that's a
3    ludicrous proposition.
4    A    To be fair, I never said no one in the industry had
5    counted seeds.  I said I wasn't aware of it.  We know
6    based on earlier testimony that folks at Scott's have
7    counted seeds.  The Love website and the Love purchase was
8    largely predicated on a professional customer as opposed
9    to a consumer customer which is a very different
10   conversation.  In the time I have been here or running
11   consumer marketing, this is not a path we traveled down.
12   Q    But, you can't say before you and particularly based
13   on this document, before you arrived at the company in
14   2011 that any of these companies were not counting seeds;
15   is that correct?
16   A    I can't say that.  I wasn't here.
17   Q    We have looked at this before.  But, could you turn
18   to Scott's Trial Exhibit 13 which is a page from the
19   Pennington SMART SEED website entitled The Real Facts?
20   Have you seen this website?
21   A    I saw it when you showed us earlier today.  But, I
22   have not seen it.  This website did not exist before I
23   joined the company.
24   Q    Do you see the graphic in the lower right where it is
25   basically showing visually one bag of SMART SEED equaling
```

```
1    two bags of seeds?
2    A    I do see that.
3    Q    And do you see below which gives the analysis based
4    on weight?
5    A    I do.
6    Q    Okay.  If you look to the language just to the left
7    of that, the last sentence where it says, fewer seeds per
8    bag means fewer plants and fewer plants means less grass.
9    Do you see that?
10   A    I do.
11   Q    Now, so isn't Pennington here suggesting to consumers
12   that more grass seed by weight means more grass seed by
13   number and this will translate to more grass plants?
14   A    I couldn't say.  Again, this wasn't done under my
15   watch.  And it's not been in existence since I have been
16   in the industry.
17   Q    Where it says fewer seed per bag means fewer plants
18   and fewer plants means less grass, that can only be true
19   if you're talking about numbers of seeds, right?  Only the
20   number of seeds will translate to the number of plants and
21   the number of grass plants, isn't that correct, not the
22   weight?
23   A    I believe so, yes.
24   Q    And, in fact, Pennington has considered increasing
25   the number of seeds in its 1 STEP COMPLETE product to
```

justify a twice the seed claim versus EZ SEED, hasn't it?

A   We have considered adjusting the weight of seed in our 1 STEP COMPLETE.  So there was never any consideration to changing the overall volume.  So if we sell 3 pound package, and if we were going to put more seeds in, we would have to take something out because it is still a 3 pound package.

Q   Could you turn to Scott's Trial Exhibit 27?  And this is an e-mail from Ronnie Stapp to Kenneth Mignight and others.  And the subject is Product Seed Counts.  Have you seen this e-mail before?

A   Again, it pre-dated my time at the company.

Q   Do you know the author Ronnie Stapp?

A   I do.

Q   Who is he?

A   Ronnie ran the grass seed division at Pennington for a long time.  He is still a vital part of the grass seed team.  We work cooperatively on a number of different initiatives.

Q   Do you see the first line of this e-mail, he is saying attached is a calculation for the number of seed in a pound of EZ SEED versus COMPLETE SUN AND SHADE and tall fescue blends?

A   I do.

Q   So isn't that referring to numbers of seeds in a

product?

A   I would surmise, just based on what you're showing me.  But, I haven't discussed it with Mr. Stapp.

Q   And if you look in the next paragraph he is addressing John, Brian and Mike.  And he says, please, play with this spread sheet to see where we need to get to show double our seed with our mix versus theirs?

A   I do.

Q   If you look at the next page of the spread sheet, isn't that using and comparing these two products in terms of numbers of seeds?

A   It could be.  But, again, this is nothing that would ever be relevant to a consumer.

Q   But, Mr. Stapp here, this is an exercise to count seeds in the products, isn't it?

    MR. SIMS:  Again, Your Honor --

A   I couldn't say.

    MR. SIMS:  He is talking about a document he doesn't know about.

    THE COURT:  I think he said what he can say about the document.

Q   You have to admit in your marketing function that you rely on technical people to give you information about these products.  Correct?

A   I do.

Q   And you've testified that -- I believe you've testified that it is ludicrous to count seeds because no one in the industry counts seeds; is that correct?

A   Okay.  Yes.

Q   Don't these documents show that people in your own company were counting seeds, maybe albeit before you arrived?

A   That's exactly what I was going to say.  In the tenure I have had, two-and-a-half years running the seed division, this is not work that's been done.

Q   Let me show you now, let me just even -- I understand that the document we just talked about preceded your arrival at the company when this was August of 2010 and I believe you got there in February of 2011.  But, despite what was done with these seed counts, Pennington still advertised its product 1 STEP COMPLETE as having twice the seed versus the Scott's product; is that correct?

A   Correct.

Q   Okay.  Could you take a look now at Scott's Exhibit 166?  And this is an e-mail, this is now after your arrival.  This is an October 18, 2011 e-mail from Madelyn Miller to you and others with the subject line new 1 STEP COMPLETE brief.  Madelyn Miller was an executive vice-president at Sachy & Sachy; is that correct?

A   She was.

Q   And Sachy & Sachy is the advertising agency for Pennington; is that correct?

A   They are.

Q   This ONE STEP COMPLETE brief relates to advertising or proposed advertising for 1 STEP; is that correct?

A   It does.  Though, to be clear, this is a brief for 1 STEP COMPLETE for year two which would be 2012 which is when the lift test I was talking about was completed.  Sachy & Sachy did not create that ad.

Q   If you look on the second page of this under the detail section, do you see where it says toward the end of that paragraph, plus 1 STEP COMPLETE contains twice as many seeds within its mulch as EZ SEED?

A   I do.

Q   So the ad agency for Pennington is also discussing and referring to seeds in the product in terms of numbers of seeds; is that correct?

A   So this is a document that Ms. Miller authored.  While I can't say it directly led to her dismissal, it did illustrate the fact she didn't understand the category very well.  She was shortly asked off of our business because this was not an appropriate way for us to be speaking to consumers.

Q   Even a vice-president at the ad agency for Pennington misunderstood this concept of number of seeds and weight

1  of seeds; is that correct?
2  A  After probably two conversations, yes.
3  Q  Okay.  Now, you've also recognized the value to
4  Pennington of having an integrated advertising campaign
5  that applies across the SMART SEED product line and the 1
6  STEP product line; is that correct?
7  A  Yes.
8  Q  And you said there can be synergist and a halo effect
9  in advertising that cuts across both product lines; is
10  that correct?
11  A  I believe that effect I referred to discusses more
12  than just those two products.  The halo effect, by virtue
13  of the fact that you're advertising premium products,
14  would give some benefit to other products in your line
15  that you wouldn't necessarily consider premium products.
16  I don't believe that there is a halo effect necessarily
17  between 1 STEP COMPLETE and SMART SEED because they are
18  both premium products.
19  Q  Okay.  But, it is -- there is an integrated
20  advertising effort --
21  A  No doubt.
22  Q  -- between those two?  Could you turn now to Scott's
23  Trial Exhibit 28?  This is a Pennington grass seed update
24  July 29, 2011.  Are you familiar with this document?
25  A  Yes.

1  Q  And are you the author of this document?
2  A  I believe so.
3  Q  Okay.  If you could turn, it is toward the end of the
4  document, and there aren't page numbers except for the
5  Bates stamp number PENEDVA 00023350.
6  A  Got it.
7  Q  Okay.  And this is a table that you made entitled
8  seed count; is that correct?
9  A  Correct.
10  Q  And here you were discussing an advertising claim of
11  two times the seed versus Scott's EZ SEED.  Correct?
12  A  Yes.
13  Q  And the first sentence terms of your recommendation
14  in the recommendation down below is the opportunity to
15  halo effect SMART SEED across the portfolio is eliminated
16  if the seed count is reduced.  Do you see that?
17  A  I do.
18  Q  And so explain to me what the nature of that
19  recommendation is, what you're saying there?
20  A  I believe the question here when this document was
21  put together was about cost savings.  And based on the
22  timing we had, I think one year of advertising sort of
23  under our belt with the "Twice The Seed" claim.  So the
24  question was how important is the "Twice The Seed" claim
25  relative to what it cost us in product.

1  Q  Okay.  But, you're saying here that you want to be
2  able to make a two times the seed claim that applies to
3  both your 1 STEP product and your SMART SEED product; is
4  that right?
5  A  Our 1 STEP COMPLETE product, yes.
6  Q  So it is a claim that cut across --
7  A  Yes.
8  Q  -- the combination product and the straight grass
9  seed product?
10  A  Yes.
11  Q  What you're comparing to here is Scott's products?
12  A  Yes.
13  Q  If you could look back, and we looked at it a few
14  minutes ago, if you could look back at Exhibit 166
15  briefly.  This, again, is the e-mail from Sachy & Sachy.
16  Do you see on the second page there under background, the
17  last sentence there, it says in doing this, we should
18  consider ways to strengthen a Pennington signature across
19  both SMART SEED and 1 STEP Complete?
20  A  Yes.
21  Q  Is that, again, this same idea of having an
22  advertising claim that cut across both of those products?
23  A  So we have executions, as we've seen for both, by
24  execution I mean different messages for both 1 STEP
25  COMPLETE and SMART SEED.  The more consistency there is

1  across those particular packages, the more integrated
2  effect there is and the more efficient it might be.
3  Q  The key message integrating those was "Twice The
4  Seed."  Correct?
5  A  Yes.
6  Q  And, in fact, we have seen it, you may have seen it
7  sitting here in the courtroom, there are points of
8  purchase materials that you've developed that have been in
9  the stores that carry this message across to the
10  consumers.  If you could look at Exhibit 20 again.
11  A  20?
12  Q  Yes.  Again, this is the point of purchase.  This is
13  a -- I think you testified this is a point of purchase
14  advertising?
15  A  It is.
16  Q  And it is entitled The Seed Matters; is that right?
17  A  It certainly says The Seed Matters.  I am not sure it
18  is entitled that.
19  Q  Fair enough.  Again, this is advertising both the
20  SMART SEED product and the 1 STEP COMPLETE product.
21  Correct?
22  A  It is.
23  Q  And the message in both is two times seed; is that
24  correct?
25  A  Correct.

1  Q   Okay. I believe recently in this lawsuit you
2  submitted a declaration saying that you were unable to
3  find any examples of Scott's uncoated TURF BUILDER for
4  sale in stores; is that correct?
5  A   Correct.
6  Q   Are you familiar with the product that is sitting to
7  your right, the Scott's grass seed product?
8  A   I am. In the discussion of what is and isn't a
9  premium product, there is no definition by which that's a
10  premium product.
11  Q   Do you dispute that that is an uncoated Scott's TURF
12  BUILDER'S product?
13  A   I don't. The seed tag would confirm it.
14  Q   Are you aware of that product?
15  A   I am.
16  Q   Okay. And you're aware that it sold in stores like
17  the Home Depot?
18  A   It is.
19  Q   Now, could you turn briefly to Scott's Exhibit 155,
20  please? And this is a Pennington document entitled EZ
21  SEED Response Plan, March 2012. Did you prepare this
22  document?
23  A   I did.
24  Q   And if you could turn again at the bottom right to
25  what is page, I will give you the last five numbers,

1  17032?
2  A   Got it.
3  Q   And this is a discussion of EZ SEED advertising; is
4  that correct?
5  A   Discussion of EZ SEED point of purchase materials.
6  Q   Okay. And it is talking about the EZ SEED ad relates
7  to whether the EZ SEED product out-performs the mulch in
8  the 1 STEP product; is that correct?
9  A   I believe so, yes.
10  Q   And you say at the bottom, our research confirms that
11  their mulch absorbs water better than ours; is that
12  correct?
13  A   Correct.
14  Q   And what research are you basing that statement on?
15  A   I mean, I could put EZ SEED mulch in a cup next to 1
16  STEP COMPLETE mulch and pour an equal amount of water over
17  it. There is no question it is absorbing more water. Key
18  point is based on the analysis I have seen that Mr.
19  Hignight performed has nothing to do with how well the
20  product performs.
21  Q   But, it does -- you don't dispute that the Scott's
22  product absorbs more water than the Pennington product?
23  A   I don't.
24  Q   Okay. If you could look briefly at the Scott's
25  Exhibit 157. And this is a series of e-mails, the first

1  one, the top one which is an e-mail from you to Ronnie
2  Stapp and others dated April 13, 2011. And did you attach
3  this document as the -- well, it is the third page here, a
4  Sachy & Sachy POV on Scott's sell seed response?
5  A   Yes.
6  Q   Could you just explain just briefly what this Sachy &
7  Sachy POV document you attached?
8  A   It is the -- Sachy & Sachy again is our advertising
9  agency. I am checking the time 2011. So Scott's had been
10  running, wrong words, Scott's had been posting sort of
11  single page self sheets, for lack of a better term, POV
12  materials. Some of the other retailers and the same
13  materials appeared on their website comparing their
14  products to ours, be it TURF BUILDER SMART SEED or EZ SEED
15  and 1 STEP COMPLETE. So the question was for discussion
16  with Sachy here was whether or not we needed to rebut,
17  hence the term, or respond to those actions by Scott's.
18  Q   One of these concepts or themes that you were
19  considering being rebutted, it is in the fourth complete
20  paragraph, right, it says you may have heard that 1 STEP
21  COMPLETE retains water for seven hours where Scott's EZ
22  SEED retains moisture for up to 30 hours and probably
23  wants to know what this means when I go trying to grow
24  thick green grass?
25  A   I do.

1  Q   It is true EZ SEED does not retain moisture longer
2  than 1 STEP COMPLETE?
3  A   Are you asking me if the claim is true?
4  Q   Is that your understanding of the way these products
5  perform?
6  A   Depending on the conditions, yes.
7  Q   And is that verified by the testing that Pennington
8  did?
9  A   I don't recall. But, again, if you continue to read
10  on, you know, part of the way that we approach things in
11  the market is making it as easy as possible for consumers
12  to grow grass and retain moisture up to eight hours. This
13  study of seen doesn't have anything to do with growing
14  grass.
15  Q   Are you familiar with the concept of containing
16  water?
17  A   In the right context.
18  Q   And are you aware that that's as a benefit to grass
19  seed, that is, establishing --
20  A   I am.
21  Q   I believe you have testified before that one of the
22  reasons you think it is improper, or why you discuss grass
23  seeds in terms of weight, is industry regulations. Is
24  that correct?
25  A   It is one of the reasons.

Q   But, when Pennington promotes its products as having either twice the seed or twice as much seed, those are advertising or marketing claims?
A   Correct.  They are put in a context that we believe would be easily understood by the consumer.
Q   They are not part of a seed analysis theme?
A   They are based on the seed analysis panel.
Q   When you actually make the claim, it is not part of the seed analysis panel?
A   That claim does not appear on the seed analysis panel.
Q   Where does it appear on a seed analysis panel when you are making that term on TV commercials or radio commercials?
A   It doesn't.  But as I testified earlier, our goal is to get consumers to do the comparison themselves.
Q   There is no basis for making the comparison based on a TV ad or radio commercial?
A   It would be up to them to go look at the products themselves and it would be on the seed analysis panel.
Q   And there is no government regulation that applies to or dictates you are using those "Twice The Seed" claims or twice as much seed claims that you are using them in radio ads or TV ads or points of purchase; is that correct?
A   To my knowledge, there is also no government

regulation that requires us to say that if that's what your asking.
Q   And you don't have any data showing that consumers are aware of seed analysis panels or the weight of different seeds or the numbers of grass seed per pound; is that correct?
A   There is three questions there.  I have a lot of data that shows consumers are not very aware of seed analysis panels.  That's part of the reason we want to bring it to their attention.  As far as the other two, I couldn't say.
Q   So when they see the "Twice The Seed" claim, not understanding the seed analysis panel, if they believe that relates to I am going to get twice as many grass plants out of this or get twice as much coverage, that's not true based on the number of seeds in the products, is it?
A   Again, I feel like you're asking me two different questions.
Q   You believe consumers don't really understand the seed analysis panel; is that correct?
A   You have to ask consumers.  The consumers I have spoken to, when they see it, they understood it completely.  In fact, we run advertising that says we have twice the seed versus SCOTT'S TURF BUILDER.  It is right there on the label.

Q   So the consumer would see in some these instances for at least coated products that there may be twice the amount of seed by weight; is that correct?
A   Correct.
Q   But, if they translate that to coverage, they are not going to get twice the amount of coverage, right, because there is not twice the number of seeds?
A   The coverage on our packages relative to TURF BUILDER'S packages with regard to square foot in an up-to number and they are relatively consistent.
Q   But, if they take the "Twice The Seed" claim to mean either its number of seeds or it is going to translate late to number of grass plants and coverage, they are being deceived by that because it really only relates to the weight?
A   If a consumer is saying, hey, I have twice the seeds so I am going to get twice the number of grass plants because I believe that there are 200 seeds in this package and 100 seeds in that package, then I agree with your supposition.  In my experience I have never seen a consumer that's been able to make that leap.
Q   But, a consumer wouldn't know?  By definition, if the consumer is being deceived, they don't know it?
A   By definition if I they don't know it.  Consumers are buying seed by weight.

THE COURT:  Anything else?
MR. SIMS:  If I may just have a moment.  I have no further questions.
THE COURT:  Thank you, sir.  You may stand down.
(Witness stood aside.)
THE COURT:  We'll stop now for lunch.  Looks like it is about 1:20.  If you all come back at 2:20 we will get started with the afternoon session.
(Luncheon recess taken from 1:20 p.m. to 2:30 p.m.)
MR. DANON:  We call Michael Faust.
MICHAEL FAUST,
called as a witness by and on behalf of the Plaintiff, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION BY MR. DANON:
Q   Good afternoon.
A   Good afternoon.
Q   Mr. Faust, can you state your full name for the report?
A   My name is Mike Faust.
Q   And can you, please, tell us about your educational background?
A   I have a bachelor's degree in environmental science

1  from Simpson College in Indianola, Iowa.  And I have a
2  master of science degree in horticulture with emphasis on
3  turf grass science from Ohio State University.
4  Q    And what do you do now?
5  A    I am a research scientist at the Scott's Miracle-Gro
6  Company.
7  Q    How long have been a research scientist at Scott's?
8  A    I have been a research scientist for about four
9  years.  I've been with the company for almost 11 years
10  now.
11  Q    What is your position, your current position, as a
12  research scientist?
13  A    I started out as a research scientist in
14  biotechnology.  And then I went with my supervisor, Dr.
15  Eric Nelson, over to the consumer grass seed team.
16  Q    Okay.  When was that?  What year?
17  A    That was, I believe it was 2005 or 2006.
18  Q    And what are your duties and responsibilities as a
19  research scientist?
20  A    As a research scientist I conduct scientific studies
21  at Scott's.  I look at competitive products.  Focus is
22  mostly on conducting research.
23  Q    The research that you conduct, do you also design
24  some of that research?
25  A    I do, yes.  I write protocols, I set up the trials,

1  help to collect the information and then do the analysis.
2  Q    And are there other scientists that are part of the R
3  & D team?
4  A    Exactly.  As I mentioned, my supervisor Dr. Eric
5  Nelson is on my team.  And then collectively across the R
6  & D group at Scott's we have a number of scientists in
7  multiple disciplines.
8  Q    And do you at times collaborate with the other
9  scientists?
10  A    Yes.
11  Q    In the R & D department?
12  A    Yes.
13       What's been the focus of your research if there has
14  been any particular focus?
15  A    The focus of my research I would say for the last
16  five or six years has been on consumer grass seed
17  products.  So that would encompass EZ SEED, that would
18  encompass the straight grass seed products and PATCH
19  MASTERS which is another of our combination products.
20  Q    Before you started the working at Scott's did you do
21  anything else in the science word?
22  A    I did.  I got started, actually got started in golf
23  course center.  I worked as a foreman on a golf course.
24  And then I was able to go back to school with Dr. Nick
25  Christians and upon graduation I went to the Texas

1  Agricultural Experiment Station in Dallas, Texas where I
2  worked for Dr. Milt Engleky for approximately two
3  and-a-half years.
4  Q    And do you do anything to stay current of any
5  developments or trends in the turf grass industry?
6  A    I do.  I attend multiple conferences, American
7  Society of Agronomy, American Sea Trade Association.  I
8  keep up with reading of journals, peer-reviewed articles.
9  So, yes, I do stay up on the current science.
10  Q    And how many turf grass experiments would you say
11  you've conducted at Scott's?
12  A    I have been there almost 11 years now.  And will
13  conduct between 70 to 100 trials a year.  So hundreds of
14  trials.
15  Q    And are these trials, are they in a greenhouse,
16  outdoors?
17  A    All the above.  We will conduct grilled chamber
18  trials, we will conduct greenhouse trials, we will conduct
19  field trials.
20  Q    About how many trials are ongoing at any given time?
21  A    We do a lot of agricultural testing.  So those are
22  multi-year trials.  We will have 10, 15 trials at least
23  going simultaneously for year to year.
24  Q    Now, the research and the testing that you do, what's
25  the point of doing that research?  Why do you do it?

1  A    I think this is a number of things.  One is the thing
2  we are most focused on is making it easier for the
3  consumer to be successful in looking at knew inventions.
4  And then part of my responsibility and my supervisor is to
5  provide claim support for the marketing team.
6  Q    And a follow-up on that, do you have any coordination
7  with marketing?
8  A    Yes, I do.  I work with marketing.  I work with them
9  on a regular basis.  We have a weekly Monday morning
10  meeting just to talk about some of the ongoing issues,
11  trying to determine where we are in the process of getting
12  products to market.  And then multiple e-mails, phone
13  calls.  So, yeah, I work with marketing on a regular
14  basis.
15  Q    Do you ever work with any scientists that are outside
16  of Scott's?
17  A    We do.  We work with a number of universities.  We
18  also work with a number of seed testing labs.  So, yes, we
19  do work outside of Scott's.
20  Q    And the work that you do with these outside
21  scientists, do you use the outside scientists to assist or
22  provide any data for the research studies that you do?
23  A    We do.  We use their data to, again, help us support
24  claims and make key business decisions.
25  Q    Are you familiar with Pennington's grass seed

1  products?

2  A   Yes, I am.

3  Q   Is that something you have become familiar with as

4  part of your role as a research scientist?

5  A   Yeah.  Again, since I was moved into the consumer

6  grass seed group, I have become very familiar with their

7  products.

8  Q   And has the Scott's R & D team conducted testing and

9  analysis comparing any of the Scott's products and the

10  Pennington products?

11  A   Yes.  We do that.

12  Q   In connection with this lawsuit, have you also been

13  asked to do any other analysis or review?

14  A   Yes.  We have been asked to do a number of different

15  trials encompassing things like seeding count and other

16  competitive tests.

17  Q   And how about yourself individually, have you been

18  asked to do anything else in this case regarding

19  testimony?

20  A   I have also been asked to look at some of the expert

21  reports in this case.  So I've looked at those.

22  Q   Okay.  And who are the other experts, the Pennington

23  experts, that you have reviewed their studies?

24  A   Primarily Mr. Highight and Dr. Karcher.

25  Q   Now, you were sitting here earlier today and you saw

1  some of the advertisements that were put up as exhibits?

2  A   Yes, I have.

3  Q   Rather than popping up television ads or photos

4  again, I will ask you, have you conducted any seed counts

5  to determine whether Pennington SMART SEED has twice the

6  number of seeds as SCOTT'S TURF BUILDER?

7  A   Yes.  I have I have conducted those tests.

8  Q   Now, before this lawsuit had you counted any seeds or

9  conducted any seed counts?

10  A   We do seed counts quite often.  However, not to the

11  magnitude we were asked for this particular case.  But,

12  yes, when we do put out our research trials, we like to

13  standardize.  Instead of putting it out by weight, we will

14  count out 75 seeds or 100 seeds, whatever is, whatever we

15  would like to look at depending on the species that we are

16  testing.  And then we will again put those through a seed

17  count or two to help standardize the testing.

18  Q   Why would seeds ever matter in connection grass seed?

19  The number of seeds, why would the number of seeds ever

20  matter in connection with grass seed?

21  A   The number of seeds are important because ultimately

22  that's what we are trying to achieve is to deliver a

23  certain number of seeds over a unit area.

24  Q   And how's that conveyed in connection with

25  application of grass seed?  How do you convey the target

1  or the idea of dropping a number of seeds per target area?

2  A   So it is based on -- depending on the formulation of

3  the product.  So it depends on if you're looking at a tall

4  fescue product which has a much larger seed compared to a

5  Kentucky Blue Grass product that has a smaller seed.

6         Again, it is trying to estimate a certain number

7  of seeds to be applied over an area of a one square foot

8  or thousand square foot, whatever it may be.

9  Q   How do the seeding rates that are put on bags and

10  number of seeds, how do they interplay?

11  A   Again, the weights, the weights go hand-in-hand with

12  the seed count.  So again, for instance, for Kentucky

13  Bluegrass, which is a much smaller seed, the seeding rate

14  is lower.  For tall fescue, which is a larger seed size,

15  the seeding rate will be higher.

16  Q   And how were seeding rates generally expressed on

17  consumer, on grass seed bags that go out to consumers?

18  A   They are expressed on a weight per area.

19  Q   What would be an example of a seeding rate?

20  A   A seeding rate could be five pounds per thousand

21  square feet.

22  Q   Now, you're familiar with Dr. Beard, correct?

23  A   Yes, I am.

24  Q   Let me pop up Exhibit 12 and go to page 512.

25         MR. WOLF:  Object to this.  It is hearsay.  This

1  exhibit is somebody else's product.  Now apparently it's

2  being offered for the truth of it.  The rule doesn't allow

3  them to put it into evidence.

4         THE COURT:  Overruled.

5  BY MR. DAMON:

6  Q   And on page 512, is there a certain number of seeds

7  per area that Dr. Beard recommends?

8  A   Dr. Beard recommends approximately, I think, 15 to 25

9  seeds per square inch.  There are a lot of recommendations

10  out there.  But, yeah, Dr. Beard does recommend

11  approximately 15 to 25 seeds per square inch.

12  Q   How does that recommendation then play forward to a

13  seeding rate, how would that apply?

14  A   So, again, it is based on a weight.  So, again, if it

15  is a smaller seed like Kentucky Bluegrass, it is a lower

16  seeding rate, but it still approximates the roughly 15 to

17  25 seeds per square inch.

18  Q   So if seeding rates look at the number of seeds, why

19  is grass seed sold by weight at the stores?

20  A   It is sold by weight because it's just more practical

21  to put hundreds of thousands of seeds, a count in a bag,

22  or if it is a Kentucky Bluegrass which could be millions,

23  it is just not practical.  That's why we sell by weight.

24  Q   And does the size or do seed species vary in size?

25  A   Yes.  As I mentioned earlier, depending on the

