UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                 :

In re Scotts EZ Seed Litigation         :           12-CV-4727 (VB)

                                 :
                                 :
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS'
## <u>PROFFERED DAMAGES EXPERT RAMAMIRTHAM SUKUMAR</u>

HUNTON & WILLIAMS LLP
Shawn Patrick Regan
Joshua S. Paster
200 Park Avenue
New York, NY 10166

- and -

Samuel Danon (*pro hac vice*)
Jason B. Sherry
1111 Brickell Avenue, Suite 2500
Miami, FL 33131

Joshua M. Kalb (*pro hac vice*)
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307

Neil K. Gilman
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Defendants The Scotts
Miracle-Gro Company and The
Scotts Company LLC*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      Legal Standard. ...................................................................................................... 3

          A.      Federal Rule of Evidence 702. ................................................................. 3

          B.      *Daubert* Imposes a "Gatekeeping" Obligation. ...................................... 4

          C.      The Interplay Between *Daubert* and Federal Rule of Evidence 403. ..........4

II.     The Court Should Exclude Sukumar's Testimony Because It Does Not Fit the Case. ............................................................................................................... 5

          A.      To Establish Injury and Damages, Plaintiffs Must Prove the Difference Between the Actual Price of EZ Seed and Its "True Market Value." ........................................................................................ 6

          B.      Sukumar's Opinions Do Not Fit Plaintiffs' Legal Theory ......................... 6

          C.      Sukumar's Opinions Will Not Help the Jury and Are Inadmissible. .......... 9

III.    Sukumar's Methodology and His Application of That Methodology Are So Flawed That His Testimony Is Inadmissible. ....................................................... 10

          A.      Sukumar's Methodology Is Unsound Because It Is Not Capable of Answering the Questions Relevant To This Case. ..................................... 10

          B.      Sukumar's Opinions Are Unreliable Because He Made Significant Errors In Application Of His Methodology. ............................................. 10

                1.      Sukumar Made An Error Across His Calculations That Greatly Skewed His Results. ................................................................... 11

                2.      When Sukumar's Calculation Error Is Fixed, His Results Are Revealed To Be Absurd. ............................................................. 12

          C.      Sukumar's Opinions Are Inadmissible Because He Did Not Follow His Own Professed Methodology. .......................................................... 15

          D.      Sukumar's Opinions Are Unreliable Because His Methodology Generated Patently Unreliable Data. ....................................................... 17

          E.      The ASEMAP Methodology Does Not Satisfy the *Daubert* Factors. .................................................................................................. 19

1.   ASEMAP Is Not a Generally Accepted Method to Conduct a
     Conjoint Analysis......................................................................... 20

2.   ASEMAP Has Not Been Adequately Tested or Validated. .......... 21

3.   ASEMAP Has Known Errors and Differs Fundamentally From
     Traditional Conjoint Analysis....................................................... 22

CONCLUSION.................................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

CASES

*Accident Ins. Co. v. Classic Bldg. Design, LLC,*
 2012 WL 3913090 (S.D. Miss. Sept. 7, 2012)...................................................................8

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
 303 F.3d 256 (2d Cir. 2002)....................................................................................3, 4, 9, 17

*Apple, Inc. v. Samsung Elecs. Co.,*
 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ("*Apple v. Samsung*")...........................8

*Astiana v. Ben & Jerry's Homemade, Inc.,*
 2014 WL 60097 (N.D. Cal. Jan. 7, 2014) .........................................................................8

*Baker v. Urban Outfitters, Inc.,*
 254 F. Supp. 2d 346 (S.D.N.Y. 2003)..............................................................................3

*Baldwin v. Bader,*
 2008 WL 2875351 (D. Me. July 23, 2008) ....................................................................20

*Bickham v. Coca Cola Refreshments USA, Inc.,*
 2015 U.S. Dist. LEXIS 156066 (S.D.N.Y. Nov. 18, 2015)......................................10

*Brazil v. Dole Packaged Foods, LLC,*
 2014 WL 2466559 (N.D. Cal. May 30, 2014) ...............................................................6

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
 509 U.S. 209 (1993).................................................................................................................8

*Bruno v. Bozzuto's, Inc.,*
 311 F.R.D. 124 (M.D. Pa. 2015)......................................................................................19

*Celebrity Cruises, Inc. v. Essef Corp.,*
 434 F. Supp. 2d 169 (S.D.N.Y. 2006)............................................................................19

*Club Car, Inc. v. Club Car (Quebec) Import, Inc.,*
 362 F.3d 775 (11th Cir. 2004) .........................................................................................23

*Comcast Corp. v. Behrend,*
 133 S. Ct. 1426 (2013).......................................................................................................5, 6

*Crawford v. SAP Am., Inc.,*
 147 F. App'x 234 (3d Cir. 2005) .....................................................................................8

*Daubert v. Merrell-Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993)................................................................................ passim

*Davis v. Ashcroft,*
   2003 WL 25665777 (D.D.C. Aug. 19, 2003) ........................................19

*Good v. Am. Water Works Co.,*
   310 F.R.D. 274 (S.D. W. Va. 2015)..................................................... 9-10

*Group Health Plan, Inc. v. Philip Morris USA, Inc.,*
   344 F.3d 753 (8th Cir. 2003) ..................................................................9

*Guillory v. Domtar Indus., Inc.,*
   95 F.3d 1320 (5th Cir. 1996) ................................................................19

*Heller v. Shaw Indus., Inc.,*
   167 F.3d 146 (3d Cir. 1999).....................................................................4

*In re NJOY,*
   120 F. Supp. 3d 1050, 1118, 1122 (C.D. Cal. 2015)("NJOY I")............6, 8

