UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
In re Scotts EZ Seed Litigation          :          12-CV-4727 (VB)
                                          :
                                          :
                                          :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS'
## <u>PROFFERED EXPERT J. MICHAEL DENNIS</u>

HUNTON & WILLIAMS LLP
Shawn Patrick Regan
Joshua S. Paster
200 Park Avenue
New York, NY 10166

- and -

Samuel Danon (*pro hac vice*)
Jason B. Sherry
1111 Brickell Avenue, Suite 2500
Miami, FL 33131

Joshua M. Kalb (*pro hac vice*)
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307

Neil K. Gilman (*pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC  20037

*Counsel for Defendants The Scotts
Miracle-Gro Company and The
Scotts Company LLC*

## TABLE OF CONTENTS

Page

BACKGROUND ....................................................................................................... 2

    I.     J. Michael Dennis............................................................................ 2

    II.    Dennis's Survey. ............................................................................ 2

ARGUMENT ............................................................................................................ 4

    I.     Legal Standard. ............................................................................. 4

    II.    Dennis's CVM and Consumer-Perception Surveys Both Should Be Excluded Because They Surveyed an Improper Universe of Respondents. ........................... 6

    III.   Dennis's CVM Survey Should Be Excluded. ........................................................ 8

        A.    CVM—as a Survey Technique—is Unreliable for the Purposes Here....... 8

            1.    Dennis's CVM Study Does not "Fit" and Therefore Is Unduly Prejudicial. .....................................................................8

            2.    CVM Does Not Provide a Reliable and Accurate Damage Assessment in A Judicial Proceeding. .............................11

        B.    Dennis's Implementation of CVM Was Seriously Flawed, Mandating Exclusion............................................................................................ 14

            1.    Dennis's CVM Survey Fails to Replicate Market Conditions. .............................................................................14

            2.    Dennis's CVM Survey Lacked a Control Group. ...........................16

            3.    Dennis's CVM Survey is Leading and Biased. .............................18

                 a.    Dennis's CVM Survey Creates Biasing Demand Artifacts/Effects. ............................................................. 18

                 b.    Dennis's CVM Survey Contains Starting Point Bias ....... 19

    IV.   Dennis's Consumer Survey Should Be Excluded............................................... 20

        A.    Dennis's Survey is Biased ................................................................... 21

        B.    Dennis's Survey Omitted Key Information Available on the Package and Asked Respondents' "Expectations" Not "Understanding" of the 50% Thicker Claim. ................................................................................ 22

        C.    Dennis's Survey Fails to Include a Control Group. ................................ 23

        D.    Dennis's Survey is Suggestive.............................................................. 23

    V.    Dennis Cannot Merely Regurgitate Other Testimony and Evidence.................... 24

CONCLUSION......................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerman v. Coca–Cola Co.*,
  2013 WL 7044866 (E.D.N.Y. July 18, 2013) ........................................................................ 10

*Am. Home Prods. Corp. v. Johnson & Johnson*,
  654 F. Supp. 568 (S.D.N.Y. 1987) .............................................................................. 21, 23

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ................................................................................................ 18

*Andrews v. Metro N. Commuter R. Co.*,
  882 F.2d 705 (2d Cir. 1989) ................................................................................................ 25

*Apple, Inc. v. Samsung Elecs. Co.*,
  2014 WL 976898 (N.D. Cal. Mar. 6, 2014) .......................................................................... 9

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ............................................................................. 9

*Bank of Utah v. Commc'l Sec. Bank*,
  369 F.2d 19 (10th Cir. 1966) ................................................................................................. 6

*Beech Aircraft Corp. v. United States*,
  51 F.3d 834 (9th Cir. 1995) ................................................................................................. 25

*Brazil v. Dole Packaged Foods, LLC*,
  2014 WL 2466559 (N.D. Cal. May 30, 2014) ....................................................................... 8

*Cannon v. BP Prods. N. Am., Inc.*,
  2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) .................................................................... 13

*Cook v. Rockwell Int'l Corp.*,
  580 F. Supp. 2d 1071 (D. Colo. 2006) ............................................................................... 12

*Cumberland Packing Corp. v. Monsanto Co.*,
  32 F. Supp. 2d 561 (E.D.N.Y. 1999) ............................................................................ 17, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .............................................................................................................. 5

*Gov't Emp'es Ins. Co. v. Google, Inc.*,
  2005 WL 1903128 (E.D. Va. Aug. 8, 2005) ....................................................................... 19

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.,*
    258 F. Supp. 2d 1197 (D. Kan. 2003) .........................................................................15, 16, 23

*Home Box Office v. Showtime/The Movie Channel,*
    665 F. Supp. 1079 (S.D.N.Y. 1987)............................................................................... 17-18, 24

*In re NJOY,*
    120 F. Supp. 3d 1050, 1118, 1122 (C.D. Cal. 2015) ("*NJOY I*") ...................................8, 9, 10

*In re NJOY,*
    2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ("*NJOY II*") .....................................................8, 9

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3rd Cir. 1994) ...................................................................................................18

*In re Pfizer Inc. Sec. Litig.,*
    2016 WL 1426211 (2d Cir. Apr. 12, 2016) ........................................................................5, 6

*In re POM Wonderful LLC,*
    2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)...................................................................8, 10

*In re Rezulin Prod. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................................................................................25

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.,*
    2012 WL 4904412 (C.D. Cal. Sept. 20, 2012) .......................................................................13

*J.T. Colby & Co., Inc. v. Apple, Inc.,*
    2013 WL 1903883 (S.D.N.Y. May 8, 2013) ............................................................................5

*Kargo Glob., Inc. v. Adv. Mag. Publ'rs, Inc.,*
    2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)................................................................ *passim*

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,*
    735 F.3d 735 (7th Cir. 2013) .............................................................................................. 20-21

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)..................................................................................................................5

*Lawson v. Smith & Nephew Richards, Inc.,*
    1999 WL 1129677 (N.D. Ga. Sept. 30, 1999) .......................................................................18

*Miller v. Fuhu Inc.,*
    2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) .........................................................................13

*MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.,*
    132 F. Supp. 2d 289 (S.D.N.Y. 2001)......................................................................................5

*Nabisco v. Warner-Lambert Co.*,
  32 F. Supp. 2d 690 (S.D.N.Y. 1999).................................................................17, 23

*Neuro-Spine Solutions, P.C. v. Freund*,
  2009 WL 3255129 (E.D. Tenn. Sept. 28, 2009) ..................................................25

*Perry v. Schwarzenegger*,
  704 F. Supp. 2d 921 (N.D. Cal. 2010) ................................................................25

*Procter & Gamble Pharm., Inc. v. Hoffmann-LaRoche Inc.*,
  2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006).......................................................17

*Rodriguez v. It's Just Lunch, Int'l*,
  2010 WL 685009 (S.D.N.Y. Feb. 23, 2010)...........................................................8

*Saavedra v. Eli Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)....................................................9, 10

*Scotts Co. v. United Indus. Corp.*,
  315 F.3d 264 (4th Cir. 2002) ...........................................................................15, 23

*Sears, Roebuck & Co. v. Menard, Inc.*,
  2003 WL 168642 (N.D. Ill. Jan. 24, 2003) .......................................................19, 23

