UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
In re Scotts EZ Seed Litigation            :            12-CV-4727 (VB)
                                                    :
                                                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PROFFERED DAMAGES EXPERT COLIN B. WEIR


HUNTON & WILLIAMS LLP
Shawn Patrick Regan
Joshua S. Paster
200 Park Avenue
New York, NY 10166

- and -

Samuel Danon (*pro hac vice*)
Jason B. Sherry
1111 Brickell Avenue, Suite 2500
Miami, FL 33131

Joshua M. Kalb (*pro hac vice*)
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307

Neil K. Gilman (*pro hac vice*)
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

BACKGROUND .....................................................................................................2

I.   Scotts Turf Builder EZ Seed. ............................................................2
II.  Plaintiffs' Lawsuit. ...........................................................................3
III. Plaintiffs' Proposed Damages Models. ............................................4

A. Colin B. Weir's 2014 Report. .........................................................4

B. Colin B. Weir's 2016 Damages Report. ...........................................6

1. Mr. Weir Proposes the Same "Full Compensatory Damages" Model and
a "Statutory Damages" Model. .........................................................6

2. Mr. Weir Proposes a "Price Premium Damages" Model.....................7

ARGUMENT............................................................................................................8

I.   Legal Standard. .....................................................................................8

A. Federal Rule of Evidence 702. .........................................................8

B. *Daubert* imposes a "gatekeeping" obligation. ..................................9

II.  Mr. Weir's "Price Premium Damages" Models Are Unreliable and Unhelpful to
the Trier of Fact Because They Do Not Measure Damages Caused by
Defendants' Challenged Conduct.........................................................10

A. Mr. Weir Performs No Expert Analysis ..........................................11

B. Mr. Weir Cannot Testify That Scotts Calculated a Price Premium Resulting
From the 50% Thicker Claim ..........................................................13

1. Mr. Weir Cannot Opine on His Interpretation of an Internal Scotts
Document.........................................................................................14

2. The ███████████████ Is Not Attributable to the 50%
Thicker Claim. ................................................................................16

III. Mr. Weir Applies No Expert Analysis in His "Statutory Damages" and "Full
Compensatory Damages" Models. .......................................................19

CONCLUSION........................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
303 F.3d 256 (2d. Cir. 2002)..................................................................8, 9

*Andrews v. Metro N. Commuter R. Co.,*
882 F.2d 705 (2d Cir. 1989).................................................................*passim*

*Baker v. Urban Outfitters, Inc.,*
254 F. Supp. 2d 346 (S.D.N.Y. 2003)...........................................................8

*Comcast Corp. v. Behrend,*
133 S.Ct. 1426 (2013)........................................................................*passim*

*Daubert v. Merrell-Dow Pharms.,*
509 U.S. 579 (1993)...........................................................................*passim*

*Greenwell v. Boatwright,*
184 F. 3d 492 (6th Cir. 1999) ....................................................................9

*Heller v. Shaw Indus., Inc.,*
167 F.3d 146 (3d Cir. 1999)........................................................................9

*In re ConAgra Foods, Inc.,*
90 F. Supp. 3d 919, 945 (C.D. Cal. 2015) ................................................12

*In re NJOY,*
2016 WL 787415 (C.D. Cal. Feb. 2, 2016)..........................................11, 17

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir. 1994)..........................................................................9

*In re Rezulin Prod. Liab. Litig.,*
309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................15, 16, 19

*In re Scotts EZ Seed Litig.,*
304 F.R.D. 397 (S.D.N.Y. 2015) .........................................................*passim*

*In re Scrap Metal Antitrust Litig.,*
527 F.3d 517 (6th Cir. 2008) .....................................................................9

*In re U.S. Foodservice Inc. Pricing Litig.,*
729 F.3d 108 (2d Cir. 2013)........................................................................6

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................................14

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ....................................................................................14

*Neuro-Spine Solutions, P.C. v. Freund*,
    2009 WL 3255129 (E.D. Tenn. Sept. 28, 2009) ............................................................16, 19

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
    49 F. Supp. 3d 385, 396 (S.D.N.Y. 2014) ........................................................................8, 12

*Small v. Lorillard Tobacco Co.*,
    94 N.Y. 2d 43 (1999) ..............................................................................................................19

*Taylor v. Evans*,
    1997 WL 154010 (S.D.N.Y. Apr. 1, 1997).................................................................13, 16, 20

**STATUTES**

N.Y. Gen Bus. L § 349 ...................................................................................................... *passim*

N.Y. Gen Bus. L § 350 ...................................................................................................... *passim*

**OTHER AUTHORITIES**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,
    *Reference Guide on Estimation of Economic Damages* 429 (3d ed. National Academy
    of Sciences 2011) ....................................................................................................................10

Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC (collectively, "Scotts") hereby move to exclude the opinions of Colin B. Weir, Plaintiffs' proffered damages expert. Mr. Weir's purported expert opinions are inadmissible under Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell-Dow Pharms.*, 509 U.S. 579 (1993).

