**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Scotts EZ Seed Litigation | Civil Action No. 12-CV-4727 (VB) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
**EXCLUDE THE TESTIMONY OF DR. J. MICHAEL DENNIS**

Dated:  September 1, 2016

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
          jmarchese@bursor.com


**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Timothy J. Peter
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Facsimile:  (212) 983-9331
Email:  nfaruqi@faruqilaw.com
          tpeter@faruqilaw.com

*Class Counsel*

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ........................................................................................ 1

    A.  Contingent Valuation (CV) Methodology ........................................ 2

    B.  Dr. Dennis's Qualifications ............................................................. 2

    C.  Dr. Dennis's CV Surveys And Testimony In The Light Cigarettes
       Cases ............................................................................................... 4

    D.  Dr. Dennis's CV Survey And Testimony In The Sprint Cellphone
       Locking Case ................................................................................... 5

    E.  Dr. Dennis's CV Survey Of Grass Seed Purchasers ........................ 6

II.  DR. DENNIS CONSIDERED BOTH SUPPLY-SIDE AND DEMAND-
    SIDE FACTORS TO ENSURE THAT HIS PRICE PREMIUM
    CALCULATION REFLECTED A REALISTIC MARKET VALUATION
    OF THE 50% THICKER CLAIM ........................................................ 10

III.  THE CV PORTION OF DR. DENNIS'S SURVEY IS RELIABLE AND
    RELEVANT ......................................................................................... 14

    A.  The Population Of Survey Respondents Was Appropriate And
       Representative Of Class Members.................................................... 14

    B.  The Survey Does Not Include A "Control Group" Because There
       Is No Such Thing As A "Control Group" In CV Methodology ......... 15

    C.  CV Surveys Are Not Designed To Precisely Mimic Every
       Potential Offering In The Marketplace ............................................. 16

    D.  The Survey Was Not Leading .......................................................... 17

    E.  The Survey Did Not Overemphasize The 50% Thicker Claim .......... 17

    F.  The Survey Design Eliminated Any Significant Impact Of Starting
       Point Bias ....................................................................................... 19

IV.  THE CONSUMER PERCEPTION PORTION OF DR. DENNIS'S
    SURVEY IS RELIABLE AND RELEVANT ......................................... 20

V.  DR. DENNIS'S ANALYSIS OF EVIDENCE RELATED TO SCOTTS'
    SALES, PRICING, AND CONSUMER SURVEY RESEARCH IS
    APPROPRIATE AND RELEVANT ...................................................... 24

CONCLUSION............................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Duran v. U.S. Bank National Assn.*,
   59 Cal.4th 1 (2014) ................................................................................................ 14

*In re Autozone, Inc.*,
   2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ........................................................ 14

*Price v. Philip Morris, Inc.*,
   848 N.E.2d 1 (Ill. 2005) .................................................................................... passim

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999) ..................................................................... 15, 17, 19

*Tiffany and Co. v. Costco Wholesale Corp.*,
   127 F. Supp. 3d 241 (S.D.N.Y. 2015) ................................................. 15, 16, 17, 19

*Trahan v. U.S. Bank National Assn.*,
   2014 WL 3750053 (N.D. Cal. July 29, 2014) ........................................................ 14

*Victoria's Secret Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*,
   2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) ....................................................... 15, 23

## RULES

Fed. R. Evid. 703 ..................................................................................................... 24

## OTHER AUTHORITIES

Reference Manual on Scientific Evidence ................................................................. 23

Report of the NOAA Panel on Contingent Valuation ......................................... 1, 2, 17

i

## I.  INTRODUCTION

It is quite obvious that the 50% Thicker Claim that appears so prominently on EZ Seed's packaging had value, and thus was responsible for at least a portion of EZ Seed's price premium. *See* Marchese Decl. Ex. CC*, Peoples Dep. at 110:17-20; SOF ¶ 829 ███████████████ ███████████████████████████.[1] But it is very difficult to measure precisely what that number is.

One way to estimate that value is through the use of the contingent valuation (or CV) technique.  "[T]his approach is based on the direct elicitation of these values from individuals through the use of carefully designed and administered sample surveys."  Kenneth Arrow, *et al*., *Report of the NOAA Panel on Contingent Valuation*, at 3.[2]  Plaintiffs have submitted such a survey, by Dr. J. Michael Dennis, a highly credentialed expert in survey research practices, to design and conduct a CV survey to measure grass seed purchasers valuation of the EZ Seed product, both with and without the 50% Thicker Claim.

