UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                 :

                                 :         **OPINION AND ORDER**

IN RE SCOTTS EZ SEED LITIGATION    :

                                 :         12 CV 4727 (VB)

                                 :
--------------------------------------------------------------x

Briccetti, J.:

       Lead plaintiffs Michael Arcuri, David Browne, Gwen Eskinazi, Stacy Lonardo, Lance Moore, Vance Smith, and Nancy Thomas (collectively, "plaintiffs" or "lead plaintiffs") bring this consumer class action against defendants The Scotts Miracle-Gro Company, Inc., and The Scotts Company LLC (collectively, "Scotts" or "defendants"). Plaintiffs allege causes of action for false advertising, breach of warranty, and unjust enrichment under New York and California law.

       Now pending are fifteen motions, consisting of nine Daubert motions (Docs. ##218, 219, 220, 221, 223, 224, 225, 226, 227), cross-motions for summary judgment (Docs. ##216, 222), defendants' motion to decertify the class (Doc. #217), defendants' motion to strike plaintiffs' Rule 56.1 statement (Doc. #231), and plaintiffs' motions to strike three declarations in whole or in part (Docs. ##228, 229). For the following reasons, defendants' motion to exclude plaintiffs' expert, Colin B. Weir, is GRANTED in part and DENIED in part; defendants' motion for summary judgment is GRANTED in part and DENIED in part; and the remaining motions are DENIED.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

## BACKGROUND

       The parties submitted briefs, statements of fact ("SOF"), and declarations ("Decl."), with supporting exhibits, which reflect the following factual background.

Scotts Turf Builder EZ Seed ("EZ Seed") is a "combination product" consisting of mulch, seed, and fertilizer. (Pls.' SOF ¶ 3). The mulch in EZ Seed is made "from ground and compressed coconut shell fibers, which are super-absorbent." (Id. ¶ 4). Retail sale of EZ Seed began in January 2009. It is sold "in a variety of package sizes, and with varying seed blends, or 'flavors.'" (Id. ¶ 6).

During the relevant period, EZ Seed packaging included one of the following claims:

50% THICKER WITH HALF THE WATER**
**Versus ordinary seed when each was watered at half the recommended rate. Results may vary.

(See Pls.' Ex. E).

An alternative version of the claim states:

50% THICKER WITH HALF THE WATER††
††Results 32 days after planting; each watered at half the recommended rate for ordinary seed. Results may vary.

(Defs.' Response to Pls.' SOF ¶ 10).[1]

In addition, EZ Seed packages included a graphic showing two images side-by-side, under the "50% THICKER WITH HALF THE WATER††" label, purporting to show a patch of grass grown using EZ Seed on one side, and using "ordinary seed" on the other. (Pls.' SOF ¶ 12). Below the images, a disclaimer reads: "*Subject to proper care,"[2] and "††Results 32 days

---

[1]    Defendants dispute that every EZ Seed product packaging included the 50% thicker claim. (See Defs.' Response to Pls.' SOF ¶ 42). However, plaintiffs point out the product defendants cite for this—EZ Seed Dog-Spot Repair—"is not at issue in this case." (Pls.' Reply SOF ¶ 42).

[2]    Scotts denies that the "subject to proper care" disclaimer applies to the 50% thicker claim. It maintains the "proper care" disclaimer relates instead to the claim also included on the packaging, but not at issue in this lawsuit, which reads, "so you can grow thick, beautiful grass anywhere!*." (Defs.' Response to Pls.' SOF ¶ 17; see also id. ¶ 165 ("'proper care' is not part of the 50% thicker claim, which, by definition, compares EZ Seed versus ordinary seed when both are not treated with proper care.")).

after planting; each watered at half the recommended rate for ordinary seed. Results may vary." (Defs.' Response to Pls.' SOF ¶ 17).

These claims are referred to together as the "50% thicker" claim.

From January 2009 through 2013, approximately 1,524,812 packages of EZ Seed were sold in California and approximately 992,338 packages of EZ Seed were sold in New York. (Defs.' Ex. 14, Weir Report, ¶ 12).

"Around the end of 2013" Scotts removed the 50% thicker claim from EZ Seed packaging. (Defs.' Ex. 1, David Report, ¶ 52). The last day it shipped EZ Seed with the 50% thicker claim was on March 4, 2014. (Pls.' SOF ¶ 29). However, Scotts began to use another claim—"50% thicker will less water† †Versus ordinary seed when both were watered at less than the recommended rate, after 21 days. Results may vary."—on secondary packaging. (Defs.' Response to Pls.' SOF ¶ 30). At the same time, Scotts added a claim that EZ Seed "Holds Up to 6X its Weight in Water" to the retail packaging of EZ Seed. (Id. ¶ 34).

This class action lawsuit is brought by seven named plaintiffs, who purchased EZ Seed in New York or California between 2010 and 2012. By Memorandum Decision dated January 26, 2015, the Court certified two classes:

(i)     All persons who purchased EZ Seed in the state of California containing the label statement "50% Thicker With Half the Water," excluding persons who purchased for purpose of resale (the "California Class").

(ii)    All persons who purchased EZ Seed in the state of New York containing the label statement "50% Thicker With Half the Water," excluding persons who purchased for purpose of resale (the "New York Class").

(Doc. #127, "Class Cert. Decision," at 3).

As the Court stated in its decision certifying the class, "[t]he crux of plaintiffs' complaints is that EZ Seed does not grow grass at all or, in the alternative, does not grow grass as advertised by the 50% thicker claim." (Class Cert. Decision at 3). Plaintiffs Browne and

Smith purchased EZ Seed in California and represent the California Class. The California Class brings claims under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA"), in addition to claims for breach of express warranty and unjust enrichment. Plaintiffs Arcuri, Eskinazi, Lonardo, Moore, and Thomas purchased EZ Seed in New York and represent the New York Class. The New York Class brings claims under New York's General Business Law ("GBL"), in addition to claims for breach of warranty and breach of contract.

## DISCUSSION

There are currently fifteen motions pending before the Court. The Court will first address three purely legal issues raised in defendants' motion for summary judgment, because those issues affect the remainder of the motions. Second, the Court will address the parties' competing Daubert motions. Third, the Court will address the remainder of defendants' arguments for summary judgment and plaintiffs' motion for summary judgment. Finally, the Court will resolve defendants' motion to decertify the class.

I.   Preliminary Issues Raised in Defendants' Motion for Summary Judgment

A.   Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

4

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which she has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The "mere existence of a scintilla of evidence in support" of the non-moving party's position is likewise insufficient; "there must be evidence on which the jury could reasonably find" for it. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

B.     Worthlessness Claim

In its class certification decision, the Court noted plaintiffs had two theories of liability: (i) that "EZ Seed 'does not grow grass at all' and thus is worthless," (the "worthlessness claim") and (ii) plaintiffs "paid an inappropriate premium for EZ Seed based on Scotts' allegedly false 50% thicker claim." (Class Cert. Decision at 5, 13).

Defendants now move for summary judgment on the first, "worthlessness claim."

In response, plaintiffs contend "there is no such claim in the case." (Pls.' Opp. at 1, n.1).

Accordingly, defendants' motion for summary judgment on this point is denied as moot, and plaintiffs' "worthlessness claim" is dismissed. The only remaining theory of liability is that the 50% thicker claim was false or misleading.

C.     The California Claims

Defendants next argue the California claims must be dismissed because they are entitled to safe harbor with respect to the 50% thicker claim.

The Court agrees with respect to the UCL, FAL, and CLRA claims, but not with respect to the California express warranty claim or the California unjust enrichment claim.