```
 1  species, if you look at cool season grasses, tall fescue
 2  is going to have larger seed size than something like
 3  Kentucky Bluegrass.
 4  Q    And have you prepared something to demonstrate that?
 5  A    I did, yes.
 6  Q    Mr. Faust, can you, please, explain what you did
 7  there and what that shows?
 8  A    So, I mean, this essentially gives you a visual.  I
 9  know it is hard for you to see up there.  Just shows you
10  in my left hand is, this is tall fescue.  There is 2000
11  seeds in this vial.  And in this vial over here on my
12  right, this is Kentucky Bluegrass.  And this just shows
13  you the 2000 seeds of Kentucky Bluegrass.
14            MR. WOLF:  Object.  Because this wasn't produced
15  to us.
16        MR. DANON:  Your Honor, it is just a demonstrative.
17            THE COURT:  Objection is overruled.
18  BY MR. DANON:
19  Q    You went through the four seeds there?
20  A    I think the easiest is to compare tall fescue to
21  Kentucky Bluegrass.  Essentially, cool season grasses have
22  different seed sizes.  And that's well-known in the
23  industry.
24  Q    Is there information available on the general
25  estimate of the number of seeds per pound by species?
```

```
 1  A    Yes.  This is something that's readily available in
 2  textbooks, extension bulletins, websites.
 3  Q    And let me show you what's been already marked here
 4  as Exhibit No. 11, Scott's Exhibit 11.  If we go to the
 5  next page, have you seen this before?
 6  A    Yes, I have.
 7  Q    And what is it?
 8  A    This is -- this just talks about the relative number
 9  of seeds or approximate number of seeds per pound that
10  came from a website that, whether it is, it was their last
11  week.  I looked at it.  So it is still available.
12  Q    And what does it show as far as seed numbers?
13  A    This just shows, again, an approximate number of
14  seeds per pound for a number of common turf grass species.
15  Q    Do you understand whether this is a Pennington
16  website?
17  A    It is, yes.
18  Q    Now, we heard some other testimony today about
19  different mixes, seed mixes and blends within products.
20  Can you explain what are the mixes and blends, what does
21  that mean?
22  A    It depends on -- the consumer has a lot of different
23  options.  So they can go to the store and they can buy a
24  tall fescue mix.  They can go to the store and buy a sun
25  and shade mix depending on what their needs are.  And so
```

```
 1  we, as well as Pennington, offer a wide variety of what we
 2  call seed flavors, seed mixes, that a consumer can
 3  purchase based on their needs and where they live.
 4  Q    And how do those mixes impact what would be the
 5  number of seeds that would be in a bag?
 6  A    Again, it all comes back to how the product is
 7  formulated.  So if it is a sun and shade mix and it has
 8  roughly 33 percent per perennial rye grass and roughly
 9  33.3 percent Bluegrass and 33.3 percent fine fescue, that
10  would be different than something that may have 60 percent
11  rye grass and 20 percent Bluegrass and 20 percent fine
12  fescue.
13  Q    Let me go back to Exhibit 12 which is Dr. Beard's
14  book and go to page 170 in that book.  And does Dr. Beard
15  make any comment about the potential to mislead consumers
16  or the layman when mix or blends of grass seed are sold?
17  A    Yes.
18  Q    Where's that?
19  A    It is in the last paragraph.
20  Q    And can you read that last paragraph?
21  A    Sure.  It says the competitive ability of a specific
22  species, a mix is best evaluated on a seed number basis
23  rather than on a weight basis.  Seed mixtures are usually
24  prepared and sold on a weight basis.  This can be
25  misleading to the layman due to the large variation in
```

```
 1  seed size and weight among the turf grass species.
 2  Q    Let me jump to Exhibit 257 which is global trial
 3  protocol.  Now, can you, please, explain what this
 4  document is?
 5  A    This is a protocol that I was asked to prepare based
 6  on some information that I received from our brand team on
 7  some of the claims that Pennington was making regarding
 8  "Twice The Seed".
 9  Q    And what did this trial test?
10  A    This was a very simple, straightforward test.  We
11  essentially went out into the retail stores and bought, I
12  think it was three different flavors, Sun & Shade, Midwest
13  Mix and Dense Shade Mix.  We brought them back to our lab
14  and riffled them down into small samples as a scientific
15  patch.  From those samples I think we riffled them down
16  into 10 samples.  We at random picked three of those
17  samples.  We weighed out 50 grams of seed for each of
18  those replicates and put them into a mechanical counting
19  device and did a straightforward count.
20  Q    How did you select the products that were counted?
21  A    We selected the product that we thought, that we knew
22  that had more grass formulated in them.  Again, based on
23  the seed size, we knew that these products would help to
24  refute the claim of opinion, Pennington saying "Twice The
25  Seed".
```

```
 1    Q    Show you Exhibit 258.  Do you see Exhibit 258?  Do
 2  you recognize that document?
 3    A    Yes.  These are the results of the counts that we
 4  made.
 5    Q    What were the results if you could summarize them.
 6    A    It really came down to, we never found any mix, any
 7  like mixes comparing Pennington to the SCOTT'S TURF
 8  BUILDER WATER SMART lines that showed twice the number of
 9  seeds by count.
10    Q    If we look at the first six products, they were
11  Pennington MIDWEST MIX and then TURF BUILDER WITH WATER
12  SMART mix.  You see that?
13    A    Yes.
14    Q    Did you compare those two products?
15    A    Yes.
16    Q    And why did you choose to compare the two Midwest
17  products.  Are they sold together?
18    A    Yes, they are.  They are comparable products.
19    Q    Is the seed mix different in those blends?
20    A    Yes.  It would be.
21    Q    If we go on to the rest of the chart with reference
22  to the SUN AND SHADE labeled products of each company,
23  would the seed mixes be different in those, also?
24    A    Yes.  That's correct.
25    Q    Is there any general seed mix, let's say, or any type
```

```
 1  of seeds that Scott's uses that you believe Scott's uses
 2  more of than Pennington?
 3    A    As I discussed, Scott's has formulated with more
 4  Kentucky Bluegrass grass in their seed products
 5  historically.
 6    Q    And why is that?
 7    A    Kentucky Bluegrass is, if you look in the textbooks,
 8  I was just looking at Dr. Christians' book, his comment is
 9  it is probably one of the most widely used cool season
10  grasses.  It provides a very good stand.  It is used
11  across the board in sports fields, home lawns,
12  recreational areas, commercial sites.  It has the ability
13  to recover through underground plant parts called
14  rhizomes.  And so this is a very popular cool season
15  grass.
16    Q    And does Dr. Beard's book also recognize the benefits
17  of the Kentucky Bluegrass seed, too?
18    A    Yes.
19    Q    If I go back to Exhibit 12 on page 511, can you point
20  out for us where Dr. Beard talks about that?
21    A    Yes.  He talks about, you know, comparison of a
22  rhizome versus -- that's more of a bunch type grass like
23  perennial rye grass.  And just the benefit of, again, the
24  self-repair of the turf grass.
25    Q    In this case, as part of the what you have analyzed,
```

```
 1  have you also read the report of Dr. Karcher, one of
 2  Pennington experts?
 3    A    Yes.
 4    Q    Did you read his statement regarding the mortality
 5  rate of Kentucky Bluegrass?
 6    A    Yes, I have.
 7    Q    Do you have an opinion as to his statement?
 8    A    I don't disagree with the statement.  I think that
 9  there is a slightly higher mortality rate for Kentucky
10  Bluegrass as compared to some other cool season grasses.
11  But, I still don't think detracts from the fact that it is
12  a very commonly used cool system.  And I think both
13  Scott's and Pennington, we both sell Kentucky Bluegrass.
14    Q    Now, we saw the seed count results of the actual seed
15  counts you conducted pursuant to growth on Exhibit 257 and
16  258.  Did Scott's do anything else, did you at Scott's
17  research and development team do anything else to confirm
18  these seed count results?
19    A    We did.  We did some mathematical computations
20  looking at the seed analysis panel.
21    Q    Show you Exhibit 313 and ask you to identify that
22  document?
23    A    Yes.  This is something that I helped to prepare.
24    Q    And what does it show?
25    A    It, again, takes the same products that we use
```

```
 1  through the mechanical seed counter.  Then we just did
 2  simple a mathematical computation where we looked and saw
 3  how much seed was in each product.  This happens to be
 4  straight seed here.  But, we calculated the pure life
 5  seed.  Then we looked and saw what species were in these
 6  mixes.  Looking at the approximate seed number chart that
 7  we just talked about, we use that information to gave a
 8  minimum and kind of maximum range.  So we used both of
 9  those ranges to determine an approximate number of seeds
10  that would be in each bag.
11    Q    Just so the record is clear, let me pop up Exhibit 11
12  again and go to page two and ask whether that's the seed
13  count per pound estimator guide that you used to conduct
14  the mathematical calculation as shown in Scott's Exhibit
15  313?
16    A    Yes.  This is the chart that we used.
17    Q    What was the conclusion of your mathematical
18  computations?
19    A    The conclusion was it was the same as doing the
20  actual physical count is that we could never find, with
21  the mix that we tested, we could never find twice the seed
22  by count of any of the products that we looked at.
23    Q    Just so the record is clear, that is, the Pennington
24  SMART SEED products did not have twice the number of seeds
25  as the Scott TURF BUILDER products?
```

```
1   A    The Pennington products did not contain twice the
2   number of seeds as the Scott's products.
3   Q    Now, did you have any outside scientist provide you
4   any data in connection with seed counts?
5   A    Yes, we did.  We used a seed lab, a registered seed
6   technologist, Mr. Matt Levy.
7   Q    And who is Matt Levy?
8   A    Matt Levy owns a seed testing lab and he does seed
9   counts on a regular basis.  We reached out to him to have
10  him also do the testing as well.
11  Q    Okay.  And did Mr. Levy conduct a count of SMART SEED
12  SUN AND SHADE mix and TURF BUILDER SUN AND SHADE mix?
13  A    He did.  He compared SUN AND SHADE mix, correct.
14  Q    And have you seen that data that he provided?
15  A    Yes, I have.
16  Q    And what was the result of his count?
17       MR. WOLF:  Objection, Your Honor.  He is trying
18  to get this witness to testify to another expert who's
19  been identified in this case report.
20       MR. DANON:  Your Honor, Mr. Faust is testifying also
21  as an expert witness.  Expert witnesses can rely on data
22  that another expert has provided.  All I am getting from
23  him is that data.
24       MR. WOLF:  And that data is hearsay, Your Honor,
25  and he can't state the hearsay.  He can say that he relied
```

```
1   on it and say what his conclusion is.  But, he can't say
2   what somebody else said.
3        THE COURT:  Did you rely on this in formulating
4   your opinions?
5        THE WITNESS:  Yes, we did.  We asked him to
6   conduct this count.
7        THE COURT:  Go ahead.  You can testify.
8   BY MR. DANON:
9   Q    So did Mr. Levy provide data and results of his
10  count?
11  A    Yes, he did provide data.
12  Q    And you're relying on his data in rendering an
13  opinion in this case?
14  A    Yes.  That is correct.
15  Q    Okay.  And what did his data provide or show?
16  A    Again, his data, it was very similar to the data we
17  collected.  He used a little bit different methodology.
18  But, essentially, it still showed that Pennington by count
19  did not have twice the number of seeds in the SUN AND
20  SHADE product that he compared.
21  Q    Based on these three, the seed counts that you did,
22  the computation that you did and the information you
23  provided or was provided to you by Mr. Levy, do you have
24  an opinion as to whether smart seed blends identified in
25  Exhibit 258, which was have the SUN AND SHADE and the
```

```
1   MIDWEST mix, and why don't we pop up Exhibit 258 just so
2   the record is clear.  Okay.  So there is Exhibit No. 258.
3   Do you have an opinion as to whether smart seed blends
4   identified in this exhibit have twice the number of seeds
5   per pound as the comparable TURF BUILDER blends?
6   A    They do not have twice the number of seeds, no.
7   Q    Now, as part of the R & D group, did you work on the
8   development of EZ SEED?
9   A    Yes, I did.
10  Q    What is EZ SEED?  I think we have heard some
11  testimony today.  If you could just briefly describe it?
12  A    EZ SEED is our combination product that contains a
13  mulch, a fertilizer and grass seed.
14  Q    What time period were you working on the development
15  of EZ SEED?
16  A    We did our first test in, I believe it was the winter
17  of 2006.  And that testing continued through 2007 and in
18  2008.
19  Q    Do you know when the product was first launched?
20  A    The product was first launched on a regional basis in
21  2009.
22  Q    And what's the, just briefly, what's the breakdown of
23  the ingredients or the components of the combination
24  product, EZ SEED?
25  A    EZ SEED is about 88.6 percent of the coconut coir
```

```
1   flakes that have been compacted.  So we have a patented
2   process that we use.  When this raw material comes in it
3   goes through a process of roll compaction and then they
4   are broken up into small granules.  So, again, that's 88.6
5   percent.  And then the fertilizer charge is 3.9 percent by
6   weight.  And the seed addition is 7.5 percent by weight.
7   Q    And going back to the coconut part of this, can you
8   just describe the characteristics of the coconut fiber,
9   the coir fiber?
10  A    Sure.  Again, the fiber comes in bricks.  Then it is
11  broken up and compacted.  And so we also do some
12  electron microscopy.  So you can see that, when
13  you look under a microscope, you can see that it
14  looks, it is kind a honeycomb appearance.  So it
15  has a lot of porous structure.  That's what
16  allows the mulch to be very porous and absorb
17  substantial amounts of water.
18  Q    When you talk about its capability to absorb, how
19  much does EZ SEED expand roughly?
20  A    EZ SEED, the mulch in EZ SEED will expand about four
21  times in volume.
22  Q    And I think we saw 282, the -- 281.  What does that
23  picture show?
24  A    That just shows -- the photograph on the left is EZ
25  SEED product that is dry.  And then the product on the
```