*In re NJOY,*
   2016 WL 787415 (C.D. Cal. Feb. 2, 2016)("NJOY II") ........................6, 8

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994)........................................................................4

*In re Scrap Metal Antitrust Litig.,*
   527 F.3d 517 (6th Cir. 2008) ................................................................12

*J.T. Colby & Co., Inc. v. Apple, Inc.,*
   2013 WL 1903883 (S.D.N.Y. May 8, 2013) ............................................5

*Kargo Glob., Inc. v. Adv. Mag. Publ'rs, Inc.,*
   2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)............................................9

*Kass v. West Bend Co.,*
   2004 WL 2475606 (E.D.N.Y. Nov. 4, 2004)..........................................20

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)................................................................................21

*Lippe v. Bairnco Corp.,*
   99 F. App'x 274 (2d Cir. 2004) ..............................................................16

*MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.,*
   132 F. Supp. 2d 289 (S.D.N.Y. 2001)......................................................9

*Saavedra v. Eli Lilly & Co.,*
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .............................................................8

*Schwab v. Nissan N. Am., Inc.,*
   502 F. Supp. 2d 980 (E.D. Mo. 2007).......................................................................8

*United Co. v. Keenan,*
   2007 WL 4260930 (W.D. Va. Nov. 30, 2007) .......................................................20

*Univ. Surveillance Corp. v. Checkpoint Systems, Inc.,*
   2015 WL 6082122 (N.D. Ohio Sept. 30, 2015)........................................................8

OTHER AUTHORITIES

Federal Rule of Evidence 403 ................................................................................ passim

Federal Rule of Evidence 702 ................................................................................ passim

Rule 702 and 403 ......................................................................................................5

Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC (collectively, "Scotts") hereby move for entry of an order excluding the opinions of Dr. Ramamirtham Sukumar, one of Plaintiffs' proffered experts in this matter. Sukumar's opinions are inadmissible under Federal Rule of Evidence 702, Federal Rule of Evidence 403, and *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## INTRODUCTION

Sukumar's report is intended to support Plaintiffs' theory that the claim "50% thicker with half the water* *Versus ordinary seed when each was watered at half the recommend rate. Results may vary." (the "50% Thicker Claim") is misleading and resulted in a "price premium" for EZ Seed. For several reasons, Sukumar's report does no such thing.

First, Sukumar does not even purport to measure a price premium. Instead, he purports to measure the amount Scotts would have needed to lower the price in order to make the same amount of sales. Sukumar did little more than ask a supposedly random sample of people what they would have preferred to pay for EZ Seed with and without the 50% Thicker Claim. That is not a sound methodology to demonstrate a price premium because it ignores what Scotts would have charged in the absence of the claim. This is not a "price premium" as defined by any case (or common sense), and his entire report is irrelevant to any issue in the case. In the parlance of *Daubert* and Rules 403 and 702, Sukumar's opinion does not "fit" this case.

Second, even if Sukumar tried to measure a "price premium," his supposed conjoint survey is incapable of doing so. Sukumar admitted at his deposition that his survey method ignores supply-side factors. Thus, his method *cannot* answer the question this case asks. Such a method is not reliable under *Daubert*.

Third, even on its own terms, Sukumar's report and calculation is, to be charitable, a mess. As explained in the report of Dr. David Reibstein, Sukumar's report contains a basic math

error with profound implications for his conclusions. Simply fixing that error results in the "price premium" found by Sukumar being greater than the price of the product. In other words, Sukumar's conclusion is that in order to sell the same number of units without the claim, Scotts would have had to pay customers to take EZ Seed. This is obviously nonsensical, and a methodology that results in such a finding cannot be reliable.

Fourth, Sukumar did not follow his own purported methodology. The responses to Sukumar's survey were incapable of generating valid and reliable data on which to base any results. Compounding this issue, Sukumar stated both in his report and his deposition that it would have been wrong to exclude certain respondents from his calculations. Yet that is exactly what he did. What is even worse, Sukumar's deposition revealed that he was not even aware this was what he had done.

Fifth, Sukumar's survey generated unreliable data. Indeed, over 80% of the survey respondents provided at least one illogical answer.

Finally, putting aside Sukumar's errors, the ASEMAP methodology used by Sukumar is an inadmissible and unreliable methodology for several reasons. The technique has not been peer-reviewed or validated.

## BACKGROUND

Sukumar utilizes a survey methodology known as Adaptive Self-Explication of Multi-Attribute Preferences ("ASEMAP") as part of what he terms ███████████████████████████ ████████████████████ (*See* Ex. 17.[1]) ASEMAP employs four steps to arrive at certain crucial metrics for its analysis.[2] In the first step, survey takers, referred to as respondents, rate product features on a scale from 1 to 10. In the second step, respondents are asked to rank pre-

---

[1] All Exhibits are attached to the Omnibus Declaration of Shawn Patrick Regan.

[2] A more robust explanation of the ASEMAP methodology is present in the record. (*See* Ex. 5 ¶ 29.)

selected features by their importance.  In the third step, respondents are presented with multiple pairwise comparisons and asked to allocate 100 points between two features to determine their relative importance (e.g., distributing 100 points between product price and packaging).  In the fourth step, ASEMAP generates a number of hypothetical grass seed profiles (i.e., grass seed products with different sets of features) and asks respondents how likely they are to purchase those products.  These condensed four steps provide the metrics which are used in essentially three equations that purport to produce a price premium for the 50% Thicker Claim.  (*See* Ex. 5 ¶¶ 37-39.)  The metrics obtained are then input to three main equations which will be discussed later.  *Id.*  This is the manner in which Sukumar claims to have performed his methodology, but as will be illustrated below, he often departed from his stated methodology.