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) ....................................................... passim

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
  Consumer Pharm. Co.*,
  2001 WL 588846 (S.D.N.Y. June 1, 2001) .......................................................16, 23

*SNAPP Sys., Inc. v. Ford Motor Co.*,
  2008 WL 5383372 (E.D. Mich. Dec. 23, 2008) .....................................................5

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999)..................................................................................6

*Sterling Sav. Bank v. Poulsen*,
  2013 WL 3945989 (N.D. Cal. July 29, 2013).......................................................25

*Taylor v. Evans*,
  1997 WL 154010 (S.D.N.Y. Apr. 1, 1997).......................................................24-25

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010).......................................................... passim

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) (Roberts, C.J. concurring) ...............................................11

*Universal City Studios, Inc. v. Nintendo Co.,*
   746 F.2d 112 (2d Cir. 1984)........................................................................................6

*Weiner v. Snapple Bev. Corp.,*
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)...........................................................10

*Zimmerman v. Nat'l Ass'n of Realtors,*
   2004 WL 763936 (U.S.P.T.O. Mar. 31, 2004) .................................................18, 24

**OTHER AUTHORITIES**

Federal Rule of Evidence 403 .........................................................................................5

Federal Rule of Evidence 702..................................................................................4, 5

Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC (collectively, "Scotts") move to exclude the opinions of J. Michael Dennis, who Plaintiffs proffer as an expert to opine on a "price premium" and consumer perceptions of the 50% Thicker claim.[1]

Dennis administered a single survey that contained two parts—a contingent-valuation ("CVM") portion, and a consumer-perception portion. Each portion should be stricken because each (i) failed to include a control group and (ii) surveyed an improper universe of purchasers.

Dennis's CVM survey should be stricken on the additional grounds that he applied CVM (which economists repeatedly warn against using in judicial proceedings) in a manner that exacerbates its unreliability, as reflected by irrational survey responses. Dennis's CVM survey fails to replicate market conditions—creating an unrealistic shopping scenario, and is overtly biased—creating demand artifacts and starting-point bias. In addition, Dennis's CVM-based opinion does not pass the "fit" test, *i.e.*, his opinion does not help "determine a fact in issue," FRE 702(a), because he opines only on respondents' subjective "willingness-to-pay," which is insufficient to measure a "price premium." Dennis does not know or calculate what EZ Seed's market price would have been absent the 50% Thicker claim or what Scotts would have been willing to sell the product for absent the claim, and thus does not calculate a "price premium."

Dennis's consumer-perception survey should also be stricken. Dennis designed the survey to favor Plaintiffs in a number of ways: (1) he asked respondents for their understanding of the 50% Thicker claim without providing *any* answer option corresponding to Scotts' intended meaning, (2) he failed to replicate conditions in which purchases are actually made, and (3) he asked survey respondents about their "expectations" for the product (rather than their understanding of the claim, a distinct concept) while providing survey respondents with answer

---

[1] This claim reads in full: "50% thicker with half the water** **Versus ordinary seed when each was watered at half the recommended rate. Results may vary." (the "50% Thicker claim").

choices that were inconsistent with directions on the EZ Seed package but which Dennis omitted from his survey.   By way of brief example, Dennis failed to show respondents the EZ Seed directions, which plainly advise that "[a] deep and thorough initial watering is the key to success," but asked, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

Finally, Dennis seeks to bolster other testimony and evidence by simply repeating it.   An expert may not "opine" by merely repeating and retyping evidence.

## BACKGROUND

Plaintiffs allege that "they paid an inappropriate premium for EZ Seed based on Scotts' allegedly false 50% thicker claim."   (Jan. 26, 2015 Mem. Dec. at 13, ECF No. 127.)   Thus, "Plaintiffs allege they suffered economic harm … when they paid a premium for EZ Seed based on the [allegedly] false 50% thicker claim."   (*Id.* at 14-15.)

### I.   J. Michael Dennis.

Plaintiffs proffer J. Michael Dennis as a survey expert.   Dennis executed an expert declaration on January 7, 2016.   (See Ex. 11.[2])   He was deposed on February 12, 2016.   (Ex. 12.)

### II.   Dennis's Survey.

Dennis gave a single group of respondents a two-part survey, containing (1) a CVM portion, purportedly to ████████████████████████████████████████████

████████████████████████████████ and (2) a consumer-perception portion, purportedly to ████████████   ██████████   ██████████████████████████████(Ex.

---

[2] All motion exhibits are attached to the Omnibus Declaration of Shawn Patrick Regan.

[3] During his deposition, Dennis made clear, however, that █████████████████████████████████

11 ¶¶ 11-12; *see also* Ex. 12 at 106:12-16.)  Dennis also purportedly ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Ex. 12 at 45:23-46:4.)  Dennis's universe of respondents included persons who ███████

████████████████████████████████████████ (Ex. 11 ¶ 44; *id.*, Attachment

F at S1_Grass.)  Despite not asking a single question that would screen for prior EZ Seed users,

Dennis speculates that his universe ████████████████████████████████████

████████████████████████████████████ (Ex. 12 at 141:7-10.)

        To perform his surveys, Dennis purportedly created a ████████████████ modeled on EZ

Seed.   (*Id.* ¶ 22.)   To "disguise" EZ Seed, Dennis ███████████████████████████

███████████ though he kept several conspicuous style features including the gold packaging and

green oval logo. (*Id.* ¶¶ 22-23.) Notably, Dennis provided respondents with ████████████

███████████ ; he omitted the back of the package, which meant he omitted EZ Seed's

planting and watering directions.  (Ex. 12 at 80:2-23.)  Following certain pre-testing (Ex. 11

¶¶ 50-56), Dennis administered his surveys, which consisted ██████████████████████.

(*Id.* at Attachment F.)  With respect to CVM, Dennis presented to respondents ████████████

████████████████████████████████████████████████████

███████.   (*Id.* ¶¶ 22-23, 25.)   He then presented follow-up questions regarding the██████

████████████████████████████████████. (*Id.* ¶¶ 25-26.) These questions

were based on his fictional product with the 50% Thicker claim costing ██████████████

█████████████ (*id.* ¶ 35)), despite Dennis agreeing it sold for an average of ████████ with an

average advertised price of █████████ (*id.* ¶ 34).[4]  Then, for the consumer-perception survey, Dennis

████████████████████████████████████████████████████████. (Ex. 12 at 62:18-64:2.)



[4] Dennis ran his surveys based only on packaging and prices for the 3.75 lb. EZ Seed. (Ex. 11 ¶¶ 34, 36.)

asked respondents seven questions about ████████████████████████████

████████. (*Id.* ¶ 42.)

  With respect to the CVM portion, Dennis calculates ██████████████ (*Id.*

¶ 48.) Dennis presents the percentage of respondents who were willing to purchase EZ Seed

without the 50% Thicker claim for each given price, from $0 to $15. (*Id.* ¶ 38.) Beginning with

that ████████, Dennis asserts that the discount-average necessary for a respondent to purchase

the product without the 50% Thicker claim ██████████████████████. (*Id.*

¶ 37.) Notably, Dennis affirms that ██████ of consumers would purchase EZ Seed without the

50% Thicker claim for $██████████████████████████████████

████. (*Id.* ¶ 28.) Dennis never asked any of the respondents at what price they would purchase

EZ Seed with the claim, which is significant because there is no evidence that any of the survey

respondents ever purchased EZ Seed. (*Id.* at Attachment F; *infra*.)