## INTRODUCTION

This Court has held Plaintiffs must propose a damages methodology that "matches" one of their two theories of liability. Plaintiffs would be entitled to "all of their money back" *if* they prove EZ Seed was "completely ineffective." For reasons explained in motions filed contemporaneously with this *Daubert* motion, Plaintiffs' first theory is frivolous. The damages model Mr. Weir proposes to "match" it with is remedial math. Because Mr. Weir does not apply any expertise, his testimony related to this first theory (as well as Plaintiffs' supposed statutory damages) is inadmissible.

Scotts thus focuses in this motion on Mr. Weir's testimony related to Plaintiffs' second liability theory, that claims made on the EZ Seed label were false and/or misleading and caused class members to pay a "price premium." Mr. Weir's testimony on this theory is similarly inadmissible, again because Mr. Weir did not apply any expertise. Instead, he takes supposed "price premiums" calculated by others – Plaintiffs' survey experts (Drs. Sukumar and Dennis) and purportedly (but not really) Scotts. The only thing Mr. Weir does is take those numbers and, once again, multiply them. He states no opinion on the validity of the surveys conducted by Plaintiffs' other experts and he actually admits that the Scotts document he cites does *not* calculate a price premium attributable to the challenged claim. Accordingly, Mr. Weir should not be permitted to testify.

# BACKGROUND

## I.    Scotts Turf Builder EZ Seed.

Scotts Turf Builder EZ Seed is an all-in-one seeding product that combines grass seed

and fertilizer with a mulch composed of coconut pith fiber, known as "coir." (Ex. 48 ¶¶ 5-6.[1])

This "coir" mulch in EZ Seed functions differently than traditional mulch. (*Id.* ¶ 9.) The mulch

in EZ Seed accomplishes "more than traditional turfgrass mulch: it must absorb and release

water to the seed in the mulch layer to encourage germination and rooting of the seedling into the

underlying soil." (*Id.*) In other words, the mulch in EZ Seed must "act[] as an absorbent

growing medium to promote seed germination and seedling establishment." *In re Scotts EZ Seed

Litig.*, 304 F.R.D. 397, 403 (S.D.N.Y. 2015) [ECF No. 127] (hereinafter, "2015 Memorandum

Decision") (quoting Ex. 48 ¶ 6).

The design of EZ Seed's mulch "to serve as a seedling nursery, caring for the seeds until

they root properly into the soil," made EZ Seed's "combination," "all-in-one" feature possible.

(Ex 48. ¶¶ 5-11; Ex. 1 ¶¶ 9-10.) The name "EZ Seed" itself was developed ████████████

████████████████████ (Ex. 1 ¶ 10.) It signaled it was ████████████ (*Id.* (quoting

"Seeding for Dummies," "Simple choices," "All-in-one," and "one-step" in internal Scotts

documents).) Even EZ Seed's jugs and bags were designed with ease-of-use in mind, with rigid,

pourable mouths on the bottles and see-through windows on the bags. (Ex 1 ¶ 12.) And, of

course, consumers were attracted to the "Scotts" brand name that appeared on EZ Seed's

packaging. (Ex 1 ¶ 11 (internal Scotts survey found ██████████████████████

████████████████████).)

---

[1] All Exhibits are attached to the Omnibus Declaration of Shawn Patrick Regan.

II.     **Plaintiffs' Lawsuit.**

From EZ Seed's launch in January 2009 through roughly the end of 2013, the product

packaging included the following:

> 50% Thicker with Half the Water* ... *[v]ersus ordinary seed
> when each was watered at half the recommended rate. Results may
> vary.[2]  (Hereinafter, the "50% Thicker Claim")

Scotts replaced the 50% Thicker Claim in late 2013 with a claim that EZ Seed "holds up

to 6x its weight in water." (Ex. 50 at SMG-EZ0156442; Ex. 39 at 98:4-10.)  Plaintiffs allege in

this lawsuit that the 50% Thicker Claim is false and misleading.  *See EZ Seed*, 397 F.R.D. at 405

(citing Plaintiffs' "two theories of liability"); (*accord* Consolidated Complaint ("CC") ¶ 28 (50%

Thicker Claim is false and misleading), ECF No. 14.)  They also allege EZ Seed "does not grow

grass" (CC ¶ 1.)