By measuring respondents' valuations of products that are identical in all respects except for the presence or absence of the 50% Thicker Claim, Dr. Dennis's survey controlled for all other variables to isolate the price premium solely attributable to the 50% Thicker Claim.  Dr. Dennis also worked closely with an expert economist retained by Plaintiffs, Colin B. Weir, to ensure that his survey design took into account both supply-side and demand-side factors so that his price premium calculation would reflect the true market value of the 50% Thicker Claim.  Dr. Dennis's survey showed the price premium was ███████████████████ ██████████████████  Scotts has moved exclude Dr. Dennis's survey as unreliable.

---

[1] Plaintiffs' Local Rule 56.1 Statement is referenced herein at "SOF."

[2] Kenneth Arrow, et al., Report of the NOAA Panel on Contingent Valuation (Jan. 11, 1993), submitted by Scotts as Regan Decl. Ex. 59, (hereafter, "NOAA Report").

A.      **Contingent Valuation (CV) Methodology**

Since the early 1970s, CV surveys have been widely used by the federal government for cost-benefit analysis of projects impacting, positively or negatively, on the environment – for example, to determine monetary valuations of things such as water quality, recreational opportunities, and biodiversity restoration.  *See generally* NOAA Report at 1-5. CV surveys are designed to elicit estimates of value for goods for which "there are no direct market transactions that can be observed."  *Id.* at 3.  In the 1980s, there was "a dramatic increase" in the use of CV surveys, "due in part to the availability of comprehensive reference texts on the subject … [and] the growing use of the CV technique in estimating lost passive-use values in litigation arising from state and federal statutes designed to protect natural resources."  *Id.* at 4-5.

The use of CV to measure economic damages "dates back to its use by the U.S. government as the tool for measuring economic damages from the 1989 Exxon Valdez Oil Spill in Prince William Sound."  *See id.* at 58 n.3.  This spurred the National Oceanic and Atmospheric Administration ("NOAA") to convene a blue-ribbon panel of experts (co-chaired by Nobel Prize laureate economists Kenneth Arrow and Robert Solow) to assess the validity of using CV surveys to support damages arguments in litigation.  The NOAA Panel issued a report on January 11, 1993 stating the following conclusion:

> The Panel's conclusion is that a well-conducted CV study provides an adequately reliable benchmark to begin such arguments.  It contains information that judges and juries will wish to use, in combination with other evidence, including the testimony of expert witnesses.  *Id.* at 44.

B.      **Dr. Dennis's Qualifications**

Dr. Dennis is a Senior Vice President of the National Opinion Research Center ("NORC") at the University of Chicago, an organization founded in 1941, which conducts survey research on behalf of the U.S. Census Bureau, U.S. Department of Labor, Bureau of

Labor Statistics, U.S. Department of Health and Human Services, U.S. Department of Defense, U.S. Department of Education, and U.S. Department of Energy.  *See* Marchese Decl. Ex. II, 1/7/16 Dennis Report ¶ 4.  Before joining NORC, Dr. Dennis was Executive Vice President and Managing Director for Government and Academic Research for GfK, based in Palo Alto, California.  He was the data collection project director for the National Immunization Survey, which at the time was the largest telephone survey ever conducted by the federal government. *Id.*, Ex. A (curriculum vitae).  Dr. Dennis currently serves as the Executive Director of AmeriSpeak, NORC's panel-based research platform.  Dr. Dennis oversees all of AmeriSpeak's operations, including business development and panel recruitment.  *Id.*

Dr. Dennis's curriculum vitae lists 20 publications and 42 presentations concerning survey design and related issues.  *Id.*  Dr. Dennis has been personally involved in the design and conduct of over a hundred statistical surveys using the internet mode of data collection.  *Id.* ¶ 6. Among the federal sponsors of Dr. Dennis's surveys are the United States Centers for Disease Control and Prevention, United States Environmental Protection Agency, the Social Security Administration, the Office of National Drug Control Policy, the National Cancer Institute, and the National Institute of Alcohol Abuse and Alcoholism.  *See generally id.,* Ex. A (curriculum vitae).