"'[C]ourts may not use the unfair competition law to condemn actions the Legislature permits.'" Alvarez v. Chevron Corp., 656 F.3d 925, 933 (9th Cir. 2011) (quoting Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 184 (1999)). Specifically, "'[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.'" Id. (quoting Cel-Tech

Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th at 184). In other words, when legislation provides such a "safe harbor," "'plaintiffs may not use the general unfair competition law to assault that harbor.'" Id. (quoting Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th at 184). See also Ebner v. Fresh, Inc., 838 F.3d 958, 963 (9th Cir. 2016) (quoting Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co., 20 Cal. 4th at 182) ("In California, unfair competition claims are subject to the safe harbor doctrine, which precludes plaintiffs from bringing claims based on 'actions the Legislature permits.'"). "This rule applies . . . to actions by the California legislature." Martin v. Medtronic, Inc., 2017 WL 825410, at *15 (E.D. Cal. Feb. 24, 2017) (citing Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1164 (9th Cir. 2012)). "For the safe harbor doctrine to apply, the challenged conduct must be 'affirmatively permitted by statute—the doctrine does not immunize from liability conduct that is merely not unlawful.'" Id. (quoting Ebner v. Fresh, Inc., 838 F.3d at 963). "[C]ourts have recognized that the [safe harbor] doctrine equally applies to claims under the [UCL,] CLRA and FAL." Barber v. Nestlé USA, Inc., 154 F. Supp. 3d 954, 958 (C.D. Cal. 2015) (citations omitted).

The California Department of Food and Agriculture ("CDFA") regulates fertilizing material and, in particular, is charged with registering labels used on fertilizers pursuant to the California Food and Agricultural Code ("CFAC"). (See Regan Ex. 21, Gunasekara Decl., ¶ 3). The CFAC requires that "[e]very lot, parcel, or package of fertilizing material distributed into or within this state shall have . . . a label as required by the secretary, by regulation." CFAC § 14631. It further states "[t]he secretary may require proof of labeling statements and claims made for any fertilizing material," and that "[t]he secretary shall cancel the approval of, or refuse to approve, a fertilizing material label if the secretary determines that adequate proof of label

claims does not exist."  Id.  In addition, Section 14681 of the CFAC prohibits the distribution of "misbranded fertilizing materials," which includes fertilizing materials that contain "labeling [that] is false or misleading in any particular way."

Here, on July 28, 2008 and December 8, 2009, Scotts submitted applications to the CDFA for fertilizing material registrations to substantiate the 50% thicker claim.  (Pls.' SOF ¶ 734).  The CDFA reviewed four studies Scotts submitted to support the claim.  By letter dated April 14, 2010, a senior scientist at the CDFA informed Scotts of the CDFA's conclusion that the 50% thicker claim was substantiated.  (Pls.' Ex. UUU, Nov. 17, 2015, Gunasekara Decl., ¶ 14, Ex. 8).  Accordingly, the California safe harbor applies here.

Plaintiffs contend summary judgment on this point is inappropriate because one of the studies the CDFA relied on when it approved the 50% thicker claim "was a complete fake." (Pls.' Br. at 1).  In particular, plaintiffs point out that one field trial the CDFA scientist relied on states on the first few pages that the trial was conducted in Gainesville, Florida, but in fact—as indicated on subsequent pages—it was conducted in Marysville, Ohio.  (Pls.' SOF ¶ 745; Pls.' Ex. WWW).  Plaintiffs have not, however, submitted any evidence that supports the conclusion that this renders the study a "fake."  They cite deposition testimony by two CDFA scientists who stated they personally did not create or catch an error in what Scotts submitted.  (Pls.' Ex. XXX, Ba Dep., at 61 ("Q: Can you explain why there's data from Ohio attached to a report that says it's from Gainesville, Florida?  A:  Well, that [sic] speculation on my part. . . . Q: You did not do that?  A:  Of course not."); Pls.' Ex. CCC, Gunasekara Dep., at 49 ("it's definitely an oversight on my part that I didn't catch that.").  Neither scientist testified or suggested the study was a "fake."  Moreover, the CDFA scientist who originally reviewed the 50% thicker claim re-reviewed his work in connection with this litigation and submitted an affidavit stating, among

8

other things, that it is his "and the CDFA's belief that Scotts has not submitted 'fabricated' data or 'fake' studies," which is "confirmed by the fact that the CDFA has not made any efforts to penalize Scotts (as CDFA is statutorily authorized to do) . . . [n]or does the CDFA have any intentions of penalizing Scotts or referring Scotts to the Attorney General with respect to its EZ Seed Application." (Regan Decl. Ex. 129, Aug. 25, 2016, Gunasekara Decl. at ¶ 11).

Based on a careful review of all of the relevant testimony and documents put forward by the parties, the Court finds no reasonable jury could conclude the Scotts trial was a "fake," and therefore there is no issue of material fact as to this issue.

Finally, plaintiffs argue the CDFA's review was not "sufficiently formal to trigger" the application of the safe harbor. However, the Court agrees with defendants that the question of whether there was "a formal and deliberative process akin to notice and comment rulemaking or an adjudicative enforcement action," applies only to <u>federal</u> agency approval. <u>Hofmann v. Fifth Generation, Inc.</u>, 2015 WL 7430801, at *6 (S.D. Cal. Nov. 20, 2015) ("a federal regulator's actions create a safe harbor only under the same circumstances required for preemption," where "the agency's actions '[are] the result of a formal, deliberative process akin to notice and comment rulemaking or an adjudicative enforcement action.'") (quoting <u>Koenig v. Snapple Beverage Corp.</u>, 713 F. Supp. 2d 1066, 1076 (E.D. Cal. 2010)). The cases addressing approval by California state agencies do not discuss such a requirement. <u>See</u> <u>e.g.</u>, <u>Alvarez v. Chevron Corp.</u>, 656 F.3d at 933–34.

Accordingly, defendants are entitled to summary judgment with respect to the California UCL, FAL, and CLRA claims. However, neither party addressed in their briefing what affect this has on the California express warranty claim or the California unjust enrichment claim, both

of which the Court previously determined to be appropriate for class treatment. (Class Cert.

Decision at 18-19). Accordingly, at least for now, those claims may proceed.

> D.    Statutory Damages Under New York GBL Sections 349 and 350

Defendants next argue statutory damages are not available in class actions brought under

New York GBL Sections 349 and 350.[3]

The Court disagrees.

Defendants assert that "[w]hen the New York legislature amended sections 349 and 350

to permit private rights of action [prior to which only the New York Attorney General could

enforce these sections], it did so on the condition that statutory damages would not be

recoverable under sections 349 and 350 in a class action." (Defs.' Br. at 7). They point to

legislative history that indicates the original bill as proposed would have expressly permitted

class actions, but that bill was rejected. Ultimately, a compromise was reached to maintain the

ability to recover statutory damages under Sections 349 and 350, but to strike the language that

specifically authorized class action suits. The intended effect of this compromise was to permit

class actions under GBL 349 and 350, but with the understanding that such class actions would

be limited by Section 901(b) of the New York Civil Practice Law and Rules ("CPLR")[4] to the

recovery of actual damages only.[5]

---

[3]    Defendants make the same argument in their motion for class decertification papers. The
Court has considered all of the briefing on this point in reaching its conclusion in this section.

[4]    Section 901(b) provides: "Unless a statute creating or imposing a penalty, or a minimum
measure of recovery specifically authorizes the recovery thereof in a class action, an action to
recover a penalty, or minimum measure of recovery created or imposed by statute may not be
maintained as a class action."