```
1   right is that same amount of product after it's been wet.
2   So you can see how it absorbs water and expands after it's
3   been wet.
4   Q    Now, this morning Judge Spencer asked a question of
5   Mr. Sass about what the advantages are of the absorption
6   or the absorbability capabilities of EZ SEED.  Why is that
7   a good quality in the mulch?
8   A    It is very important because grass seed, the water
9   that it needs to imbibe, to start the germination process,
10  it is very important to supply an ample amount of that
11  water to encourage the seed to germinate.
12  Q    Now, have you also, as part of your R & D role,
13  compared the performance of EZ SEED and 1 STEP COMPLETE?
14  A    Yes, I have.
15  Q    Okay.  And what kind of tests have you conducted?
16  A    We have conducted some growth tests and we've also
17  done some absorbency and water holding tests.
18  Q    Let me put on exhibits or start with Exhibit 270.
19  And ask you to tell us what this document is?
20  A    This is a trial report from one of the tests that we
21  conducted looking at the ability of two different
22  products, EZ SEED and Pennington's 1 STEP COMPLETE, to
23  absorb water and to hold it over time.
24  Q    And if we go to Exhibit 271, can you identify this
25  document for us?
```

```
1   A    Again, this is another report that we completed on
2   another absorbability that we ran on Scott's.
3   Q    Was this test similar to the test that is shown in
4   Exhibit 270?
5   A    Yes.
6   Q    What's different about it?
7   A    I believe that this one -- in one of the tests we
8   actually looked at Pennington's newer formulation.  They
9   made a claim that they changed their mulch formulation in
10  2012.  So we tested 2012 product.
11  Q    And let me show you Exhibit 272 and ask you to
12  identify that trial report?
13  A    Again, this is another one of our tests that we
14  conducted looking at EZ SEED and 1 STEP COMPLETE for water
15  holding and retention.  Water holding and absorbency.
16  Q    So the three exhibits we just went through, 270, 271
17  and 272 were all trials that were conducted at Scott's R &
18  D department that looked at the absorption capability and
19  water holding capability?
20  A    Yes.  That's correct.  Absorption and water holding
21  capability of the products.
22  Q    Now, how did you come up with this study?
23  A    This was something that we developed.  We needed to
24  find a way to be able to look at these two materials and
25  figure out how much water they can truly absorb.  And so
```

```
1   one of the methodologies, the methodology we chose to use
2   was using a subsurface soak by putting these materials
3   into a PVC tray that was lined with an erosion fabric.
4   And so what that did is it didn't allow any of the
5   materials that we put on top of the fabric to migrate
6   through the tray itself.  But, it did allow water to move
7   into the tray.
8        Then after we took the trays out of the water
9   bath, it allowed the water to move back out of the tray.
10  Q    And how did you come about with the idea of using
11  that type of study to test absorption and water holding?
12  A    Because this is a test that really helps to pinpoint
13  the ability of these materials to hold water and to look
14  and see how long they are going to hold water over time.
15  Q    Now, if we turn to 270 and turn to the results page
16  on Exhibit 270.  And can you just identify what we are
17  looking at in Fig. 1?
18  A    These are the results of the tests for this
19  particular trial.  You've got three different treatments
20  here.  EZ SEED that was planted at the thin spot rate is
21  the, I guess, looks look a blue colored line.  EZ SEED
22  that was applied at the bare spot rate is the top line,
23  the yellow line.  And then Pennington's 1 STEP COMPLETE is
24  the green line.
25  Q    Okay.  Now, when you talked about these rates, can
```

```
1   you explain to us how you went about determining the
2   application rates that you used in this study?
3   A    EZ SEED, if you look at the pack, and it has two
4   different rates on it.  It has a maximum rate coverage
5   rate that you can find on the front of the package.  And
6   it also has a bare spot rate that we've dubbed one
7   sixteenth of an inch for the thin spot and one eighth of
8   an inch for the bare spot.  For the 1 STEP COMPLETE we
9   used the one and only application rate that's listed on
10  the package.  It is listing at a planting rate of one
11  pound per 20 square feet.  In this case it is three pounds
12  per 60 square feet.
13  Q    If I could have you look at Exhibit 330 which is one
14  of the containers over there by the deputy.  Exhibit 330
15  is a container of EZ SEED.  Can you just describe for us
16  and point to us where the application rate that you use
17  and how you derived that?
18  A    So, again, the maximum coverage rate is listed right
19  on the front of this package.  3.75 pounds covers 80
20  square feet.  And then that is the one sixteenth of an
21  inch rate.  And then the one eighth of an inch rate for
22  the bare spot rate is half of that coverage.  So that
23  would be what we would use, 1.875 pounds per 20 square
24  foot rate.
25  Q    Can you just explain what's the difference between
```

1  thin, not and bare spot rates, and why do they exist?
2  A   So a majority of grass seed products have two
3  different application rates.  One that would be used on a
4  bare spot, essentially it would be completely devoid of
5  plants.  It would just be soil.  And there's also an over
6  seeding rate or a thin spot rate.  These would be areas
7  that would have a sparse population of seedlings or plants
8  that you would want to thicken up.  So you wouldn't need
9  to necessarily put the complete coverage rate of the
10 product on that area.  But, just a smaller amount to
11 thicken up that area.
12 Q   Now, let me now show you what's been marked as 331
13 which is the other EZ SEED container.  Can you tell us
14 what is that?
15 A   This is also a package of EZ SEED, a jug of EZ SEED.
16 This has the new directions for use on it.  And with the
17 new directions for use, what the planting rate that
18 Scott's intends the product to be applied at.
19    So it still contains the up-to coverage on the front
20 of the jug.  The up-to coverage was changed slightly from
21 80 to 85 square feet.  And then we use a photograph that's
22 in step number two under apply.  That photograph is there
23 for the consumer to be able to determine what the
24 appropriate rate of product should be, how it should be
25 applied on the soil.

1     Again, we have explicit directions underneath to
2  talk about how you should evenly apply the product so the
3  area is mostly covered, but there is still bare ground
4  visible.  So, again, this is there to help the consumer to
5  not over-apply the trod.  And then it says after that it
6  says use half as much for the thin areas.
7  Q   Now, first you identified a little bit of a change in
8  the up-to rate?
9  A   Yes.
10 Q   Why was that change made?
11 A   That change was made because of a state, New Jersey,
12 New Jersey has a new fertilizer law that went into effect
13 in 2013.  And that law states that you can only apply .9
14 pounds of nitrogen per thousand square feet.
15    Looking at the older product, we were slightly
16 above that.  We were actually like .9375 pounds of
17 nitrogen.  And so we dropped, we increased our coverage a
18 little bit to make sure that we stayed below that new
19 fertilizer law in New Jersey.
20 Q   And from your role as R & D, are the rates that are
21 depicted in the directions for use in those two
22 containers, was the intention to be any different from
23 each other?
24 A   No.
25 Q   Okay.  In fact, when you developed the product, did

1  you also develop a rate that you wanted EZ SEED to be
2  applied at?
3  A   Yes.  All of the work that we completed for
4  formulating EZ SEED was all done on a weight per unit
5  area.
6  Q   And what was that weight per unit area?
7  A   The weight per unit area, it was 1.875 per 20 square
8  feet for bare spot.
9  Q   And have you used that weight per area to apply EZ
10 SEED in the trials that you conducted on EZ SEED since the
11 development of the product?
12 A   We did.  We have, we in the formulation of this
13 product, we were looking at different application rates.
14 Different formulations.  This was all work that was done
15 in 2007, early, maybe late 2007.  But, yes, we always have
16 been applying the product with 1.875 pounds per thousand
17 square feet for the bare spot.
18 Q   So then I want to go to Exhibit 332 which is, I
19 think, ONE STEP.  If you look at Exhibit 332, can you tell
20 us what that is and where on that package you find the
21 application rate that you used for the study that we
22 identified as Exhibit 270?
23 A   It is inside that tab.  You open it up and it clearly
24 says planting rate one pound per 20 square feet.
25 Q   Okay.  So if we go back to Fig. 1 one on Exhibit 270,

1  that depicts the three application rates that you used?
2  A   That's correct.
3  Q   Now, the bag on Pennington 1 STEP COMPLETE mentions a
4  planting thickness, does it not?
5  A   Yes, it does.
6  Q   What is that thickness?
7  A   Planting thickness is one-eighth of an inch.
8  Q   The EZ SEED container, Exhibit 330, the old, did that
9  also have a reference or statement about eighth of an
10 inch?
11 A   Yes.  The old label did mention a bare spot
12 application of an eighth of an inch.
13 Q   Now, why did you not apply that eighth of an inch?
14 A   Everything that we have been testing for in R & D was
15 again tested on a weight per unit area.  The one eighth of
16 an inch that's listed on EZ SEED was there to help guide
17 the consumer to apply a thin, it says a thin eighth of an
18 inch layer.  This is something that, again, when talking
19 to the marketing team, this was something that they
20 thought would be better for the consumer to help them be
21 more successful in delivering a clear message on how to
22 apply the product.
23 Q   Let me ask you to look at, once again, the new EZ
24 SEED directions for use in Exhibit 331.
25    THE COURT:  I don't understand the last answer.

What is the relationship of this one eighth of an inch to the application rate? I don't understand.

THE WITNESS: So everything that we tested in all of our research was not using a volumetric application rate. It was using a weight of product over an area. And so all the testing that we ever conducted at Scott's in the R & D G group, the R & D team, was always about putting a weight per area which is very typical of most grass seed products.

The decision was made outside of R & D to use a volume estimate. Because the thought was is that would help the consumer, make it easier for the consumer as, again, the name of the product implies, we wanted this to be easy. And so instead of putting numbers on the bag, the thought was to put a layer, a thin layer, to help them to understand that it doesn't take that much EZ SEED product to be successful.

THE COURT: All right.

BY MR. DANON:

Q    And as a scientist are you concerned when running studies like this with applying or using a volumetric rate as opposed to a weight per area?

A    Yes.

Q    Why?

A    Because there is much more variability in using a

volumetric measurement compared to simply weighing out the product on a weight per area.

Q    Let me refer you back to Exhibit 331 which is the EZ SEED container that contains the new directions for use. Were you involved in helping create that new directions for use?

A    I was involved in the new directions for use, yes.

Q    And can you just explain what your involvement was?

A    I helped to establish the photograph that's on the new directions for use. So basically, again, showing the consumer what the product should look like when it is applied to the soil to make sure that they left spaces, voids and didn't put a thick layer down.

Q    Why do you want to instruct the consumer, why do you want to put in a statement there to leave voids so you could see soil in between the EZ SEED granules?

A    One of the things we have been talking about, one of the benefits of this mulch is when it gets wet it will expand. And so putting down a discontinuous amount like this where you have got open voids, open areas to the soil, you wet that product up, it will expand and it will help to cover the soil.

Q    Now, why was the direction for use changed?

A    Well, I think there's -- I think the main reason was we started to look at some of the consumer feedback. We

noticed that consumers were over-applying the product. And one of the things we haven't talked about yet is the watering instruction. So when you over-apply and under-water, EZ SEED doesn't perform very well.

Q    And what dates or what was the time period in which you were working on the redesign of this label?

A    The redesign was 2010. We submitted plans for regulatory, regulatory submitted for state submission. I believe it was July 2011.

Q    Let me ask you, you understand that Pennington in this case has said that you misinterpreted the application rates and should have applied an eighth of an inch; is that correct?

A    That's correct.

Q    And have you seen any pictures of what Pennington has described as what an eighth of an inch of EZ SEED would look like?

A    Yes, I have.

Q    Let me show Exhibit 275 on the screen. Can you identify what those pictures are?

A    These are some photographs that were included in Mr. Hignight's declaration. Basically, they depict the rates that we would use on the top two photographs and the rates that he proposed, what he used in his research in the bottom two photographs.

Q    If we focus in on the bottom right photograph, where it states NexGen's interpretation of an eighth of an inch Scott's, eight of an inch to thin areas.

Does that depict the application of EZ SEED that Scott's intended to have that product applied at?

A    No. That is an over-application of our product.

Q    Does that represent an application of EZ SEED that would be consistent with the rate of 1.875 per 20 square feet?

A    Definitely not.

Q    And would that picture depict an application rate that would be consistent with the directions for use instructions on the back of the current EZ SEED container?

A    No. Clearly the photograph for Mr. Hignight and the photograph that we use on our new directions for use are not similar.

Q    Earlier we talked about seeding rates and getting a number of seeds per area. Would application of EZ SEED at a rate like expressed in this photograph, would that yield a seeding rate that would be something Scott's would recommend?

A    No. It would not. This would be a very high seeding rate. Nothing that we would recommend to the consumer.

Q    I think you referred earlier to New Jersey law and the impact of applying nitrogen. What would be the

1  nitrogen levels that would be applied if EZ SEED was
2  applied at a rate comparable to what's put in this
3  photograph?
4  A    It would give a range, it would be somewhere between
5  three or four pounds of nitrogen per thousand square feet
6  which is much higher than the .9 pounds of nitrogen that's
7  allowed.
8  Q    Now, you have cited two rates for EZ SEED; is that
9  right?
10 A    Yes.  Correct.
11 Q    And when the product was formulated, EZ SEED was
12 being developed, was it intended to only be a patching
13 product or could it be used for more than one purpose?
14 A    No.  That's why we have two different rates,
15 application rates on the product, is it could be used in
16 larger areas, not just in patching.
17 Q    Now, if we pop up again 270 and the Fig. 1.  What did
18 this study, and we go to Fig. 1, what did this study
19 demonstrate regarding the absorption capabilities of the
20 mulch and EZ SEED?
21 A    It shows that the mulch in EZ SEED has superior water
22 absorptive capacity and it has a much greater ability to
23 hold that water over a period of time.
24 Q    Okay.  And if we go to Exhibit 271 and also go to the
25 figure in 271, can you tell us about the results of this

1  test?
2  A    This test compared tall fescue products to different
3  lots each of EZ SEED and two different lots of 1 STEP
4  COMPLETE.  And so the top two lines are the EZ SEED
5  product and the bottom two lines are the 1 STEP COMPLETE
6  product.
7  Now, I notice in the title of this, you have EZ SEED
8  versual STEP COMPLETE tall fescue product water absorbancy
9  absorbency and release trial.  What do you mean by water
10 absorbency and release, the two go hand-in-hand.
11 A    That's our intent with EZ SEED, is the nice
12 thing about the product is it has a higher
13 propensity it to absorb water.  And also because
14 of that it also has the ability to hold that
15 water over time longer than 1 STEP COMPLETE can.
16 Q    And if we go to Exhibit 272, and also go to
17 the figure in that trial, if you could summarize
18 the results?
19 A    This, again, is another depiction of EZ SEED and how
20 it out-performs the Pennington 1 STEP COMPLETE product
21 from the standpoint of water holding and water absorption
22 and water holding.
23 Q    Do these studies that we've seen in Exhibits 270, 271
24 and 272, do they support the claim that the mulch in EZ
25 SEED absorbs and holds water longer than paper can?

1  A    Yes, they do.
2  Q    Now, has Scott's done any other absorption testing
3  for the mulch in EZ SEED?
4  A    Have we done any other absorption testing?
5  Q    Yes.  Did you run any other studies that show the
6  weight of water that the mulch in EZ SEED can absorb?
7  A    These were the primary tests that we did conduct.
8  Again, it was approximately 10 or 11 different trials that
9  focused on the water holding, the water absorption and the
10 water holding capacity of EZ SEED compared to 1 STEP
11 COMPLETE.
12 Q    Let me show you Exhibit 324 and ask you to identify
13 what that is?
14 A    Right.  So this is actually another test that was
15 run.  This was named TURF BUILDER EZ SEED ULTIMATE WINTER
16 LAWN MIX.  The thing to note here is that the
17 coconut-based mulch that's used in ULTIMATE WINTER LONG
18 mix, it is the same mix, it is the same mulch we use in EZ
19 SEED.  So we currently have a claim on our winter lawn mix
20 of water holding of 8 times the mulch.  And so this test
21 showed, looking at four different lots of the mulch, how
22 we replicated it three times.  And then we simply took
23 these jars that were, I think, 300 milliliter volume
24 capacity.  We added five grams of material to each of
25 these jars of the four different lots.  And then we added

1  the 8X water.  So five grams multiplied by 8, that would
2  be 40 milliliters of water, 40 grams of water.
3  We let that water soak for about five minutes
4  and then we inverted these jars on top of this blue
5  blotter paper.  You can see in the bottom right-hand
6  corner when this blotter paper, when it gets wet, you can
7  definitely see the presence of moisture.
8  And so if you look at the bottom left-hand
9  corner you can see jars that are inverted and had clearly
10 no water leaking out of  those containers.
11 Q    Did you participate in this study or help conduct the
12 study?
13 A    I did, yes.
14 Q    And does this study support Scott's claim that the
15 mulch in EZ SEED absorbs 8 times its weight in water?
16 A    In mulch in EZ SEED.
17 Q    Now, I just want to backtrack to Exhibits 270 and 271
18 which was the absorption testing that you talked about, we
19 talked about there.
20 When you conducted that test, did you apply more
21 water to EZ SEED than you did to 1 STEP.
22 A    No, I did not.  These products were put into a water
23 bath.  I did not apply the water.  The water essentially
24 applied itself.
25 Q    And, again, going back to some of the other work you

1  have done in this case as you have seen some of the
2  studies from Mr. Highight; is that correct?
3  A   Yes.
4  Q   And have you seen a study where he tested these
5  products on soil?
6  A   Yes, I have.
7  Q   Okay.  Do you believe that testing absorption and
8  water release or water holding capabilities of the mulch
9  in EZ SEED must be conducted on soil?
10 A   No, I do not.
11 Q   Why not?
12 A   Because when you add another variable like soil, you
13 can't separate out what is actually holding the water.
14 And so, for instance, the tests that we ran, they clearly
15 selected the mulch, the products themselves, to look at
16 the ability of those products to absorb water and to
17 determine how long those products were holding the water.
18     When you add a variable like soil, again, you
19 just can't determine where the water is being held.  Is it
20 being held in the mulch or is it being held in the soil
21 beneath.  So, no, I don't think that testing on soil is
22 relevant.
23 Q   Now, are you also aware of any statements by
24 Pennington's experts regarding or claiming that the
25 greater absorptive qualities of EZ SEED are not

1  necessarily better?
2  A   Yes.  I have read that.
3  Q   And what is your opinion on that statement?
4  A   I don't believe that that's true.  I think all the
5  testing that we have done looking at EZ SEED under reduced
6  watering, it clearly shows that EZ SEED has the ability to
7  absorb a lot of water, but it also will give the water
8  back to the seed.  So that that seed can germinate and
9  grow.  I think the testing that we have done, and I think
10 even the testing that Pennington has done, it shows that
11 to be true.  It shows that EZ SEED will hold water, absorb
12 water, and it has the ability to release more water back
13 to the seed over time.
14 Q   So do you have that concern that when conditions are
15 drying up that the mulch in EZ SEED will actually wick
16 moisture or water from the soil and --
17     I haven't done that exact testing.  But, I think
18 that's probably -- that's one of the things that a mulch
19 will do is it will have the ability to pull from that
20 reservoir of water that's in the soil to be able to stay
21 hydrated and stay wet.  But, I think that it depends on
22 the soil type that it's been applied to.  If it is applied
23 to a soil that may be more porous like a sandy soil, it
24 may have the ability to pull moisture from that soil
25 surface.

1      However, if it is a soil that has a finer
2  particles, like a clay soil, I think it would be a
3  challenge for that mulch to pull moisture, too much
4  moisture from that soil.
5  Q   Now, would you be concerned if the mulch was, had the
6  strong absorptive qualities, but did not release the
7  water?
8  A   Yes, I would.  If it didn't release the water back.
9  If all it did was absorb it and hold it, absolutely, that
10 would not be of benefit to the seed.
11 Q   From your experience with EZ SEED and the mulch in EZ
12 SEED from development up to today, is the mulch in EZ SEED
13 a mulch that absorbs a greater amount of water but then
14 fails to release it?
15 A   That has not been shown by any of the testing that
16 I've done.
17 Q   Now, have you also done side-by-side growth testing
18 of EZ SEED and SMART SEED?
19 A   Yes, I have.
20 Q   Okay.  And let me just show you Exhibit 276.  I will
21 start with that.  It is a series of exhibits.  Can you
22 explain or identify what that document shows?
23 A   This is one of the first tests that we conducted that
24 is a comparison between EZ SEED and 1 STEP COMPLETE.
25 Q   Okay.  What did you -- and let me just go through 277

1  and have you identify Exhibit 277?
2  A   Again, another trial that we conducted comparing EZ
3  SEED to 1 STEP COMPLETE under reduced irrigation, reduced
4  watering.
5  Q   And then Exhibit 278.
6  A   Yes.  Again, this is another test that we
7  conducted, competitive testing, looking at EZ
8  SEED and 1 STEP COMPLETE under reduced watering.
9  Q   And Exhibit 279?
10 A   Again, another test that we have conducted.
11 Q   And if we just go to 279, if we fast forward
12 to one of the charts.  If you could just explain what it
13 is that you were looking for in these charts and how your
14 results were measured?
15 A   This looked -- this was EZ SEED SUN AND SHADE, two
16 different lots, compared to Pennington's 1 STEP COMPLETE,
17 two different lots.  We were looking at sealing
18 establishment seedlings.
19     So, essentially, after applying the water, we
20 looked for the first sign of germination.  When we saw
21 that we started to make seedling counts in the pot.  And
22 so at five days we counted, seven days we counted, nine,
23 eleven and fourteen days.  And as you can see in this
24 graph here, this chart, the lots of EZ SEED out-performed
25 the 1 STEP COMPLETE products again under a reduced

1  watering condition.
2  Q   Now, what application rates did you use for these
3  studies, again, studies identified in Exhibit 276, 277,
4  278  and 279?
5  A   These trials were set up on bare soil.  So we used
6  the EZ SEED bare spot rate.
7  Q   What is that bare spot rate?
8  A   I believe this one was -- this is 1.875 pounds per 20
9  square feet.  We used the listed planting rate for 1 STEP
10 COMPLETE at one pound per 20 square feet.
11 Q   And if we just go to Exhibit 276 and go to the
12 results section there.
13         MR. DANON:  Your Honor, this is something, these
14 are exhibits that were already introduced in the PI
15 hearing.  So, for sake of brevity, I am going to go
16 through these pictures that we did at the PI hearing.
17 BY MR. DANON:
18 Q   Looking at Fig. 1 and 2, can you summarize what the
19 results of your studies were?
20 A   So this particular study we looked at EZ SEED applied
21 at both the bare spot rate and also the thin spot rate.
22 So, again, the thin spot rate would be used in a situation
23 where there were already seedlings.  But, we wanted to do
24 that test here as well, the application rate.  And that
25 was compared to the 1 STEP COMPLETE rate at one pound per

1  20 square feet.
2  Q   In all of these studies that were identified in 276,
3  277, 278 and 279, as a result of your test, indicate that
4  EZ SEED out-performed 1 STEP COMPLETE in these trials?
5  A   When you compared the bare spot rate, the 1.875 pound
6  down application rate of EZ SEED compares to the one pound
7  per 20 square foot rate of Pennington 1 STEP COMPLETE, I
8  think in almost every case.  Maybe one instance where
9  there was a lot that wasn't significantly different.  But,
10 almost across the board, it out-performed the Pennington 1
11 STEP COMPLETE product.
12 Q   And when you mention the word significant, what are
13 you referring to?
14 A   It was statistically significant.
15 Q   That was with the bare spot rate?
16 A   Yes.  The bare spot rate.  The thin spot rate was, it
17 was generally equal to the Pennington 1 STEP COMPLETE
18 product.
19 Q   And what were your results with the EZ SEED thin spot
20 rate?
21 A   Again, the thin spot rate was, in some cases we were
22 significantly better.  But, in other cases we weren't.  So
23 it was a little more inconsistent.
24 Q   And in the cases that you weren't significantly or
25 statistically significant, what were the results that you

1  obtained?
2  A   We were always equal, if not higher, even though they
3  weren't statistically significant.
4  Q   Now, you are familiar with what we call the lift tray
5  or the lift test?
6  A   Yes, I am.
7  Q   The TV ad.  And do you believe that that TV ad is a
8  fair depiction of EZ SEED'S ability to establish roots?
9  A   No, I do not.
10 Q   And why not?
11 A   When I was asked to view that, the test, the
12 commercial that was used, it is not consistent with any of
13 the testing that I've conducted and the results that I've
14 achieved in the tests that I've run.
15 Q   And from whom or what department did you here about
16 this TV ad?
17 A   This would be a marketing brand thing.  They would
18 have got their information from their sources, whether it
19 be a sales team, sales force.  As soon as they received
20 that information and received the commercial, they showed
21 it to us so we could take a look at it and try to, they
22 asked us to look at the test itself and try to recreate
23 it.
24 Q   And did Scott's R & D actually try to recreate that
25 test?

1  A   Yes, we did.
2  Q   Let me show you what's Exhibit 213.  Scott's Exhibit
3  213.  Can you identify what that is?
4  A   This is the report that was created from the results
5  of the lift test that we conducted at Scott's.
6  Q   Okay.  And what did -- well, let's ask you, were
7  there any videos or pictures taken?
8  A   Yes.  There were both.  Both a video and photographs.
9  Q   And can you describe what kind of videos and what
10 kind of photographs were taken?
11 A   The photographs that were taken there were time lapse
12 photographs.
13 Q   Let me pop up 232.  This is for demonstration
14 purposes.  Go ahead.
15 A   This shows the trial itself, how they were planted in
16 these shallow trays.  Then you can see over time there is
17 two different cameras, one is facing north and one is
18 facing south, just to show you how these trays established
19 and filled in over time.
20 Q   And what were the results of the lift tray or the
21 lift test that Scott's conducted?
22 A   The results showed that EZ SEED successfully lifted
23 in every single case.  I think there maybe was one or two
24 failed lifts for the Pennington 1 STEP COMPLETE product.
25 But, in general, both of them performed in a similar

fashion.

Q    And what's on the video now, what's the video of?

A    This is just showing we had somebody who was blindfolded so they couldn't tell if they were lifting a 1 STEP COMPLETE tray or an EZ SEED tray.  And then we had another technician who brought the trays over in front of this individual and he would reach down and lift the tray off of the bench.

       And then over in the left-hand side, that's Dr. Eric Nelson, who is recording whether it is a successful lift or not.

Q    And you also mentioned some pictures.  I would like to put up Exhibit 213 and have you identify that exhibit. I'm sorry.  Pictures on Figure 3.

A    So these were some photographs that were taken at the end of the trial.  And what you can see is the figure that has a three underneath it, the figure that has a six underneath it, the top left and the middle, those are both EZ SEED products.  What you can see there is we pulled the soil, we pulled the turf out of the tray and just propped it on the side just so you could see the development of roots that did occur in those trays.  And treatment number two on the far right at the top is a 1 STEP COMPLETE product.

Q    And, again, what were the application rates that were

used or the comparable application rates that were used in this study that Scott's conducted?

A    We used a similar rate that we have used all along in all of our testing.  Then we used the one pound per 20 square foot rate for Pennington products.

Q    Now, at the time that this lift test was conducted at Scott's, had you seen the materials and methods and report of Mr. Hignight in the lift test study that he conducted in connection with the television ad?

A    No.  When we set this trial up we had not seen the report from Mr. Hignight.

Q    Okay.  So how did you set up the trial, what did you use to set up this trial?

A    So, again, we used the short amount of footage that we had in the commercial to get an idea of what the tray sizes were, understand the depth of the tray.  But, we used, as I mentioned before, the rates that we had always used in our EZ SEED product.  I think this one actually was a slight variation with the new up-to coverage rate, the new bare spot rate of 1.76 pounds per 20 square feet compared to Pennington's one pound per 20 square feet.

Q    And at the time of this study did you have an opinion as to why, in Mr. Hignight's study, or why in the television ad, it shows the EZ SEED tray falling apart?

A    I think if you look at the commercial, and you see

how they are pulled, if you look at the EZ SEED tray, it just appeared that there was an over-application of product and in my opinion it looked like the material, it was dry.  So as he pulled it up you can see dust coming out of the sample itself.  So, in my opinion, it was based on an over-application and under-watering.

Q    Now, you subsequent to that you had the opportunity to see Mr. Hignight report; is that correct?

A    Yes.  I have seen it.

Q    And when you saw Mr. Hignight's report, were you able to confirm your opinion that there was a grows over-application of EZ SEED in that test?

A    When I saw his report, there was no indication of how much material he actually applied to each of the trays. So, no, I could not make a calculation at that time.

Q    Did you also have the opportunity to see some videos that were provided in connection with that report?

A    Yes.  I did see some videos.  That was something that we used to help us determine that there was an over-application just based on the thickness of the EZ SEED that was shown in those photographs videos.

Q    Anything else in the videos or pictures that helped you confirm your opinion that it was over-applied?

A    Again, it was just, you know, simply being able to see the product and see how thick it was.  As they were

lifted and they kind of came up on the side, you could see that it was an over-application of EZ SEED.

Q    Now just last night you received information that actually disclosed to you what the application rate was for this test; is that correct?

A    That is correct.

Q    And I would like to pop that up on the screen.  If we focus on No. 11, Report No. 11, which is -- first of all, when did you first see this document?

A    I saw it yesterday evening.  I don't know what time it was.  But, it was maybe 6:30, 7:00.

Q    And what do you understand this document to be?

A    This is a document that shows the tests that Mr. Hignight conducted.  And it breaks out the amount of product that's used on the, by weight, on his, the pots that he used or the trays that he used.

Q    So now having seen this document last night, does this document confirm your opinion that Mr. Hignight and Pennington in their study over-applied EZ SEED when they conducted the lift test study?

A    Yes.  I mean, compared to the rate that we have always used to EZ SEED to test at the bare spot rate, it does confirm that it is higher than what we would recommend.

Q    What is the application rate that was used by