## ARGUMENT

I.   **Legal Standard.**

   A.   **Federal Rule of Evidence 702.**

   Federal Rule of Evidence 702 establishes the admissibility of expert testimony.  Rule 702 permits a qualified expert to testify if:  (1) the expert's scientific, technical, or other specialized knowledge will assist the fact-finder to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.   Plaintiffs must establish the admissibility of Sukumar's testimony by a preponderance of the evidence.  *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352-53 (S.D.N.Y. 2003).  The trial court is given broad discretion to admit or exclude expert testimony and does not abuse its discretion unless the decision is "manifestly erroneous."  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

**B.**     *Daubert* **Imposes a "Gatekeeping" Obligation.**

*Daubert* and its progeny control the interpretation of Rule 702.  In *Daubert*, the Supreme

Court held that Rule 702 imposes a "gatekeeping" obligation on trial courts to ensure that expert

testimony "is not only relevant, but reliable."  509 U.S. at 589.  As part of its gatekeeping

obligation, the Court's analysis should focus on whether each step of Sukumar's methodology is

reliable.  *See Amorgianos*, 303 F.3d at 265 ("[T]he *Daubert* requirement that the expert testify to

scientific knowledge—conclusions supported by good grounds for each step in the analysis—

means that *any* step that renders the analysis unreliable under the *Daubert* factors *renders the

expert's testimony inadmissible*.") (emphasis supplied) (citing *In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 745 (3d Cir. 1994)).  Indeed, "the reliability analysis applies to all aspects of an

expert's testimony:  the methodology, the facts underlying the expert's opinion, the link between

the facts and the conclusion, *et alia*."  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.

1999).  A failure to follow the expert's prescribed methodology renders the testimony

inadmissible.  *See Amorgianos,* 303 F.3d at 269 ("Because [the expert]'s opinion rested on a

faulty assumption due to his failure to apply his stated methodology reliably to the facts of the

case, [the] expert['s] opinion ... was not based on good grounds.") (citation omitted) (quotation

omitted).

**C.**     **The Interplay Between** *Daubert* **and Federal Rule of Evidence 403.**

In *Daubert,* the Supreme Court of the United States instructed that when assessing the

admissibility of expert testimony under Federal Rule of Evidence 702, trial courts "should also

be mindful of other applicable rules," and the Court specifically mentioned Federal Rule of

Evidence 403.  Rule 403 states that the Court "may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following:  unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." The danger of prejudice is heightened with expert evidence: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 506 U.S. at 595 (citation omitted). Put in other words, the Court is afforded wide latitude in weighing the probative value of Sukumar's testimony against its potential for prejudice, bearing in mind that expert testimony "can be both powerful and misleading." *Id.* That is the case here, where the methodology does not even seek to find the relevant conclusion and is so flawed, the expert testimony is rendered inadmissible under both Rule 702 and 403. *See J.T. Colby & Co., Inc. v. Apple, Inc.*, 2013 WL 1903883, at *19 (S.D.N.Y. May 8, 2013).

## II.     The Court Should Exclude Sukumar's Testimony Because It Does Not Fit the Case.

The measure of damages for Plaintiffs' price-premium theory is the difference between the actual price of EZ Seed and the "true market value" of the product without the 50% Thicker Claim on the label. Rudimentary economic principles state that price lies at the intersection of supply and demand. Analysis of merely supply-side or merely demand-side factors would lead to unreliable results. The proper way to calculate a price premium, then, is to analyze the behavior of buyers *and sellers*. (*See* Ex. 1 ¶ 48.)

But that is not what Sukumar calculated. Instead, Sukumar tried to determine ███████ ████████████████████████████████████████████████████████. The Supreme Court requires that a "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributed to [Plaintiffs'] theory." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Sukumar's opinions do not pass that test, and they will not help the jury because they address the wrong issue. Thus, his opinions do not fit the case and are inadmissible under Federal Rules of Evidence 403 and 702.

**A.      To Establish Injury and Damages, Plaintiffs Must Prove the Difference Between the Actual Price of EZ Seed and Its "True Market Value."**

To prove their case, Plaintiffs must establish a price premium attributable to the 50% Thicker Claim.  A "price premium" is the difference (if any) between the price at which EZ Seed was sold to consumers with the 50% Thicker claim and the price at which EZ Seed would have been sold had Scotts not included the 50% Thicker claim.  *In re NJOY*, 120 F. Supp. 3d 1050, 1118, 1122 (C.D. Cal. 2015) ("*NJOY I*") (price-premium calculated "by taking 'the difference between *the market price actually paid* by consumers and the *true market price* that reflects the impact of the unlawful, unfair, or fraudulent business practices.'") (emphasis in original) (citations omitted); *In re NJOY*, 2016 WL 787415, at *5-7 (C.D. Cal. Feb. 2, 2016) ("*NJOY II*") (same); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *15 (N.D. Cal. May 30, 2014) (mislabeling premium calculated "by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices").

**B.      Sukumar's Opinions Do Not Fit Plaintiffs' Legal Theory.**

The first step in any price premium analysis should have been to determine the price at which EZ Seed would have sold if Scotts did not include the 50% Thicker Claim.  *See Comcast*, 133 S.Ct. at 1433 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (emphasis supplied) (quoting Mark A. Allen et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432 (3d. ed., 2011)) (attached as Ex. 54).  A damages expert must first construct a "but-for scenario" and then compare it to the harm from "what actually happened." (Ex. 54 at 432.)  Sukumar never did that:



(Ex. 18 at 55:2-9.)  Instead of estimating "but-for" prices, Sukumar performed a different

calculation.  He ███████████████████████████████████████████████████████████████

██████████████████████████████████████████.[3]  (*See id.* at 45:9-15.)  This is

different than the amount prices would fall—if they would fall at all—in the "but-for" world

(regardless any changes in the number of units sold). (*See* Ex. 1 ¶ 47.)