  With respect to his consumer-perception survey, Dennis opines that ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ (Ex. 11 ¶ 42.)

## **ARGUMENT**

I. **Legal Standard.**

  Federal Rule of Evidence 702, controls admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based on
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to

---

[5] Dennis actually calculated "willing to accept" estimates. (*Infra* at 20 n.21.) For purposes of this motion, except
where noted otherwise, this brief refers to the commonly used term "willing to pay" as incorporating both concepts.

the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on the trial court to exclude evidence that is either not "relevant" or not "reliable." 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Plaintiffs bear "the burden to establish admissibility...." *In re Pfizer Inc. Sec. Litig.*, 2016 WL 1426211, at *14 (2d Cir. Apr. 12, 2016). As one court has explained:

> Essentially, *Daubert* and *Kumho* require a two-step inquiry that involves an analysis of the "relevance and the reliability" of an expert's opinion. The relevance step of the inquiry is designed to ensure that "there is a 'fit' between the testimony and the issue to be resolved by the trial." The reliability step focuses on the "methodology and principles" that form the basis for the testimony. A trial court must inquire as to whether the methodology underlying the proffered expert testimony is valid and whether the methodology may be properly applied to the facts at issue in a particular case.

*SNAPP Sys., Inc. v. Ford Motor Co.*, 2008 WL 5383372, at *2 (E.D. Mich. Dec. 23, 2008) (citations omitted); *see also MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 291 (S.D.N.Y. 2001) (describing the "fit" test as whether the evidence is "relevant in that it 'fits' the facts of this case" and thereby will "'assist the trier of fact to understand the evidence or to determine a fact in issue'"). Where a survey does not "fit" with an issue to be resolved, it "should be excluded under Federal Rule of Evidence 403" because "its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury...." *Kargo Glob., Inc. v. Adv. Mag. Publ'rs, Inc.*, 2007 WL 2258688, at *6 (S.D.N.Y. Aug. 6, 2007) (citations omitted); *J.T. Colby & Co., Inc. v. Apple, Inc.*, 2013 WL 1903883, at *19 (S.D.N.Y. May 8, 2013) (where survey and methodology are too flawed, expert inadmissible under Rule 702 and 403).

> The court need not and should not respond reflexively to every criticism by saying it merely "goes to the weight" of the survey rather than to its admissibility.

> If the flaws in the proposed survey are too great, the court may find that the
> probative value of the survey is substantially outweighed by the prejudice, waste
> of time, and confusion it will cause at trial.

*Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (citing

*Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999)).[6]

## II.  Dennis's CVM and Consumer-Perception Surveys Both Should Be Excluded Because They Surveyed an Improper Universe of Respondents.

"A survey is inadmissible when the sample is clearly not representative of the universe it

is intended to reflect." *Bank of Utah v. Commc'l Sec. Bank*, 369 F.2d 19, 27 (10th Cir. 1966);

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (survey utilizing

improper universe flawed and unreliable); *see also* Ex. 53 at 377-78 ("A survey that provides

information about a wholly irrelevant population is itself irrelevant."); Ex. 56 ("The universe is

that segment of the population whose perceptions and state of mind are relevant to the issues in

the case.  Selection of the proper universe is a crucial step, for even if the proper questions are

asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.").

Dennis's universe (used for both CVM and consumer-perception portions) is not representative

of EZ Seed users and Dennis cannot identify a single respondent who meets the relevant criteria

(someone who used EZ Seed or a comparable product).

Plaintiffs seek to establish through Dennis that the 50% Thicker claim is misleading and

consumers paid a "price premium" as a result of that claim.  As Dennis acknowledged at his

deposition, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ (Ex. 12 at 43:12-44:23.)  Consistent with this difference, the relevant universe is

---

[6] The Second Circuit's recent decision in *Pfizer* allows a court only to strike parts of an expert report if what remains is valid expert testimony. *Pfizer*, 2016 WL 1426211, at *21. *Pfizer* is inapplicable here because, as demonstrated, all of Dennis's opinions are unreliable.

people who purchased and used EZ Seed (or perhaps also those who purchased and used a comparable combination product).  (Ex. 11 ¶ 44; Ex. 7 ¶¶ 45-52, 15; Ex. 5 ¶ 33; Ex. 6 at 220:1-227:25; Ex. 8 at 78:7-79:10.)  In other words, the relevant universe is the class.

Dennis's survey, however, included a much broader universe of respondents because Dennis's only product screen required the individuals to have previously purchased a combination product *or* ordinary grass seed.[7]  (Ex. 11 ¶ 44; *id.*, Attachment F at S1_Grass (asking if respondents ███████████████████████  ████████████████████ ██████) (emphasis added).)   And Dennis cannot identify the relevant subset within his universe—respondents who purchased and/or used EZ Seed or comparable product.  Although he testified ███████████████████████ (Ex. 12 at 141:7-10, he cannot point to a single respondent who purchased EZ Seed, or even a comparable product. Moreover, his testimony makes no sense.  Because ordinary seed is a much more common product than combination products, any screen that allows inclusion of purchasers of both products will almost certainly result in far more ordinary seed purchasers.[8]

Dennis's failure undermines his entire CVM analysis.  Dennis asked respondents ████ █████████████████████████████████, but he never asked what they would pay for EZ Seed with the claim.  Instead, he *assumed* that all respondents would be willing to pay the price that was charged.  This might make sense if he had been surveying known EZ Seed purchasers—after all, they had already exhibited a willingness to pay a specific price for EZ

---

[7] Dennis administered his survey to a single group of respondents but identified in his report two different universe definitions in the CVM and consumer-perception portions respectively.  (*Compare* Ex. 11 ¶ 19 *with id.* ¶ 44; *see also* Ex. 7 ¶¶ 45-52, 15; Ex. 5 ¶ 33.)  While the universe definition for the consumer-perception portion of his report purports to be better (referring to ████████ he failed to screen or limit his universe to these persons.

[8] If a respondent has not purchased and used EZ Seed or a comparable combination product, his or her state of mind does not tend to establish what a class member would be willing to pay for EZ Seed or whether class members were misled by the 50% Thicker claim in the marketplace.  (Ex. 7 ¶¶ 15-16, 45-52; Ex. 5 ¶ 33.)

Seed with the 50% Thicker claim. But it makes no sense with respect to respondents who neither purchased nor considered purchasing EZ Seed. This problem makes his results wholly unreliable. For example, Dennis reports ███████████████████████████████████████ ███████████████████████████████. (Ex. 11 at p. 28.) But without knowing what these respondents would pay for EZ Seed *with* the claim, this tells him absolutely nothing.