Plaintiffs' allegations that (i) the 50% Thicker Claim is false and misleading and (ii) EZ

Seed does not grow grass "at all" were described by this Court in its 2015 Memorandum

Decision as Plaintiffs' "two theories of liability."  *See EZ Seed*, 397 F.R.D. at 405 ("Although it

is not entirely clear from plaintiffs' briefing, the Court determines they propose two theories of

liability.").  The first theory is EZ Seed "does not grow grass at all and thus is worthless."  *Id.*

The second theory is "EZ Seed was mislabeled because the statement that it grows '50% Thicker

With Half the Water" is both false and misleading."  *Id.*

This Court certified New York and California purchasers of EZ Seed in its 2015

Memorandum Decision.  "A common question with respect to the first theory of liability," the

Court explained, "is whether EZ Seed grows grass."  *Id.*  Alternatively, a common question with

respect to Plaintiffs' second theory of liability is "whether the 50% thicker claim is false and/or

---

[2] A similar statement appears on the inside flap of the 3.75-pound jug and on the outside of the 10-pound and 20-pound bags of EZ Seed.  Both versions contain the qualifying language that the claim is in comparison to ordinary seed also watered at half recommend rates, and "results may vary."

misleading." *Id.* Because Plaintiffs purport to represent New York and California classes of EZ

Seed purchasers, Federal Rule of Civil Procedure 23 requires Plaintiffs to propose a "damages

model [that is] consistent with [each theory] of liability." *Id.* at 412 (citing *Comcast Corp. v.*

*Behrend*, 133 S.Ct. 1426, 1432 (2013)).  Their damages model must "match" their theory of

liability.  *Id.* at 412-13  "If the model does not even attempt to do that, it cannot possibly

establish that damages are susceptible of measurement across the entire class for purposes of

23(b)(3)," meaning classwide treatment of Plaintiffs' claims is inappropriate under Rule 23.  *Id.*

at 412-15 (quoting *Comcast*, 133 S.Ct. at 1433).)

## III.   Plaintiffs' Proposed Damages Models.

Plaintiffs commissioned two reports from their purported damages expert, Colin B. Weir.

The first was completed in 2014, at the time the parties submitted briefs on class certification,

and the second was completed earlier this year.  In each report, Plaintiffs retained Mr. Weir to

propose methods for calculating class-wide damages ███████████████ resulting from

Plaintiffs' theories of liability.  (Ex. 13 ¶ 4; Ex. 14 ¶ 3.)

### A.   Colin B. Weir's 2014 Report.

Mr. Weir proposed three models to calculate class-wide damages in his original report.

They were (i) "Full Compensatory Damages," (ii) "Disgorgement of Money Damages," and

(iii) "Price Premium Damages."  (Ex. 13 ¶¶ 8-12.)  The first model, "Full Compensatory

Damages," was straightforward: Mr. Weir proposed ██████████████████████████

████████████████████████████  (*Id.*)  This Court summarized this model in its

2015 Memorandum Decision as "rest[ing] on the assumption that plaintiffs received no benefit

whatsoever from purchasing EZ Seed."  *EZ Seed*, 397 F.R.D. at 412-13.  It therefore "matche[d]"

Plaintiffs' theory that EZ Seed "does not grow grass."  *Id.*; ( CC ¶ 1).

4

Mr. Weir's second model for calculating damages was "Disgorgement of Money Damages." (Ex. 13 ¶¶ 13-15.) Similarly straightforward, this model involved Mr. Weir

█████████████████████████████████████████████████████████████████

████████████████. (*Id.* ¶ 13.) This would "disgorge" the money Scotts received from sales of EZ Seed. In its 2015 Memorandum Decision, this Court rejected that model, explaining that Mr. Weir's "Disgorgement of Money Damages" does not "match either of [P]laintiffs' theories of liability" because Plaintiffs would either be entitled to a full refund of their retail purchase price or a "price premium" attributable to the 50% Thicker Claim. *EZ Seed*, 397 F.R.D. at 413.

Mr. Weir finally proposed a "Price Premium Damages" model in his original report. (Ex. 13 ¶¶ 16-20.) ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████. (*Id.* at ¶ 16.) This would yield ████████████████████████ (*Id.*) Mr. Weir then proposed ████████████████████████████████████████████████████████

██████ (*Id.*)

Mr. Weir acknowledged ██████████████████████████████████████████

████████████████████████████████████████ (Ex. 15 at 76:11-13 █████████████

█████████████████████████████████████████████████ But he maintained he *could* ██████████████████████████████████████████████████ (*Id.* at 71:16-73:3.) One method he could use was "hedonic regression," which he explained during deposition was ███████████████████████████████████████████████████

██████████████████████ (*Id.*) He also cited two other methods, "contingent valuation" and "conjoint analysis," which are surveys that measure how consumers value a claim. (*Id.*)