Dr. Dennis has designed and conducted CV surveys to measure damages in litigation in at least 6 prior cases.  *Id.* ¶ 7.  His testimony based on CV surveys has never been excluded under *Daubert* or any similar legal standard.  His expert testimony has never been found unreliable or excluded in any case for any reason.

C.      **Dr. Dennis's CV Surveys And Testimony In The Light Cigarettes Cases**

Dr. Dennis was the principal researcher and author of the 2002 Marlboro Lights Survey and 2003 Lights Consumer Survey (collectively, the "Lights Surveys").  Both surveys were conducted using CV to measure the price premium attributable to certain allegedly misrepresented qualities of Marlboro and Cambridge Lights cigarettes.  The Lights Surveys showed that:

> respondents would have demanded a discount of 77.7% had they known that light cigarettes did not provide any health benefit when compared to the full-flavored cigarettes, and a discount of 92.3% had they known that light cigarettes were more harmful than regular cigarettes.

*Price v. Philip Morris, Inc.,* 848 N.E.2d 1, 78 n.6 (Ill. 2005).

Dr. Dennis testified in *Price* at a bench trial before Judge Nicholas G. Byron of the Illinois Circuit Court, and "was subjected to extensive cross-examination."  *Id.* at 89.  Defendant moved to strike his testimony on various grounds, which motion was denied.  *See id.*  The *Price* plaintiffs also presented trial testimony by an economist who applied Dr. Dennis's 92.3% discount to Philip Morris's aggregate sales of Marlboro and Cambridge Lights in Illinois to calculate $7.1005 billion in economic damages to the class.  *Id.* at 28-29.  After considering all of the evidence presented at the trial, Judge Byron found Philip Morris liable for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and awarded $7.1005 billion in actual damages, plus punitive damages and attorney's fees.  *Id.* at 31.

A closely divided Illinois Supreme Court reversed Judge Byron in a 4-2 decision, holding that the Federal Trade Commission had "specifically authorized" cigarette manufacturers to use the allegedly misleading terms describing light cigarettes, thus Philip Morris's conduct fell within the Illinois Consumer Fraud Act's statutory exemption from liability for "conduct in compliance with orders" of a federal agency.  *Id.* at 6, 54.  The majority opinion includes no

4

criticism of Dr. Dennis's testimony and "decline[s] to address" the issue of damages.  *Id.* at 53. Two separate dissenting opinions, however, strongly endorsed Dr. Dennis's qualifications, his testimony, and the validity of his surveys.  *E.g.*, *id.* at 83-84 (dissent of Justice Freeman, joined by Justice Kilbride) (stating that Dr. Dennis's survey was "sufficient evidence to support an award of damages to the plaintiff class"); *id.* at 89 (separate dissent of Justice Kilbride) (stating that "defendant has not challenged the trial court's qualification of Dr. Dennis as an expert, nor could it legitimately question his qualifications").

> **D.     Dr. Dennis's CV Survey And Testimony In The Sprint Cellphone Locking Case**

Dr. Dennis also conducted a consumer perception and CV survey in *In re Cellphone Termination Fee Cases* (California Superior Court, Alameda County), a class action involving claims that Sprint placed software-based locks on cellphones to prevent them from being used to receive services from other carriers.  This survey began with screening questions to identify respondents that purchased a cell phone since 1999 from one or more of the five largest U.S. carriers.  9/1/16 Declaration of J. Michael Dennis ("9/1/16 Dennis Decl.")  ¶ 6.  Respondents who qualified were then asked a series of questions designed to determine what expectations they would form with certain descriptive terms, including manufacturers' brand names as well as terms like "dual-band" and "tri-mode," which had been featured prominently in Sprint's retail displays.  *Id.*  The survey also included a series of CV questions using a design closely based on Dr. Dennis's prior work in the Lights Surveys.  It began with a referendum-type question asking respondents to choose between two hypothetical handsets that are identical in every respect except that one is locked and the other is unlocked.  *Id.* ¶ 7.  Respondents were then asked a series of questions to determine how much of a discount would be required to induce them to purchase the locked handset instead of an otherwise identical unlocked handset priced at $100.