[5]    See, e.g., Defs.' Ex. 31 ("[T]his bill differs from a bill passed by the Assembly earlier this
session . . . which specifically authorized class action suits. That provision . . . was deleted in an
effort to strike a compromise with the Senate. It should be noted that this change does not bar
class actions . . . rather, class actions, for actual damages (not s[t]atutory damages) would still lie

However, the Supreme Court in <u>Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393 (2010) ("<u>Shady Grove</u>") addressed the interplay between Section 901(b) and Rule 23 of the Federal Rule of Civil Procedure and determined that, because Rule 23 permits class actions to be maintained with certain specific criteria, but contains no limitation on the types of damages recoverable, Section 901(b)'s limitation on the ability to maintain class actions only for actual damages conflicted with Rule 23, and therefore could not stand, at least in federal court.  <u>Shady Grove</u>, 559 U.S. at 399 ("Because § 901(b) attempts to answer the same question— <u>i.e.</u>, it states that Shady Grove's suit "may <u>not</u> be maintained as a class action" (emphasis added) because of the relief it seeks—it cannot apply in diversity suits unless Rule 23 is ultra vires."). <u>See</u> <u>also</u> <u>Kurtz v. Kimberly-Clark Corp.</u>, 2017 WL 1155398, at *11 (E.D.N.Y. Mar. 27, 2017) ("A majority of the Court concluded that section 901(b) and Rule 23 do conflict, and that Rule 23 represents a lawful exercise of Congress's procedural rulemaking power.").

Defendants claim <u>Shady Grove</u> is inapplicable and statutory damages are not permitted because "in affirmatively amending the substantive law (GBL §§ 349 and 350) to add private rights of action under each, the legislature sought to allow for recovery, in a class action, of actual damages but not statutory damages."  (Defs.' Br. at 9).  They point to language in <u>Shady Grove</u> stating that the Court did not need to "decide whether a state law that limits the remedies available in an existing class action would conflict with Rule 23."  559 U.S. at 401.

---

under Article 9 of the CPLR."); Defs.' Ex. 32 ("This bill does not diminish a part[y']s right to initiate a class action.  However, in a class action suit the plaintiffs could recover only actual damages under CPLR §901(b)."); and Defs.' Ex. 30 ("By taking class action language out of the bill and by inserting the limiting language of 'may bring an action in his own name to enjoin' instead of 'may bring an action in his own name on behalf of a class of similarly situated persons' I feel a fair compromise was set upon.").

The problem with defendants' argument is that GBL Sections 349 and 350 do not on their face prohibit statutory damages in class actions.[6] Instead, the legislative history shows the legislators' intent was specifically to rely on CPLR Section 901(b) for that prohibition. But Section 901(b) is no longer valid in federal court after Shady Grove.

Even though the Court does not agree with the implications of Shady Grove—including that class actions for statutory damages under Sections 349 and 350 may be brought in federal court, but not state court—it is constrained by them. See Kurtz v. Kimberly-Clark Corp., 2017 WL 1155398, at *58 ("A certified damages class under Rule 23 is not controlled by section 901(b)—statutory damages under section 349(h) are available on a class basis in federal court, even though they would be barred by section 901(b) if the same action were to proceed in state court."); Guido v. L'Oreal, USA, Inc., 2013 WL 3353857, at *16–17 (C.D. Cal. July 1, 2013) ("The Court acknowledges that, under New York procedural rules, a class action to recover statutory damages under section 349(h) cannot be maintained [under N.Y. C.P.L.R. § 901(b)] . . . These rules do not apply to a class action proceeding in federal court, however, despite the risk of forum shopping this divergence in state and federal law creates.").

Finally, defendants argue statutory damages in this case "would be grossly excessive and offend due process." (Defs.' Br. at 13). The Court is sympathetic to defendants' position; however, this argument is premature at this stage. The Court cannot determine as a matter of law

---

[6]     In relevant part, Section 349(h) provides, "[i]n addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  Section 350(e) provides, "[a]ny person who has been injured by reason of any violation of section three hundred fifty or three hundred fifty-a of this article may bring an action in his or her own name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such actions."

that the "the aggregation in [this] class action of large numbers of statutory damages claims . . . distorts the purpose of both statutory damages and class actions." Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13, 22 (2d Cir. 2003).  Defendants' motion is therefore denied in this respect without prejudice to raising it again if and when a jury has actually awarded damages, at which time defendants may make the appropriate motion for a reduction of that award.  See id. ("[I]t may be that in a sufficiently serious case the due process clause might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award.").

Accordingly, the Court concludes statutory damages under GBL Sections 349 and 350 are available to the New York Class.  Defendants' motion for summary judgment with respect to statutory damages under GBL Sections 349 and 350 must therefore be denied.

II.     Daubert Motions

The Court next turns to the parties' competing motions for the exclusion of expert testimony under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) ("Daubert").   In particular, defendants seek to exclude the expert opinions of J. Michael Dennis, Colin B. Weir, and Douglas E. Karcher.[7]  Plaintiffs, for their part, move to exclude defendants' experts Bryan Hopkins, Douglas Soldat, Eric Nelson, and Michael Faust, and they seek to prohibit defendants from presenting any expert testimony regarding consumer understanding of the 50% thicker claim, or any testimony regarding the existence or amount of the price premium attributable to the 50% thicker claim.

With the exception of defendants' motion as to Weir, which is granted in part as explained below, all these motions are denied.

---

[7]     By Notice dated September 1, 2016, plaintiffs withdrew the January 7, 2016, declaration and report of another of their experts, Dr. R. Sukumar.  (Doc. #263).  Defendants' motion for the exclusion of Dr. Sukumar (Doc. #218) is therefore denied as moot.

A.     Legal Standard

Under Rule 702 of the Federal Rules of Evidence, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

"In Daubert, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community."  Kass v. W. Bend Co., 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004), aff'd, 158 F. App'x 352 (2d Cir. 2005) (summary order) (citing Daubert, 509 U.S. at 593-94).  However, these factors do not constitute a definitive checklist or test, and the admissibility of expert testimony depends on the particular circumstances of each case.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) ("Kumho Tire").

"'The inquiry envisioned by Rule 702 is . . . a flexible one,' and 'the gatekeeping inquiry must be tied to the facts of a particular case.'"  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 594 and Kumho Tire, 526 U.S. at 150).

"Even in light of <u>Daubert</u> and its progeny, exclusion of expert testimony remains the exception rather than the rule. Instead, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" <u>Qube Films Ltd. v. Padell</u>, 2016 WL 888791, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting <u>Daubert</u>, 509 U.S. at 596; other citations and quotations omitted).

Moreover, "in analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d at 265. That discretion is particularly broad where the area of expertise in question is not a so-called "hard science." <u>See</u> <u>E.E.O.C. v. Bloomberg L.P.</u>, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine 'whether <u>Daubert's</u> specific factors are, or are not, reasonable measures of reliability in a particular case.') (quoting <u>Kumho Tire</u>, 526 U.S. at 153). Still, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

"The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence." <u>Baker v. Urban Outfitters, Inc.</u>, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003).

B.    J. Michael Dennis

First, defendants move to exclude the opinions of J. Michael Dennis, Ph.D.

Plaintiffs offer Dr. Dennis as an expert to opine on the value and consumer perception of

the 50% thicker claim.  Dr. Dennis's analysis consists of a two-part survey: (i) a contingent

valuation method ("CVM") survey, to measure grass seed purchasers' valuation of EZ Seed with

and without the 50% thicker claim, and (ii) a consumer-perception survey, to measure

purchasers' understanding and expectations about the 50% thicker claim ("consumer perception

survey").