```
1   Pennington in this lift study?
2   A    This looks like it is almost seven pounds per 20
3   square feet.
4   Q    That's 6.98?
5   A    6.98.
6   Q    And how much more product is that than Scott's
7   recommends or intends their product to be applied at?
8   A    That's over, what, three times.
9   Q    And if we go back to your prior testimony about the
10  impact on seeding rates and thus the amount of nitrogen
11  that would end up being applied, how much nitrogen would
12  end up being applied at a rate of 6.98 pounds per 20
13  square feet?
14  A    It would be over two pounds, probably two and-a-half,
15  close to three pounds per thousand square feet.  So quite
16  a bit of nitrogen.
17  Q    And, again, is that in excess of what is allowed by
18  New Jersey?
19  A    Yes.  Based on the information that I have, based on
20  the new Jersey law, that would be too much.
21  Q    And how about the seeding rate itself, what would be
22  the seeding rate that would, you would estimate based on
23  applying 6.98 pounds per 20 square feet of EZ SEED?
24  A    For this particular trial, I think that equates to 25
25  to 26 pounds of seed per thousand square feet.
```

```
1   Q    And is that a rate of seed per thousand square feet
2   that Scott's would recommend or have on any of its bags
3   for its consumers?
4   A    No.  We would not recommend that high of a rate.
5   Q    What is Scott's typical seeding rate on comparable
6   grass seed products?
7   A    Our seeding rate for SUN AND SHADE is two and-a-half,
8   I think it is two and-a-half pounds of seed per thousand
9   square feet.  So this would be much higher.
10  Q    Is 6.98 pounds per 20 square feet, the rate that
11  Pennington used for this lift study, is that rate
12  consistent with the application rate that is indicated on
13  the EZ SEED, the current label of EZ SEED?
14  A    No, it is not.  It is an over-application.
15  Q    What are your concerns with over-application?
16  A    I testified earlier, it says in my opinion,
17  over-application of EZ SEED, and one thing we haven't
18  talked about yet, but based on the report that Mr.
19  Highnight has provided, you can do calculations on the
20  amount of water that he applied on a daily basis over a
21  seven day period.  And based on that information, and
22  based on the amount of product that he applied per tray
23  which would be, I think it was 110 grams per tray, doing
24  the calculations on that and knowing the misting nozzle
25  that he used in his report saying that he basically
```

```
1   watered for 8 to 12 seconds per tray, you can calculate
2   that he would have applied approximately 150 to 200
3   milliliters of water per day.  And so if you look at 110
4   grams of product, assuming the 8 X water holding, it would
5   have taken four, potentially five days until the EZ SEED
6   product would have even have been saturated.  That's not
7   even taking into consideration any evaporation that would
8   have happened.  It is an over-application of the product
9   and it definitely doesn't follow our directions for use on
10  saturating the material after it's been applied.
11  Q    So, just to get that clear, as far as from what you
12  saw in the report regarding how the product was watered,
13  was there a sufficient amount of water to saturate or
14  water all of the EZ SEED that was applied?
15  A    In my opinion, no.
16  Q    And if you look at Exhibit 331, which is the current
17  container for EZ SEED, does it also have instructions
18  regarding watering?
19  A    It does.  It says a deep and thorough initial
20  watering is the key to success.  Gently water the area
21  until EZ SEED is completely saturated and no more water is
22  being absorbed.  It says this may take several minutes.
23  Q    So, in your opinion, based on what you read in
24  Mr. Highnight's report regarding the lift tray and the
25  calculations that you just testified about, was there
```

```
1   enough water to saturate the product as instructed on the
2   back of the EZ SEED container?
3   A    No, there was not.
4   Q    Now, prior to receiving this document last night, had
5   you, in looking at other reports submitted by Mr.
6   Highnight, attempted to calculate the weight of product
7   applied or the pound on a pound by 20 square foot basis?
8   A    I did try to do some calculations.  If I recall there
9   were two trials where I could do that.
10  Q    And let me ask you the ones you weren't, why weren't
11  you able to calculate the weight per 20 square foot area
12  in some of the other trials?
13  A    It just mentioned that the products were applied at
14  an eight of an inch volume layer.  So there was no, there
15  was nothing on the amount of weight that was of the
16  product that was applied.
17  Q    In making those calculations prior to receiving this
18  document, how would you go about making the calculation?
19  What would you need, what information would you need to
20  make that calculation?
21  A    I would need to know the size of the pot and I would
22  need to know how much of the product was applied on that
23  pot.
24  Q    You said you were able to calculate the application
25  rate on a pound per 20 square foot basis for at least two
```

of the trials. Have you been able to, after reviewing
this document, identify which were the trials that you
were able to calculate?

A     The two trials that I recall are the trial that was
looking at the 80 percent thicker claim. And I believe
the other one was a trial where he was doing testing in
deep root tubes.

Q     And if we look at this chart, is one of those No.
7?

A     Yes. No. 7. That's correct. No. 7 would be one of
those.

Q     And when you calculated the application rate that Mr.
Highnight used in this study, No. 7, how did you go about
calculating it and what was the result that you arrived
at?

A     This test provided the area of the tray. And it
provided the grams of product that was applied over that
area. So I was able to do a calculation over a thousand
square foot area which is common in the industry. And so
I was able to calculate how much product was applied on a
thousand square foot basis.

Q     What did your calculation show, what was the rate he
had used?

A     In this particular one, it was extremely high. This
one here, it provided, it was like 42 or 43 pounds of

grass seed per thousand square feet.

Q     And what was the application rate of EZ SEED on a
weight per 20 square foot basis?

A     Say that again, please.

Q     What was the application rate of EZ SEED on a weight
by 20 square foot basis?

A     It is 11.74 pounds per 20 square feet.

Q     And had you actually calculated the same kinds of
rate when you made your calculation?

A     Yes. This is the same calculation that I made.

Q     Okay. Let me, if I can do another demonstration,
Your Honor. Two jars of product in front of you. First
of all, did you prepare that?

A     Yes, I did.

Q     And what did you want to demonstrate?

A     So this just looks at the application rate of this
particular trial, the 80 percent thicker trial. This jar
here in my right hand, this is on a square foot basis.
This is the amount of EZ SEED that we would use at Scott's
in our testing to put on a square foot. And this is the
amount of EZ SEED that was used in this particular test.
So you can see the discrepancy. I mean, based on all the
testing that we have conducted, that would be an over
application of our product, yes.

Q     And would the 11.7 four pounds per 20 square feet be

consistent with the application rate that is indicated on
the directions for use on the container of EZ SEED?

A     No, it would not.

Q     And would 11.74 pounds per 20 square feet be
consistent with the intended rate or what Scott's intended
the application weight of EZ SEED to be?

A     No, it would not.

Q     Now, if we look -- if you look at the chart that
contains Mr. Highnight's application rates in the various
studies, are there any rates that were applied, if we just
scroll through these very quickly, so the first study
which was No. 5, what was the application rate?

A     No. 5 is, that's the 11.74 pounds per 20 square feet.
And then, again, there is another one. So far there is
three of them in a row. And then it drops down to 7.07
pounds per 20 square feet. And then down to 6.54, 6.98,
6.98.

Q     Okay. And again, do any of those rates, are any of
those rates consistent with either Scott's application
rate that it intends the product to be used at?

A     No, they are not.

Q     Are any consistent with the application rates that
are on the directions for use on the back of an EZ SEED
container?

A     No.

Q     I think there is some more on the back page. And can
you look at those in the last two studies there?

A     Yes. And so 25 is, is that 6.93 and 5.34 and then
7.58.

      MR. DANON: If I can have a minute. It is a document
we got last night. Actually I can keep going and do that
if we are going to take a break in a little while.
There's something I need to coordinate with that document
again since we got it last night.

Q     Let me just go back to the 11.74 pounds per 20 square
feet and ask you, what would be the seeding rate that
would come out of an application rate that high?

A     Again, this would be 43 pounds of seed per thousand
square feet.

Q     How about the nitrogen levels?

A     They would be, I think, around four, four pounds of
nitrogen. Maybe a little bit more than that.

Q     When you're talking about seeding rates of about 40
pounds of seed per thousand square feet, again, is that
something that you would find to be agronomically sound?

A     No. I would not consider that to be a sound
agronomic seeding rate. I don't think that you'll find
any textbooks or any experts that would agree that that
would be a sound seeding rate.

      MR. DANON: Your Honor, if I can have a minute now to

1　try to coordinate that.  Thank you.
2　　　　　　THE COURT:  I tell you what, we will go ahead
3　and take the afternoon break now, give you some time.  We
4　will just take 15 minutes and then we are going to go
5　until about 5:30.
6　　　　　　MR. DANON:  I apologize, Your Honor.  Just
7　trying to get it together.
8　　　　　　(Recess taken from 4:00 p.m. to 4:15 p.m.)
9　　　　　　THE COURT:  All right.
10　BY MR. DANON:
11　Q    So, Mr. Faust, when we had broke I'd asked you about
12　the seeding rates that would yield or come from a rate
13　like 11.74 pounds of EZ SEED per 20 square feet; do you
14　recall that?
15　A    Yes, I do.
16　Q    Up on the chart, Exhibit 26 at Page 41 is a listing
17　of Manufacturer Recommended Seeding Rates; do you see
18　it?
19　A    Yes, I do.
20　Q    What is that?  What does this chart list?
21　A    So this would be something that you would use on your
22　products to recommend a certain amount of product over an
23　area.
24　Q    And as you look at these rates per area, I guess what
25　would be a common pound per square feet or thousand square

1　feet that would be used?
2　A    It looks like with this particular graph or table
3　here, the Sun & Shade is roughly six pounds per thousand
4　square feet or three pounds per 500 square feet.  Tall
5　Fescue is going to have a slightly higher seeding rate.
6　　　　　　MR. WOLF:  I missed the number of this exhibit.
7　　　　　　MR. DANON:  It is 26.
8　BY MR. DANON:
9　Q    You previously had testified, I believe, that you
10　estimated that 11.74 pounds of EZ SEED for 20 square feet
11　would yield something like 40 pounds per thousand square
12　feet?
13　A    Roughly, maybe a little bit more.
14　Q    And as far as seeding rates on pounds per thousand
15　square feet in the industry, have you -- are you familiar
16　with seeing any rates that approach 40 pounds?
17　A    No, I'm not.
18　Q    Seed per thousand square feet?
19　A    No.
20　Q    Are you familiar with any rates, seeding rates that
21　approach 20 or 30 pounds per thousand square feet?
22　A    Not in my knowledge.  There's higher rates that are
23　used sometimes in applications like overseeding or -- when
24　you are overseeding on a golf course and putting perennial
25　ryegrass or something like that out there.  But no,

1　typically you would not see rates that high.
2　Q    Just want to go back to exhibit -- the current EZ
3　SEED container, 331.  So Exhibit 331.  Now, what is the
4　coverage area that is indicated on that package?
5　A    The coverage area is 3.75 pounds per 85 square feet.
6　Q    Okay.  And how many, or what is that intended to
7　convey as far as how much area of lawn or grass could that
8　cover?
9　A    This jug will cover at the maximum rate 85 square
10　feet.
11　Q    Now, that's applied at Scotts' R&D rates, right?
12　A    Correct.
13　Q    And what is that application rate that would yield or
14　cover that square footage contained or represented on the
15　container in Exhibit 331?
16　A    For the up-to coverage?
17　Q    Yes.
18　A    Again, 3.75 pounds per 85 square feet.
19　Q    And what would be the application rate?  Oh, that's
20　the application rate.
21　A    That is the application rate.
22　Q    I'm trying to get it.  On Exhibit 327, which was
23　Mr. Hignight's reported rates, the last rate we looked at
24　in that report was 11.74 pounds per 20 square feet.  How
25　many containers of EZ SEED would be required in order to

1　apply at this rate Mr. Hignight was applying at and to
2　cover the coverage rate that's on that container?
3　A    It would take approximately three, maybe a little bit
4　more.
5　Q    Thank you.  Now, going back to the back side of that
6　label and the Directions For Use, the Directions For Use
7　on Exhibit 331, the photograph that you said you assisted
8　with that new label?
9　A    Yes.
10　Q    What's the rate or application rate that was intended
11　to be represented by that picture?
12　A    This would be the bare spot rate.
13　Q    What is that rate?
14　A    The rate would be 1.75 pounds per 20 square feet.
15　Q    Okay.  And I know we -- I'm done with that exhibit.
16　We have had or you had some testimony here regarding the
17　lift test and the fact that Scotts, or Mr. Hignight ran a
18　lift test and then Scotts tried to recreate it.  Do you
19　consider the lift test is a valid scientific test?
20　A    No, I do not.
21　Q    Why not?
22　A    I think as I mentioned earlier, there was an over
23　application of product, and coupled with that, it didn't
24　appear that the product was watered properly, so when you
25　combine those two things, I don't think it was an