With information only about willingness to pay, Sukumar was left unable to even

speculate about the price of EZ Seed in the but-for world without the 50% Thicker claim:



(Ex. 18 at 60:25-61:8.)[4]

Sukumar never addressed, and his chosen methodology *cannot* address, how Scotts or its

competitors would have reacted to the removal of the 50% Thicker Claim.  Instead of

determining the price "but for" the presence of the 50% Thicker Claim on the EZ Seed

packaging, he tried to ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

---

[3] Sukumar's definition of "price premium" is ████████████████████████████████████
████████████████████ (Ex. 17 at 4.)

[4] Sukumar's admission █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████ (*See* Ex. 18 at 93:13-95:7.)  But Sukumar's personal definition of "price premium" requires
████████████████████████████████████████████████████ (*See id.* at 246:5-10
████████████████████████████████ ").)  Sukumar went so far as to assert that █
████████████████████████████████████████████ (*See id.* at 70:4-7 █████████████ ").)

[5] The notion that Scotts would have made no claim on its packaging in the "but for" world is not supported
by any factual analysis.  In fact, Sukumar conducts no analysis at all, but, rather, simply assumes it.  Sukumar's

███████████████████████████████████████████

███████████████████████████████████████████  (Ex. 18 at 60:25-61:8,

61:19-62:4.)

Sukumar's testimony is inadmissible because his entire methodology seeks a conclusion

of no value to this case: "[a] consumer's subjective valuation of the purported [50% Thicker]

message, measured by their relative willingness to pay for products with or without the message,

is not an accurate indicator of restitutionary damages, because it does not permit the court to

calculate the true market price of [EZ Seed] absent the purported misrepresentations." *NJOY I*,

120 F. Supp. 3d at 1122. As one court stated, it could find "no case holding that a consumer may

recover based on consumers' willingness to pay irrespective of what would happen in a

functioning market (*i.e.* what could be called sellers' willingness to sell)." *Id.* at 1120. *See also*

*Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *3-6 (C.D. Cal. Dec. 18, 2014) (same); *NJOY*

*II*, 2016 WL 787415, at *5-7; *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *11 (N.D.

Cal. Mar. 6, 2014) ("*Apple v. Samsung*");[6] *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL

---

assumption is belied by the real world fact that when Scotts removed the 50% Thicker Claim it replaced it with another claim, namely that EZ Seed "holds up to 6x its weight in water" (the "6x Claim"). (Ex. 50 at SMG-EZ0156442; Ex. 39 at 98:4-10.) Contradiction of assumptions by real-world facts is grounds for exclusion. *See, e.g.*, *Schwab v. Nissan N. Am., Inc.*, 502 F. Supp. 2d 980, 984 (E.D. Mo. 2007) ("Plaintiffs have failed to establish … that the parameters … are appropriately correlated to real world events or to the specific facts in this case."); *Crawford v. SAP Am., Inc.*, 147 F. App'x 234, 239 (3d Cir. 2005) ("[T]he district judge did not err in rejecting Plaintiffs' hypothetical damage claims in favor of data pertaining to Titan's actual performance in 1999 and 2000."); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (holding that "expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them" and that "'expert opinion evidence … has little probative value in comparison with the economic factors' that may dictate a particular conclusion"); *Accident Ins. Co. v. Classic Bldg. Design, LLC*, 2012 WL 3913090, at *13 (S.D. Miss. Sept. 7, 2012) (holding that an expert's "opinions are 'unreliable' and 'irrelevant' (and thus inadmissible under Rule 702), since they were based on [an] erroneous assumption"); *Univ. Surveillance Corp. v. Checkpoint Systems, Inc.*, 2015 WL 6082122, at *22 (N.D. Ohio Sept. 30, 2015) (excluding an expert's testimony because it was "premised on a fictitious set of facts that contradict the undisputed evidence"). In spite of removing the 50% Thicker Claim, which according to Sukumar's methodology should result in Scotts having to pay consumers to maintain the same number of unit sales, *Scotts sold nearly the same number of units without the claim at a higher price.* (Ex. 1 ¶ 57 n.110.)

[6] The court in *Apple v. Samsung* found the expert's survey failed to calculate a proper "price premium" where the "survey measures the market demand for the patented features in a vacuum, without relation to the actual price or value of the devices" and because "his figures do not reflect 'what people would actually pay in the marketplace,'" and therefore the survey "leaves the Court with no way to compare [] willingness to pay metrics—

60097, at *12 (N.D. Cal. Jan. 7, 2014) ("Plaintiff has not offered any expert testimony demonstrating that the market price of Ben & Jerry's ice cream with the 'all natural' designation was higher than the market price of Ben & Jerry's without the "all natural" designation. Thus, by definition, there is no evidence showing how much higher the price of one was than the other."). Sukumar's testimony puts the jury no closer to determining the difference between what the class members actually paid and a "true market price" and this mandates its exclusion.