## III.   Dennis's CVM Survey Should Be Excluded.

### A.   *CVM—as a Survey Technique—is Unreliable for the Purposes Here.*

#### 1.   **Dennis's CVM Study Does not "Fit" and Therefore Is Unduly Prejudicial.**

Plaintiffs must establish a price premium attributable to the 50% Thicker claim. A "price premium" is the difference (if any) between the price at which EZ Seed was sold to consumers with the 50% Thicker claim and the price at which EZ Seed would have been sold had Scotts not included the 50% Thicker claim. *In re NJOY*, 120 F. Supp. 3d 1050, 1118, 1122 (C.D. Cal. 2015) ("*NJOY I*") (price-premium calculated "by taking 'the difference between *the market price actually paid* by consumers and the *true market price* that reflects the impact of the unlawful, unfair, or fraudulent business practices.'") (emphasis in original) (citations omitted); *In re NJOY*, 2016 WL 787415, at *5-7 (C.D. Cal. Feb. 2, 2016) ("*NJOY II*") (same); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *15 (N.D. Cal. May 30, 2014) (mislabeling premium calculated "by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices."); *see also In re POM Wonderful LLC*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014); *Rodriguez v. It's Just Lunch, Int'l*, 2010 WL 685009, at *9 (S.D.N.Y. Feb. 23, 2010) ("price premium" injury exists where consumer actually paid a "higher price" than the true market price the consumer would have actually paid "absent deceptive acts").

Even assuming Dennis's CVM survey was properly done (it was not), it does not "fit" with any issue that needs to be resolved at trial. Dennis measured respondents' subjective willingness to pay. (Ex. 11 ¶¶ 26-27 & n.1-2, 48-53; Ex. 52 at 1-4; Ex 5 ¶ 109.) But "[a] consumer's subjective valuation of the purported [50% Thicker] message, measured by their relative willingness to pay for products with or without the message, is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the true market price of [EZ Seed] absent the purported misrepresentations." *NJOY I*, 120 F. Supp. 3d at 1122; *See also id.* at 1120 ("Harris's methodology completely ignores the price for which NJOY is willing to sell its products, what other e-cigarette manufacturers say about their products, and the prices at which those entities are willing to sell their products."[9]); *NJOY II*, 2016 WL 787415, at *5-7; *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014)[10]; *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014) ("Plaintiff has not offered any expert testimony demonstrating that the market price of Ben & Jerry's ice cream with the 'all natural' designation was higher than the market price of Ben & Jerry's without the 'all natural' designation. Thus, by definition, there is no evidence showing how much higher the price of one was than the other."); (Ex. 1 ¶¶ 44-51).

Indeed, Dennis testified that ███████████████████████████████████████ ████████████████████████ (Ex. 12 at 184:14-21; *see also id.* at 98:5-100:25.) As Dennis acknowledged, ██████████████████

---

[9] The court in *NJOY I* continued, "The [c]ourt has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell)." 120 F. Supp. 3d at 1120 (alteration in original) (citation omitted); *see also Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *3-6 (C.D. Cal. Dec. 18, 2014) (same).

[10] The court in *Apple* found the expert's survey failed to calculate a proper "price premium" where the "survey measures the market demand for the patented features in a vacuum, without relation to the actual price or value of the devices" and because "his figures do not reflect 'what people would actually pay in the marketplace,'" and therefore the survey "leaves the Court with no way to compare [] willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices." 2014 WL 976898, at *11.

████████████████████████████████████████████ (*Id.* at 98:14-17.) There
was no obligation for Scotts to change EZ Seed's MSRP due to changes on its label, and, indeed,
Scotts did ***not*** change EZ Seed's price as demand fluctuated. (Ex. 1 ¶¶ 28-33.) Thus, Dennis
does not address the market value of EZ Seed—and what Scotts was willing to sell it for—absent
the 50% Thicker claim.[11]

       The impropriety of relying on subjective willingness to pay as the measure of a "price
premium" is illustrated by the inescapable problems that result when one attempts to apply
Dennis's model to determine injuries or damages suffered by any class member. (*See* Ex. 11 at
p. 28; Ex. 12 at 209:4-210:24 (testifying that the price respondents are willing to pay for the
product without the 50% Thicker claim varies from person to person, as does therefore each
person's alleged resulting "premium.").) Indeed, for approximately ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ (Ex. 12 at 210:18-23.) Thus, Dennis's
methodology is unsuitable for establishing injury or damages on a classwide basis. *Ackerman v.
Coca-Cola Co.*, 2013 WL 7044866, at *20 (E.D.N.Y. July 18, 2013) (class may not be certified
if plaintiffs lack suitable methodology for establishing classwide injury/damages); *Weiner v.
Snapple Bev. Corp.*, 2010 WL 3119452, at *10 (S.D.N.Y. Aug. 5, 2010) (same)..

       Furthermore, Dennis's "premium" calculation is premised on all consumers having paid
the same ███ for EZ Seed with the claim. In reality, many consumers purchased EZ Seed with

---

[11] Dennis purports ████████████████████████████████████████
████████████ (Ex. 12 at 87:21-88:2, 212:12-214:10.) This assertion is flawed because he presents no evidence
that the market for EZ Seed is efficient, and "[i]n an inefficient market … some information is not reflected in the
price of an item. In such a market, even a material misrepresentation might not necessarily have any effect on
prices." *POM*, 2014 WL 1225184, at *4 (market for juice not efficient) (citations omitted). Dennis ignores
completely the relevant issue—for what price Scotts was willing to sell EZ Seed. *NJOY I*, 120 F. Supp. 3d at 1120
(rejecting methodology that failed to account for "willingness to sell"); (Ex. 1 ¶¶ 48-51).

the claim for far less than even ████   For example, Plaintiff Arcuri paid $7.37 for his 3.75 lb. jug. (Compl. ¶ 69, ECF No. 14; *see also* Ex. 1 ¶¶ 30-31.) If EZ Seed sold for $7 with the claim (as it did for consumers like Arcuri), according to Dennis ████ of consumers would be willing to pay that price—or more—for the product without the claim.   (Ex. 11 at 28.)   Those consumers—like Arcuri—have not been injured and are not entitled to any damages under Dennis's rubric since they paid less than ████ (Dennis's average economic valuation), and were willing to pay more for EZ Seed without the claim than they paid for EZ Seed with the claim.[12]  Dennis's methodology contemplates providing relief to uninjured class members.  This cannot be permitted.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1052-53 (2016) (Roberts, C.J. concurring).[13]

Dennis's survey does not answer the price-premium question.  It shows nothing more than what a handful of people say they would pay for a product.  Even if the survey were correct about what these specific people would have paid, the survey says nothing about the price Scotts would have charged absent the claims.  It is therefore incapable of calculating a price premium.

## 2.   CVM Does Not Provide a Reliable and Accurate Damage Assessment in A Judicial Proceeding.

"Contingent Valuation is a method of estimating the value that a person places on a good." (Ex. 52 at 1.)  It "seeks to determine the economic value of something *that is not ordinarily bought and sold and thus does not have a well-defined market or market price*."[14]

---

[12] Of course, the determination of which class members were willing to pay what amount for EZ Seed without the claim, as compared with the particular price each member paid for his or her EZ Seed with the claim, is replete with individualized issues. (*Accord* Scotts' Motion to Decertify the Class.)