In its 2015 Memorandum Decision, this Court did not find Mr. Weir had proved a price premium attributable to the 50% Thicker Claim.  Instead, the Court found that the Second Circuit "has interpreted *Comcast* to require only that courts should examine the proposed damages methodology at the class certification stage to ensure that it is consistent with the class-wide theory of liability and capable of measurement on a class-wide basis." *EZ Seed*, 397 F.R.D. at 414 n.11 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013)).  Therefore, the Court found Mr. Weir had provided enough evidence, "at this stage," to satisfy the Court that a price premium associated with the 50% Thicker Claim existed.  *Id.* at 414.  But, at that time, Mr. Weir had not calculated any premium, prompting this Court to observe that "consumers may pay a higher price for a product for many reasons that have nothing to do with specific advertising claims, including brand loyalty and product quality." *Id.* at 413. In his future calculations, Mr. Weir must therefore "control for product features other than the [50% Thicker Claim.]" *Id.*

**B.     Colin B. Weir's 2016 Damages Report.**

**1.     Mr. Weir Proposes the Same "Full Compensatory Damages" Model and a "Statutory Damages" Model.**

In his 2016 report, Mr. Weir proposes three damages models.  The first model is replicated from his original report and is again titled the "Full Compensatory Damages" model. Mr. Weir proposes calculating class-wide damages under this model as follows:



"Full Compensatory" damages in this case would therefore be:

(Ex. 14 ¶¶ 9-15.)

The second model Mr. Weir proposes is a "Statutory Damages" model.  (*Id.* ¶¶ 49-51.)
Not proposed in his original 2014 report, classwide damages under Mr. Weir's "Statutory
Damages" model are limited to the New York class and calculated by ███████████████

████████████████████████████████████████████

████████████████████████  (*Id.*)  In other words, Mr. Weir proposes calculating
damages under this model with the following formula:

████████████████████████████

(*Id.*)

In place of "Violations," Mr. Weir proposes using the total number of EZ Seed units sold
in New York. (*Id.* ¶¶ 49-50.) ████████████████████████

██████████████████████████████████████ (*See id.*)

## 2. Mr. Weir Proposes a "Price Premium Damages" Model.

Finally, Mr. Weir proposes a "Price Premium Damages" model.  Mr. Weir docs *not*
himself seek to calculate a price premium in his 2016 report.  He performs no "hedonic
regression" analysis.  Nor does Mr. Weir perform either "contingent valuation" or "conjoint
analysis."  He instead ██████████████████████████████████████

████████████████████████ (*Id.* ¶¶ 16-48.)

Mr. Weir also does not analyze how removing the 50% Thicker Claim from EZ Seed's
packaging affected retail pricing *after* the removal.  He acknowledges ████████████████

████████████████████████. (*Id.*)  And he acknowledges he

████████████████████████████████████

████████████████ (*Id.*)  But he states ████████████████████████

████████████████████████████████████████,

7



(*Id.* ¶¶ 16-21.)

      Mr. Weir also cites an internal Scotts document, which he claims █████████████ ████████████████████████ (*Id.* ¶¶ 27-29.)  Although he admits that██████████ ████████████████████████████████████████████████████████ ███████████████████████████████ (*Id.*)

## ARGUMENT

### I.    Legal Standard.

#### A.    Federal Rule of Evidence 702.

      Rule 702 of the Federal Rules of Evidence establishes the admissibility of expert testimony.  Rule 702 permits a qualified expert to testify if: (1) the expert's scientific, technical, or other specialized knowledge will assist the fact-finder to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.  Plaintiffs must establish the admissibility of Mr. Weir's testimony by a preponderance of the evidence. *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352-53 (S.D.N.Y. 2003).  The trial court is given broad discretion to admit or exclude expert testimony and does not abuse its discretion unless it the decision was "manifestly erroneous." *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d. Cir. 2002).

---

[3] Mr. Weir has controlled for market influences in other cases.  In *In re ConAgra Foods*, Mr. Weir presented a regression model in which he controlled for changing market conditions over time.  (*See* Ex. 64 at pp. 29-30.)  Indeed, controlling for other factors is the purpose of regression analysis.  *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 396 (S.D.N.Y. 2014).

### B.   *Daubert* imposes a "gatekeeping" obligation.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny control the interpretation of Federal Rule of Evidence 702.  In *Daubert*, the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on trial courts to ensure that expert testimony "is not only relevant, but reliable." 509 U.S. at 589.  "The reliability requirement is designed to focus on the methodology and principles underlying the testimony." *Greenwell v. Boatwright*, 184 F. 3d 492, 496-97 (6th Cir. 1999).  As part of its gatekeeping obligation, the Court's analysis should focus on whether each step of Mr. Weir's methodology is reliable. *See Amorgianos*, 303 F.3d at 265 ("[T]he *Daubert* requirement that the expert testify to scientific knowledge— conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert* factors *renders the expert's testimony inadmissible*.") (emphasis supplied) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).  Indeed, "the reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).

While some errors may only go to the credibility of an expert's testimony as opposed to its admissibility, a "significant error in application" renders the testimony inadmissible. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) ("[A]ny step that renders the analysis unreliable… renders the expert's testimony inadmissible.") (quoting Fed. R. Evid. 702 adv. cmte. note, 2000 amend.).  As the Second Circuit emphasized, "to warrant admissibility… it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

9

## II.  Mr. Weir's "Price Premium Damages" Models Are Unreliable and Unhelpful to the Trier of Fact Because They Do Not Measure Damages Caused by Defendants' Challenged Conduct.