*Id.* Their responses indicated that, on average, a discount of $55.60 was required to induce the purchase of the locked handset. *Id.*

Sprint moved to strike Dr. Dennis's expert declaration in connection with its motion for summary judgment. The court denied the motion to strike:

> The Court DENIES the motion of Sprint to strike portions of the Declaration of Dr. J. Michael Dennis. Dr. Dennis performed a survey of consumer knowledge and expectations. Sprint argues that the Court should exclude the survey because it is not based on reliable and accepted statistical principles and it measures matters that are not germane to the questions before the Court. The Court has considered the Declaration of Dr. Dennis. The trier of fact can evaluate what weight to give to Dr. Dennis's Declaration or testimony at trial.

Marchese Supp. Decl. Ex. PPPP, *In re Cellphone Termination Fee Cases*, 1/12/07 Order at 11.

The court relied heavily on Dr. Dennis's testimony in denying Sprint's summary judgment motion:

> The Dennis Report at ¶ 14 suggests that 84% of Sprint purchasers are unaware of the locking feature. … The failure to disclose the locking feature is arguably material because it affects the capabilities of the handsets.

*Id.* at 6-7.

> Dr. Dennis's survey provides evidence that consumers prefer by a 7-1 margin unlocked phones and that some consumers (15%) would be unwilling to purchase a locked handset at any price. *See* Dennis Report ¶¶ 17, 19. The Dennis Report also suggests that consumers would require on average a $55 discount to purchase a locked handset instead of an equivalent unlocked handset. Dennis Report ¶17.

*Id.* at 7-8.

### E.    Dr. Dennis's CV Survey Of Grass Seed Purchasers

For this case, Dr. Dennis surveyed ████████████████████████████████ ████████████████████████████ The survey included a contingent valuation (CV) section

6

designed to measure the price premium, if any, attributable to the 50% Thicker Claim.  It also included a series of questions designed to measure purchasers understanding and expectations from that claim. Marchese Decl. Ex. II, 1/7/16 Dennis Report ¶ 11.



*Id.* at 14.

The survey includes several screens that provide information about these two products.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Perhaps unsurprisingly, ███████████████████████████████████

█████████████. *Id.* ¶ 26.  The next question asks the respondent if ███████████████

████████████████████████████████████████████████████████

████████████[3]  Respondents are also offered ████████████████ when responding to this

initial valuation question.  *Id.*  Depending on the answer, ████████████████████████

████████████████████████████████████████████████████████

---

[3] ████████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████  *See id.* ¶ 26; *see also* Part III.F below.

8

███████████████████████████. *Id.* ¶ 27. ██████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 37.

This showed that the average discount required to induce the purchase of the grass seed without

the 50% Thicker Claim was ██████████████████████████████████

████████ *Id.* Dr. Dennis opines that these percentages measure the price premium

attributable to the 50% Thicker Claim.  Regan Decl. Ex. 12, Dennis Dep. at 139:4-9 ██████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

    After the contingent valuation section, ████████████████████

███████████████████████████████████████████████████

    ████ Marchese Decl. Ex. II, 1/7/16 Dennis Report ¶ 42.  Seven questions were administered

asking the respondent to select the statement that ██████████████████████████

*Id.*  The results are set forth in this table:



## II.   DR. DENNIS CONSIDERED BOTH SUPPLY-SIDE AND DEMAND-SIDE FACTORS TO ENSURE THAT HIS PRICE PREMIUM CALCULATION REFLECTED A REALISTIC MARKET VALUATION OF THE 50% THICKER CLAIM

Scotts argues that Dennis measured only respondents' "subjective willingness to pay"

and "does not address the market value of EZ Seed – and what Scotts was willing to sell it for –

absent the 50% thicker claim."  Scotts Dennis Br. at 9-10.  That argument is false.  Dr. Dennis

considered both supply-side and demand-side factors in designing and interpreting the results of

10

his survey to ensure that the price premium he calculated ████████████████████████

████████████████████████ 9/1/16 Dennis Decl. ¶ 17.

      Dr. Dennis identified a number of supply-side factors that influenced his survey design

and analysis, ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ Regan Decl. Ex. 12, Dennis Dep. at

212:12-214:10.  Dr. Dennis explained that ████████████████████████████████

██████████████████████████████ *Id.* at 213:24-214:2.  Dr. Dennis

also took these data into account in setting the ████████████████████████████

████████████████████████ 9/1/16 Dennis Decl. ¶ 20.