Defendants do not contest Dr. Dennis's expert qualifications.  Instead, they argue the

methodologies he applied warrant exclusion of his testimony here.   In particular, defendants

argue Dr. Dennis's opinions must be excluded for at least ten reasons: (i) he failed to survey the

proper universe; (ii) he failed to include a control group; (iii) the CVM survey measured

subjective willingness to pay, not price premium; (iv) the CVM survey itself cannot provide an

accurate or reliable damages assessment; (v) the CVM survey did not replicate market

conditions; (vi) the CVM survey was leading and biased; (vii) the consumer perception survey

was biased; (viii) the consumer perception survey omitted key label information such as watering

instructions from the package shown to respondents; (ix) the consumer perception survey lacked

open-ended questions, rendering it suggestive; and (x) the consumer perception survey did not

test consumer understanding.

Each of these arguments "ultimately go to the weight, not the admissibility, of [Dr.

Dennis's] testimony and are fodder for cross-examination, not exclusion."  In re Gen. Motors

LLC Ignition Switch Litig., 2017 WL 2664199, at *2 (S.D.N.Y. June 20, 2017).

First, Dr. Dennis has thoroughly explained the rationale behind his decisions in constructing the CVM and consumer perception surveys.  For example, he explains "[t]here is no such thing" as a control group in CVM, and that "[i]n more than 12 years of designing and conducting CVM surveys, I have never employed a control group or seen another expert use a control group in a CVM study."  (Dennis Reply Decl. ¶ 23).  This is not his so-called <u>ipse</u> <u>dixit</u>; he is relying on his extensive experience in the field, which defendants do not question.  This is of course open to attack on cross-examination or via testimony of one or more of defendants' witnesses.

Likewise, defendants' argument that Dr. Dennis should have surveyed people who purchased and used EZ Seed or a "comparable combination product," rather than people who had previously purchased a combination product or ordinary grass seed (Defs.' Br. at 6-7), goes to the weight, not admissibility of Dr. Dennis's opinions.  Defendants argue this failure "undermines [Dr. Dennis's] entire CVM analysis" because he never asked what the survey respondents would pay for the product <u>with</u> the claim, instead assuming they would be willing to pay the survey-set price of $15.00.  (<u>Id</u>. at 7).  However, Dr. Dennis makes clear he relied on "actual Scotts EZ Seed price data and advertising circulars" when setting the $15.00 price for the product with the 50% thicker claim.  (Defs.' Ex. 11, Dennis Decl., at ¶ 34).  Defendants' quibbles with whether this was the best starting point price are "insufficient to render the survey inadmissible."  <u>Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.</u>, 97 F. Supp. 3d 485, 510 (S.D.N.Y. 2015).

The Court similarly rejects defendants' argument that Dr. Dennis's CVM survey should be excluded because it measured respondents' willingness to pay, not price premium.  At the <u>Daubert</u> stage, the Court is tasked with determining whether the expert testimony will "assist the

trier of fact to understand the evidence or to determine a fact in issue." Daubert, 509 U.S. at 591

(quoting Rule 702). "This condition goes primarily to relevance," and "'[e]xpert testimony

which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" Id.

(quoting 3 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 702[02], at 702–18 (1988)).

Even if defendants are right that Dr. Dennis does not measure the precise price premium amount

attributable to the 50% thicker claim, his analysis is relevant to the issue of injury at the very

least, and provides some evidence of a price premium. It will assist the trier of fact because, as

defendants admit, it shows at least half of the equation—the demand side. Their critique that it

says nothing about the supply side is appropriate for cross-examination, but does not warrant

exclusion. Dzielak v. Whirlpool Corp., 2017 WL 1034197, at *19 (D.N.J. Mar. 17, 2017)

("Defendants' challenges to the 'willingness to pay' and survey population components go to

weight, not admissibility. The defendants' criticisms are far from frivolous. Those criticisms,

however, do not so undermine the reliability of Dr. Dennis's methods or their application to the

case as to warrant exclusion.").[8]

The Court similarly rejects defendants' argument that CVM "does not provide a good

basis for . . . accurate damages assessments in judicial proceedings," (Defs.' Br. at 12 (internal

quotations omitted)), and that CVM is better suited to measure the value of items "not ordinarily

bought and sold," such as public goods. (Id. at 11 (internal quotations omitted)). There is at

least one reason this is appropriate here: no version of EZ Seed was sold on the market during

---

[8]     Moreover, the price premium measurement of damages is less important in light of the
fact that statutory damages are available for the New York class bringing claims under New
York GBL Sections 349 and 350 (and because the Court dismisses most of the California
claims), as explained above. Because statutory damages are available for the New York class,
and likely to be greater than an individual's actual damages, the calculation of damages are
easily measured without an elaborate calculation of the difference between the actual price and
the theoretical price of EZ Seed without the 50% thicker claim.

the relevant period without the 50% thicker claim (other than the EZ Seed Dog-Spot Repair mentioned supra n.1, which is "not at issue in this case"), and thus there was an "absence of actual market transactions that would reveal the value that consumers place on the product without the '50% thicker' label." (Dennis Report ¶ 30). Therefore, the CVM survey "creates such a hypothetical marketplace where consumers can compare the two products." (Id.). As a result, the Court concludes CVM was "a reasonable, reliable methodology" for Dr. Dennis to have used. Dzielak v. Whirlpool Corp., 2017 WL 1034197, at *17; see also Kurtz v. Kimberly-Clark Corp., 2017 WL 1155398, at *58.

Defendants also argue Dr. Dennis did not include a "control question"—meaning questions with a "don't know" or "no opinion" possible response—in parts of his survey. (Defs.' Br. at 17). However, a review of the survey itself shows that many of the questions did have such questions. (See Dennis Report, Attachment F, pp. 22-24). His decision to have some but not all of his questions include control answers is fodder for cross-examination.

Defendants argue Dr. Dennis's CVM survey creates "biasing demand artifacts," "focalism bias," and "starting point bias." (Defs.' Br. at 18-20). They argue Dr. Dennis's survey highlights the 50% thicker claim, and forces the survey respondents to focus on that claim. This "suggest[s] to respondents that the claim bears significance." (Id. at 19). This is different from a real-life in-store purchase, where the 50% thicker label "is one of many [labels] on a product that is one of many [products] available for purchase, making it far less likely that consumers will focus" on it. (Id.). Similarly, they argue Dr. Dennis's survey creates starting point bias by giving respondents only two potential "starting 'bids' of $12 or $14," which causes respondents to be "anchored" to those starting bids. (Id. at 20).

But Dr. Dennis carefully explained the efforts he went through to ensure the reliability of his survey results. For example, Dr. Dennis explains that he "modified the branding and product descriptors of the EZ Seed product to disguise the EZ Seed product from the purchasers responding to the survey . . . in order to prevent respondents from answering the valuation questions by relying on pre-existing beliefs, opinions, and attitudes towards the Scotts brand name." (Dennis Report ¶ 22). He further explains that by creating this "fictitious product" he "was able to isolate the effect of the '50% thicker' label and prevent extraneous variables, such as brand name, from influencing respondents' valuations." (Id.). Moreover, he used an established surveying company to build his survey and conducted an "incidence check survey" to estimate the percentage of the surveyed population that would meet the target group of "qualified grass seed purchasers." (Dennis Report ¶ 49). He also pre-tested the survey questionnaire to assure its quality and identify improvements. (See id. ¶¶ 50-52). In addition, he carried out telephone interviews with seven pre-test respondents to determine whether any of his questions were confusing or unclear, and made certain revisions accordingly based on these interviews. (Id. ¶¶ 55-56). The Court again concludes Dr. Dennis's methods "do not raise significant Daubert problems," and any weaknesses may be more properly brought out on cross-examination. Dzielak v. Whirlpool Corp., 2017 WL 1034197, at *20.