```
 1   appropriate test.
 2   Q    How about the method itself, the actual study and the
 3   method that was used?
 4   A    I think that, you know, doing rooting tests using
 5   two-inch thick layer of soil is probably not the way that
 6   we would have done it.  It doesn't really give you a lot
 7   of opportunity for that, you know, the materials to root.
 8   And, you know, most of the time they will root down to
 9   that bottom, that plastic layer, and then just kind of
10   form across the bottom of that tray.
11   Q    Now, what I would like to do now, and this is part of
12   what we were trying to organize in the break, I want to
13   show you the exhibits that Mr. Hignight has presented,
14   which are studies that he conducted, and I'd like you to
15   identify the application rate that was used in that study.
16   So the first thing that I would like to pull up is
17   Defendant's Exhibit 56.  And have you seen this test?
18   A    I believe that I have, yes.
19   Q    And what test is this one?
20   A    This is the lift test.
21   Q    And you have already testified that when you saw this
22   materials and methods, you could not determine or
23   calculate what the weight or what the application rate was
24   on a weight per square foot area, correct?
25   A    Correct.
```

```
 1   Q    Now if we go back to Exhibit 327 and you look at
 2   report Number 11 on 327, does that disclose or give or
 3   Mr. Hignight give there the application rate of EZ SEED on
 4   a weight per square foot area for that test?
 5   A    Yes, it does.
 6   Q    Okay.  What rate was that?
 7   A    That was 6.98 pounds per 20 square feet.
 8   Q    Okay.  I think I have already testified as to that
 9   one so we will move on.  If you pull up Exhibit 51 at Page
10   1167.  And do you recognize that study?
11   A    Yes, I do.
12   Q    And was that a study where you were or you attempted
13   to calculate the application rate on a weight per square
14   foot basis?
15   A    For this particular trial, I could calculate that,
16   yes.
17   Q    And what did you arrive at?
18   A    This was 11.7 pounds per 20 square feet.
19   Q    And if we go back to Exhibit 327, which is the chart
20   of Mr. Hignight's calculated rates, can you look at Report
21   Number 7, and is that the study?
22   A    Yes, it is.
23   Q    And what was the application rate that Mr. Hignight
24   used on that study?
25   A    11.74 pounds per 20 square feet.
```

```
 1   Q    Again, that's an over application of EZ SEED, right?
 2   A    Yes.
 3   Q    Okay.  If we go to same Exhibit Number 51 and go to
 4   page 1172 of that exhibit, and do you recognize that
 5   exhibit?
 6   A    Yes.  But this is the one that was conducted in the
 7   PVC drains or the PVC tubes, I should say.
 8   Q    Were you able to or did you attempt to calculate the
 9   application rate on a weight per square foot area?
10   A    Yes.
11   Q    And what did you calculate?
12   A    This one I can't remember exactly, but I think this
13   was roughly 7.1 pounds per 20 square feet.
14   Q    And if we go to Exhibit 327, and it is Report Number
15   8 on Exhibit 327; is that the application rate that was
16   used by Mr. Hignight in this study?
17   A    7.07 pounds per 20 square feet.
18   Q    Again, is 7.07 pounds per 20 square feet an
19   appropriate rate for EZ SEED?
20   A    It is higher than what we tested, so no, it is not.
21   Q    And if we go to Defendant's Exhibit 57, is that a
22   study that you have seen?
23   A    Yes, it is.
24   Q    And did you attempt to calculate the application rate
25   of EZ SEED on a weight per square foot basis prior to
```

```
 1   receiving Exhibit 327?
 2   A    Yes, I did, but I don't believe I could with this
 3   one.
 4   Q    Okay.  You couldn't because you weren't provided with
 5   the weight or the surface area?
 6   A    Correct.
 7   Q    If we go to Exhibit 327, and if we go to Number
 8   9 -- I'm sorry, it is not 8, it is Number 9.  If we go to
 9   Number 9, is Number 9 as listed on Exhibit 327 the
10   application rate that Mr. Hignight used in his study that
11   is identified by Defendant's Exhibit 57?
12   A    Yes, it is.  It was 6.54 pounds per 20 square feet.
13   Q    Again, is that 6.54 pounds per 20 square feet a rate
14   that is consistent with the EZ SEED application rate?
15   A    No, it is not.
16   Q    Turn to Defendant's Exhibit 58.  I'm sorry, 59.  And
17   do you recognize this study?
18   A    I do, yes.
19   Q    Is this a study where you attempted to calculate the
20   application rate for EZ SEED prior to receiving Exhibit
21   327?
22   A    Yes, this is one that I tried to calculate.
23   Q    Could you calculate?
24   A    I believe that I, if I remember right, I believe I
25   could on some of these.  The maximum, up-to rates that was
```

1   provided. But I don't recall if I could on all of them.

2   Q   And if we turn to Exhibit 327, and turn to 25, do you

3   see that as listing the application rates that

4   Mr. Hignight used for the study indicated in Defendant's

5   Exhibit 59?

6   A   Yes, I see those, 6.93 and 5.34.

7   Q   6.93, is that rate consistent with the rate,

8   application rate for EZ SEED?

9   A   No, it is not.

10  Q   And what about 5.34 pounds per 20 square feet, is

11  that consistent with the application rate for EZ SEED?

12  A   No, it is not.

13  Q   Now, when you are running scientific studies, does

14  the fact that the two numbers or the application rates for

15  EZ SEED vary within that same study indicate anything to

16  you?

17  A   Yes. I mean, this would show me that using a volume

18  to establish your trials is not a very reliable

19  methodology. Instead, you should use a weight per unit

20  area. So there's a lot of variability from test to test

21  here.

22  Q   And actually, if you look throughout the application

23  rates that were calculated by Mr. Hignight in Exhibit 327,

24  do you see that pattern of variability?

25  A   Yes. It is shown clearly on this document.

1   Q   And does that confirm your opinion prior to receiving

2   this document that one of the problems with applying an

3   eighth of an inch is the variability that is inherent in a

4   volumetric application rate?

5   A   That's correct, yes.

6   Q   Let's take a step back to Defendant's Exhibit 58.

7   And I'll ask if that's -- do you recall seeing this study?

8   A   Yes, I do.

9   Q   Okay. And did you attempt to calculate the

10  application rate in this study?

11  A   I believe I did. I can't remember exactly, but yes,

12  I believe I did.

13  Q   And if we go to Exhibit 327 and look at Report Number

14  8, is that indicating the application rate that

15  Mr. Hignight used for Defendant's Exhibit 58?

16  A   Yes, this is the one again with the PVC.

17  Q   And what is the rate?

18  A   This is 7.07 pounds per 20 square feet.

19  Q   Again, is that rate consistent with the application

20  rate for EZ SEED?

21  A   No, it is not.

22  Q   If we turn to Defendant's Exhibit 60. Do you

23  recognize that exhibit?

24  A   Yes, I do.

25  Q   Okay. Did you attempt to calculate the application

1   rate on a weight per square foot basis in connection with

2   this study once you reviewed it?

3   A   Yes, I believe I did, but I can't remember if I was

4   able to on this one or not.

5   Q   And if we turn to Exhibit 327 and go to Report Number

6   26, is that the application rate that Mr. Hignight

7   calculated for that study?

8   A   Yes, that's correct.

9   Q   And what is that application rate?

10  A   That was 7.58 pounds per 20 square feet.

11  Q   And again, is 7.58 pounds per 20 square feet

12  consistent for the appropriate application rate for EZ

13  SEED?

14  A   No, it is not.

15          MR. DANON: Nothing further at this time, Your

16  Honor.

17          THE COURT: All right. Thank you. Cross?

18                  CROSS-EXAMINATION

19  BY MR. WOLF:

20  Q   I just want to clear up one thing, Mr. Faust. If I

21  wrote this down correctly, you answered the question from

22  Mr. Danon: One problem in applying at one-eighth inch is

23  the variability that is inherent in volumetric

24  application. Right?

25  A   That's correct.

1   Q   And at the time that Mr. Hignight did his studies,

2   volumetric application, that is, the one-eighth inch layer

3   is what you were telling the consumers to do.

4   A   Yes, one-eighth of an inch was on the old label,

5   that's correct.

6   Q   And how much of the product did Mr. Hignight apply

7   volumetrically?

8   A   He says he applied an eighth of an inch.

9   Q   Okay. And after Mr. Hignight did his studies, you

10  changed the label to take off the one-eighth inch

11  instruction, correct?

12  A   I don't think that our label change had anything to

13  do with Mr. Hignight's studies.

14  Q   Whether or not it had anything to do with the

15  studies, it is a fact that after Mr. Hignight did his

16  studies using the one-eighth inch application that was on

17  the EZ SEED package, then you changed the package to get

18  rid of that one-eighth inch application instruction,

19  correct?

20  A   Based on the feedback that we got from some of the

21  research that was done by our marketing team.

22  Q   From your consumers who were applying too much of the

23  product and getting bad results trying to follow the

24  one-eighth inch instruction, correct?

25  A   Correct. I mean, as I say, everything that I have

1  done in my testing was based on a weight per area.  The
2  decision to put an eighth of an inch, a thin layer, on the
3  package was a marketing decision.
4  Q   Okay.  So the consumers who were trying to follow the
5  instructions often came up with the same results that
6  Mr. Hignight did.
7  A   I would say that that is probably correct, yes.
8  Q   Now, let's talk about weight versus number of seeds.
9  You agree with me that on the basis of weight, there is
10  twice the seed in the Pennington products as compared to
11  the Scotts products.
12  A   On a weight basis, yes.
13  Q   And so in other words, when comparing weight to
14  weight the claim of "Twice The Seed" is literally true.
15  A   Yes, that's correct.
16  Q   The EZ SEED product at the thin spot rate has half
17  the amount of seed as the Pennington 1 STEP COMPLETE
18  product, correct?
19  A   Say that again, please.
20  Q   The EZ SEED product at the thin spot rate has half
21  the amount of seed as the Pennington 1 STEP COMPLETE
22  product.
23  A   The 1 STEP COMPLETE product at what rate?
24  Q   What?
25  A   At one pound per 20 square feet, yes, that's correct.

1  Q   Okay.  There is nothing on either of Pennington's
2  seed bags or Scotts' seed bags that mentions seed count?
3  A   No, there is not.
4  Q   TURF BUILDER WITH WATER SMART is 47 percent seed and
5  50 percent coating or filler, right?
6  A   I don't think it says "filler" anywhere on the
7  package.
8  Q   Well, it is something that's added to the product
9  that's not seed, right?
10  A   Yes.
11  Q   Okay.  So it is 47 percent seed and 53 percent not
12  seed because of the other things added.
13  A   No, it is probably more like 47.5 or 47.8 percent.  I
14  don't know exactly, but yes, it is not exactly 50 percent
15  because of some of the inert weed seed, other things.
16  Q   So it is 47-and-a-half percent or something like that
17  seed and 52-and-a-half percent not seed.
18  A   Correct.
19  Q   Now, Scotts has never published on its website or
20  anywhere else seed counts like the ones that are included
21  from other manufacturers in the various Declarations that
22  have been submitted by Scotts in this case?
23  A   I'm not aware of anything that we published on a
24  website about seed counts.
25  Q   And you understand that it is Pennington's intention

1  to justify its seed content comparison on a weight basis,
2  right?
3  A   That's not for me to determine.
4  Q   Well, do you recall testifying at the preliminary
5  injunction hearing and being asked the question:  "And you
6  understand that it is Pennington's intention to justify
7  its seed content comparison on a weight basis, right?"
8  You said, "Okay."  You were asked:  "Do you understand
9  that?"  Answer:  "Again, yes, that is how seed is sold and
10  that is how we list it on our panel."
11  A   Seed is sold by weight, that is correct.
12  Q   And at the time of the preliminary injunction, you
13  admitted that you understood that that was how Pennington
14  was intending to justify its seed content comparison.
15  Would you like to see the transcript?
16  A   No, I believe you.
17  Q   Okay.  Now, EZ SEED and 1 STEP COMPLETE are both
18  intended mostly for patching grass, not for the original
19  seeding of an entire lawn, correct?
20  A   I would say that EZ SEED has -- you can apply EZ SEED
21  to larger areas.
22  Q   Sure, you can.  But it is so expensive compared to
23  the seeds that you actually aim at people who are seeding
24  entire new lawns who would be expected to then put mulch
25  down over top of that that it is not a viable market for

1  you to do that.
2  A   Correct.  Primarily, consumers would purchase a
3  straight seed product over a patching product.
4  Q   And the EZ SEED bare spot rate is not the rate for
5  maximum coverage area, right?
6  A   No, it is not.
7  Q   So your tests compared maximum coverage area of the
8  Pennington 1 STEP COMPLETE to Scotts' non-maximum coverage
9  area rate, correct?
10  A   The 1 STEP COMPLETE product has a planting rate
11  clearly labeled on their package.  The rate is one pound
12  per 20 square feet.  That rate, when you apply it to the
13  area, it matches the photographs that are on the label.
14  Q   The maximum coverage area that is shown on the
15  Pennington 1 STEP COMPLETE product is one pound per 20
16  square feet, right?
17  A   As I said earlier, if there was a maximum, if there
18  was a bare spot rate for the 1 STEP COMPLETE product, the
19  photos don't match what that rate would be.
20  Q   But do you know what's meant by maximum coverage
21  area?
22  A   I do know what that means, yes.
23  Q   Every bag of grass seed says on the front of it
24  "Covers up to so many square feet," right?
25  A   That's correct.

```
1   Q    Then you can determine the maximum coverage per pound
2   by making a division of however many pounds are in that
3   bag and how many square feet it is supposed to cover,
4   right?
5   A    Correct.
6   Q    And you would agree with Mr. Sass that it is pretty
7   standard in the grass seed industry that the coverage
8   claim on the front of the bag is an up-to number that
9   coincides with half the rate that is used for bare spots.
10  A    I would say in general, that is true.
11  Q    Okay.  And you would agree with his testimony -- you
12  were sitting here for his testimony, right?
13  A    Yes.
14  Q    That it is typical in the industry that the up-to
15  coverage rate on the front of the bag is the thin spot
16  application rate, not the bare spot rate.
17  A    For certain seed products, that's correct.
18  Q    Well, you heard Mr. Sass say that's typical in the
19  industry, right?
20  A    It is typical on --
21  Q    Grass seed industry.
22  A    I wouldn't say it is typical across all products, no.
23  Q    So you don't agree it is typical.
24  A    No, I think it is typical on most of the straight
25  seed products.  But I don't see that on the 1 STEP
```

```
1   COMPLETE label.
2   Q    You thought Mr. Sass's response to that was limited
3   to straight grass seed products?
4   A    I think that if it doesn't say anything about thin
5   spot or bare spot -- there is no indication on the 1 STEP
6   COMPLETE product that there are two application rates.
7   Q    You heard Mr. Sass testify that it is standard across
8   most of the packaging and the market for grass seed that
9   the coverage claim on the front of the bag is an up-to
10  number that coincides with half the rate that's used for
11  bare spots?
12  A    I did hear him say that, yes.
13  Q    But you disagree?
14  A    I don't completely agree across the board, no.
15  Q    You didn't do a bare spot rate comparison of
16  one-eighth inch Pennington 1 STEP COMPLETE to one-eighth
17  inch Scotts EZ SEED, did you?
18  A    I did not do an eighth of an inch compared to an
19  eighth of an inch by volume, no.
20  Q    Could we have Pennington Exhibit 29, please?  And can
21  you blow up the "Apply," right there, Paragraph 2, "Apply"
22  on the top.  You would admit that on the Pennington 1 STEP
23  COMPLETE product, the back of the bag where it says,
24  "Apply," it says, "Spread seeding mix approximately
25  one-eighth inch thick everywhere healthy, beautiful grass
```

```
1   is desired"?
2   A    I see that, yes.
3   Q    And if you would then go down to the next photo, the
4   part that is already highlighted in yellow there.  The EZ
5   STEP -- excuse me, the EZ SEED product says, "Apply a
6   one-eighth inch layer to bare spots, one-sixteenth to thin
7   areas."
8   A    Yes, I see that.
9   Q    So you did not do a one-eighth inch to one-eighth
10  inch comparison of the two products, did you?
11  A    On a volumetric basis, no, I did not.
12  Q    Now, you could have made a comparison in your test to
13  comparing the maximum coverage area rate for each of the
14  products, right?  EZ SEED and 1 STEP COMPLETE?
15  A    Yes, I could have, yes.
16  Q    And on lawns you don't really just have just bare
17  spots and one kind of thin spot, right?  I mean, it is
18  really a continuum from completely bare to not quite full.
19  A    I think that you do on your lawn have spots that are
20  completely devoid of turf.  And I think you have other
21  areas that are thin that can be thickened using our thin
22  spot rate.
23  Q    But wouldn't you expect the consumer knowing that
24  one-eighth inch is for completely bare to adjust that
25  based on how close their thin spot is to being completely
```