### C.    Sukumar's Opinions Will Not Help the Jury and Are Inadmissible.

Plaintiffs rely on Sukumar to establish both injury and damages. But the purported injury and damages on which he opines—derived from his respondents' "willingness to pay"—does not match Plaintiffs' legal theory.  To be relevant and admissible, an expert opinion must "'fit[]' the facts of the case" in order to "assist the trier of fact to understand the evidence or to determine a fact in issue." *MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 291 (S.D.N.Y. 2001).  Where a survey opinion does not "fit" with an issue to be resolved, it "should be excluded under Federal Rule of Evidence 403" because "its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury." *Kargo Glob., Inc. v. Adv. Mag. Publ'rs, Inc.*, 2007 WL 2258688, at *6 (S.D.N.Y. Aug. 6, 2007) (citations omitted). Sukumar's opinions address the wrong issue:   the difference between actual price and his respondents' willingness to pay, rather than the difference between actual price and a "true market value," calculated based on both willingness to pay and willingness to sell.  That severs any "'legal nexus between the [alleged] injury and the defendants' wrongful conduct' and thus does not properly 'fit' the [Plaintiffs'] case." *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003) (quoting *Amorgianos*, 303 F.3d at 270). *See also, e.g.,*

---

which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices." 2014 WL 976898, at *11.

*Good v. Am. Water Works Co.*, 310 F.R.D. 274, 292-93 (S.D. W. Va. 2015) (excluding experts' "model of consumer willingness to pay" because it did not "fit[] closely enough to the facts of this case to be helpful or relevant under *Daubert*").

### III. Sukumar's Methodology and His Application of That Methodology Are So Flawed That His Testimony Is Inadmissible.

Even if Sukumar attempted to calculate a legally cognizable price premium (which he did not), his attempt is so flawed and so lacking in scientific merit as to require its exclusion. That is precisely where the Court's gatekeeper function becomes critical. *See Bickham v. Coca Cola Refreshments USA, Inc.*, 2015 U.S. Dist. LEXIS 156066, * (S.D.N.Y. Nov. 18, 2015) (this Court exercising its gatekeeper function and excluding expert testimony) (citing *Daubert*, 509 U.S. at 597).

#### A. Sukumar's Methodology Is Unsound Because It Is Not Capable of Answering the Questions Relevant To This Case.

Sukumar never calculated the proper measure of damages because the method he used is not capable of doing that. At his deposition, Sukumar explained ███████████████ ██████████████████████████████████████ (Ex. 18 at 71:22-23. *See also id.* at 38:7-10 ███████████████████████████████████████ ██████████████████████████████ ) (emphasis added).) That is not merely a fit problem implicating Rule 403—it is a methodology problem implicating Rule 702. His methodology cannot do the thing the case requires, so it cannot produce reliable, relevant answers.

#### B. Sukumar's Opinions Are Unreliable Because He Made Significant Errors In Application Of His Methodology.

Sukumar made a crucial error in his work that ineluctably corrupts his conclusions. In using the output from ASEMAP, he used the wrong set of numbers to do part of his

calculation—essentially, he made a typo in a formula in an Excel spreadsheet, which caused his error to metastasize to the entirety of his work.  The mistake would have been a happy one for Plaintiffs had Scotts not caught it.  With the mistake, Sukumar's results might have seemed plausible.  With the mistake corrected, his results become absurd, and demonstrate that his methodology is fundamentally flawed and incapable of answering even the incorrect question that Sukumar asked.

      **1.**     *Sukumar Made An Error Across His Calculations That Greatly Skewed His Results.*

Sukumar purports to calculate the price premium—as he defines it—associated with the 50% Thicker Claim by comparing the utility of the claim (i.e., the importance of the 50% Thicker Claim to the individual as revealed through the survey questions) with the utility of a dollar (as also revealed for each individual through the survey questions).  The main equation is:



The denominator of Sukumar's main equation is the ▓▓▓▓▓▓▓▓▓▓.  It can be summarized as follows:

(*See* Ex. 5 ¶ 38.)

But this is not the equation that Sukumar actually used.  While he likely intended to use it, he made a mistake.  He pulled into his equation the wrong column from his Excel spreadsheet.  As explained in Dr. Reibstein's report, this resulted in Sukumar including the utility of the 50% Thicker Claim in the denominator using the following mistaken calculation:



(*See* Ex. 5 ¶ 40.)  In other words, as carried out, Sukumar allowed ████████████

████████████████████████████████████████████████████████████

This is wholly inconsistent with the methodology suggested by Sukumar and outlined in the sole

paper describing ASEMAP (discussed below).   More importantly, the mistake puts the

methodology ████████████████████████████████████████████[7]

Ex. 5 ¶ 41 (emphasis supplied).)  Indeed, although Sukumar was unaware of his mistake, he has

admitted ████████████████████ Sukumar testified unequivocally that ████████████

████████████████████████████████████████████████████████████

████████████████████   (Ex. 18 at 231:24-233:19, 302:25-309:21; Ex. 17 at 14-15.)

This is not a minor misstep that goes to credibility—this error skews his results and

contaminates all of his conclusions.  A "significant error in application" of this kind renders

testimony inadmissible.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008)

("[A]ny step that renders the analysis unreliable… renders the expert's testimony inadmissible.")

(quoting Fed. R. Evid. 702 adv. comm. note, 2000 amd.).  "[T]o warrant admissibility … it is

critical that an expert's analysis be reliable at every step." *Id.* at 267.

### 2.   *When Sukumar's Calculation Error Is Fixed, His Results Are Revealed To Be Absurd.*

When  Sukumar's  calculation  errors  are  corrected,  the  unreliable  nature  of  his

methodology is thrown into sharp relief.  Sukumar states that ████████████████████

When the formula Sukumar contends is the correct formula is used, his methodology results ████

████████████████████████████████████████████ Reibstein Rep.  ¶ 42-3.