[13] Dennis's survey also fails because it ignores the "but for" world—had Scotts not used the 50% Thicker claim, Scotts would not have left the label blank; Scotts would have replaced it with another claim. (Ex. 38 ¶ 6.) Indeed, this is what Scotts did when it removed the 50% Thicker claim. (Ex. 53 at SMG-EZ0156442; Ex. 39 at 98:4-10.) Thus, the MSRP of EZ Seed in the "but for" world (without the 50% Thicker claim) would not have been for EZ Seed without *any* claim; but rather the MSRP of EZ Seed with a different claim. (Ex. 1 ¶¶ 25, 51; Ex. 5 ¶ 119.)

[14] The classic CVM use is to estimate how much citizens would be willing to pay for some passive-use environmental project. (*See* Ex. 5 ¶¶ 20, 121-24; *see also* Ex. 52 at 1; Ex. 59 at 3-6). In contrast, grass seed

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1128 (D. Colo. 2006) (emphasis added); (Ex. 52 at 1; Ex. 5 ¶¶ 121-24; Ex. 57 ¶ 17). CVM "asks people to directly report their willingness to pay (WTP) to obtain a specified good, or willingness to accept (WTA) to give up a good, rather than inferring them from observed behaviours in regular market places." (Ex. 52 at 1.)

"[B]ecause of the manner in which they are provided, private goods differ fundamentally from public goods with respect to incentives for truthful preference revelation both in actual and survey contexts. As a consequence, ***drawing inferences about private goods from [contingent valuation] is problematic.***" (Ex. 58 at 81 n.6 (emphasis added).[15])

Even those who utilize CVM concede it is flawed. The NOAA report, upon which Dennis relies heavily, acknowledges "[t]he contingent valuation method has been criticized for many reasons and the Panel believes that a number of these criticisms are particularly compelling." (Ex. 59 at 6.) The NOAA Report further acknowledges that "it is worth pointing out that [the problems] take on added importance in light of the impossibility of validating externally the results of CV studies." (*Id.*) Among the nine problems the NOAA Report highlights (*id.* at 10-29), one that is "of most concern" is that "the contingent valuation method can produce results that appear to be inconsistent with assumptions of rational choice ...." (*Id.* at 9.) But with public/environmental goods—unlike with private goods—"there are currently no other methods capable of providing information on these values [of assessing damages from deprivation of passive-use]." (*Id.* at 7.)

As a result, CVM "does not provide a good basis for either informed policymaking or accurate damage assessments in judicial proceedings." (Ex. 60 at 44.[16]) This is because

---

generally, and EZ Seed specifically, are both bought and sold and have a well-defined market and market price.

[15] Dennis relies on and cites this Carson article (exhibit 58). (Ex. 11 ¶ 31.)

[16] The author of exhibit 60, Dr. Jerry Hausman is the John and Jennie S. MacDonald Professor of Economics at the Massachusetts Institute of Technology, http://economics.mit.edu/faculty/hausman

"respondents to contingent valuation surveys are often not responding out of stable or well-defined preferences, but are essentially inventing their answers on the fly, in a way which makes the resulting data useless for serious analysis." (*Id.* at 43.) Additionally, CVM is infected with hypothetical bias, where there exists a "significant divergence between stated and actual behaviors." (*Id.* at 45 (citations omitted); Ex. 5 ¶¶ 109-14, *see also id.* ¶¶ 134-50 (addressing flaws and bias in CVM).) Here, that results in respondents overstating the true importance of the 50% Thicker claim. As Dr. Hausman demonstrates through his CVM study, preferences in CVM are "irrationally unstable, in the sense that minor differences in wording—that is, the framing of the questions—[lead] to large differences in response." (Ex. 60 at 51.) Dr. Hausman demonstrates that this means that in CVM, "consumers [do] not reveal true preferences in the stated preference questionnaire and are instead, to some unknown extent, 'making-up' or 'inventing' their answers to a hypothetical situation with which they are unfamiliar." (*Id.*)

What is more, CVM in the federal courts is not well-established. A Westlaw search for "contingent valuation" returns 25 cases, 9 of which are class actions (including this one). Of the nine, only one, *Miller*, addressed CVM with respect to overall admissibility (as opposed to a more cursory analysis at certification). *Miller v. Fuhu Inc.*, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015). Tellingly, although the court in *Miller* avers that "numerous" courts accept CVM, it cites to only three cases (one of which confuses conjoint analysis with CVM, and one of which is this case). *Id.* at \*21. The third case is *Toyota*, which provides no substantive analysis. *See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 2012 WL 4904412, at \*4 (C.D. Cal. Sept. 20, 2012). And *Miller* ignores *Cannon*, where the court expressed doubt that CVM itself is reliable (before rejecting the CVM analysis there as flawed). *Cannon v. BP Prods. N. Am., Inc.*, 2013 WL 5514284, at \*12-14 (S.D. Tex. Sept. 30, 2013). Because the CVM methodology itself is unreliable and incapable of providing an accurate

-13-

damage assessment, Dennis's report could not stand even if it were capable of answering a question relevant to this litigation.

**B.    *Dennis's Implementation of CVM Was Seriously Flawed, Mandating Exclusion.***

Dennis begins with an unreliable methodology, designed to answer the wrong question. He then improperly applies that methodology, resulting in an unreliable CVM study whose prejudice substantially outweighs any probative value. (*See* Ex. 5 ¶¶ 125-58; Ex. 7 ¶¶ 44-70.)

**1.    Dennis's CVM Survey Fails to Replicate Market Conditions.**

Dennis's CVM study asked respondents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 11 ¶ 25.)   The CVM instructs that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* at Attachment F (emphasis added).)   This is unrealistic and fails to replicate market conditions. (*See* Ex. 5 ¶¶ 115-21; Ex. 7 ¶¶ 55.)

A survey is unreliable when it fails to replicate market conditions. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 234-37 (S.D.N.Y. 2010).   In *THOIP*, the court found a survey unreliable, failing to replicate marketplace conditions, where it placed the two products at issue (t-shirts) in a sequential array so that respondents viewed them one right after another, even though the t-shirts were not actually sold side-by-side in the same store. *Id.* at 234, 237. The court held the survey "did not sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace." *Id.* at 237; *see also Kargo*, 2007 WL 2258688, at *7 ("The back-to-back display of parties' products has been characterized as a 'major flaw' in survey methodology" and did not replicate market conditions); *Simon*, 104 F. Supp. 2d at 1041-43 (side-by-side presentation failed to replicate market conditions; in actual

market, consumer would possess additional information "to influence the consumer's choice").[17]

Similarly here, Dennis's forced-choice survey fails to approximate the manner in which consumers encountered EZ Seed and decided whether to purchase.[18]   In the actual market, consumers never faced the choice between EZ Seed with or without the 50% Thicker claim, on the same shelf, without access to any other products.  Dennis's choices did not reflect the realities of the marketplace.  (Ex. 12 at 177:5-179:10.)