The Federal Judicial Center has identified what it calls the "essential elements of a study

of losses ...." (REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Estimation

of Economic Damages* 429 (3d ed. National Academy of Sciences 2011), Ex. 54).[4]  Per the

REFERENCE MANUAL, an estimate of losses must be based on the plaintiffs' legal theory, and

must be limited to harm caused by the defendant.  (*Id.* at 432.)  The expert's first step "is the

translation of the legal theory of the harmful event into an analysis of the economic impact of

that event.  In most cases, the analysis considers the difference between the plaintiff's economic

position if the harmful event had not occurred and the plaintiff's actual economic position."  (*Id.*)

The "characterization of the harmful event" then "begins with a clear statement of what

occurred. The characterization also will include a description of the defendant's proper actions in

place of its unlawful actions and a statement about the economic situation absent the

wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for

scenario)."  (*Id.*)  The "[d]amages measurement then determines the plaintiff's hypothetical value

in the but-for scenario. Economic damages are the difference between that value and the actual

value that the plaintiff achieved."  (*Id.*)  Since any "but-for scenario" will differ "from what

actually happened only with respect to the harmful act, damages measured in this way isolate the

loss of value caused by the harmful act and exclude any change in the plaintiff's value arising

from other sources."  (*Id.*)  Therefore, "a proper construction of the but-for scenario and

measurement of the hypothetical but-for plaintiff's value by definition includes in damages only

the loss *caused* by the harmful act."  (*Id.* (emphasis in original); *see also* Ex. 1 ¶ 22.)

---

[4] *See also Comcast*, 133 S.Ct. at 1432 (quoting with approval REFERENCE MANUAL).

In this case, Plaintiffs must isolate the amount of any alleged price premium that can be attributed to the 50% Thicker Claim by "control[ling] for product features other than the [50% Thicker Claim]." *EZ Seed*, 397 F.R.D. at 413.  Plaintiffs must, in other words, "present evidence of a damages methodology that can determine the price premium attributable to [Scotts'] use of the [allegedly] misleading advertisements[.]"  *In re NJOY*, 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016).

### A.    Mr. Weir Performs No Expert Analysis

Two years ago, Plaintiffs and Mr. Weir repeatedly cited "hedonic regression" as a methodology that could be used to control for EZ Seed's spectrum of features.  Mr. Weir testified during his deposition ████████████████████████████████████████████████

████████████████████████████████████████████.  (Ex. 15 at 72:3-10.)  He explained it was ████████████████████████████████████████████

████████████████████  (*Id.*)  He continued:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

(*Id.* at 78:15-24.)[5]

This testimony from Mr. Weir is consistent with what he has done in other similar cases.  In *Langan v. Johnson & Johnson Consumer Co.*, for example, Mr. Weir employed hedonic

---

[5] A district judge in this district has provided the following helpful description of a regression analysis:

> The basic regression method is simple:  isolate the effect of one variable (the "independent variable") on another variable (the "dependent variable") by holding all other potentially relevant variables (the "control variables") constant. By controlling for other factors that might influence the dependent variable, one "regresses" the influence of the independent variable on the dependent variable. The number associated with that influence is called a "coefficient."

*Reed Constr. Data*, 49 F. Supp. 3d at 396.

regression analysis to calculate a premium attributable to a "Natural Oat Formula" statement on two labels of Aveeno® baby cleanser. (*See* Ex. 65 at *3.)  In *In re ConAgra Foods*, Mr. Weir used hedonic regression to isolate a price premium attributable to the challenged advertising statement "Natural" from "twenty [other] product attributes" of Wesson Oil. (*See* Ex. 63); *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 945 (C.D. Cal. 2015).

Mr. Weir performed no similar analysis in this case.  Plaintiffs argued in their class certification briefing that "*Comcast* d[oes] not articulate any requirement" that Mr. Weir calculate a price premium *at the class certification stage*." (ECF No. 101, at 13 (emphasis added).)  It was therefore not "fatal" to their motion to certify a class that he had "yet to actually run the regression[.]"[6]  (*Id.*)

Quoting *ConAgra* in its 2015 Memorandum Decision, this Court acknowledged "conern[]" with Mr. Weir's failure to "identify ... variables he intends to build into his models" or describe in detail his damage methodologies. *EZ Seed*, 304 F.R.D. at 414 n.11.  But it declined to require more of Mr. Weir at the time. "[A]t this stage," the Court accepted that there was a premium attributable to the 50% Thicker Claim and that Mr. Weir could calculate it. *Id.* at 414.  But this Court also offered the following caveat: "If ... [Mr.] Weir is unable to prove the existence of a price premium, or isolate a price premium associated with the [50% Thicker Claim], [Scotts] may move to decertify the class." *Id.*