      Another important supply-side factor Dr. Dennis considered, and discussed with Mr.

Weir, was the cost of inputs.  *Id.* ¶ 18.  Scotts' internal EZ Seed Product Pricing Summary shows

████████████████████████████████



Marchese Decl. Ex. GGGG, at SMG-EZ009018.

      Another important supply-side factor Dr. Dennis considered, and discussed with Mr.

Weir, was Scotts' profit margins and pricing strategy.  9/1/16 Dennis Decl. ¶¶ 18-19.  Scotts'

profit margins on EZ Seed ████████████████████████

Marchese Decl. Ex. GGGG, at SMG-EZ009018.  These margins were expected to improve after

2011 ███████████████████████████████ *Id.*  And Scotts had adopted a pricing

strategy designed to ████████████████████████ *Id.*

Another important supply-side factor Dr. Dennis considered and discussed with Mr. Weir

was the fact that Scotts ████████████████████████████████████████

████████████████████.  . 9/1/16 Dennis Decl. ¶ 21.  This fact suggested to Dr. Dennis that

Scotts' pricing decisions █████████████████████████████████████

████████████████████████.  *Id.*

Dr. Dennis explains:



*Id.* ¶ 19.

Scotts contends Dr. Dennis's and Mr. Weir's analyses are wrong because "Scotts did *not*

change EZ Seed's price as demand fluctuated," Scotts' Dennis Br. at 10, and because "Scotts

was not willing to sell EZ Seed for any less than the prices that it set in 2009," Regan Decl. Ex.

38, Peoples Decl. ¶ 5.  Both of those statements are demonstrably false.  In fact, Scotts ████████

██████████████████████████████████████████████

███████████████████████  *See* 9/1/16 Declaration of Colin B. Weir ("9/1/16 Weir

Decl.") ¶¶ 3-81; SOF ¶¶ 860-933.  Retail pricing for EZ Seed similarly fluctuated in response to

changing market conditions.  9/1/16 Weir Decl. ¶¶ 82-99; SOF ¶¶ 934-956.

Scotts also argues that Dr. Dennis's price premium calculation is "premised on all consumers having paid the same $15 for EZ Seed with the claim."  Scotts' Dennis Br. at 10. That is false.  ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████.  Marchese Decl. II, 1/7/16 Dennis Report ¶¶ 34-35.  This price was chosen to ensure the pricing in the survey was very close to the real-world market pricing.  But ████████████

███████████████████████████████████████████████ 9/1/16 Dennis

Decl. ¶ 22.  ████████████████████████████████████████████████

████████████████████  *Id.*  Dr. Dennis's price premium calculation ██████████████

██████████████████████████████████████  *Id.*  Rather Dr. Dennis

calculated the premium █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  *Id.*

Scotts also argues that the absolute price paid by some class members demonstrates that they were not injured.  Scotts' Dennis Br. at 10-11.  That argument is wrong.  As Mr. Weir explains:  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ 9/1/16

Weir Decl. ¶ 113.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████  *Id.*

13

III.    **THE CV PORTION OF DR. DENNIS'S SURVEY IS RELIABLE AND**
        **RELEVANT**

Scotts makes a number of criticisms of the CV portion of Dr. Dennis's survey.  None of

those criticisms has any merit.

A.    **The Population Of Survey Respondents Was Appropriate And**
      **Representative Of Class Members**

Scotts argues that Dr. Dennis surveyed the wrong population because he did not limit his

survey to class members, but instead surveyed the broader category of persons who had

purchased grass seed by itself or in combination with mulch and fertilizer, for personal use since

2009.  Scotts' Dennis Br. at 6-7.  As Dr. Dennis explains, he used █████████████████

████████████████████████████████████ 9/1/16 Dennis Decl. ¶ 10.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ *Id.*  Dr. Dennis also determined that █████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* ¶ 15. ████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ *Id.*[4]

_____

[4] *See also Duran v. U.S. Bank National Assn.*, 59 Cal.4th 1, 43 (2014) ("Self-interest may
motivate class members to act in ways that will maximize the award.  …  A sample that includes
even a small number of interested parties can produce biased results."); *Trahan v. U.S. Bank
National Assn.*, 2014 WL 3750053, at *3 (N.D. Cal. July 29, 2014) (denying motion to approve a
survey instrument, stating the proposed population of respondents "is composed entirely of class
members" which could introduce bias because "each class member has an interest in the outcome
of this litigation"); *In re Autozone, Inc.*, 2016 WL 4208200, at *18 (N.D. Cal. Aug. 10, 2016)
(noting the problem of "self-interest bias" in a survey limited to class members).