Finally, for largely the same reasons the Court accepts the CVM survey as reliable under Daubert, the Court concludes Dr. Dennis's methodology in the consumer perception survey will assist the trier of fact in evaluating issues in this case, is based on sufficient facts and data, and is "the product of reliable principles and methods," and that Dr. Dennis has "reliably applied th[ose] principles and methods to the facts of th[is] case." Rule 702; see also Daubert, 509 U.S. at 594-95. Plaintiffs' criticisms to the contrary "ultimately go to the weight, not the

admissibility, of [Dr. Dennis's] testimony and are fodder for cross-examination, not exclusion." In re Gen. Motors LLC Ignition Switch Litig., 2017 WL 2664199, at *2.

C.    Colin B. Weir

Next, defendants move to exclude the opinions of Colin B. Weir.

Plaintiffs' offer Weir as an expert to opine on damages calculations. Weir's analysis consisted of providing a damages calculation "on a Class-wide basis using common evidence resulting from Plaintiffs' theories of liability." (Defs.' Ex. 14, Weir Report ¶ 3).

Here, again, defendants do not contest Weir's qualifications as an expert. Instead, they argue his methodologies warrant exclusion.

The Court agrees in part with defendants' arguments.

In his January 8, 2016, report, Dr. Weir provides three proposed damages models: (i) full compensatory damages, (ii) price premium damages, and (iii) statutory damages.

For the full compensatory damages calculation, Weir proposes multiplying the average price per unit of EZ Seed—$20.79 in California, and $21.35 in New York—by the total number of sales in each state. Alternatively, he proposes "using only sales data from four retailers: Home Depot, Lowes, Walmart and Sam's Club," which "comprise some 74% of all of the Product units sold in California and New York during the class period." (Weir Report ¶¶ 10, 15). The Court concludes this proposed damages calculation does not "fit" with any of the theories of the case. Daubert, 509 U.S. at 591.

 In particular, full compensatory damages would be relevant if plaintiffs still claimed EZ Seed does not grow grass at all, and therefore consumers are entitled to a full refund. However, plaintiffs have withdrawn that claim. (See Pls. Opp. to Defs.' Motion for Summary Judgment, p. 1, n.1 ("[T]here is no such claim in this case.")). Accordingly, because this damages model does

not relate to an issue in the case, it is not relevant or admissible. Daubert, 509 U.S. at 591; see also Comcast Corp. v. Behrend, 569 U.S. 27 (2013).

Next, Weir proposes calculating price premium damages in three ways.

First, he proposes relying on a single Scotts document, which states "[c]onsumers are already paying a 34% premium for EZ Seed compared to using seed, soil and starter combined on a sq ft coverage basis." (Defs.' Ex. 43 at SMG-EZ009018; Weir Report ¶ 27). Based on this document alone, Weir proposes applying a 34% price premium to the total retail sales in dollars to calculate price premium damages. However, this is insufficiently reliable under Daubert. As Weir himself admits, the document "does not appear to include controls to ensure the entire premium is attributable solely to the [50% thicker claim]." (Weir Report ¶ 29). Moreover, as Scotts points out, "[t]here are a number of differences between EZ Seed and its physical components sold separately including . . . the convenience of purchasing one product instead of three." (Defs.' Br. at 17). Accordingly, Weir will not be permitted to testify regarding his price premium calculation relying on this Scotts document. See Dzielak v. Whirlpool Corp., 2017 WL 1034197, at *24 ("to extract a 55.7% Energy Star price premium for the Washers based on this document, without any independent investigation into the data depicted in the document, is just too much.").

Second, Weir proposes relying on Dr. Sukumar's estimation of the price premium to calculate price premium damages. However, plaintiffs have withdrawn Dr. Sukumar's report. (See Doc. #263). Accordingly, Weir's methodology relying on it may not be used at trial.

However, the Court concludes Weir's third proposed method of calculating price premium damages is admissible. In particular, he relies on the expert work and report of Dr. Dennis for the price premium percentage, then applies that to the total retail sales for a damages

calculation.  (Weir Report ¶¶ 30-34).  The Court concluded above that Dr. Dennis's opinions are admissible.  Because Weir's application of that analysis to calculate damages will be helpful to a jury, is based on sufficient facts and data, and the principles and methods he uses are reliable and reliably applied, it is admissible.

The Court rejects defendants' argument that Weir is merely "bootstrapping" his testimony on that of Dr. Dennis, and that the probative value of his "elementary multiplication is virtually zero."  (Def. Br. at 13).  As Weir explains, he "reviewed the production of sales records" in addition to "data that appear to show the number of wholesale packages of EZ Seed Products sold by Scotts," and calculated the "average price per unit."  (Weir Report ¶¶ 10-11).  He then used the results of Dr. Dennis's survey as an "input" in his damages calculation.  (Id. ¶ 34).  This evidence will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Finally, Weir's damages calculations are admissible with respect to the calculation of statutory damages under New York GBL Sections 349 and 350.  He uses the sales data numbers from Home Depot, Lowes, Walmart and Sam's Club and total retail sales for the number of "violations" and multiplies that by the statutory amounts of $50 (for the New York GBL Section 349 claim) and $500 (for the New York GBL Section 350 claim).  Although hardly a complicated analysis, his testimony and explanation of his calculations will assist the trier of fact in understanding how he calculated the number of "violations"—which defendants are of course welcome to attack on cross-examination—and how that translates into a total damages amount.  Defendants' criticisms of this methodology are well-taken, but fall short.  Ultimately, they are "largely beside the point [because] [o]nce an injury is established, statutory damages can be precisely calculated for each class member."  Kurtz v. Kimberly-Clark Corp., 2017 WL

1155398, at *57. The Court thus concludes it is permissible to have Weir explain this calculation to the jury.

D.      Douglas E. Karcher

Defendants also move to exclude the opinions of Douglas E. Karcher, Ph.D.

Plaintiffs' offer Dr. Karcher as a turfgrass expert. Dr. Karcher conducted a trial to test the growth of Scotts EZ Seed as compared to ordinary seed when each was watered at half the recommended rate. In addition, Dr. Karcher reviewed eighteen trials conducted by Scotts research scientists and university scientists.

Again, defendants do not contest Dr. Karcher's qualifications as an expert; instead, they argue his methodologies and opinions are flawed and unreliable. In particular, they argue Dr. Karcher made at least eight errors that render his analysis unreliable, as follows:

- Dr. Karcher failed to follow "basic scientific method" when he conducted his grass seed trial, primarily because he introduced more than one independent variable, only tested "a single package of EZ Seed that he mail ordered from an unknown vendor on Amazon.com," and then "failed to account for the possibility of non-viable seed." (Defs.' Br. at 10).

- Dr. Karcher compared two different groups of grass species and used a "flavor" of EZ Seed not sold in Arkansas, where he tested it. (Defs.' Br. at 13-15).

- Dr. Karcher failed to control for certain variables—including seed count, mulch, fertilizer, and raking—rendering his test unreliable. (Defs.' Br. at 15-16).

- Dr. Karcher improperly used "reference evapotranspiration," or "ETo"—an estimate of the amount of water lost to evaporation (from the soil surface) and transpiration (from the plant leaves)—instead of trying to determine the actual ET, to determine how much water to use to water at full and half rates. (Defs.' Br. at 17-18).

- Dr. Karcher did not test "ordinary seed" because he added mulch and fertilizer to plain seed. (Defs.' Br. at 19).

- Dr. Karcher did not follow the directions included on the EZ Seed package requiring a "deep and thorough initial watering." (Defs.' Br. at 21).

- Dr. Karcher's reliance on publicly available 30 year average ETo calculations taken from RainMaster.com was improper because this data is "completely divorced from the actual conditions experienced during the Scotts trials." (Defs.' Br. at 23).