```
1   bare or completely full?
2   A    I think a consumer would have to make that
3   consideration, yes.
4   Q    So it is not really that you would expect them to use
5   a sixteenth of an inch anytime there is any amount of
6   grass on the spot.
7   A    True.  I mean, I think that if there's just a few
8   plants there that they probably will use a bare spot rate.
9   Q    Or if it is close to full but not quite, they might
10  use something less than a sixteenth of an inch, right?
11  A    Potentially.
12  Q    Now, the up-to coverage rate, I think you said, for
13  Pennington is one pound per 20 square feet, right?
14  A    I said that's the planting rate.
15  Q    It is also the up-to rate, right?
16  A    It says "Planting Rate" on the package.
17  Q    Sir?
18  A    It says "Planting Rate" on the package.
19  Q    It also has an up-to on the front of the bag, right?
20  A    Correct.
21  Q    And that's the up-to rate, isn't it?
22  A    That is, that coincides with the front of the
23  package, yes.
24  Q    Okay.  And the up-to coverage rate of Scotts EZ SEED
25  is 140 square feet for a bag of 6.25 pounds, right?
```

1  A    That sounds about right, yes.

2  Q    That comes out to 22.4 square feet per pound?

3  A    Yes, that's probably about right.

4  Q    And 3.75 pounds per 40 square feet, which is what you

5  used in some of your tests, that comes out to 10.66 square

6  feet per pound; does that sound right?

7  A    That sounds about right.

8  Q    And if you double that coverage to 80 square feet,

9  then you get 21.33 square feet per pound.

10  A    Correct.

11  Q    Which is less than the coverage that is indicated on

12  the front of the package of the 6.25 pounds per 140 square

13  feet, which comes out to 22.4 square feet per pound.

14  A    I'm not sure.  I'm not following.

15  Q    Did you realize that the application rates that you

16  were using for your test was less than the -- it was

17  actually more than the maximum coverage rate that's shown

18  on the front of the bag of 140 square feet for a

19  six-and-a-quarter pound bag?

20  A    I was using a bare spot rate.

21  Q    Well, you also used thin spot rates, right?

22  A    Correct.  In some of the trials.

23  Q    But your thin spot rate did not equal your up-to

24  coverage rate shown on the front of the bag, did it?

25  A    In the tests that I conducted, yes, I believe that it

1  did.  .9375 pounds per 20 square feet.

2  Q    I'll come back to that after I get my calculator out,

3  but I'll move on for right now.  Let's talk about water

4  absorption and retention here.  You would agree any claim

5  of superiority based on your testing has to be

6  statistically significant to a 95 percent confidence

7  level, right?

8  A    I don't think that that's necessarily true.

9  Q    As a scientist, when you are running studies --

10  A    If you are making --

11  Q    Let me finish my question, please.  You have

12  something called statistical significance, right?

13  A    Correct.

14  Q    And for that, you are looking for a 95 percent

15  confidence level, which is what is referred to in your

16  figures as P = 0.05.

17  A    Correct.

18  Q    And that's because requiring statistical significance

19  eliminates the possibility that the results were due to

20  random chance, right?

21  A    I agree with that, yes.

22  Q    So when you compare the same amount of product to the

23  same amount of product after seven days in your test,

24  there was no statistical significance between 1 STEP

25  COMPLETE and EZ SEED, right?

1  A    I don't think that the two products are applied at

2  exactly the same rate.

3  Q    Right.  But when you do compare them, the same amount

4  of product to the same amount of product, after seven days

5  there is no statistical scientific difference between 1

6  STEP COMPLETE and EZ SEED, right?

7  A    I guess, like I said, they are not exactly the same

8  application rate.

9  Q    You recall, this is from Page 153 of the preliminary

10  injunction transcript, Line 18, you were asked the

11  question: "When you apply the same amount of product to

12  the same amount of product after seven days there is no

13  statistical scientific difference between 1 STEP COMPLETE

14  and EZ SEED; is that correct?  Answer:  Yes."

15       Do you recall that?

16  A    I don't recall that statement.  But like I said, they

17  are not exactly the same.  They are close.  Just trying to

18  make a point.

19  Q    Okay.  That was your testimony at the earlier

20  hearing, right?

21  A    Yes, I believe so, yes.

22  Q    And generally, when you looked at performance of a

23  certain amount of EZ SEED versus the same amount of 1 STEP

24  COMPLETE, you found no statistically significant

25  difference in performance, right?

1  A    Yes, that is correct.  I think that what you need to

2  understand here is that just because when you are

3  comparing equal amounts of application rate, it doesn't

4  necessarily mean that the formulations are the same.  So

5  if you break that formulation apart, there's actually more

6  seed by weight in the 1 STEP COMPLETE product than there

7  would be for EZ SEED.  So you are not necessarily

8  comparing -- you are not standardizing your test.

9  Q    Of course the two products don't have the same

10  formulation.

11  A    Correct.

12  Q    They have quite different formulations, right?

13  A    So what I'm saying, though, is even though there was

14  no statistical differences, you aren't comparing the same

15  amount of seed in each product.

16  Q    You were comparing, when you did compare the same

17  amount of product by weight, you got similar results.

18  Correct?

19  A    Correct.

20  Q    Your tests showed that the thin spot rate of EZ SEED,

21  which is roughly one pound per 22 square feet, and the

22  maximum coverage rate of 1 STEP COMPLETE, which is one

23  pound per 20 square feet, did not produce statistically

24  significant results, right?

25  A    In general, the two performed in a similar fashion.

1  But again, I want to emphasize the fact that there wasn't
2  the same amount of seed applied in both of those products.
3  Q    Now, you would agree that testing should, wherever
4  possible, mimic the outdoor growing conditions that
5  consumers experience, right?
6  A    I would say in general that's true.
7  Q    That's actually a statement that you made in a
8  Declaration that you filed with the Court in this case,
9  right?
10 A    Yes.
11 Q    So you want to use the products in the testing in a
12 manner comparable to how consumers would use the products,
13 right?
14 A    Yes, you would, to look at the performance of the
15 product.   Correct.
16 Q    And if the test does not use the products in a manner
17 comparable to the way consumers use the products, then the
18 testing may not be relevant, correct?
19 A    Not necessarily.
20 Q    Do you recall being asked in your deposition, Page
21 86, Line 10:  "And if you don't use the products in a
22 manner comparable to the way consumers use the products,
23 the testing has limited application; is that right?
24 Answer:  I would say that it is -- it may not be as
25 applicable if you do something with your testing

1  methodologies to not necessarily follow exactly what the
2  consumer would experience."
3      Right?  Do you recall that testimony?
4  A    Yes, I do.
5           MR. DANON:  Objection, Your Honor.  Improper
6  impeachment there.  The question was different.
7           THE COURT:  It did seem a different question.
8  BY MR. WOLF:
9  Q    If you don't use the products in a manner comparable
10 to the way consumers use the products, the testing has
11 limited application; is that right?
12 A    I would say you would want to use the product as a
13 consumer would use the product, that's correct.
14 Q    Your water absorption studies were performed without
15 soil, correct?
16 A    Yes, they were.
17 Q    But the products EZ SEED and 1 STEP COMPLETE are not
18 used by the consumer without soil, are they?
19 A    No, they are meant to be applied to the landscape, to
20 the soil.
21 Q    In fact, consumers are only concerned with how the
22 product performs in the soil, right?
23 A    Yes.
24 Q    And if the water remains in the mulch and doesn't get
25 into the soil, that doesn't help germination in the soil

1  of the seed, correct?
2  A    If the seed was in the soil, that is correct.  It
3  would not help.
4  Q    And consumers don't water new grass seed from below
5  the grass seed, do they?
6  A    No.
7  Q    They don't put their grass seed in a bath to make it
8  grow.
9  A    No.
10 Q    The water for the grass seed comes from above, right?
11 A    Yes.
12 Q    And the idea is to make the soil moist so that the
13 seeds can germinate in the soil, correct?
14 A    Correct.  That is where you would want the seed
15 ultimately to tack down into the soil.
16 Q    So the relevant question is not how much moisture the
17 mulch will hold, but how the product will help the soil to
18 retain water to germinate the seeds, correct?
19 A    I think ultimately that's correct.  You want the
20 mulch to hold water, but you also need to have moisture in
21 the underlying soil.
22 Q    And is it your opinion that when the 1 STEP and the
23 EZ SEED products, 1 STEP COMPLETE and the EZ SEED products
24 are watered at their recommended irrigation schedule or
25 the full irrigation schedule, the products will perform

1  pretty much the same, correct?
2  A    That is correct, based on the lift test that we
3  performed under optimal moisture, they performed in a
4  similar fashion.
5  Q    Based on your testing where the two products were
6  applied at the same rate and watered at the recommended
7  watering schedule, both products filled in and seemed to
8  knit down in a similar fashion, correct?
9  A    Correct.
10 Q    You never did your water absorption and retention
11 tests with soil, did you?
12 A    No, I did not.
13 Q    In the absence of testing on soil, you don't have any
14 empirical data telling you the water holding or moisture
15 release capabilities of these products when used on soil,
16 do you?
17 A    Not on soil, I do not.
18 Q    The only way you would know empirically,
19 scientifically, the water holding capacity and moisture
20 release capabilities of these products on soil would be to
21 test them on soil, correct?
22 A    I think that is a challenge.
23 Q    But is it correct?
24 A    I would say that I don't know how you would do that.
25 How do you know how much water is being absorbed by the

```
1   mulch and how much water is being absorbed by the soil?
2   Q    Do you recall being asked exactly this question in
3   your deposition and giving a one-word answer, "Yes"?
4   A    No, I do not recall that.
5   Q    Let me refer you to Page 209 of your deposition, Line
6   3, where you were asked:  "And the only way you would know
7   empirically, scientifically the water holding capacity and
8   moisture release capabilities of these products on soil
9   would be to test them on soil, correct?  Answer:  Yes."
10  A    Okay.
11  Q    Based on your testing, where the two products were
12  applied at the same rate and watered at the
13  recommended -- excuse me, I already asked you that.
14       You can't come to any valid conclusions from test
15  results that are not statistically significant, can you?
16  A    Correct.
17  Q    And you did not provide a statistical analysis with
18  your water bath study, correct?
19  A    No, I did not.
20  Q    You didn't randomize the test, correct?
21  A    I absolutely did randomize the test.
22  Q    Did you read Dr. Hummel's testimony in his report
23  where he said you did not randomize the test?
24  A    No, I did not read that.
25  Q    Would you disagree with Dr. Hummel if he said you
```

```
1   didn't randomize?
2   A    I think it clearly lists that I completely randomized
3   that test in my report.
4   Q    And you know that the EZ SEED lost water at a faster
5   rate than the 1 STEP COMPLETE in your test?
6   A    I don't disagree with that.
7   Q    You started out with the EZ SEED having twice as much
8   water because it absorbed twice as much, right?
9   A    Yes, it does.
10  Q    And water loss is linear, not geometric, right?
11  A    I don't know enough about the release of water to
12  know if that is true or not.
13  Q    You haven't studied it enough to know that?
14  A    I am not an expert in water release.
15  Q    You do know that the EZ SEED starting with twice as
16  much water should retain the water twice as long compared
17  to the product that has only half that amount of water.
18  A    Not necessarily if it is losing it faster.
19  Q    Okay.  So you recall from your test that the 1 STEP
20  COMPLETE retained its water seven hours and the EZ SEED
21  with twice the water retained it only ten hours?
22  A    That sounds right.
23  Q    So your studies show that EZ SEED loses its water 30
24  percent faster than the 1 STEP COMPLETE in the first seven
25  hours?
```

```
1   A    Say that again.
2   Q    Your studies showed that EZ SEED loses its water 30
3   percent faster than 1 STEP COMPLETE in the first seven
4   hours.
5   A    That sounds correct.
6   Q    Did you count up the number of errors that you made
7   in your Declaration that you submitted under oath to this
8   Court in March of 2012?
9   A    No, I haven't counted them.
10  Q    There were a number of them, right?
11  A    That's correct.
12  Q    And your assistance with that document was
13  essentially to review it as drafted by your attorneys,
14  right?
15  A    Yes, that is correct.
16  Q    And you didn't do a very good job of reviewing it
17  before you signed it under penalty of perjury, did you?
18  A    That's correct.
19  Q    Now, your charts use a term, "LSD."  That stands for
20  least significant difference?
21  A    Right.
22  Q    And in your charts, some of which we have seen here
23  today, it is a little tedious going over every one of
24  these.  The numbers are very, very tiny.  But you recall
25  that in a lot of those charts, the differences that you
```

```
1   showed and that in your narrative you said were
2   significant were not significant statistically, right?
3   A    I think I just said that, yes.
4   Q    In light of that, you conceded that a number of the
5   conclusions that were stated in your Declaration you would
6   withdraw, correct?
7   A    I think that I did make some of those comments in my
8   deposition.
9   Q    Okay.  So for example, you recall that in Paragraph
10  26 of your Declaration filed with the Court that you
11  withdrew that paragraph?
12  A    I don't recall if that was what I said or not.
13  Q    All right.
14       MR. WOLF:  May I approach the witness, Your
15  Honor?
16       THE COURT:  Sure, go ahead.
17       (Document proffered to witness.)
18       MR. WOLF:  Your Honor, I'm not going to offer
19  this exhibit into evidence.  This is an earlier
20  Declaration that he filed with the Court and I just wanted
21  to get him to admit to specific errors that he committed.
22  BY MR. WOLF:
23  Q    If you would turn to Paragraph 26, please.  This is
24  your Declaration, correct?
25  A    Correct.
```

| | |
|---|---|
| 1 | Q    That was submitted to the Court. |
| 2 | A    Correct. |
| 3 | Q    You recall agreeing as to this paragraph that you |
| 4 | would have to withdraw it because the claim that at each |
| 5 | observation date the results were significantly higher was |
| 6 | not accurate? |
| 7 | A    I do recall this.  I mean, I think that the problem |
| 8 | was that it wasn't significant at all the thin spot rates. |
| 9 | So yes, that's not a correct statement. |
| 10 | Q    Right.  It wasn't statistically significant when you |
| 11 | compared the same amount of product to the same amount of |
| 12 | product, right? |
| 13 | A    Right. |
| 14 | Q    Okay.  And you also agreed that on Page 13, the photo |
| 15 | that you included showing the Pennington product there, |
| 16 | you would withdraw because it was not the appropriate |
| 17 | photo to select for the comparison? |
| 18 | A    I did make that comment, yes. |
| 19 | Q    Okay.  And you agreed that if these photographs had |
| 20 | been taken at the planting rates indicated with full |
| 21 | watering, they would have shown more comparable results, |
| 22 | right? |
| 23 | A    These tests were not conducted at optimal watering |
| 24 | rates. |
| 25 | Q    And turn to Paragraph 29.  You conceded that you |

| | |
|---|---|
| 1 | should withdraw the conclusion stated in the last sentence |
| 2 | because it is not based on statistically significant test |
| 3 | results? |
| 4 | A    You know, I think that that statement -- I think it |
| 5 | is factual.  They were numerically higher.  Whether they |
| 6 | were significantly different, no, they were not.  But I |
| 7 | think they are numerically higher. |
| 8 | Q    Well, is it appropriate to claim statistical |
| 9 | significance for an average which contains numbers that |
| 10 | are not statistically significant, sir, as a scientist? |
| 11 | A    No, it is not.  You are correct.  That is right.  You |
| 12 | would want them to be significantly different.  However, |
| 13 | as I mentioned, I don't think that the sentence is |
| 14 | inaccurate. |
| 15 | Q    If the number is not statistically higher, it is sort |
| 16 | of a meaningless number, right? |
| 17 | A    Correct. |
| 18 | Q    And you withdrew the conclusion in Paragraph 31 of |
| 19 | your Declaration because the average is based on numbers |
| 20 | that are not statistically significant? |
| 21 | A    I believe that's correct. |
| 22 | Q    And in Paragraph 32, you retracted the last sentence |
| 23 | related to the thin spot rate of EZ SEED versus 1 STEP |
| 24 | COMPLETE, correct? |
| 25 | A    Again, I can't remember exactly, but yes, I don't |

| | |
|---|---|
| 1 | disagree with you. |
| 2 | Q    Do you recall on Page 175 of your deposition, Line |
| 3 | 12, you were asked, "Then let's go to 32.  You have to |
| 4 | retract your statements as they relate to the thin spot |
| 5 | comparison to 1 STEP COMPLETE in this paragraph as well, |
| 6 | right?  Answer:  Yes, correct." |
| 7 | A    Okay. |
| 8 | Q    On Page 18 of your Declaration, you agreed that the |
| 9 | photograph that was shown there would have to be withdrawn |
| 10 | because it was not appropriate. |
| 11 | A    I would say that -- |
| 12 | Q    The photograph of the 1 STEP COMPLETE. |
| 13 | A    I would say that in that particular replication, that |
| 14 | that would not be appropriate. |
| 15 | Q    All right.  Let's talk about the lift test.  You |
| 16 | conducted your lift test in April or May of 2012, right? |
| 17 | A    Yes. |
| 18 | Q    And the person conducting the lift test was |
| 19 | blindfolded? |
| 20 | A    The person that was lifting the trays was |
| 21 | blindfolded. |
| 22 | Q    Right.  And he wasn't grabbing the same spot in the |
| 23 | tray with each grab, right? |
| 24 | A    He may not have been, no. |
| 25 | Q    Well, that would be a pretty amazing trick if he did |

| | |
|---|---|
| 1 | it blindfolded, right? |
| 2 | A    It would be difficult, yes. |
| 3 | Q    And there again, you were not testing the same amount |
| 4 | of product to the same amount of product.  You were |
| 5 | testing, you were putting in almost twice as much of the |
| 6 | EZ SEED product and then comparing the results in your |
| 7 | lift test, correct, to the Pennington product. |
| 8 | A    On an application rate of the total product, that's |
| 9 | correct.  But when you look at the formulation, the |
| 10 | seeding rate is essentially equal.  So I think it is a |
| 11 | valid comparison. |
| 12 | Q    Would you show us where the specific instruction of |
| 13 | 1.875 pounds per 20 square feet appears on the Scotts |
| 14 | package? |
| 15 | A    It doesn't specifically say that. |
| 16 | Q    But that's the rate that you used. |
| 17 | A    That's the rate that we have used in our research and |
| 18 | our testing, yes. |
| 19 | Q    In fact, you don't tell the consumer anywhere that he |
| 20 | is to apply the product at 1.875 pounds per 20 square |
| 21 | feet, the rate you used. |
| 22 | A    No, we do not. |
| 23 | Q    And at the time of the lift test, all that you |
| 24 | instructed the consumer to do is apply it as a |
| 25 | thickness-based rate, correct? |

```
1   A    I can't remember.  The lift test was done in 2012.
2   So at that particular time, the new labels were coming
3   out.  And so, the thickness was no longer part of the
4   label.
5   Q    Well, you may have changed the label around that
6   time, but you still had a lot of product in the store
7   being purchased by consumers every day in the thousands if
8   not tens of thousands that said one-eighth inch for bare
9   spot and didn't say anything about how many pounds per
10  square feet.
11  A    I'm in Research & Development.  I have no idea what's
12  in the marketplace.
13  Q    Well, when you ran your tests, did you look to see
14  what was on the label of your own product that you were
15  testing?
16  A    Yes.
17  Q    And it said an eighth of an inch, didn't it, for bare
18  spots and a sixteenth for thin spots?
19  A    No, it was this label here.  It was the new label.
20  Q    Your new bag, the new label, doesn't say anything
21  about a thin spot rate, does it?
22  A    It says -- I think it says for -- use half as much
23  for thin areas.  Yes, it does.
24  Q    Now, you yourself have very little involvement in
25  talking to consumers, correct?
```

```
1   A    That is not the -- not my primary function in my
2   responsibility at Scotts, no.
3   Q    So how a consumer would understand or interpret the
4   instructions given to them on the EZ SEED bag is something
5   that you can't testify to, correct?
6   A    That is not -- that would not be my expertise.
7   Q    Did you do a lift test in any of your studies that
8   actually used the same amount of the Pennington product to
9   compare to the same amount of the EZ SEED product?
10  A    Product to product application rate?  No, we did not
11  do a lift test using that.
12  Q    Now, when you went from the maximum coverage of 80
13  square feet to maximum coverage of 85 square feet, did you
14  change the formula of the product?
15  A    No.
16  Q    So you just changed the coverage rate or that
17  difference is just not significant in your book?
18  A    It was a very minor change.  Again, the change was
19  made primarily to make sure that we were compliant with
20  New Jersey fertilizer law.
21  Q    Regardless, you are still telling the consumer what
22  the coverage rate is, and so it was basically a six, seven
23  percent change?
24  A    Yes, that sounds right.
25  Q    But you still think it is comparable.
```

```
1   A    It is comparable.
2   Q    Did you run any tests on the Scotts EZ SEED when the
3   label said apply one-eighth inch to bare spots?
4   A    Did I run any tests?
5   Q    Yes.
6   A    Yes, we did.
7   Q    Okay.  And in any of those tests, did you apply
8   one-eighth of an inch?
9   A    No.  That was not anything that we ever -- that was
10  not consistent with any of the testing we ever did.  I
11  think I said earlier that all the testing we have done in
12  R&D has been on a weight per unit area, not looking at
13  something on a volumetric basis.
14  Q    The thickness of the product, if it is just laid out
15  so that it touches the ground, is an eighth of an inch,
16  right?
17  A    What do you mean by that?
18  Q    You don't stack product on product, but you are just
19  spreading a thin layer of the product on the ground; the
20  product thickness itself is about eighth of an inch,
21  right?
22  A    I would say that the granules in the EZ SEED are
23  approximately an eighth of an inch thick.
24  Q    Okay.  And when in your development of the label did
25  you start telling consumers, "Leave some bare ground"?
```