─────────────────────

[7] In his report, Dr. Reibstein explains in greater detail the mechanics of how Sukumar made this mistake. (Ex. 5 ¶¶ 37-44.)

Sukumar actually finds that ██████████████████████████████████

███████████████████ This is also radically different from Sukumar's reported conclusion of a

██████████████████████.

Thus, after correcting for his calculation error, Sukumar's analysis suggests that Scotts

would have to pay customers to take the EZ Seed product without the claim just to sell the same

number of units. In Sukumar's own words, ████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████ (Ex. 98 ¶ 18.)

In fact, Sukumar conceded that results even less absurd than his would indicate an error.

For example, he would ████████████████████████████████████████

████████████████████████████████████████████████████████:



...

(Ex. 18 at 216:18-217:11.)  When posed with a hypothetical price premium *less than* what his

calculations—post correction—would show, Sukumar conceded ███████████████████

███████████████:

...

(*Id.* at 217:20-218:17.)

-13-

Moreover, applying Sukumar's methodology correctly to the other features of EZ Seed that he surveyed leads ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████. This table summarizes Dr. Sukumar's findings for the tested features and related price premiums:



Taken in the aggregate, the results of Sukumar's method become surreal: ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ – such as

---

[8] (Ex. 5 at incorporated exhibit 5A, 'Bias Adjusted Premium' column.)  The figures are based on Sukumar's 510 "high quality" "main sample." Considering only those respondents actually included in Sukumar's analysis results in a total of $62.83 for the 18 features listed above.

the species of grass, whether the product is meant for patching or new lawns, or fungicide treatment, among others – that Sukumar did not address in his survey.

While the total value attributable to the product's features need not perfectly match the average price of the product, the fact that the total is higher by more than an order of magnitude is evidence that Sukumar's methodology finds price premiums well beyond what real-world facts would suggest. (*See* Ex. 5 ¶ 69.) Once Sukumar's math error is corrected, the implausible and illogical results demonstrate that Sukumar's methodology is unreliable and should be excluded.

**C.    Sukumar's Opinions Are Inadmissible Because He Did Not Follow His Own Professed Methodology.**

In his report, Sukumar claimed 

(*See* Ex. 5 ¶ 45.) That is false. Sukumar (or his assistants) excluded far more, indeed most, respondents. Even more remarkably, Sukumar was wholly unaware of these exclusions and insisted at deposition that ▮▮▮▮▮▮▮▮. The indisputable fact is that contrary to his professed methodology, Sukumar arbitrarily and randomly excluded respondents.

Sukumar collected data from ▮▮▮▮▮▮. After applying ▮▮▮▮▮▮ ▮▮▮▮▮▮), he states in his report that ▮▮▮▮▮▮. He deemed these respondents ▮▮▮▮▮▮

▮▮▮▮▮▮. (Ex. 17 at 16; Ex. 18 at 198:21-199:18.)

Dr. Reibstein undertook a detailed review of Sukumar's work and found that Sukumar did something very different, which he explains in great detail. (*See* Ex. 5 ¶ 47.) Instead of

███████████████████████    ███████████████████████
███████████████████████████████████████████████████████

(*Id.* ¶ 48.)   That is far fewer than what Sukumar maintains he used and only highlights the arbitrariness and unreliability of Sukumar's testimony.  (*Id.* ¶ 53.)

Even more incredibly, Sukumar included ***different*** Respondents in the numerator and denominator of his equation.  As noted above, Sukumar's equation is:



As Dr. Reibstein explains in detail, Sukumar included the data for a large number of individuals in the numerator, but did not include them in the denominator.  ████████████████ ███████████████████████████████████████████████████████████████.

(*See generally* Ex. 5 ¶¶ 49-61.)  █████████████████████████████████████ ███████████████████████████. (*Id.* at ¶ 60.)  Sukumar was unable to explain why he did this because he did not even know he did it.  However, he admits that ███████ ███████████████████████████████████████.

███████████████████████████████████████████████████ ███████████████████████████████████████████.

(Ex. 18 at 362:6-11 (emphasis added).)

There is no valid explanation for the different sets of respondents used in the numerator and denominator.  That alone warrants exclusion: expert testimony should be excluded when the expert fails to adequately explain how or why certain methodological steps were taken.  *See Lippe v. Bairnco Corp.*, 99 F. App'x 274, 278-79 (2d Cir. 2004) (affirming exclusion of valuation experts who could not explain *why* they chose certain methods and *how* they applied

control premium); *Amorgianos,* 303 F.3d at 269 ("Because [the expert]'s opinion rested on a faulty assumption due to his failure to apply his stated methodology reliably to the facts of the case, [the] expert['s] opinion … was not based on good grounds.") (citation omitted) (quotation omitted).

### D. Sukumar's Opinions Are Unreliable Because His Methodology Generated Patently Unreliable Data.

The Court should also exclude Sukumar because the bulk of the data his survey generated was unreliable, as demonstrated by the fact that the overwhelming majority of the respondents professed to have irrational or internally-contradictory preferences. Sukumar's █████████

█████████████████████████████████████

As stated before, all the respondents were presented with pairwise comparisons where they had to allocate points between different features. They were asked to, for example, ████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████The majority of survey takers whose responses form the entirety of Sukumar's data expressed a preference for higher prices in at least some instances.

Focusing solely on price, ███████████████████████████████

███████████████████████████████████████████

█████████████.[9]  Below is a summary:[10]

---

[9] Sukumar tried to explain this away at deposition by asserting that ████████████████████ ██████████████████ (Ex. 18 at 267:21-268:20.)  This is probably true, but it does not help Sukumar. █████████████████████████ (*See id.* at 266:22.) His testimony that a█████████████████████.