Dennis's CVM survey also fails to replicate market conditions because it presented the 50% Thicker claim out of context.  In the actual marketplace, consumers have access to the entire EZ Seed label, which impacts them as a whole.  (*E.g.*, Ex. 7 ¶ 62.)  Dennis, however, improperly omitted from his fictitious product package certain other label claims and the instructions.  (Ex. 12 at 63:18-64:2, 75:2-78:21, 80:8-81:16.)  *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 281 (4th Cir. 2002) (survey that obscured packaging and "elicited information about the consumer's reaction to an isolated part of the packaging ... weaken[s] the relevance and credibility of the survey evidence to the point that it sheds no light on the critical question in this case."); *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1201, 1203, 1210 (D. Kan. 2003) (crediting Dr. Jacoby's critiques to find survey "lack[ed] scientific validity" where it used photograph of front panel of product packaging only); *THOIP*, 690 F. Supp. 2d at 237 (failing, *inter alia*, to provide respondents with sources of information

---

[17] While this is not a case of confusion, as in *THOIP*, *Simon*, or *Kargo*, the courts' criticisms of the back-to-back viewing—that such a survey technique fails to replicate actual market conditions—remain applicable.

[18] Dennis also omitted ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. 11 ¶¶ 22-23), purportedly to ▇▇▇▇▇▇▇▇▇▇▇ (Ex. 12 at 116:23-117:3.)  But assuming doing so was proper, Dennis's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  (*See* Ex. 11 at 13; Ex. 5 at 70 n.194.)  Dennis performed no screening to determine which respondents perceived the fictitious logo as Scotts.  (Ex. 12 at 118:21-120:10; Ex. 7 ¶ 69.)  Moreover, by excluding the Scotts' brand (or by not rotating real brands on the fictitious product), Dennis fails to account for consumers who have strong brand preference, and may be willing to pay more for a product with or without the 50% Thicker claim based on the brand.  (Ex. 5 ¶ 116.)

available on product in actual marketplace renders survey unreliable); *Simon*, 104 F. Supp. 2d at 1044 (plaintiffs' survey failed to replicate experience in actual marketplace by presenting only products at issue to respondents, removing additional inputs available to real-world consumers, and omitting information that may help consumers sort through products).

### 2.    Dennis's CVM Survey Lacked a Control Group.

Dennis's CVM also lacked a control group. (Ex. 11; Ex. 12 at 106:12-22, 188:2-9.[19]) "A control is designed to estimate the degree of background 'noise' or 'error' in the survey," and is necessary to determine whether respondents' choices are significant or reflect flaws in the survey methodology. *THOIP*, 690 F. Supp. 2d at 240; *cf. Kargo*, 2007 WL 2258688, at *9 (rejecting survey where control group indicated that survey's design was biased).

Lack of a control group is fatal. *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 2001 WL 588846, at *12 (S.D.N.Y. June 1, 2001) ("The consumer survey ... suffers from a fatal flaw as to the first factor, in that there were no controls in place to assure the accuracy of the results.  A control is a way of measuring and rooting out whatever error potential, or 'noise' exists, that is, something other than what is being measured in the first place."); *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1203, 1210 (survey "lack[ed] scientific validity" where it "failed to use a control group"); (Ex. 53 at 397-401 (control group necessary to eliminate error)).

Dennis administered all respondents the same survey— ███████████████████████ ████████████████████████████████████████ (Ex. 11 ¶¶ 22-23.)  There was no control group. (*See generally id.*; Ex. 12 at 106:12-22, 188:2-9.)  It is thus impossible to tell why

---

[19] Dennis asserts ████████████████████████. (Ex. 11 ¶ 40; Ex. 12 at 161:7-18)  By his own testimony, ████████████████████ (Ex. 12 at 188:2-9).  His entire study lacked a control group; he had one set of respondents take the entire survey and no group of respondents took any other survey. (*See id.* at 106:12-22; Ex. 11.)

respondents preferred the product with the 50% Thicker claim—was it the presence of *any* label claim that drove their preference, or did respondents actually prefer the substance of the 50% Thicker claim? Indeed, it is unremarkable that respondents may prefer a product that provides some additional claim. Lacking any control group, it is impossible for Dennis to assert—or the Court to find—that respondents had an actual preference for the 50% Thicker claim as opposed to consumers simply preferring receipt of something additional. *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 575 (E.D.N.Y. 1999) (rejecting survey that used improper controls and therefore failed to account for factors legally irrelevant to question at issue, and thus failed to isolate factor being tested: "Given the inadequacy of the controls, one cannot determine from the data the extent of the relevant type of confusion by indirectly approximating the background noise."); *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999) (rejecting survey that lacked a suitable control).

Nor did Dennis's CVM survey contain a funneling or control question. "Control questions offer a 'don't know' or 'no opinion' option, as part of a set of response alternatives to a closed-ended question. Such questions screen out respondents who may truly not have an opinion on the issue under investigation and minimizes guessing." *Procter & Gamble Pharm., Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006).

Dennis did not provide respondents with a "don't know" or "no opinion" option in the key "referendum" question—which product they preferred.  (Ex. 11, Attachment F at "Referendum/Vote.")  This was not an oversight; Dennis affirmatively decided not to include a funneling or control question. (Ex. 12 at 169:5-19.) This violates the NOAA report's guidelines, upon which Dennis purports to rely (Ex. 11 at ¶¶ 31-32). (Ex. 59 at 34 ("A 'no-answer' option should be explicitly allowed in addition to the 'yes' and 'no' vote options on the main valuation (referendum) question.").)  This failure renders Dennis's CVM leading. *Home Box Office v.*

-17-

*Showtime/The Movie Channel*, 665 F. Supp. 1079, 1084 (S.D.N.Y. 1987) ("a key question in the Sorensen survey and important for his conclusion, is leading because it does not give respondents a fair opportunity to say that they do not know the answer, forcing them to guess.") *vacated in part on other grounds*, 832 F.2d 1311 (2d Cir. 1987); *Zimmerman v. Nat'l Ass'n of Realtors*, 2004 WL 763936, at *12-13 (U.S.P.T.O. Mar. 31, 2004) (crediting criticism that "The failure to provide survey subjects with a 'don't know' option forced guessing or choosing an option by default."); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (affirming exclusion of expert who failed to follow his own stated methodology); *Lawson v. Smith & Nephew Richards, Inc.*, 1999 WL 1129677, at *4 (N.D. Ga. Sept. 30, 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3rd Cir. 1994)).

### 3. Dennis's CVM Survey is Leading and Biased.

#### a. Dennis's CVM Survey Creates Biasing Demand Artifacts/Effects.

A demand artifact or effect is an "aspect[] of the experiment which cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter." (Ex. 61 at 20.) As Dennis acknowledges, a survey must be designed "to disguise the research objectives so that the respondent would not be able to identify the purposes of the research." (Ex. 57 ¶ 26.) Dennis's survey, however, does not disguise its objective. Rather, it focuses on and highlights the 50% Thicker claim, suggests that there is great importance associated with the claim, creating biasing demand artifacts. (*See* Ex. 11 & attachment F.)

The CVM's six slides preceding—and including—the referendum/vote question focus on and emphasize the 50% Thicker claim. (*Id.*, Attachment F.) Indeed, to even proceed with the CVM survey, respondents must affirm ███████████████████████████████ ███████████████████████████████████. (*Id.*, Attachment F at Comprehension Test.)