Mr. Weir also mentioned conjoint analysis and contingent valuation in his 2014 deposition. (Ex. 15 at 72:11-20.)  But Mr. Weir has not performed either of these analyses.  Rather, Plaintiffs had other purported experts perform those analyses. (*See* Exs. 11, 17.)  Mr. Weir simply ███████████████████████████████████████████

---

[6] Plaintiffs also blamed Scotts.  They argued Scotts had failed to provide adequate pricing data of *non-Scotts* products that Mr. Weir could use in running his regression analysis. (*Id.*)  They claimed Mr. Weir lacked "the data needed to complete the regression calculation prior to class certification." (*Id.*)

████████████████████. (Ex. 14 at 15.)  Mr. Weir did nothing to validate the other experts' work

and admitted ████████████████████.[7]  (Ex. 16 at 30:20-32:21.)  Indeed,

allowing Mr. Weir to testify would improperly and inappropriately suggest to the jury that

another "expert" reviewed and relied on the surveys conducted by Drs. Sukumar and Dennis.

Such bootstrapping testimony is inappropriate under Rule 403, especially where the probative

value of Mr. Weir's elementary multiplication is virtually zero.

Put simply, Mr. Weir did no expert work in this case and the Court should not allow his

testimony.  *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) ("Expert testimony

is [] not admissible when it addresses 'lay matters which a jury is capable of understanding and

deciding without the expert's help.'") (quoting *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d

705, 708 (2d Cir. 1989)).

### B.   Mr. Weir Cannot Testify That Scotts Calculated a Price Premium Resulting From the 50% Thicker Claim



Mr. Weir also proposes ████████████████████

████████████████.  The following statement appears in an internal

PowerPoint presentation ████████████████████

████████████████████ (Ex. 43 at SMG-

EZ009018.)  Mr. Weir proposes ████████████████████

████████████████ (*See* Ex. 14 ¶¶ 27-29.)

A proposed expert's testimony must be reliable, *i.e.*, the product of a reliable

methodology, applied in a reliable manner to the facts of the case.  Fed. R. Evid. 702.  This is

---

[7] As demonstrated in Scotts' *Daubert* motions with respect to Drs. Sukumar and Dennis, the testimony of both experts should be stricken.  If the Court grants those motions, it is readily apparent that Mr. Weir cannot rely on them for his damages calculations.

true for scientific and non-scientific expert testimony. *See, e.g., Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999). The Rules do "not allow a witness, under the guise of giving expert testimony, to become the mouthpiece for the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

Mr. Weir's attempt to opine on the meaning of a phrase that appears in an internal Scotts document is simply not expert testimony. Once again, Mr. Weir performs no analysis and employs no methodology in his report. He only finds some evidence that he believes helps the side that is paying him, and then purports to "interpret" that evidence.

### 1. Mr. Weir Cannot Opine on His Interpretation of an Internal Scotts Document.

Mr. Weir proposes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ (Ex. 14 ¶ 27) The calculation he cites comes from an internal Scotts 2011 Pricing US Consumer Review of Consumer Grass Seed. (*See* Ex. 43.) A four-page summary of Scotts' price positioning in the consumer grass seed market, this document includes ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Ex. 1 ¶ 39.) One bullet-point reflects the following:



(Ex. 43 at SMG-EZ009018.)

Mr. Weir uses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ (Ex. 14 at Tbl. 4, 5.) Mr. Weir further stated during deposition that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14



(Ex. 16 at 212:7-213:3.)

Mr. Weir's "methodology" was nothing more than simply reviewing selected evidence –

without investigation – and opining as to what those materials might mean.  Such an approach is

inherently unreliable.  In *Andrews*, for example, the district court permitted the plaintiff's expert

to summarize testimony from fact witnesses – the plaintiff had testified earlier in the case the

railroad station was "dirty, filthy and kind of icy, that the platform had trash and ice on it, and

that the lighting was very dim" – by opining the station was not a 'safe place.'"  882 F.2d at 708.

The Second Circuit reversed.  The court noted the "expert" testimony permitted by the district

court was not cured by the district court's charge that the jury was not bound to accept the

testimony of expert witnesses.  *Id.*  The testimony was impermissible because it was "about

matters that were neither scientific nor in any way beyond the jury's ken."  *Id.*  The jury, the

court explained, "needed no special training or expertise to decide whether the platform was a

"safe place."  *Id.*

This is consistent with other court's holdings that experts cannot merely interpret

documentary evidence or argue ultimate legal conclusions.  *See In re Rezulin Prod. Liab. Litig.*,

309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (excluding proposed expert whose testimony would

"supplant the role of counsel in making argument at trial, and the role of the jury in interpreting

the evidence"); *Neuro-Spine Solutions, P.C. v. Freund*, 2009 WL 3255129, at *2-3 (E.D. Tenn. Sept. 28, 2009) (excluding testimony as unhelpful to trier of fact where proposed expert did not conduct "his own audit, analysis, [or] calculations of the underlying numbers and data," but merely "read [a document] and opine[d] that he agrees with" another witness's "interpretation thereof.").