14

Scotts offers no reason to question Dr. Dennis's judgment on this point, and there is no evidence that the broader category of grass seed purchasers are different, in any way, from purchasers of combination products.  In any event, Scotts' criticism on this point is at most a quibble that would go to the weight but not the admissibility of the survey.  *See Tiffany and Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 250 (S.D.N.Y. 2015) (holding that criticism that survey expert "should have surveyed a different population of consumers," "goes to the weight, rather than the admissibility"); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (Sotomayor, J.) ("[E]rrors in methodology [of consumer surveys] … go only to the weight of the evidence.").

**B.     The Survey Does Not Include A "Control Group" Because There Is No Such Thing As A "Control Group" In CV Methodology**

Scotts' argues that "Dennis's CVM also lacked a control group" and that "[l]ack of a control group is fatal."  Scotts' Dennis Br. at 16.  That is nonsense.  There is no such thing as a "control group" in CVM.  Dr. Dennis explains: ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

9/1/16 Dennis Decl. ¶ 23.

In any event, Scotts' criticism on this point is again at most a quibble that would go to the weight but not the admissibility of the survey.  *See Victoria's Secret Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *11 n.9 (S.D.N.Y. Apr. 8, 2009) (holding that

criticism that consumer survey "failed to incorporate a control group" "bear[ed] exclusively on the weight to be given the survey rather than bearing on an admissibility determination").

**C.    CV Surveys Are Not Designed To Precisely Mimic Every Potential Offering In The Marketplace**

Scotts argues that because Dr. Dennis's survey asks respondents to select between two products – one with and one without the 50% Thicker Claim – it "is unrealistic and fails to replicate market conditions" where many other products would be available.  Scotts' Dennis Br. at 14.  Dr. Dennis explained at his deposition:



Regan Decl. Ex. 12, Dennis Dep. at 170:20-171:9.



*Id.* at 171:10-20.

In any event, Scotts' criticism on this point is again at most a quibble that would go to the weight but not the admissibility of the survey.  *See Tiffany*, 127 F. Supp. 3d at 250 (holding that criticism that survey expert's "study was not designed in a way that approximated actual marketplace conditions," "goes to the weight, rather than the admissibility").

16

### D.      The Survey Was Not Leading

Scotts argues that the survey was leading because "Dennis did not provide respondents with a 'don't know' or 'no opinion' option in the key 'referendum' question – which product they preferred."  Scotts' Dennis Br. at 17.  Scotts contends this "violates the NOAA report's guidelines."  *Id.*  This criticism is mistaken and wrong.  As Dr. Dennis explains,



9/1/16 Dennis Decl. ¶ 30.  Thus, the survey design was not leading on the question of valuation, and respondents who were unable to quantify or value their preference for the 50% Thicker Claim were able to, and did, indicate that in response to the main valuation question.  *Id.* ¶ 31.

In any event, Scotts' criticism on this point is again at most a quibble that would go to the weight but not the admissibility of the survey.  *See Tiffany*, 127 F. Supp. 3d at 250 (holding that criticism that survey expert's "study … utilized 'biasing' stimuli," "goes to the weight, rather than the admissibility"); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d at 228 ("[E]rrors in methodology [of consumer surveys] … go only to the weight of the evidence.").

### E.      The Survey Did Not Overemphasize The 50% Thicker Claim

Scotts argues that "by highlighting the 50% Thicker claim, Dennis introduces focalism bias, causing respondents to focus on things they may not focus on otherwise – here the 50%

Thicker claim."  Scotts' Dennis Br. at 19.  That argument flies in the face of the marketplace

reality.  Scotts highlighted the 50% Thicker Claim in large bold type on the front center of the

package.  SOF ¶ 9.  And indeed it appeared on every surface of the package.  *Id.* ¶ 11.  In

multiple languages, English and Spanish.  *Id.*  In both words and photographs.  *Id.* ¶ 12.  The

photographs appeared not once, but on 3 of 5 surfaces of the 10 lb. bag.  *Id.* ¶ 13.  Scotts was

well aware from its own consumer research ████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  *id.* ¶ 755.  That

is why Scotts chose to emphasize this claim so heavily on every surface of the package.  That

was the reality of the marketplace.  And in light of that reality, Scotts' argument that Dr.