- Dr. Karcher's results "could be highly prejudicial to a jury," and "are not probative as to the truth or falsity of the 50% Thicker claim." (Defs.' Br. at 24-25).

Ultimately, the Court concludes each of these critiques goes to the weight, not the admissibility of Dr. Karcher's testimony. They can be brought out through cross-examination or the introduction of other relevant evidence at trial. Dr. Karcher's grass seed trial and opinions are relevant to a central issue in the case—whether the 50% thicker claim is misleading—and it will help a jury better understand that issue. In addition, plaintiffs have met their burden of showing that Dr. Karcher used scientific data and reliable principles and methods which were reliably applied. For example, they explain that Dr. Karcher has now "confirmed that the EZ Seed he tested was viable" (Pls.' Opp. at 9); the "flavor" of EZ Seed he tested was "the most similar to the EZ Seed products sold to each of the seven named plaintiffs" (id. at 10); he applied fertilizer and mulch to the ordinary seed and raked it because he was testing EZ Seed against ordinary seed when both were "subject to proper care with the exception of applying the recommended rate of water" (id. at 13); and he explained that the use of ETo is "well-accepted in the turfgrass science community to irrigate establishing turfgrass from seed in bare soil." (Id. at 15).

Accordingly, the motion to exclude Dr. Karcher is denied.

E. Douglas Soldat

Turning now to plaintiffs' motions to exclude defendants' experts, plaintiffs' first move to exclude Douglas Soldat, Ph.D.

Defendants offer Dr. Soldat as an expert on "the water holding and release characteristics of Scotts EZ Seed." (Marchese Decl. Ex. TTT, Soldat Report, ¶ 2).

Plaintiffs argue Dr. Soldat's opinions should be excluded under Rules 401 and 702. (Doc. #227). However, they do not take issue with Dr. Soldat's credentials or with his methodology. Instead, they argue his opinions are "not relevant to any issue in this case" because he did not test the 50% thicker claim. (Pls. Br. at 1-2).

It appears Dr. Soldat's opinions relate to plaintiffs' first theory of liability—that EZ Seed does not grow grass at all. (Defs.' Opp. at 1 ("Dr. Soldat's expert opinions directly refute the allegations made in the very first paragraph of Plaintiffs' complaint . . . that 'EZ Seed does not grow grass at all and thus is worthless.'")). Plaintiffs have now abandoned that claim. Defendants' opposition to plaintiffs' motion contains one sentence suggesting Dr. Soldat may be called to testify regarding the 50% thicker claim: "[E]ven if 'half the water' is the only relevant issue, Dr. Soldat's trial provides insight on the performance of EZ Seed at any water content." (Defs.' Opp. at 3).

Because it is likely Dr. Soldat will not be called to testify at trial now that the worthlessness claim has been eliminated from the case, the Court denies as moot plaintiffs' motion to exclude Dr. Soldat, without prejudice to renewal should defendants seek to call Dr. Soldat to testify regarding the 50% thicker claim.

F.      Bryan Hopkins

Plaintiffs also move to exclude the opinions of Bryan Hopkins, Ph.D.

Defendants offer Dr. Hopkins as a turfgrass expert.

Plaintiffs argue Dr. Hopkins failed to make a required disclosure, is not qualified to testify as a turfgrass expert, and that his methodologies are deficient.

The Court disagrees.

First, plaintiffs argue Dr. Hopkins's report does not comply with Fed. R. Civ. P. 26 because it fails to include a list of cases in which he has testified during the previous four years. Defendants point out this was an error which was remedied when Scotts identified and provided the deposition transcript from the one case Dr. Hopkins was involved in previously, more than a week before Dr. Hopkins's deposition in this case. The Court therefore concludes the failure to comply with Rule 26 was harmless and does not justify exclusion.

Plaintiffs next argue Dr. Hopkins is a "potato specialist" and not a turfgrass specialist, and that he made errors regarding turfgrass physiology, such that he is not qualified to offer expert opinion testimony in this case. The "Qualifications Summary" included in Dr. Hopkins's report belies this assertion. Dr. Hopkins holds an "A.A.S. degree in Horticulture with a Turfgrass Science specialty" from Brigham Young University ("BYU") and he has a Ph.D. in Agronomy from Kansas State University. He is a professor at BYU, where he teaches "undergraduate and graduate courses in Turfgrass Science," among other things, and he "consult[s] extensively with agricultural and turfgrass clients." (Defs.' Ex. 9, Hopkins Report, ¶¶ 2-5). Just because Dr. Hopkins has held himself out as a "potato specialist" elsewhere and because plaintiffs' expert has identified "errors," does not preclude Dr. Hopkins from being qualified as a "turfgrass specialist" here. The Court has reviewed Dr. Hopkins's resume and report and concludes he is qualified to testify as a turfgrass specialist at trial.

Finally, plaintiffs argue Dr. Hopkins's analysis is irrelevant to the issues in this case for several reasons. In particular, they argue:

- Dr. Hopkins "did not report the results of any tests of EZ Seed as sold to consumers." (Pls.' Br. at 4).

- Dr. Hopkins's "tests are not representative of how consumers use EZ Seed" because, among other things, he planted the seed in 3-inch pots instead of planting

them directly into the ground. These pots did not permit proper drainage, thus keeping the soil artificially wet. (Pls.' Br. at 4-5).

- Dr. Hopkins "failed to conduct any testing at half the recommended rate for watering ordinary seed" because he saturated the pots from the bottom-up, he did not calculate the amount of water used for the initial saturation, he exceeded the rate of watering ordinary seed, his water loss method was flawed, and his tests cannot be replicated. (Pls.' Br. at 4-10).

- Dr. Hopkins did not review Dr. Hignight or Scotts' own trials, rendering invalid his criticisms of Dr. Karcher's review of them. (Pls.' Br. at 11-12).

Ultimately, much like the defendants' criticisms of Dr. Karcher's opinions, the Court concludes each of plaintiffs' attacks on Dr. Hopkins's methodologies go to the weight, not the admissibility of his testimony. Dr. Hopkins's analysis and opinions are relevant to a central issue in the case—whether the 50% thicker claim is misleading—and they will help a jury better understand that issue. In addition, defendants have met their burden of showing that Dr. Hopkins used scientific data and reliable principles and methods which were reliably applied. Plaintiffs are welcome to attack the specifics of those methods on cross-examination at trial.

Accordingly, the Court declines to exclude Dr. Hopkins's opinions.

G. <u>Plaintiffs' Motion to Exclude Scotts from Offering Expert Testimony Regarding Price Premium</u>

Plaintiffs next seek to preclude defendants from "offering any opinion on the existence or amount of the price premium associated with the 50% Thicker Claim." (Pls. Br. at 1). This is essentially a <u>Daubert</u> motion to exclude defendants' damages experts, Jesse David, Ph.D., Jacob Jacoby, Ph.D., and David Reibstein, Ph.D., from testifying regarding the price premium issue.

Plaintiffs argue that because Dr. David, Dr. Jacoby, and Dr. Reibstein did not attempt to isolate the price premium attributable to the 50% thicker claim, Scotts should not be permitted to offer any expert opinion on the existence or amount of the price premium. Defendants counter that neither Dr. Jacoby nor Dr. Reibstein intends to testify concerning the existence of a price

premium; rather, they plan to testify regarding plaintiffs' experts' analysis of the price premium, and why they believe those analyses are "fatally flawed."  (Defs'. Br. at 3).  Defendants state Dr. David is a "possible exception" because he conducted a "difference-in-differences analysis" and "conclude[d] that there was no price premium attributable to the 50% thicker Claim."  (Defs.' Br. at 2, n.3).  Plaintiffs argue Dr. David's opinions should be excluded because he failed to control for several variables—including that Scotts continued to use a different label relating to growing grass 50% thicker (namely "50% thicker With <u>Less</u> Water") on secondary packaging; the 50% thicker label was replaced by a new "6x claim" (that EZ Seed "holds up to 6X its weight in water") (Pls. Br. at 4); the product did not "sell in more volumes" post-January 2014 as Dr. David's report states (<u>id</u>. at 6); and grass seed prices increased market-wide from 2013-2014.  Plaintiffs otherwise do not critique Dr. David's qualifications or methodology.