```
1   A    That was when the new label came out in 2012.
2   Q    The old label didn't say that, did it?
3   A    No.
4   Q    What the old label said was "Spread a layer of it an
5   eighth of an inch thick."
6   A    It didn't specifically say to leave voids, no.
7   Q    It used the word "layer," right?
8   A    It used the word "layer," "a thin layer."
9   Q    Could we have Scotts Exhibit 275, please?  The photo
10  is the last page on it.  And if we could look at the photo
11  in the lower left -- excuse me, the lower left there.
12  What's the thickness of the application in that photo,
13  sir?
14  A    You want me to estimate that?  I have no idea.
15  Q    Okay.  Could it be an eighth of an inch?
16  A    Potentially.
17  Q    Okay.  Show all the photos now.  So you are saying
18  from these photos, you can't tell the thickness of the
19  application rate?
20  A    Looking down on those?  Absolutely not.
21  Q    All right.  Now, at one point in your testimony, I
22  think you misspoke, but what you said was testing on soil
23  of your mulch product, the EZ SEED, is not relevant.  You
24  didn't mean that it is not relevant, did you?
25  A    I think that the claim that we have been making about
```

1  absorption, it is extremely difficult to make that claim.
2  You need to separate the product out and do the testing on
3  the product itself.  So what I meant by relevant, I meant
4  that it is very difficult to do any sort of absorption
5  testing and retention testing on -- when you have added
6  another variable like soil that also will absorb water.
7  Q   So you at least would be incapable of designing a
8  study that would test the absorption capability of the EZ
9  SEED product in soil.
10 A   I think I am capable of doing that testing.
11 Q   Oh.  It is not that it is impossible.  It is just
12 that it is a lot of work?
13 A   I think you would have to use some different
14 methodology than what Mr. Hignight used.
15 Q   And different methodology from what you used.
16 A   I did the test specifically on the water holding
17 capacity of the mulch.  I think that the test that I ran,
18 it was a good test.
19 Q   Okay.  But it is not impossible to test the water
20 absorption in the soil which is how it is used by the
21 consumer.
22 A   I think you would have to modify anything that
23 Mr. Hignight used to be able to determine how much water
24 was absorbed by the mulch and how much water was absorbed
25 by the soil.  Because in his report, you can't determine

1  where the water was.
2  Q   I'm not talking about Mr. Hignight's report.  I'm
3  talking about your reports.  You could do a study that
4  would test the water absorption capability of your product
5  in the soil, which is how it is used by consumers.
6  A   I think it would be extremely difficult to do that.
7  Q   So you couldn't do it?
8  A   I'm not saying that we necessarily couldn't, but on
9  the spot right now, I can't think of one.  I'm sure you
10 could use some sort of a screen or something.  You would
11 have to somehow be able to separate the mulch from the
12 soil to be able to calculate after you have added your
13 water how much water is absorbed by the mulch and how much
14 water is absorbed by the underlying soil.
15 Q   Well, you could test using the mulch how much water
16 is retained in the soil where the seed is germinating,
17 correct?
18 A   Again, I don't know how you would determine where the
19 water is.  There is no way to know where that water is in
20 that profile.
21 Q   So it can't be done?
22 A   I think it is extremely difficult to do testing on
23 soil.
24 Q   You have talked about the water being released to the
25 seed.  You didn't do any tests to determine water being

1  released to the seed versus released to the atmosphere,
2  did you?
3  A   No.
4  Q   If you remember your reports that are Scotts Exhibits
5  276, 277, 278, 279, all of those reports involved
6  intentionally starving the product of water, correct?
7  A   The tests were set up to evaluate these two different
8  products, these two different combination products and
9  their ability to grow under water deficit; that's correct.
10 Q   Under "Failure To Follow Instructions" on the
11 package.
12 A   Those would -- yes, we would not instruct a consumer
13 to follow the directions that we used in our testing
14 methodology.
15 Q   But the testing was not testing what would happen if
16 a consumer actually follows the instructions on the
17 package, right?
18 A   That's correct.  Although some of those tests were
19 conducted based on our directions to water the product
20 when it turns light brown.
21 Q   Now, the word "saturate" has been used in some of
22 your testimony.  When did the EZ SEED label start telling
23 consumers to saturate the product?
24 A   Specifically, the word "saturate" was used in the new
25 label, 2012.

1  Q   So when this litigation began, that was not in the
2  Scotts label, correct?
3  A   The word "saturate" was not used; however, we used a
4  word called "activate."
5  Q   You think that's the same as saturate?
6  A   I'm telling you that that was the intent of that
7  word, was to activate the product by saturating it.
8  Q   Without using the word "saturate."
9  A   It was not used, that's correct.
10 Q   Now, when you were talking about seeding rates per
11 thousand square feet, those rates are for straight seed
12 products, right?
13 A   Those rates would be for straight seed and
14 combination products.
15 Q   Well, don't you generally have a different rate for
16 combination products because you have a higher mortality
17 rate of the seed when you are applying it?
18 A   In general, seeding rates are higher, slightly higher
19 for combination products than they are for straight seed.
20 Q   Thank you.  You mentioned that perhaps the soil
21 thickness in the Hignight lift test was not sufficient.
22 Regardless, it was the same for both products, right?
23 A   It was, that's correct.
24 Q   Let's talk about the Levy seed counting test.  You
25 didn't conduct those tests with him, did you?

```
1   A    I was not there when he conducted those tests, no.
2   Q    And you were not responsible for telling him to
3   conduct the test?
4   A    We asked him to conduct those tests.
5   Q    You did not ask him to conduct the test, you
6   yourself.
7   A    No, I did not specifically ask him to conduct that
8   test.
9   Q    You did not advise him what was intended by the test
10  that he was conducting?
11  A    No.
12  Q    You didn't have any communications with him while he
13  was conducting the test?
14  A    No.
15  Q    Or after he conducted the test?
16  A    After he conducted the test?  Possibly.
17  Q    As of the time of your deposition you hadn't, had
18  you?
19  A    Hadn't what?
20  Q    Talked with him about the test.
21  A    I didn't talk to him about the test.
22  Q    And you didn't speak to him about his methodologies?
23  A    No.
24  Q    And you are not a registered seed technologist?
25  A    I am not.
```

```
1   Q    You saw how Mr. Levy described his expertise, right,
2   in his report?
3   A    Yes.
4   Q    You don't have any of the expertise he described in
5   his report?
6   A    No, I do not.
7   Q    And Mr. Levy was counting uncoated TURF BUILDER,
8   right?
9   A    I believe he counted both uncoated and coated.
10  Q    The one uncoated TURF BUILDER product that Scotts
11  still sells is not a premium product like WATER SMART is a
12  premium product, correct?
13  A    It is not branded WATER SMART, no.
14  Q    No, but I mean, Scotts has premium products or
15  products that it regards as premium product, just like
16  Pennington does, and other products that it doesn't regard
17  as its premium product, correct?
18  A    Correct.
19  Q    Okay.  And the Quick Fix is not a premium product,
20  correct?
21  A    I would not consider it a premium product, no.
22  Q    And you also did some seed counting with Mr.
23  Caldwell?
24  A    Yes.
25  Q    But you didn't do any statistical analysis of those
```

```
1   counts?
2   A    I did not do any mean separation.  I did conduct -- I
3   did standard deviation, just to show the variability
4   around the mean.
5   Q    You were involved in the development and testing of
6   EZ SEED at Scotts?
7   A    Yes.
8   Q    During the development of the EZ SEED product, did
9   you review any literature concerning mulch, seed, and
10  fertilizer products?
11  A    Not that I can recall, no.
12  Q    And you have reviewed Dr. Rogers's article discussing
13  mulch and seed and fertilizer application and grass seed
14  trials, correct?
15  A    I believe I said in my deposition that I may have
16  read the abstract.  I have not looked at that document or
17  that article.
18  Q    You are aware that in Dr. Rogers's article, among
19  others, that the mulch was applied on a thickness basis?
20  A    That's my understanding, yes.
21  Q    And you understand that the procedure that was
22  employed applying the mulch on a thickness basis was the
23  subject of a peer review?
24  A    Yes, that's my understanding, is it a peer
25  reviewed article.
```

```
1   Q    That means it was reviewed by other people in the
2   industry that have expertise to criticize and request
3   changes in the article, correct?
4   A    Correct.
5   Q    And you understand that peer reviewed articles are
6   subject to scientific scrutiny and rigor?
7   A    Correct.
8   Q    That's important, right?
9   A    I agree.
10  Q    And the intent of the peer review process is to force
11  the article authors to be very exact and precise and
12  careful in their analysis and experiments, correct?
13  A    Correct.
14  Q    And the idea of the peer review process is for
15  multiple people to actually look at the article, tear it
16  apart, make sure it makes sense scientifically, correct?
17  A    That's correct.
18  Q    And to make sure it has the correct analysis and
19  contains the proper citations to support the findings,
20  correct?
21  A    I don't disagree.
22  Q    You are not criticizing Dr. Rogers for having applied
23  the mulch in his experiment on a thickness basis, are you?
24  A    Like I said, I'm not that familiar with that piece of
25  research, so -- my understanding with that research is he
```

```
1   didn't apply it in a combination product.  The mulch was
2   replied after the seed was sown.
3   Q    But the mulch was applied in a thickness basis.
4   A    The mulch was applied as a thickness basis, yes.
5   Q    And your not criticizing Dr. Rogers for having done
6   it that way, are you?
7   A    That's how he set up his experiment.
8   Q    You are not criticizing him for having done that, are
9   you?
10  A    No.
11  Q    Okay.  One of the purposes of mulch is to help keep
12  moisture in the soil, correct?
13  A    Correct.
14  Q    And when you are watering the EZ SEED product, you
15  need to apply a lot more water compared to 1 STEP COMPLETE
16  for the water to penetrate down into the soil, correct?
17  A    You need to apply more water to the EZ SEED product,
18  correct.
19  Q    You remember in your deposition agreeing that it was
20  a lot more?
21  A    I don't remember if I said "a lot."
22       THE COURT:  It doesn't matter.  Please.
23  BY MR. WOLF:
24  Q    Initially, you would have to apply more water to
25  Scotts EZ SEED to get the water to migrate through the
```

```
1   mulch and to go into the soil, correct?
2   A    Because of the superior absorption capacity of EZ
3   SEED, that is correct.
4   Q    So it will take more water to saturate the EZ SEED
5   product than it will the 1 STEP COMPLETE product.
6   A    Yes.
7   Q    And the purpose for saturating the products is to
8   activate them so that they will work right, correct?
9   A    Correct.
10  Q    At the time of your tests, well, at the time when
11  this suit was filed -- withdraw that.
12       The 1 STEP COMPLETE product with its one-eighth inch
13  application rate and the EZ SEED product with its
14  one-eighth inch application rate, it is not unfair to
15  compare those two using that same rate, is it?
16  A    I think on the old label they both said an eighth of
17  an inch.
18  Q    So it wouldn't be unfair to compare them at the rates
19  they are both saying, right?
20  A    I would say that they both use an eighth of an inch
21  comparison.
22  Q    So using that comparison would be an appropriate, or
23  using that rate would be an appropriate way to compare the
24  products then.
25  A    To compare them both at an eighth of an inch
```

```
1   application?
2   Q    Yes.
3   A    Yes.
4   Q    And if the consumer is told to apply an eighth of an
5   inch layer to bare spots and then sees a picture right
6   above that statement showing a layer of EZ SEED, a
7   consumer is going to assume that that picture shows an
8   eighth of an inch thickness, right?
9   A    Yes, I agree.  Exactly.
10  Q    And Scotts' intention is for consumers to follow the
11  directions that it provides, right?
12  A    These were the directions on the old label.
13  Q    Right.  But at the time you were giving those
14  directions you intended them to be followed by the
15  consumer, right?
16  A    We intend the consumer to follow our Directions For
17  Use.
18  Q    So the fairest way to test the product is to test it
19  according to the way consumers would use it if they were
20  following the directions, right?
21  A    The consumer should follow the Directions For Use.
22  Q    But that's the fairest way to test the products
23  against each other, is how the consumers would use it if
24  they are following each product's directions.
25  A    As I've said many times before, the eighth of an inch
```

```
1   we put on EZ SEED, that's not what was tested in R&D at
2   Scotts.
3   Q    That wasn't my question.  If a consumer were to
4   follow directions, the fairest way to test the product is
5   to test it according to the way consumers would if they
6   were following the directions, right?
7   A    Correct.
8   Q    Now, the thin spot rate of 3.75 pounds per 80 square
9   feet is comparable in application rate to the three pounds
10  per 60 square feet for the Pennington 1 STEP COMPLETE.
11  A    It is similar.
12  Q    With the coir fiber mulch in EZ SEED, there is some
13  variability in the manufacturing process, right?
14  A    There is some.
15  Q    The product density can vary from package to package
16  and lot to lot?
17  A    Yes.
18  Q    And the moisture content and the raw materials can
19  vary from lot to lot?
20  A    I would say that's accurate.
21  Q    So on a volumetric or cubic foot basis, the amount of
22  product per pound of EZ SEED can vary?
23  A    It can vary slightly.
24  Q    So if you were to apply EZ seed at 1.875 pounds per
25  20 square feet from one bag with one density and you were
```

```
1    to apply that same weight, 1.875 pounds per 20 square feet
2    from another bag with a different density, you are
3    actually going to apply a different amount of product,
4    right?
5    A    You would apply a different volume.  That's why I
6    would not use volume.
7    Q    Well, if the density is different, you can either do
8    it by volume or by weight.  If you do it by weight, then
9    you are going to have more volume in one of the tests, or
10   if you do it by volume, you are going to vary the weight.
11   You have to vary one or the other, correct?
12   A    You don't compensate for the volume.  That's why you
13   want to test products on a weight basis regardless of the
14   density of those products.  They are going to give you the
15   same amount of seed, fertilizer, et cetera.
16   Q    They vary in relation to one another, right, the
17   volume -- when the density changes, the weight and the
18   volume will vary with respect to one another, correct?
19   A    If you have two products that are applied at the same
20   weight, they may have a different volume.
21   Q    Right.  And similarly, if you have two products that
22   are applied at the same volume, they may have a different
23   weight.
24   A    Yes.
25   Q    And the thickness-based application is by definition
```

```
1    volumetric, right?
2    A    Yes.
3    Q    And your tests showed that at the comparable
4    weight-based applications of EZ SEED and 1 STEP COMPLETE,
5    that at least at 11 days after planting, there is no
6    significant difference in seedling count, correct?
7    A    I don't recall.  It is possible.
8    Q    Now, one of the common misapplications of EZ SEED is
9    that people believe that it is dark brown and they stop
10   watering before Scotts thinks they should stop watering?
11   A    Yes.
12   Q    And lack of erosion control with EZ SEED has
13   contributed to a number of consumer complaints as well?
14   A    Lack of erosion control?
15   Q    Yes.
16   A    I'm not sure about that.
17   Q    Did you get a lot of consumer complaints about the
18   product moving around?
19   A    I don't deal with consumer complaints.  That's not my
20   function.
21   Q    You do know that the complaint numbers on that score
22   were high, correct?
23   A    EZ SEED has had complaints, that's correct.
24   Q    And the biggest complaint was that the product did
25   not germinate, right?
```

```
1    A    I think that was a big complaint.  I think another
2    complaint that rose to the top was germinated, then died.
3    Q    And your belief was that the instructions on the EZ
4    SEED package were causing the complaints because they were
5    not clear, right?
6    A    I think that the label could be more clear, yes.
7    Q    So you thought that the one-eighth inch and
8    one-sixteenth inch instructions were not clear?
9    A    I think we have taken the steps to improve those,
10   yes.
11   Q    You thought they were not clear.
12   A    They were not as clear as I would like them to be.
13   Q    And that the watering instructions were not clear.
14   A    Correct.
15            MR. WOLF:  May I approach the witness, Your
16   Honor?
17            THE COURT:  Sure.
18            MR. WOLF:  Could you please show me the new
19   container?
20        (Exhibit proffered to counsel.)
21        (Counsel conferring with co-counsel.)
22   BY MR. WOLF:
23   Q    So the package shows 3.75 pounds for 85 square feet,
24   right?
25   A    Yes.
```

```
1    Q    And if you -- on the back, it says, "Use half as much
2    for thin areas," right?
3    A    Yes.  The half as much would be the up-to coverage.
4    Q    Well, actually, this coverage of 3.75 pounds per 85
5    square feet, that's the only mathematical rate that's on
6    the package anywhere, right?
7    A    That is correct.
8            MR. WOLF:  I have no more questions, Your Honor.
9            THE COURT:  All right.  Let's see if we can
10   finish with this witness.
11            REDIRECT EXAMINATION
12   BY MR. DANON:
13   Q    Mr. Faust, you were just asked just now a couple
14   questions regarding how changes in density or the
15   variation in density may affect product application.  I
16   just want to ask a question:  If you apply the product on
17   a weight by area basis, however, how does that affect the
18   amount of seed and fertilizer that's in the combination
19   product?
20   A    It remains constant.
21   Q    So if you allow the density to affect the volumetric
22   rate, what would happen with the seed and fertilizer?
23   A    You would have greater variability and fluctuations.
24   Q    And there were some questions regarding the
25   application rates for mulch.  These are combination
```

```
 1   products.  And what is the difference between a
 2   combination product and just a pure mulch?
 3   A    A combination product also contains grass seed and
 4   fertilizer.
 5   Q    Now, there were some questions regarding the use of,
 6   or trying to state that the thin spot rate that you used
 7   for EZ SEED would be comparable to the one pound per 20
 8   square feet rate that is on the 1 STEP COMPLETE bag.
 9   However, I think you started to testify about how using
10   the bare spot rate of 1.875 per 20 square feet becomes
11   equivalent to the one pound per 20 square feet on seeding
12   rate.  Can you explain that, please?
13   A    Yes, that's correct.  Due to the differences in the
14   formulation of the products, our bare spot rate, the 1.875
15   pound rate, it essentially standardizes the seeding rate
16   of the two products.
17   Q    Now, there were also some questions regarding some
18   testing that I believe you did and also Mr. Hignight did
19   on absorption and water release.  I think the questions
20   were about the rate at which EZ SEED releases water.  Do
21   you remember that?
22   A    Yes.
23   Q    In your opinion, is that a positive attribute for a
24   mulch to have in a product like this?
25   A    It is absolutely a positive attribute.
```

```
 1   Q    Why is that?
 2   A    Because that water will be available for that seed to
 3   imbibe and to start the germination process.
 4   Q    How does that interplay with absorption and the
 5   increased absorptive abilities of EZ SEED's mulch?
 6   A    Like I said, they go hand in hand.  Having the
 7   superior absorption and having the ability to release that
 8   water back is a positive attribute.
 9   Q    There were some questions about the Levy seed count
10   report.  Who delivered the product that was actually
11   counted to Mr. Levy?
12   A    I did deliver that product.
13   Q    Okay.  And I believe there were some questions
14   regarding Exhibit 270, which is your water absorption
15   trial, regarding whether you randomized the test or not.
16   I believe in your response, you indicated that it was
17   listed on the report.  I just want to pop that exhibit up
18   and turn to Page 5 and ask you if on your report you
19   actually indicated that that was a randomized test.
20   A    So under Section F, it says "Experimental Design and
21   Statistical Analysis."  It says, "Type of Experimental
22   Design:  Completely randomized design."
23   Q    And taking a step back here, when was it that the
24   process began to change the EZ SEED label and the
25   Directions For Use on the EZ SEED label?
```

```
 1   A    The process began in 2010.
 2   Q    Okay.  You were involved in that process, right?
 3   A    Yes.
 4   Q    I just want to pop up Exhibit 327, which is, again,
 5   the exhibit of Mr. Hignight's application rates.  But he
 6   also indicated years.  I want you to go to the fifth
 7   column.  You see where it says "Trial Years" as you move
 8   your way down?
 9   A    Yes.
10   Q    Okay.  As you look at these dates, as they range from
11   2010 through 2012, are these dates before or after you
12   began the process of changing the EZ SEED label?
13         MR. WOLF:  Objection to relevance.  If they are
14   beginning the process in-house, how is that relevant to
15   Mr. Hignight?
16         THE COURT:  The objection is overruled.
17   BY MR. DANON:
18   Q    Are these before or after the process began for you
19   to change?
20   A    These are after.
21         MR. DANON:  Let me just check one second, Your
22   Honor.  No further questions, Your Honor.  Thank you.
23         THE COURT:  All right.  Thank you, sir.  You may
24   stand down.
25         (Witness stood aside.)
```

```
 1         We will be in adjournment until tomorrow morning at
 2   9:30.
 3         MR. DANON:  We have one issue with a witness to
 4   raise.  I think 9:30 might be a little early for the next
 5   witness.  10 a.m., I think we can get him in.  I apologize
 6   for that.  But in the order of witnesses that we had with
 7   the prior commitment that he had in trying to get him in
 8   here, he is actually arriving at nine, and I just don't
 9   want to commit to 9:30 and then --
10         THE COURT:  We will make it 10 o'clock.
11         MR. ROTHSTEIN:  That's fine with us, Your Honor.
12         THE COURT:  All right.
13         (Proceedings adjourned at 5:56 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT PPPP**



SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

F I L E D

ALAMEDA COUNTY

JAN 1 2 2007

CLERK OF THE SUPERIOR COURT

By _____

                              Deputy

In re: CELLPHONE TERMINATION
       FEE CASES

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

J.C.C.P. 4332

ORDER (1) DENYING MOTION OF
SPRINT FOR SUMMARY
ADJUDICATION OF UCL AND CLRA
DISCLOSURE CLAIMS, (2) GRANTING
MOTION OF SPRINT FOR SUMMARY
ADJUDICATION OF UCL "FACT OF
LOCKING" CLAIM, AND (3) DENYING
MOTIONS TO STRIKE EVIDENCE.