[10] The table and further detail regarding the incorrect nature of the data is in the record. (*See* Ex. 5 ¶¶ 74-79.)



This phenomenon is not limited to price features, but other features as well.[11]  All in all, █████

████████████████████████████████████████████████████████████████████████████████

███████████████████████ (Ex. 5 ¶ 78.)  That the vast majority of the survey takers who

compose the "high quality" main data expressed illogical preferences invalidates and makes

unreliable Sukumar's testimony.[12]

        Again,  ██████████████████████████████████████████████████████████

███████████████████████████████████. (*Id.* ¶ 78.)  Sukumar should have

excluded this flawed data. As stated by Sukumar in another case:

> [c]onjoint studies frequently include product attributes for which almost everyone
> would be expected to prefer one level to another. However, estimated part worths
> sometimes turn out not to have those expected orders. This can be a problem,

---

[11] This includes irrationality as to expressing a preference for grass seed that is not safe for pets to grass seed that is and grass seed that does not grow everywhere to grass seed that grows anywhere.  (*See* Ex. 5 ¶ 77 (providing a complete list).)

[12] The unreliability of these irrational preferences are present in and poison other aspects of the methodology. ████████████████████████████████████████████████████████████████████ ████████████████████████ (*See* Ex. 5 ¶¶ 82-83.) This is done, as Sukumar himself stated, █████████████ (Ex. 17 at 14.)  Even so, ██████████████████████████████████ ████████████████████████████████████████████████████████████████. (*See* Ex. 5 ¶ 83.)  Another internal validity test concludes ████████████████████████████████████ (*Id.* ¶ 88.)  This suggests that respondents, in allocating points, provided self-contradictory responses. Notably, these two measures were *negatively* correlated for ███████████ █████████ (*Id.* ¶ 88.)  In other words, for a substantial portion of Dr. Sukumar's "high quality" respondents, ASEMAP generally generated *higher* importance estimates for features that were assigned *lower* importance ranks.  This is another indicator of the testimony's unreliability.

since part worths with wrong slopes, or coefficients with wrong signs, *are likely to yield nonsense results and can undermine users' confidence*.

(Ex. 99 ¶ 22a (quotation omitted) (emphasis added); *see also* Ex. 18 at 256:22-257:7 ███████

████████████████████████████████████████).)

The high frequency of irrational responses yielded nonsense results here. Why the survey takers responded illogically is irrelevant. "It is, as [] described, the 'garbage in, garbage out' problem." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 143 (M.D. Pa. 2015) (excluding testimony that inputted inflated projections into a model in order to arrive at a damages calculation). Indeed, federal courts have made clear that expert testimony is unreliable if it is based on bad, illogical, or otherwise incorrect data. "Any analysis will be only as good as the inputs to the model." *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 179 (S.D.N.Y. 2006). "[A]n opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant." *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (quotation omitted). Put simply, "expert opinion based on incorrect data is not admissible." *Davis v. Ashcroft*, 2003 WL 25665777, at *1 (D.D.C. Aug. 19, 2003). Sukumar's testimony must be excluded as unreliable because the vast majority of the respondents upon which he relied provided at least some illogical and irrational responses, thus demonstrating that the survey on which Sukumar relied was itself unreliable.

## E.    The ASEMAP Methodology Does Not Satisfy the *Daubert* Factors.

A potential cause of much of the unreliability present in Sukumar's testimony is his use of ASEMAP to conduct his conjoint analysis.

In *Daubert*, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology:  (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling

the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Kass v. West Bend Co.*, 2004 WL 2475606, *4 (E.D.N.Y. Nov. 4, 2004). ASEMAP, the methodology employed by Sukumar does not satisfy the articulated factors.

### 1. *ASEMAP Is Not a Generally Accepted Method to Conduct a Conjoint Analysis.*

Sukumar claims to be conducting a conjoint analysis[13] which very generally refers to a statistical technique (more specifically a particular application of regression analysis) that can be used, when done properly, to estimate how people value different attributes of a product. ASEMAP is a survey method that purports to be an appropriate methodology for conducting a conjoint analysis. (*See* Ex. 5 ¶¶ 90-91.) Conjoint analysis in marketing research dates back to 1978, ASEMAP, however, was developed in 2011. (*Id.* ¶ 16.) It originates from a single paper co-authored by Professor Srinivasan, the Chief Research Advisor at Optimal Strategix Group. (*Id.* ¶ 90.) Sukumar is the Chief Executive Officer of Optimal Strategix Group. (Ex. 17 at 3.) The ASEMAP methodology is copyrighted and owned by Professor Srinivasan and referred to as

███████████████████████████████████████████████████ (Ex. 5 ¶ 90.)

Given its novelty, lack of external validation, and that it differs from traditional conjoint analysis in very fundamental ways, it is not known whether it is indeed appropriate or sound. (*Id.* ¶¶ 90-97.) As a result, Sukumar's testimony should be excluded. *See United Co. v. Keenan*, 2007 WL 4260930, at *18 (W.D. Va. Nov. 30, 2007) (excluding testimony of expert who "ignored the accepted methodologies and chose to formulate his own approach").

---

[13] That Sukumar *claims* to be conducting a conjoint analysis should not bear on the reliability inquiry. *See Baldwin v. Bader*, 2008 WL 2875351, at *8 (D. Me. July 23, 2008) (excluding testimony regarding value of personal guaranty where expert claimed to rely on well-established methods and treatises for general business valuation but could not establish that they supported his conclusions).