Emphasizing the 50% Thicker claim, placing the two fictitious items side-by-side, and then again focusing respondents on the 50% Thicker claim led to demand artifacts that bias the survey by suggesting to respondents that the claim bears significance. *E.g.*, *Kargo*, 2007 WL 2258688, at *8 (demand effects bias respondents in side-by-side comparison); *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 WL 168642, at *2 (N.D. Ill. Jan. 24, 2003) (focusing consumers on specific phrase creates demand effect); *Gov't Emp'es Ins. Co. v. Google, Inc.*, 2005 WL 1903128, at *6 (E.D. Va. Aug. 8, 2005) ("demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants … [and] can significantly bias the survey results."); (Ex. 5 ¶¶ 143-47).

Indeed Plaintiffs' proffered expert Ramamirtham Sukumar confirmed that Dennis's failure to provide an "I don't know" option in his referendum/vote question created demand artifacts: ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ (Ex. 18 at 347:12-16.)

Relatedly, by highlighting the 50% Thicker claim, Dennis introduces focalism bias, causing respondents to focus on things they may not focus on otherwise—here the 50% Thicker claim. (Ex. 5 ¶¶148-50; Ex. 6 at 181:19-182:4, 183:4-184:2.) This can be contrasted with an actual in-store purchase, where the claim is one of many on a product that is one of many available for purchase, making it far less likely that consumers will focus on the 50% Thicker claim and base purchasing decisions solely on the presence (or absence) of the claim. (*See id.*)

The demand artifacts, along with the other flaws, require exclusion. *Simon*, 104 F. Supp. 2d at 1048-49 (demand artifacts contributed to exclusion of survey).

**b.      Dennis's CVM Survey Contains Starting Point Bias**

-19-

Dennis acknowledged the potential for starting point bias, which "anchors" respondents to the initial bid amount provided to them in the survey.  (Ex. 11 at 18 n.2.)  Dennis's CVM contains starting-point bias.  (Ex. 5 ¶¶ 138-42; Ex. 7 ¶ 58.)

Dennis provided respondents with starting "bids" of $ ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇[20]  (Ex. 11 ¶¶ 34, 40.)  Respondents were then anchored to those starting

bids in selecting the amount willing to pay for the product.  (Ex. 5 ¶¶ 138-42.)  Indeed, Dennis's

own study proves that starting point bias existed—▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇  (Ex. 11 ¶¶ 51, 53, 37.)  If starting-point bias were absent, the resulting premium

should have been consistent regardless of the initial bid amounts.  This was not so; after Dennis

increased the bid amounts in the main study, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇[21]  (*Id.* ¶ 37.)

## IV.   Dennis's Consumer Survey Should Be Excluded.

Surveys are often inherently biased in favor of the commissioning party.  The Seventh

Circuit recently advised, "caution is required in the screening of proposed experts on consumer

surveys." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d

---

[20] Dennis did not include a control group that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Also, by using whole dollar amounts ▇▇▇▇
Dennis ensured that any "premium" would be in the magnitude of dollars as opposed to cents (for example, by
providing starting bids of $14.50 to $14.75).

[21] Dennis further biases his study by using a "willingness to accept" rubric, asking respondents whether they would
accept the product without the 50% Thicker claim for some monetary amount.  (Ex. 11, Attachment F; Ex. 5 ¶ 37.)
A willingness-to-pay survey, conversely, would take the form of advising respondents of the price of the product
without the 50% Thicker claim and asking how much more (if any) respondents would pay for the product with the
claim.  (Ex. 5 ¶ 37.)  According to the study Dennis relies on—a study he calls "landmark" (Ex. 11 ¶ 31)—
willingness to pay, not willingness to accept, should be used because it is the more conservative choice.  (Ex. 59 at
32.)  Dennis, failing to heed Arrow's admonition, consequently overstates his findings.  (Ex. 5 ¶ 137.)

735, 742 (7th Cir. 2013).  Survey responses differ from responses in real shopping experiences: "[t]he contexts are radically different, and the stakes much higher when actual shopping decisions have to be made (because that means parting with money), which may influence responses." *Id.*  And "the expert witnesses who conduct surveys in aid of litigation are likely to be biased in favor of the party that hired and is paying them, usually generously." *Id.* at 741.

### A.    *Dennis's Survey is Biased*

Dennis's consumer survey should be excluded because, as designed, it is incapable of producing a result indicating consumers interpreted the 50% Thicker claim as Scotts intended.[22] Dennis inexplicably omitted from among the possible interpretations Scotts' intended meaning.[23] (Ex. 11 at 32.)   Indeed, Dennis testified ██████████████████████████

██████████████████████████████████████████████████████████████████

████  (Ex. 12 at 191:16-22; *id.* at 192:6-23 ████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████  The omission of Scotts' intended meaning renders the survey inherently biased and unreliable, and requires it be excluded. *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 581 (S.D.N.Y. 1987) ("the most serious shortcoming of Question 14 is that its list of choices is incomplete, inexplicably omitting to include, as one of its options, the literal meaning of the advertisement!"); (Ex. 7 ¶ 66).

---

[22] Dennis always administered his consumer-perception questions following the CVM study. (Ex. 11 ¶ 28.)  He did not administer to some respondents the consumer-perception questions before the CVM.  There thus is no way to measure the influence and effects the CVM study—and the flaws outlined above—had on respondents' "expectations."  (*See* Ex. 53 at 395 ("The order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers.").)

[23] EZ Seed grows 50% thicker than ordinary seed when they both receive half the recommended rate of water. Results may vary.

**B.** *Dennis's Survey Omitted Key Information Available on the Package and Asked Respondents' "Expectations" Not "Understanding" of the 50% Thicker Claim.*

Dennis's consumer-perception survey must be excluded because it fails to replicate actual market conditions, omitting key information from the package that addressed specific questions he surveyed. First, his survey was not directed to (indeed it never asked) what consumers "understand" the 50% Thicker claim to mean. Instead, ██████████████████████████ ████████████████████████████████████████████. (Ex. 12 at 62:18-64:2.) For example, Dennis asked whether, based on the claim, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ (Ex. 11 at 32.) This is a distinct question from what consumers *understand* the 50% Thicker claim to mean itself. Moreover, and this is the second flaw, Dennis omitted from his fictitious product the directions which plainly address proper watering and advise that "[a] deep and thorough initial watering is the key to success" and that a consumer should water the product until "completely saturated." (Ex. 12 at 63:17-64:2, 80:8-23.)[24] Thus, Dennis's conclusions, ██████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████ must be stricken because they fail, in material fashion, to replicate actual market conditions. No reasonable consumer or survey respondent, if shown the actual watering directions, could disbelieve with EZ Seed, that "[a] deep and thorough initial watering is the key to success" and not believe that a consumer should water the product until "completely saturated." (*See also* Ex. 62 at SMG-EZ0164380

---

[24] Indeed, Dennis asserted ████████████████████ (Ex. 12 at 63:17-64:2.) He asserted he did not include the directions because ████████████████████████████████████████ (*Id.* at 80:16-23.) But Dennis included portions of the package's back when it fit his need. (Ex. 11, Attachment F at Information Provision (showing photos from rear of EZ Seed jug).) Dennis provided no justification for omitting EZ Seed's instructions other than ████████████████████████████████████████████████████████ ██████████ (Ex. 12 at 203:4-204:11.) He ignored real-world conditions to fit within Plaintiffs' requested rubric.