The same is true for Mr. Weir's professed belief that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇ (Ex. 16 at 212:8-213:3.) Courts have disallowed "expert" testimony purporting to opine on defendants' "motives" in the past. As one sister court in this district explained, courts have excluded "expert" testimony when it "include[s] factual narratives and interpretations of conduct or views as to the motivation of parties." *Rezulin*, 309 F. Supp. 2d at 541, 546 (opinions of expert witnesses on "intent, motives, or states of mind" of corporations, regulatory agencies, and others "have no basis in any relevant body of knowledge or expertise"); *see also Taylor*, 1997 WL 154010, at *2 (purported expert's "musings as to defendants' motivations would not be admissible if given by any witness—lay or expert."). It is clear Mr. Weir lacks "specialized knowledge" that could "assist the trier of fact" in understanding an internal Scotts presentation. His testimony should be excluded for that reason alone.

### 2.   The ▇▇▇▇▇▇▇▇▇▇▇ Is Not Attributable to the 50% Thicker Claim.



Mr. Weir's testimony should be excluded for another reason. Any testimony he could offer about what *Scotts* employees meant when they used the phrase ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ irrelevant to the issue that is presently before the trier of fact: the amount, if any, of the price premium attributable to the 50% Thicker Claim. The phrase which immediately follows "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ (Ex. 43 (emphasis added).) Indeed, Mr. Weir *admits* ▇▇▇▇▇▇▇

16

████████████████████████████████████. (*See* Ex. 14 ¶ 29

████████████████████████████████████████

████████████████████████████████).) Thus, he

essentially concedes that the use of the 34% figure was improper. *EZ Seed*, 397 F.R.D. at 413

(stating to meet Plaintiffs' burden, Mr. Weir must "control for product features other than the

[50% Thicker Claim.]").

Moreover, it is obvious from the face of the document and common sense that the ████████

████████████████ cannot be solely attributable to the 50% Thicker Claim.  There are a

number of differences between EZ Seed and its physical components sold separately, including:

- The convenience of purchasing one product instead of three;

- The convenience of applying only one product pre-mixed to optimal proportions instead of three un-mixed products;

- The ability to purchase smaller quantities, and potentially save money, to cover only a small patch;

- The convenience of carefully designed containers with a rigid, pourable jug or a zip-lock closure with see-through windows for larger bags.

(Ex. 1 ¶ 40.)

As this Court has noted, "Plaintiffs' damages model must measure only damages

attributable to plaintiff's theory of liability[.]"  *EZ Seed*, 397 F.R.D. at 412; *see also NJOY*, 2016

WL 787415, at *5 (damages methodology must determine the price premium attributable to use

of the allegedly misleading advertisements).  Because "consumers may pay a higher price for a

product for many reasons that have nothing to do with the specific advertising claims," courts

17

"routinely reject price premium methodologies" that do not isolate a premium attributable to the purportedly misleading advertising claim. *EZ Seed*, 397 F.R.D. at 413.

Mr. Weir attempts to explain away his failure to isolate a premium attributable to the 50% Thicker Claim by saying ████████████████████████████████████ ████████████████████████████████████ Mr. Weir explained at deposition that ████████████████████████████████████ ████████████████ (Ex. 16 at 206:8-11.) Mr. Weir appears to be implying in this testimony, then, that █████████████████████████████████████ ███████████████████████████████████ ██████ Again, Mr. Weir's belief is not expert testimony. It would be within the ken of any juror to know ███████████████████

In any event, the fact that EZ Seed purportedly commands only a ████████████ ████████ (*see* Ex. 1 ¶ 43)) ██████████████████████ in fact demonstrates that Dr. Dennis's ███████ is nonsensical. If Dr. Dennis' report is understood to calculate a price premium, he would in fact be opining that EZ Seed without the 50% Thicker Claim would be *cheaper* than its component parts. (*See* Ex. 1 at p.23 n.84.)

As to Dr. Sukumar, as explained in the Sukumar *Daubert* motion, he made a math error and correcting that error his "analysis" actually results in a "price premium" of ███████ (*See* Mem. L. In Support of Defs. Mot. to Exclude Pls. Proffered Expert Ramamirtham Sukumar, at Arg.III.) Scotts explains therein why this renders Sukumar's analysis inadmissible, but for purposes of Mr. Weir's purported analysis, it wholly undermines his rationale for using the ███ figure from the Scotts document. Any testimony based on Mr. Weir's reliance on the single

irrelevant Scotts document must be stricken.[8]  *Andrews*, 882 F.2d at 708; *Rezulin*, 309 F. Supp.