Dennis's survey design caused respondents to "focus on things [the 50% Thicker Claim] they

may not have focused on otherwise" is preposterous.



9/1/16 Dennis Decl. ¶ 33.

In any event, Scotts' criticism on this point is again at most a quibble that would go to the weight but not the admissibility of the survey.  *See Tiffany*, 127 F. Supp. 3d at 250 (holding that criticism that survey expert's "study … utilized 'biasing' stimuli," "goes to the weight, rather than the admissibility"); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d at 228 ("[E]rrors in methodology [of consumer surveys] … go only to the weight of the evidence.").

**F.    The Survey Design Eliminated Any Significant Impact Of Starting Point Bias**

Scotts argues that because Dr. Dennis's survey provided respondents with starting "bids" of \$12 or \$14, "[r]espondents were … anchored to those starting bids in selecting the amount willing to pay for the product."  Scotts' Dennis Br. at 20.  Scotts contends this caused a "starting point bias" in Dr. Dennis's calculation of the price premium.  *Id.* at 19-20.

Starting point bias is a known risk for CV studies, though it can be minimized or eliminated with proper design and careful pretesting.  9/1/16 Dennis Decl. ¶ 36.  Dr. Dennis thus designed and implemented his survey ████████████████████████████ *Id.*  He

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████  *Id.*; *see also* Marchese Decl. Ex. II, 1/7/16 Dennis Report ¶ 40. ██

████████████████████████████████████  Dr. Dennis explains:

████████████████████████████████
████████████████████████████████
██████████████████████████████████
████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████

9/1/16 Dennis Decl. ¶ 37.

Then, after conducting the main survey, Dr. Dennis evaluated the results to determine if any starting point bias remained.  He explained in his initial report:



Marchese Decl. Ex. II, 1/7/16 Dennis Report ¶ 40.  So the amount of starting point bias in Dr.

Dennis's main study may ███████████████████████████████████████████████

████████████████████████.  9/1/16 Dennis Decl. ¶ 37.  But, ultimately, the degree

of starting point bias in Dr. Dennis's main survey (as opposed to the pretest) was not statistically

significant.  *Id.* ¶¶ 37-38.

Scotts' claim of starting point bias is based on a flawed comparison of the pretest data to

the main survey.  That is not the appropriate comparison.  ███████████████████████

███████████████████████████████████████████████████████████████

██████████████  *Id.* ¶ 36.  And that is what Dr. Dennis did here.  His recognition of the potential

for starting point bias, his incorporation of controls to measure it, his pretest to evaluate it, and

his revisions to the main survey to eliminate it, illustrate the high degree of expertise and

neutrality he brought to bear on the project.

## IV.   THE CONSUMER PERCEPTION PORTION OF DR. DENNIS'S SURVEY IS RELIABLE AND RELEVANT

Scotts makes a number of arguments challenging the reliability of the consumer

perception portion of Dr. Dennis's survey.  None of Scotts' arguments has any merit.

First, Scotts argues that the survey questions asking for respondents' expectations for a

combination grass seed product with the "50% Thicker" label were biased because they omitted

"Scotts' intended meaning" of the claim.  But Scotts' "intended meaning," as set forth in its

brief, merely repeats the text of the claim:  "EZ Seed grows 50% thicker than ordinary seed when

they both receive half the recommended rate of water.  Results may vary."  Scotts' Dennis Br.

at 21 n.23.[5]  Dr. Dennis responds:



9/1/16 Dennis Decl. ¶ 39.