The Court concludes Dr. Jacoby's and Dr. Reibstein's testimony regarding critiques of plaintiffs' experts' price premium analysis is highly relevant to the issues in the case.  <u>Nature's Plus Nordic A/S v. Nat. Organics, Inc.</u>, 982 F. Supp. 2d 237, 239 (E.D.N.Y. 2013) ("expert opinions . . . which assess or critique another expert's substantive testimony are relevant," and "need not provide an independent analysis.") (internal quotations and citations omitted).  Accordingly, and because plaintiffs do not critique these experts' actual methodology, the Court concludes exclusion of these opinions would be inappropriate.  With respect to Dr. David, the Court concludes his choices to control for certain factors but not others do not render his opinions or testimony inadmissible.  Any such critiques may be adequately addressed on cross-examination at trial.

H.   Plaintiffs' Motion to Exclude Scotts from Offering Expert Testimony Regarding Consumer Understanding

Plaintiffs argue the Court should not permit defendants' experts Dr. Jacoby or Dr. Reibstein to testify regarding how consumers understood the 50% thicker claim because they did not conduct any consumer surveys of their own to counter Dr. Dennis's consumer survey, or the Smith-Dahmer survey, on which plaintiffs also rely.  However, plaintiffs fail to assert any valid reasons under Rule 702 or Daubert for why this testimony should be excluded.  Moreover, Dr. Jacoby's and Dr. Rubinstein's critiques of Dr. Dennis's analysis are relevant and will assist the jury in evaluating central issues in this case, regardless of whether they do their own analyses on the same points.  Nature's Plus Nordic A/S v. Nat. Organics, Inc., 982 F. Supp. 2d at 239.  As a result, plaintiffs' arguments, in addition to those raised for the first time in their reply regarding the testimony of Ann Dahmer, of the the Smith-Dahmer survey, are best addressed in motions in limine or on cross-examination at trial.

I.   Plaintiffs' Motion to Exclude Eric Nelson and Michael Faust

Finally, plaintiffs move, pursuant to Rule 702 and Daubert, to preclude Scotts from offering the expert testimony of Eric Nelson and Michael Faust concerning EZ Seed's performance at half-water levels.  Defendants counter that Daubert does not apply to Dr. Nelson and Faust's testing of EZ Seed because they are fact witnesses, and their testimony relates to "facts about testing not prepared for litigation."  (Defs.' Br. at 3).  In the alternative, defendants argue Dr. Nelson and Faust's tests are admissible under Daubert.

Defendants represent that "[n]either Dr. Nelson nor Mr. Foust is a retained expert witness, and their testimony relates [to] facts about testing not prepared for litigation."  (Defs.' Br. at 3).  The Court understands from this that Dr. Nelson and Foust will be treated as fact witnesses and such, the admissibility of any opinion testimony they may be asked to provide

at trial will be evaluated under Federal Rule of Evidence 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.") and not under Rule 702.

Based on that understanding and because deciding plaintiffs' Daubert motion with respect to Dr. Nelson and Foust is not necessary for deciding the parties' cross-motions for summary judgment, plaintiffs' motion to preclude the testimony of Dr. Nelson and Foust is denied without prejudice. Plaintiffs will be permitted to raise objections to particular questions at trial. See In re Gen. Motors LLC Ignition Switch Litig., 2017 WL 2664199, at *4 (Denying a Daubert motion "without prejudice to objection at trial should [plaintiff] believe that [defendant] crosses the line by eliciting" certain opinions from the witness.).

Plaintiffs also move to strike eight paragraphs of Dr. Nelson's declaration and one exhibit he relied on. (Doc. #229). They argue certain statements should be stricken under Daubert, others should be stricken because they contradict previous deposition testimony, and the exhibit should be stricken because it was not produced in the context of discovery. Defendants respond that the paragraphs in question do not contradict Dr. Nelson's deposition testimony, are based on his personal observations and knowledge, and that they produced the exhibit in question at a late stage in response to an argument by plaintiffs raised for the first time post-discovery.

At this juncture, the Court rejects plaintiffs' argument that the disputed paragraphs and exhibit render Dr. Nelson's affidavit a "sham." (Pls.' Br. at 2). The Court denies plaintiffs' motion without prejudice to renewal at the motions in limine stage or at trial, if appropriate.

III.    Summary Judgment on the 50% Thicker Claim

The Court incorporates by reference the standards for summary judgment provided above.

A.    Defendants' Motion for Summary Judgment

The Court has already addressed the first three arguments in defendants' motion for summary judgment—namely, the "worthlessness" claim, the California safe harbor, and New York statutory damages.  Now that the relevant Daubert motions have been decided, the Court turns to defendants' argument that they are entitled to summary judgment on plaintiffs' claim that the 50% thicker claim is false or misleading.

In particular, defendants argue plaintiffs cannot show class-wide injury stemming from the 50% thicker claim, and that no jury reasonable could conclude the 50% thicker claim is false or misleading.

The Court disagrees.

Defendants argue plaintiffs cannot prove "price premium" injury because they "have no evidence—expert or otherwise—that Scotts was willing to sell EZ Seed for less" without the 50% thicker claim than it would with the claim included on its packaging.  (Defs.' Br. at 17).  In response, plaintiffs cite several categories of evidence addressing this point.  For one, they cite testimony by Scotts' Vice President of Marketing, John Sass, who said the 50% thicker claim was "the number one issue" for consumers because "the number one concern consumers have is all around watering."  (Pls.' SOF ¶ 2).[9]  They also cite testimony of Scotts' Director of

_____

[9]    Defendants have moved to strike plaintiffs Local Rule 56.1 statement.  (Doc. #231).  The Court agrees with defendants that plaintiffs' 56.1 statement is unnecessarily long, repetitive, and contains some facts that do not appear to be material.  Nevertheless, the 56.1 statement is helpful in many respects and the Court sees no need to strike it in order to reach the substantive issues on summary judgment, so it declines to do so.  See Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d

Marketing, Tiffany Peoples, who testified "[p]roduct claims were one of the many factors that contributed to determining that this deserved to be a premium price." (Regan Decl. Ex. 37, Peoples Dep., at 143).[10] In addition, plaintiffs' experts Dr. Dennis and Weir will further testify regarding their analyses of the price premium. As a result, there is a material question of fact regarding whether the price of EZ Seed would have been lower without the 50% thicker claim.

Defendants also argue that when Scotts removed the 50% thicker label, the price went up, not down. They say this definitively disproves plaintiffs' 50% thicker claim. Defendants cite their economics expert, Dr. David, for this proposition. Specifically, among other things, Dr. David determined that EZ Seed's price increased 7.5% between 2013 and 2014. However, as plaintiffs point out, Dr. David's analysis only looked at one variety of EZ Seed that was sold in California, not in New York. (Pls. Opp. at 26, n.14). It is therefore of only limited relevance or weight, especially now that the Court has dismissed most of the California claims. Moreover, plaintiffs' expert Weir analyzed price data and determined prices rose market-wide during this period, which would also tend to undermine defendants' argument on this point.