Date:  December 19, 2006
Time:  9:00 am
Dept.:  22

The motion of Sprint for summary adjudication of UCL causes of action and "no

merit" determination of CLRA cause of action and related motions to strike evidence

came on for hearing on December 19, 2006, in Department 22 of this Court, the

Honorable Ronald M. Sabraw presiding.  After consideration of the original and

supplemental briefing and the oral argument, IT IS ORDERED:  (1) the motion of Sprint

for summary adjudication of UCL causes of action concerning disclosures is DENIED;

(2) the motion of Sprint for summary adjudication of UCL cause of action concerning the

fact of locking is GRANTED, (3) the motion of Sprint for "no merit" determination of

CLRA cause of action is DENIED, and (4) the motions to strike evidence are DENIED.

1

# FACTUAL BACKGROUND

This is a class action alleging that when Defendant Sprint sold handsets (phones) to consumers all the handsets were sold with a software lock that prevented consumers from using the handsets to receive the services of other providers. This lock has never been disclosed to consumers. Sprint argues that it has consistently represented that its phones "will not accept the services of any wireless provider other than Sprint." Plaintiffs dispute that Sprint has adequately disclosed that its phones will not accept the services of other wireless providers and further argue that even if such disclosures were made, they are materially misleading. The locked phones sold by Sprint can be used on the networks of other providers (as when a phone is on "roam"), but class-members cannot use a locked Sprint phone to receive the services of another provider. Sprint allegedly uses these locks to make it more expensive for consumers to leave Sprint and start service with another carrier.

The Sixth Amended Complaint in *Zill v. Sprint*, RG03-114147, filed January 3, 2006, alleges four causes of action: (1) Business and Professions Code 17200 et seq., (the UCL) - fraudulent; (2) UCL – unlawful (borrowing Civil Code 1770(a)(5), (6), (7),and (9) and the FTC Act, 15 USC 45(n)); (3) UCL – unfair; and (4) the CLRA, Civil Code 1770(a)(5), (6), (7),and (9).

# THE STATE OF THE LAW UNDER THE UCL.

There is some uncertainty regarding the elements of a UCL claim. The Court sets out its understanding of the current state of the law.

2

<u>UCL – claims by public prosecutors on behalf of the People of the State of</u>

<u>California.</u>  Nothing in Proposition 64 changed the ability of public prosecutors to assert UCL claims.  Public prosecutors pursue UCL claims as part of law enforcement and do not need to demonstrate that they or any members of the public have suffered a loss of money or property as a result of the business practice at issue.  *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17.  When public prosecutors assert "unlawful" claims, the claims must borrow from the constitution, a statute, or a regulation.  When prosecutors assert "fraudulent" claims, the court would apply the "likely to deceive" standard.  UCL claims by public prosecutors are in the nature of law enforcement efforts to protect the public and public entities have standing to enjoin practices before injury has occurred.

When public prosecutors assert "unfair" claims, the Court would be inclined to apply the F.T.C.'s test of unfairness.  The FTC test for unfairness sets forth four criteria: (1) defendants must have engaged in a "business practice"; (2) the business practice must cause, or be likely to cause, injury to consumers; (3) the injury must be substantial; (4) the injury must not be reasonably avoidable by consumers themselves.  Federal Trade Commission Act, 15 U.S.C. §45(n).  See also, *Camacho v. Auto Club of Southern Calif.* (2006) 142 Cal. App. 4th 1394.  California public prosecutors, like the F.T.C., are part of "law enforcement," and can use the UCL to stop business practices that are unfair even if they might not violate any specific statute.  *In re Firearm Cases* (2005) 126 Cal. App. 4th 959, 979-982 (discussing use of FTC test in claims by "a number of California cities and counties").  It is appropriate to permit public prosecutors (the Attorney General, district Attorneys, etc) to pursue claims under the flexible FTC Act standard because they

3

represent the People as a whole and have an obligation to use their prosecutorial

discretion in bringing and pursuing those cases.  *People v. Eubanks* (1996) 14 Cal.4th

580, 589-590; *People v. Pacific Land, supra.*

UCL – reliance and causation in claims by private persons. The UCL's current

standing provision requires private plaintiffs to have suffered injury in fact and a loss of

money or property as a result of the business practice at issue.  Business and Professions

Code 17204.  Private plaintiffs must prove that the allegedly improper business practice

was the cause of some actual injury.  See this Court's Orders dated June 7, 2005, and May

25, 2006.

UCL – "unlawful" claims by private persons.  When private persons assert

"unlawful" claims, the claims must borrow from the constitution, a statute, or a

regulation.

UCL – "unfair" claims by private persons.  "The Supreme Court has not yet

enunciated a legal test for unfairness in consumer actions under the unfair competition

law." *Kunert v. Mission Financial Services Corp.* (2003) 110 Cal. App. 4th 242, 265.

See also *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal. App. 4th 1255, 1274 ("we

urge the Legislature and the Supreme Court to clarify the scope of the definition of

"unfair" under the UCL.").  Where Courts of Appeal are in conflict, a trial court may

consider the different authorities and reach its own conclusions. *Sears v. Morrison*

(1999) 76 Cal. App. 4th 577, 587.  In other cases this Court has held that UCL unfair

claims brought by private parties must be tethered to specific constitutional, statutory or

regulatory provisions.  Consistent with *Cel-Tech Communications, Inc. v. Los Angeles*

*Cellular Telephone Co.* (1999) 20 Cal. 4th 163, 186-187, this provides some

4

predictability in private UCL claims and is consistent with *Gantt v. Sentry Insurance* (1992) 1 Cal. 4th 1083, 1095, where the Court held claims for wrongful termination of employment in violation of public policy must be "carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions." The Court applies different standards for private parties and public prosecutors because private parties are motivated only by their private interests and their decisions regarding the initiation and resolution of "unfair" UCL claims are not tempered by an obligation to use prosecutorial discretion and pursue only those claims that benefit the public as a whole. In this case, however, the parties agree that the Court should use the more flexible FTC section 5 test adopted in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394. Therefore, the Court will use the FTC section 5 test.

UCL – "fraudulent" claims by private parties. When private persons assert "fraudulent" claims, the UCL now requires evidence that the Plaintiff was deceived by a misrepresentation, the Plaintiff relied on the misrepresentation, and the plaintiff has suffered injury in fact and a loss of money or property as a result of the misrepresentation. As suggested in the class certification order of May 25, 2006, at 10:11-11:2, this change in legal theory may have little practical effect on how the law is applied. The fraudulent prong of the UCL prohibits statements or omissions that are misleading. The alleged misleading statement or omission must be material. The Court uses the "reasonable consumer" test in determining materiality. Plaintiffs also refer the Court to *Cliffdale Associates,* 103 F.T.C. 110 for the proposition that in the consumer context "[M]ateriality has been generally defined to include any sort of consumer preference which is more likely to affect the purchasing decision or post-purchase use of the product." The Court

1  finds this authority to be persuasive under the facts of this case where the issue of post-

2  purchase behavior of consumers is at issue.   If a statement or omission is materially

3  misleading, then the trier of fact can presume that plaintiff and the member of any class

4  relied on the statement to their detriment. *Mass. Mutual*, 97 Cal. App. 4th at 1292-1293.

5
   If a statement is misleading and material, then the burden of production (not proof) shifts
6
7  to the defendant to prove that the plaintiff did not actually rely on the statement.

8  Although this analysis is focused on the plaintiffs and not an abstract reasonable

9  consumer, the focus remains on the materiality of the alleged misrepresentation.

10

11
   UCL – FRAUDULENT.
12

13      The motion of Sprint for summary adjudication of the UCL fraudulent cause of

14  action concerning disclosures is DENIED.

15      Plaintiffs have presented triable issues of fact whether Sprint's failure to disclose

16  that the handsets were locked was a material omission that deceived the plaintiffs.   Sprint

17  admits that throughout the class period it has locked every handset it has sold and the

18
   locking feature is not disclosed. See Finerty Dep. at 33, 66, and 117.   The Dennis Report
19
20  at ¶ 14 suggests that 84% of Sprint purchasers are unaware of the locking feature.  Sprint

21  makes a number of representations concerning the capabilities of the handsets that it sells.

22  For example, all of Sprint's handsets are brand name handsets such as Nokia, Sanyo, and

23  Kyocera, etc., operate as dual or tri-band handsets, and are CDMA capable.  See

24
   Henderson Dec. at ¶¶1-26 and Exhibits 1-25 attached thereto (disclosures made in Sprint
25
26  stores); Dennis Dec, Exh C (consumer understanding of disclosures); Fisher Decl. Exh.

27  R. The Court finds triable issues of material fact exist concerning whether plaintiffs

6

1 might have reasonably believed that the Sprint handsets were and are usable on networks

2 other than Sprint's.   The failure to disclose the locking feature is arguably material

3 because it affects the capabilities of the handsets.   Sprint's PMK admits that the

4 representation from Sprint that "Your PCS phone will not accept the services of any

5 wireless provider other than Sprint" is literally false.  Finerty Dep. at page 79 and Zicker

6

7 Decl. at ¶¶17-19.   If the omission was material, then the trier of fact can presume that

8 members of the plaintiff class relied on the omission.

9 　　　　　The Court has considered Sprint's argument that its failure to disclose that the

10 handsets were locked is not material because it did disclose that its phones "will not

11 accept the services of any wireless provider other than Sprint."  Sprint argues that as long

12 as consumers are informed that the phones will not work with any other carrier, it is

13 irrelevant why they will not work with any other carrier.   This presents another disputed

14

15 issue of material fact concerning whether plaintiffs in purchasing their phones from

16 Sprint would want to know why their phones will not work with any other carrier and

17 whether it would affect the economic behavior of plaintiffs in their purchase and use of

18 Sprint handsets.   This is a fact issue that the Court cannot resolve at summary judgment.

19

20 　　　　　Plaintiffs have presented triable issues of fact whether consumers have suffered an

21 injury because they purchased locked handsets.  The evidence on this issue is primarily

22 expert economic testimony.  Sprint has two arguments.  First, that the sales price

23 reflected the value of a locked phone – the "consumers got what they paid for" argument.

24 Ecomomides Depo. This is a disputed fact issue because it presumes that consumers were

25 fully informed when they paid for the phone they got.  Second, Sprint presents evidence

26

27 that carriers simply did not activate phones unless the activating carrier also sold the

7

1  phone, with the result that locked and unlocked phones are equally transportable, i.e., not

2  transportable at all.  Sprint then argues that a locked phone and an unlocked phone were

3  functionally equivalent even if the locked phone has diminished technical capabilities.

4  Plaintiffs offer evidence challenging Sprint's arguments in this regard.  See Dietel Decl.

5  at ¶13 "Verizon Wireless's policy is to activate that handset."  Fisher Decl. Exh. BB re

6  Tara Pal e-mail "So the Verizon customer is …[able to] purchase the Sprint PCS handset,

7  find a tech from Verizon, and transfer the software over to work on the Verizon network."

8  Fisher Decl. Exh. Z, Ron Hall e-mail "If there is a question to whether Alltel customers

9  are coming and buying our phones and having them activated on Alltel, they are."

10  Further, there are triable issues of material fact regarding whether consumers could

11  transport unlocked phones from carrier to carrier.  See Zicker Dep. at pages 25, 28-29

12  where Dr. Zicker suggests that a Sprint phone reprogrammed for Verizon "would work

13  exactly the way all other Verizon phones work."  See also, Fisher Decl. Exh. AA Ron Alt

14  e-mail "If the handset hardware is identical to what SPCS [Sprint PCS] has approved,

15  having the reseller re-flash the handsets with SPCS software and the PRLs [preferred

16  roaming lists] should result in handsets identical to the SPCS phones."

17          The Court finds triable issues of material fact exist with regard to whether class

18  members have suffered injury in fact and lost money or property based upon the alleged

19  material misrepresentations and omissions concerning handset locking.   Mr. Fazio

20  testified that disclosure of the lock in the Palm example leads to a $50 price difference.

21  See 1/23/06 Fazio Decl. ¶10 and Exh. I.   Dr. Dennis 's survey provides evidence that

22  consumers prefer by a 7-1 margin unlocked phones and that some consumers (15%)

23  would be unwilling to purchase a locked handset at any price.  See Dennis Report ¶¶ 17,

19. The Dennis Report also suggests that consumers would require on average a $55 discount to purchase a locked handset instead of an equivalent unlocked handset. Dennis Report ¶17. The diminution in value based on locking is also reflected in the testimony of Mr. Dippon. Mr. Dippon testified that a person selling an "unlocked" handset over the internet would expect to "get more money" because the handset was unlocked. Dippon Depo. At 85:24-86:22.

UCL – UNLAWFUL.

The motion of Sprint for summary adjudication of the UCL unlawful cause of action concerning disclosures is DENIED. The UCL unlawful cause of action borrows from the CLRA. The analysis of the UCL-fraudulent cause of action regarding materiality, causation, and damages applies equally to the UCL-unlawful cause of action.

UCL – UNFAIR.

Applying the FTC test for unfairness, the motion of Sprint for summary adjudication of the UCL unfair cause of action concerning matters other than disclosures is GRANTED.

The UCL unfair cause of action concerns whether it is unfair for Sprint to sell handsets that work only with the wireless service provided by Sprint. The UCL unfair cause of action concerns the act of locking and not the failure to disclose the locking. Therefore, for purposes of considering this claim the Court assumes that Sprint's disclosures were adequate. In addition, the UCL unfair cause of action does not include any conspiracy among the Defendants, so the Court considers Sprint's actions alone and

1   not in the context of an industry with similar practices. The Court understands that

2   antitrust claims alleging an industry-wide conspiracy are being asserted elsewhere.

3       The FTC section 5 test requires Plaintiffs to prove: (1) The consumer injury must

4   be substantial; (2) the injury must not be outweighed by any countervailing benefits to

5   consumers or competition; and (3) it must be an injury that consumers themselves could

6   not reasonably have avoided.

7

8       Sprint does not address whether the consumer injury was substantial.

9       The undisputed evidence demonstrates that the arguable injury to consumers from

10  locking was outweighed by countervailing benefits to consumers or competition. Sprint

11  has identified benefits to consumers or competition in the form of higher quality within

12  the Sprint system and greater control of hardware with the Sprint brand. (Dec. of Charles

13  Jackson.) Sprint's motivations and the benefits of locking are disputed. (Dec. of

14  Zimmer.) Even though the motivations for and benefits of locking are disputed, the

15  evidence of injury is so slight that it is undisputed that the benefits of locking outweigh

16  the arguable injury to consumers.

17

18      The undisputed evidence demonstrates that (assuming full disclosures) consumers

19  could reasonably have avoided the injury of buying Sprint's locked handsets. Consumers

20  could have purchased handsets from other carriers.

21

22

23  CLRA

24      The motion of Sprint for no merit determination of the CLRA cause of action

25  concerning disclosures is DENIED. The analysis of the UCL-fraudulent cause of action

26

27

1  regarding materiality, causation, and damages applies equally to the CLRA cause of

2  action.

3

4  EVIDENCE/MOTIONS TO STRIKE.

5      The evidentiary objections by the parties are OVERRULED except as specifically

6

7  stated otherwise in this order. *City of Long Beach v. Farmers & Merchants Bank of Long*

8  *Beach* (2000) 81 Cal.App.4th 780 (noting importance of evidentiary decisions). The

9  Court's consideration of the evidence is limited to this motion only and is not to be

10  construed as an indication of admissibility in future motions or at trial.

11      The Court DENIES the motion of Sprint to strike or exclude the Declaration of

12  Van Henderson. Ms. Henderson is an investigator who was hired by Plaintiffs to make

13

14  observations about Sprint's business practices. Ms. Henderson is not an "expert." Ms.

15  Henderson is both a percipient witness and an agent of counsel. In that circumstance,

16  Ms. Henderson was required to testify about her relevant perceptions of Sprint's business

17  practices and to provide testimony regarding her potential for bias and motive, but was

18  not required to reveal all her communications with Plaintiffs' counsel.

19

20      The Court DENIES the motion of Sprint to strike portions of the Declaration of

21  Dr. J. Michael Dennis. Dr. Dennis performed a survey of consumer knowledge and

22  expectations. Sprint argues that the Court should exclude the survey because it is not

23  based on reliable and accepted statistical principles and it measures matters that are not

24  germane to the questions before the Court. The Court has considered the Declaration of

25  Dr. Dennis. The trier of fact can evaluate what weight to give to Dr. Dennis's

26

27  Declaration or testimony at trial.

The Court DENIES the motion of Sprint to Strike the Declaration of Robert Zicker. The trier of fact can evaluate what weight to give to Mr. Zicker's Declaration or testimony at trial. The Court considers the attachments to the Zicker Declaration only as foundation to Zicker's testimony and not for the truth of the mattes asserted in those attachments.

The Court GRANTS the motion of Plaintiffs to strike the factual assertions of Sprint based on the conclusions of Judge Denise Cote in *In re Wireless Tel. Servs. Antitrust Litig.* (S.D.N.Y. 2005) 385 F. Supp. 2d 403. The federal case has no claim or issue preclusion effect and the factual statements of Judge Cote are hearsay.

Dated: January /2, 2007

_____
Judge Ronald M. Sabraw

**Case Title/No.:**    **Cellphone Termination Fee Cases JCCP004332**

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the Alameda County Superior Court and not a party to this cause. I served this ORDER (1) DENYING MOTION OF SPRINT FOR SUMMARY ADJUDICATION OF UCL AND CLRA DISCLOSURE CLAIMS, (2) GRANTING MOTION OF SPRINT FOR SUMMARY ADJUDICATION OF UCL "FACT OF LOCKING" CLAIM, AND (3) DENYING MOTION S TO STRIKE EVIDENCE by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

**Plaintiff's Liaison Counsel**

Alan R. Plutzik, Esq.
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598

**Defendant's Liaison Counsel**

Kristen Linsley Myles, Esq.
John Hunt, Esq.
MUNGER, TOLLES & OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907

**Defendant's Liaison Counsel**

Christopher Hockett, Esq.
Thomas S. Hixson, Esq.
BINGHAM McCUTCHEN, LLP
Three Embarcadero Center, Suite 1800
San Francisco, CA 94111


Dated: January 17, 2007

Executive Officer/Clerk of the Superior Court

By _____

*Elizabeth Opelski-Erickson, Deputy Clerk*