## 2.     *ASEMAP Has Not Been Adequately Tested or Validated.*

ASEMAP is not externally validated in academic literature. Sukumar himself has stated

the importance of external validation: ████████████████████████████████████████

████████████████████████████████████████████████ (Ex. 98 ¶ 16.)   External

validation is a key consideration in making the reliability analysis. *See Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 152 (1999) (holding that the trial court should "make certain that an

expert … employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field.").

Sukumar does not provide, because he cannot provide, any external validation of the

ASEMAP methodology.[14]   At best, Sukumar states that ██████████████████████████

████████████████████████████████████████████████████████████████████.[15]

(*See* Ex. 5 ¶ 97.)  He is not aware of ███████████████████████████████████████

████████████████████████████████████.  (*Id.*)   There is no academic literature on

ASEMAP, save the one paper co-authored by Professor Srinivasan, nor is ASEMAP readily

available to researchers.  *Id.*   This stands in stark contrast to the rigorous and numerous

validation studies on conjoint analysis using different methodologies.   As ASEMAP is not

externally validated, the same criticism Sukumar has raised in other cases is applicable here:

> The import of [a lack of external validity] is twofold. First, it is undisputed that …
> [the] valuations… do not reflect dollar amounts consumers would actually pay in
> the real world.… Second, because [the] results are inconsistent with consumer
> data, … [the] results cannot be equated with actual consumer demand.

(Ex. 98 ¶ 16.)

---

[14] Although Sukumar claims that ██████████████████████████████████████████████
████████████████████████████████████████████████████████ (*See* Ex. 18 at
111:21-115:16.)  That the paper was published in a peer-reviewed journal, does not address external validity.
[15] The potential for bias should be factored into the reliability analysis.  (*See* Ex. 66 (an expert using
generally accepted methodology must demonstrate it was "implemented . . . in an appropriate and unbiased manner"
or the testimony is inadmissible).)

3.    *ASEMAP Has Known Errors and Differs Fundamentally From Traditional Conjoint Analysis.*

ASEMAP also fundamentally differs from the traditional manner in which conjoint analyses are carried out.  ASEMAP first determines survey takers' preference levels for features (*e.g.*, not important, somewhat important, and very important), and then determines the relative preference for those features against the preference for other product features (*e.g.*, price vs. packaging, ease of use vs. coverage area).  ASEMAP is therefore ███████████████ (*See* Ex. 5 ¶ 92.) ██████████████████████████

████████████████████████████████████████████

██████████ (*Id.* ¶ 93.)

As opposed to ASEMAP's compositional approach, traditional conjoint analysis is decompositional and estimates consumer preferences indirectly from their evaluations of products as a whole.  (*Id.* at ¶ 92.)  The traditional methods are considered to be a more realistic approximation of the consumer purchase decision because, in contrast, ASEMAP involves rating, ranking, and point allocation tasks which do not realistically represent how people consider and weigh features when choosing a grass seed product.  (*Id.* at ¶ 94.)  In fact, one of the reasons conjoint analysis was designed in a decompositional manner was because of survey takers' inability to accurately assess and describe what weights they place on attributes when they make choices—which is explicitly what ASEMAP is doing.  (*Id.*)

In sum, Sukumar claims to be conducting a valid conjoint analysis but at the core of his testimony he relies on a novel ASEMAP methodology that has not been externally validated and fundamentally differs from traditional conjoint analysis.  This means that ASEMAP and Sukumar's testimony do not satisfy the four factors laid out in *Daubert* regarding the reliability of a method.  For those reasons, Sukumar's testimony, which is wholly based on the ASEMAP

methodology, should be excluded.  *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (affirming exclusion of expert testimony on lost profits based on flawed methodology that was unaccepted in the accounting community).

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Ramamirtham Sukumar's testimony.

Dated:  June 30, 2016
        New York, New York

By:  ___/s/ Shawn Patrick Regan____

Shawn Patrick Regan
Joshua S. Paster
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 309-1000
Facsimile: (212) 309-1100
Email:  sregan@hunton.com
Email:  jpaster@hunton.com

- and -

Samuel A. Danon (*pro hac vice*)
Jason B. Sherry
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
Email:  sdanon@hunton.com
Email:  jsherry@hunton.com

- and -

Joshua M. Kalb (*pro hac vice*)
HUNTON & WILLIAMS LLP
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307
Telephone:  (404) 888-4000
Facsimile:  (404) 602-9077
Email:  jkalb@hunton.com

-and-

Neil K. Gilman
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:      (202) 955-1674
Facsimile:       (202) 862-3629
Email:  ngilman@hunton.com

*Counsel for Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC*

-24-

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2016 I served a copy of the foregoing, on all counsel of record at the addresses listed below, by email and FTP site.

/s/ Shawn Patrick Regan
Shawn Patrick Regan

Scott A. Bursor, Esq.
Joseph L. Marchese, Esq.
Neal Deckant, Esq.
Yitzchak Kopel, Esq.
Bursor & Fisher, P.A.
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
Email: scott@bursor.com
       jmarchese@bursor.com
       ndeckant@bursor.com
       ykopel@bursor.com

Adam Richard Gonnelli, Esq.
Nadeem Faruqi, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 983-9330
Fax: (212) 983-9331
Email: agonnelli@faruqilaw.com
       nfaruqi@faruqilaw.com

Timothy Peters, Esq.
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: (215) 277-5770
Fax: (215) 277-5771
Email: tpeters@faruqilaw.com

Antonio Vozzolo, Esq.
Vozzolo LLC
Email: avozzolo@vozzolo.com