(noting actual consumers in the marketplace considered the 50% Thicker claim in context with EZ Seed's instructions).)  Dennis's survey is thus misleading, unduly prejudicial and should be excluded.  *THOIP*, 690 F. Supp. 2d at 239 (rejecting survey that omitted "source information" on labels[25] as deviating from marketplace conditions); *Am. Home Prods.*, 654 F. Supp. at 582 (survey misleading where respondents were not presented with actual advertisement being surveyed about); *see also Scotts*, 315 F.3d at 281 (survey that obscured packaging and asked consumers to consider "isolated part" worthless); *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1201, 1203, 1210 (survey lacked scientific validity where showed front of packaging only); *Sears*, 2003 WL 168642, at *2 (survey unduly prejudicial where "distorted marketplace conditions by taking the advertisements out of context.").

**C.    *Dennis's Survey Fails to Include a Control Group.***

Like with his CVM survey, Dennis's consumer-perception survey lacked any control group.  For the same reasons discussed with the CVM (*supra* at 16-18), this omission mandates exclusion.  *SmithKline*, 2001 WL 588846, at *12; *Hill's Pet Nutrition.*, 258 F. Supp. 2d at 1203, 1210; *Cumberland Packing*, 32 F. Supp. 2d at 575; *Nabisco*, 32 F. Supp. 2d at 700.

**D.    *Dennis's Survey is Suggestive.***

Dennis's consumer survey contained no open-ended questions, ▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  Such a survey is "inherently suggestive" and invites guessing.  *Am. Home Prods.* 654 F. Supp. at 581 ("It is well recognized that closed-end or multiple-choice questions are inherently suggestive and invite guessing by those who did not get any clear message at all."); (Ex. 7 ¶ 63).  This problem is compounded here because Dennis failed to provide respondents with a reasonable response-choice to all seven questions, a "same"

---

[25] The court in *THOIP* noted that "Labels are not unnoticed by consumers; rather, they serve as important sources of information, including brand identification."  *THOIP*, 690 F. Supp. 2d at 239.

option (for example, the respondent perceives the 50% Thicker claim to mean that one would have to water EZ Seed the *same* frequency as ordinary seed).  Dennis provided respondents with only ███████████████████████████████████████████████████████

███████████████████████████████████[26]   (Ex. 12 at 198:12-17.)

## V.   Dennis Cannot Merely Regurgitate Other Testimony and Evidence.

Dennis's final "assignment" was to ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ (Ex. 12 at 45:23-4, 47:22-48:2; Ex. 11 ¶¶ 58-64.)  Dennis cannot "opine" by merely restating what he purports other evidence states; the jury can read and hear the testimony from the source and does not need an "expert" to read it to them.

While Dennis asserts he used "expertise" in ████████████████████████

████████████████he also testified that ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ (Ex. 12 at 49:21-50:2, 50:24-51:3.)

Indeed, a review of the final section of Dennis's report reveals it is nothing more than a summary of some evidence Dennis reviewed.  (Ex. 11 ¶¶ 58-64.)  Dennis cannot simply restate other evidence, providing the imprimatur of expertise, where he concededly did nothing to determine whether it independently supports his opinion, and where by his own testimony that evidence was invalid.  "Expert testimony is [] not admissible when it addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help.'"  *Taylor v.*

---

[26] Nor did Dennis provide respondents with an "I don't know" option in his perception questions.  (Ex. 11, Attachment F.)  "I don't know" is different than no expectation, and the lack of a "don't know" option renders the survey misleading.  (*See supra*); *Home Box Office*, 665 F. Supp. at 1084; *Zimmerman*, 2004 WL 763936, at *12-13.

*Evans*, 1997 WL 154010, at \*2 (S.D.N.Y. Apr. 1, 1997) (quoting *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)). It takes no expertise to summarize discovery and testimony *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (excluding expert whose testimony would "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence"); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 947 (N.D. Cal. 2010) (excluding expert because "mere recitation of text in evidence does not assist the court in understanding the evidence because reading, as much as hearing, 'is within the ability and experience of the trier of fact.'") (quoting *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 842 (9th Cir. 1995)); *Sterling Sav. Bank v. Poulsen*, 2013 WL 3945989, at \*9 (N.D. Cal. July 29, 2013) (rejecting expert "opinion" entailing of summary documents); *Neuro-Spine Solutions, P.C. v. Freund*, 2009 WL 3255129, at \*2-3 (E.D. Tenn. Sept. 28, 2009) (excluding testimony as unhelpful where expert did not conduct "his own audit, analysis, [or] calculations of the underlying numbers and data," but merely "read [a document] and opine[d] that he agrees with" another witness's "interpretation thereof.").

## CONCLUSION

Dennis's surveys are fundamentally flawed, because, as set forth above: (1) he failed to survey the proper universe; (2) he failed to include a control group; (3) CVM measures subjective willingness to pay, not a "price premium"; (4) CVM itself cannot provide an accurate or reliable damages assessment as required by FRE 702; (5) his CVM did not replicate market conditions; (6) his CVM was leading and biased; (6) his consumer survey was biased; (7) his consumer survey omitted key label information; and (8) his consumer survey did not test consumer *understanding*. Nor can Dennis simply regurgitate evidence. His opinions should be excluded.

Dated:  June 30, 2016           By:    /s/ Shawn Patrick Regan        
        New York, New York                  Shawn Patrick Regan
                                                Joshua S. Paster
                                                  HUNTON & WILLIAMS LLP
200 Park Avenue

New York, New York 10166

Telephone:  (212) 309-1000

Facsimile: (212) 309-1100

Email:  sregan@hunton.com

Email:  jpaster@hunton.com

- and -

Samuel A. Danon (*pro hac vice*)
Jason B. Sherry
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
Email:  sdanon@hunton.com
Email:  jsherry@hunton.com

- and -

Joshua M. Kalb (*pro hac vice*)
HUNTON & WILLIAMS LLP
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307
Telephone:  (404) 888-4000
Facsimile:  (404) 602-9077
Email:  jkalb@hunton.com

-and-

Neil K. Gilman (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:     (202) 955-1674
Facsimile:     (202) 862-3629
Email:  ngilman@hunton.com

*Counsel for Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC*

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2016 I served a copy of the foregoing, on all counsel of record at the addresses listed below, by email and FTP site.

/s/ Shawn Patrick Regan
Shawn Patrick Regan

Scott A. Bursor, Esq.
Joseph L. Marchese, Esq.
Neal Deckant, Esq.
Yitzchak Kopel, Esq.
Bursor & Fisher, P.A.
888 Seventh Avenue
New York, NY 10019
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        ndeckant@bursor.com
        ykopel@bursor.com

Adam Richard Gonnelli, Esq.
Nadeem Faruqi, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Fax: (212) 983-9331
Email:  agonnelli@faruqilaw.com
        nfaruqi@faruqilaw.com

Timothy Peters, Esq.
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Telephone: (215) 277-5770
Fax: (215) 277-5771
Email:   tpeters@faruqilaw.com

Antonio Vozzolo, Esq.
Vozzolo LLC
Email: avozzolo@vozzolo.com