2d at 541; *Neuro-Spine Solutions*, 2009 WL 3255129, at *2-3.

### III.  Mr. Weir Applies No Expert Analysis in His "Statutory Damages" and "Full Compensatory Damages" Models.

Mr. Weir's "Statutory Damages" and "Full Compensatory Damages" models are not

based on expertise and should be stricken.  Mr. Weir simply multiplied the full refund price, or

the $50 and $500 figures provided in New York General Business Law §§ 349 and 350, by EZ

Seed's unit sales in New York or California.  (Ex. 14 ¶¶ 49-51.)  "Expert testimony is [] not

admissible when it addresses 'lay matters which a jury is capable of understanding and deciding

without the expert's help.'"  *Taylor*, 1997 WL 154010, at *2 (quoting *Andrews v. Metro N.*

*Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).  Counsel, this Court, and the jury would

each be able to perform Mr. Weir's calculations without his testimony.[9]  They should therefore

be stricken.

## CONCLUSION

For the foregoing reasons, the Court should exclude Weir's "opinions" and declaration.[10]

---

[8] Mr. Weir also cites deposition testimony from Scotts' marketing personnel to conclude ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮(Ex. 14 ¶ 28.)  Scotts explains in its summary judgment brief why Mr. Weir's "interpretation" of this snippet of testimony is incorrect, but more importantly for this *Daubert* motion, Mr. Weir testimony is just impermissible opining on his "interpretation" of the evidence.  Mr. Weir attempts to put a veneer of expertise by stating that the testimony ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  (*Id.* ¶ 29.)  But the testimony cannot "confirm" anything because neither Mr. Weir nor those on whom he relies (Drs. Sukumar and Dennis) have established that there was any price premium attributable solely to the 50% Thicker Claim in the first place.  In short, there is no basis in law or fact whereby Mr. Weir can testify as an expert that Scotts witnesses testified that there is a price premium *solely attributable* to the 50% Thicker Claim.

[9] Utilizing Mr. Weir's "Statutory Damages" model would not relieve Plaintiffs of the obligation to calculate a price premium that is attributable to the 50% Thicker Claim.  Both GBL §§ 349 and 350 require a showing of "actual" harm.  *Small v. Lorillard Tobacco Co.*, 94 N.Y. 2d 43, 56 (1999).  As explained in Section II, *supra*, Mr. Weir has failed to isolate a classwide price premium attributable to the 50% Thicker Claim.  Plaintiffs have not shown an "actual" class-wide harm sufficient to invoke the statutory penalties in §§ 349 and 350.  Mr. Weir's "Statutory Damages" model should therefore be stricken.

[10] Of course, if the Court grants Scotts' motions to exclude Drs. Sukumar and Dennis, it must grant this Motion.

Dated:  June 30, 2016
New York, New York

By:  ___/s/ Shawn Patrick Regan___
Shawn Patrick Regan
Joshua S. Paster
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 309-1000
Facsimile: (212) 309-1100
Email:  sregan@hunton.com
Email:  jpaster@hunton.com

- and -

Samuel A. Danon (*pro hac vice*)
Jason B. Sherry
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
Email:  sdanon@hunton.com
Email:  jsherry@hunton.com

- and -

Joshua M. Kalb (*pro hac vice*)
HUNTON & WILLIAMS LLP
600 Peachtree Street NE, Suite 4100
Atlanta, Georgia 30307
Telephone:  (404) 888-4000
Facsimile:  (404) 602-9077
Email:  jkalb@hunton.com

-and-

Neil K. Gilman (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:     (202) 955-1674
Facsimile:     (202) 862-3629
Email:  ngilman@hunton.com

*Counsel for Defendants The Scotts Miracle-Gro Company and The Scotts Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2016 I served a copy of the foregoing, on all counsel of record at the addresses listed below, by email and FTP site.

/s/ Shawn Patrick Regan   <br>Shawn Patrick Regan

Scott A. Bursor, Esq.
Joseph L. Marchese, Esq.
Neal Deckant, Esq.
Yitzchak Kopel, Esq.
Bursor & Fisher, P.A.
888 Seventh Avenue
New York, NY 10019
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
         jmarchese@bursor.com
         ndeckant@bursor.com
         ykopel@bursor.com

Adam Richard Gonnelli, Esq.
Nadeem Faruqi, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Fax: (212) 983-9331
Email:  agonnelli@faruqilaw.com
         nfaruqi@faruqilaw.com

Timothy Peters, Esq.
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Telephone: (215) 277-5770
Fax: (215) 277-5771
Email:   tpeters@faruqilaw.com

Antonio Vozzolo, Esq.
Vozzolo LLC
Email: avozzolo@vozzolo.com

54936.030018 EMF_US 59895284v17