Second, Scotts contends that Dr. Dennis omitted the revised watering directions stating

that "A deep and thorough initial watering is the key to success.  Gently water the area until EZ

Seed® is completely saturated and no more water is being absorbed (this may take several

minutes)."  Scotts' Dennis Br. at 22; *see also* SOF ¶¶ 24-27.  Scotts contends that "[n]o

reasonable consumer or survey respondent, if shown the actual watering directions, could

disbelieve with EZ Seed, that '[a] deep and thorough watering is the key to success' and not

believe that a consumer should water the product until 'completely saturated.'"  Scotts' Dennis

Br. at 22. ███████████████████████████████████████████████████████

████████.  SOF ¶ 23.  They also contradict the 50% Thicker Claim because, as Dr. Karcher

explains, ███████████████████████████████████████████████████

███████████████████████  9/1/16 Declaration of Douglas E. Karcher, Ph.D.  ¶ 24.  Thus,

---

[5] Ms. Peoples testified at her deposition that the intended meaning was different:  ████████████
████████████████████████████████████████████████████████  Marchese Decl. Ex. CC,
Peoples Dep. at 91:10-19.

21



*Id.* Dr. Dennis responds:

9/1/16 Dennis Decl. ¶ 40.

Third, Scotts contends that Dr. Dennis's consumer perception survey is flawed because it lacked a control group.  Scotts' Dennis Br. at 23.  This criticism is baseless.  Dr. Dennis responds:



9/1/16 Dennis Decl. ¶ 41.

22

In any event, Scotts' criticism on this point is again at most a quibble that would go to the weight but not the admissibility of the survey. *See Victoria's Secret Brand Mgmt.*, 2009 WL 959775, at *11 n.9 (holding that criticism that consumer survey "failed to incorporate a control group," "bear[ed] exclusively on the weight to be given the survey rather than bearing on an admissibility determination").

<u>Fourth</u>, Scotts argues that the consumer perception survey "contained no open-ended questions, consisting solely of multiple choice, closed-ended questions." Scotts' Dennis Br. at 23. Scotts contends this makes the survey "inherently suggestive" and "invites guessing." *Id.* Dr. Dennis disagrees:



9/1/16 Dennis Decl. ¶ 42.

V.    **DR. DENNIS'S ANALYSIS OF EVIDENCE RELATED TO SCOTTS' SALES, PRICING, AND CONSUMER SURVEY RESEARCH IS APPROPRIATE AND RELEVANT**

Dr. Dennis examined many of Scotts' internal documents on sales, pricing strategy, and consumer research, and he discusses those materials in his report and testimony.  Scotts complains that Dr. Dennis "cannot merely regurgitate" these materials.  Scotts' Dennis Br. at 24.  But Dr. Dennis does not regurgitate anything.  He analyzed these materials in the course of his work in a manner that fits precisely within the framework of Fed. R. Evid. 703.  Dr. Dennis's analysis of Scotts' real-world pricing and actual sales data influenced his survey design in setting the pricing and initial bid amounts for his valuation questions, and his conclusion that the price premium he calculated ██████████████████████████████████ *See* Part II, above.  Dr. Dennis's analysis of the testimony of Scotts' marketing personnel and Scotts' market research on the importance of the 50% Thicker Claim influenced his design of the survey as well, and his conclusion that his results were reliable was informed, in part, by the corroboration he found in the results of Scotts' own consumer surveys.  These are materials that an expert in the field would reasonably rely on in forming opinions for this case.  *See* Fed. R. Evid. 703.

## CONCLUSION

For the reasons set forth above, the Court should deny Scotts' motion to exclude Dr. Dennis's testimony.

Dated:  September 1, 2016

                                              Respectfully submitted,


                                              By:     */s/ Scott A. Bursor*
                                                     Scott A. Bursor

                                            **BURSOR & FISHER, P.A.**
                                            Scott A. Bursor
                                            Joseph I. Marchese
                                            888 Seventh Avenue
                                            New York, NY 10019
                                            Telephone: (646) 837-7150
                                            Facsimile:  (212) 989-9163
                                            Email:  scott@bursor.com
                                                          jmarchese@bursor.com

                                            **FARUQI & FARUQI LLP**
                                            Nadeem Faruqi
                                          Timothy J. Peter
                                            685 Third Avenue, 26th Floor
                                          New York, NY 10017
                                          Telephone:  (212) 983-9330
                                          Facsimile:  (212) 983-9331
                                          Email:  nfaruqi@faruqilaw.com
                                                        tpeter@faruqilaw.com

                                            *Class Counsel*