---

Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

[10]    Peoples submitted a declaration in connection with the instant motions in which she writes, "[i]f Scotts had not made the 50% thicker claim, EZ Seed's invoice price and suggested retail price would have been the exact same. Scotts was not willing to sell EZ Seed for any less than the prices that it set in 2009." (Regan Ex. 38 ¶ 5). A reasonable jury could conclude this testimony is not credible, especially in light of Peoples's seemingly contradictory deposition testimony.

Nevertheless, the Court rejects plaintiffs' argument that the Peoples declaration, and that of Peoples's successor, Emily Winters, should be stricken under Rule 56(c)(4), or that defendants should be ordered to pay sanctions under Rule 56(h). (Doc. #228). Because the Court denies defendants' motion for summary judgment, and because the Peoples and Winters declarations are not dispositive on that or any other motion currently before the Court, the Court need not decide plaintiffs' motion to strike, and therefore denies it without prejudice. The Court denies plaintiffs' motion for sanctions with prejudice.

Finally, defendants argue plaintiffs cannot show that the 50% thicker claim is false or misleading. They argue none of plaintiffs' three scientific experts "reliably demonstrates that the 50% Thicker claim is false or misleading." (Defs.' Br. at 23). Defendants also point to their own and other third party trials that they claim "substantiate the 50% thicker claim." (Id. at 27). However, defendants' own briefing belies their argument. For example, they admit "Scotts' own scientists freely admit that not every trial within the 11 claim book tests could substantiate the claim standing alone." (Defs.' Br. at 27). As another example, they argue each of three tests they retained professors to conduct showed "at half water rates" EZ Seed "grew 50% thicker than ordinary seed at that same watering level." (Id. at 28). However, they include a parenthetical which states "in the case of bermudagrass grown in hot climates, twice daily watering is often recommended, and once daily would be half that recommendation." (Id. (emphasis added)). They do not include a citation for this "fact" nor do they explain what a recommendation that is "often" made means in concrete terms. Moreover, plaintiffs have presented evidence on which a reasonable jury could rely to conclude the 50% thicker claim is false or misleading. For example, the consumer perception survey conducted by Dr. Dennis shows that 61% of consumers surveyed expected that based on the 50% thicker claim EZ Seed "would perform better with less water than it would with more water." (Dennis Report ¶ 42).

Accordingly, there are issues of material fact which preclude summary judgment for defendants on the 50% thicker claim.

B.     Plaintiffs' Partial Motion for Summary Judgment

Plaintiffs argue they are entitled to summary judgment on their New York GBL claims. The Court disagrees.

As noted in the Court's decision certifying the classes here, to establish a prima facie case under GBL Section 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000). The same analysis applies to false advertising claims brought under Section 350. Id.; see also Goshen v. Mut. Life Ins. Co. of N.Y., 98 N.Y.2d 314, 324 n.1 (2002).

First and foremost, the Court concludes that because there are issues of material fact regarding whether the 50% thicker claim is misleading in a material way, summary judgment is inappropriate here. For example, plaintiffs cite the Smith-Dahmer Associates survey as evidence that consumers "understood the Half-Water Claim to mean EZ Seed required less frequent watering, less time spent watering, or both." (Pls.' Br. at 6). But, as defendants point out, that survey did not include the "whole claim" because it does not include the language "[v]ersus ordinary seed when each was watered at half the recommended rate"; the alternative language appearing on some packaging, "[r]esults 32 days after planting; each watered at half the recommended rate for ordinary seed"; or the language appearing on both versions, "[r]esults may vary." (See Pls.' Ex. E; Defs.' Response to Pls.' SOF ¶ 10). Plaintiffs also rely on their expert Dr. Dennis's consumer survey to support their argument. But, as discussed above, defendants have offered many relevant critiques of Dr. Dennis's survey that ultimately must be weighed by the trier of fact. In short, a reasonable jury could conclude the 50% thicker claim was not misleading.

In addition, there are issues of material fact with respect to the question of injury. Although the Court has concluded plaintiffs have offered some evidence of price premium—in the form of Dr. Dennis's report and relevant testimony—this does not mean a reasonable jury

will necessarily side with plaintiffs on the ultimate issue and conclude consumers were injured by the 50% thicker label. In addition, there is some evidence, albeit disputed by plaintiffs, that the price of EZ Seed went up after Scotts removed the 50% thicker label. This would tend to show consumers were not injured by the label.

Accordingly, the Court concludes summary judgment for plaintiffs is inappropriate here.

IV.    Decertification Motion

Defendants argue the class must be decertified for two reasons: (i) plaintiffs cannot prove price premium injury or damages on a class-wide basis, and (ii) no class can recover statutory damages under New York law.

The Court disagrees.

"[A] district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982). However, "the Court may not disturb its prior [certification] findings absent 'some significant intervening event,' or 'a showing of compelling reasons to reexamine the question.'" Doe v. Karadzic, 192 F.R.D. 133, 136–137 (S.D.N.Y. 2000) (internal citations omitted).

With respect to defendants' first argument—that individual questions predominate because plaintiffs cannot prove injury or damages on a class-wide basis—as the Court has concluded, Dr. Dennis's surveys offer reliable and relevant expert opinions on the issue of injury. In particular, Dr. Dennis's survey shows that 94.5% of respondents would choose the combination grass seed product with the 50% thicker claim over the same product without that claim and, assuming the product with the claim sold for $15, they would not have been willing to spend $15 for the product without the 50% thicker label. This would tend to prove injury under New York law:

> New York law does not require that the injury must be proven with a specified degree of certitude; a plaintiff is only required to show 'that plaintiffs paid more than they would have for the good [because of] the deceptive practices of the defendants-sellers.' 'A plaintiff must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'

Kurtz v. Kimberly-Clark Corp., 2017 WL 1155398, at *57 (quoting Orlander v. Staples, Inc., 802 F.3d 289, 302 (2d Cir. 2015)).

As a result, if EZ Seed is proven not to grow grass 50% thicker with half the water, "then all consumers were injured by being overcharged. This question predominates." Kurtz v. Kimberly-Clark Corp., 2017 WL 1155398, at *55. That is because "[a]ll that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 88 (2d Cir. 2015) (quoting Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013)); see also Ebin v. Kangadis Food Inc., 297 F.R.D. 561, 569 (S.D.N.Y. 2014) (concluding "that the common actual injury consisted of the payment of the price of olive oil for a product that was pomace oil and the associated receipt of an inferior product different from that which the consumers purchased").

Finally, the Court has already addressed and rejected defendants' second argument—that no class can recover statutory damages under New York law. Because statutory damages are available for the New York class in this case, the damages calculation for the New York class may be proved on a class-wide basis.

The Court concludes, therefore, that the requirements of Rule 23 are still met—most significantly there are common questions of law and fact, those questions predominate over individualized issues, and plaintiffs' damages calculations are consistent with their theory of liability.

Accordingly, defendants' motion to decertify the class is denied.

## CONCLUSION

Defendants' motion to exclude the testimony of plaintiffs' damages expert Colin B. Weir is GRANTED in part and DENIED in part. The remainder of the <u>Daubert</u> motions and motions to strike are DENIED.

Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Plaintiffs' partial motion for summary judgment is DENIED.

Defendants' motion to decertify the class is DENIED.

All counsel are directed to appear for an in-person status conference on September 22, 2017, at 2:15 p.m., at which time the Court expects to set a trial date and a schedule for pretrial submissions.

By September 15, 2017, the parties shall submit a Joint Pretrial Order in accordance with the Court's Individual Practices.

The Clerk is instructed to terminate the motions. (Docs. ##216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 231).

Dated: August 7, 2016
      White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge

38